**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

Derrick Washington,
Plaintiff,

v.

Massachusetts Department of Corrections, Superintendent Kenneway, Lieutenant Deschene, Lieutenant Forget, Sergeant Hellis, Sergeant Tocci, Officer Catalano, Officer Gagnon, Nurse Capoccia, Officer Does 1–23, Medical Director Doe, and Nurse Doe,

Defendants.

Civ. Case No. ___________________

COMPLAINT, REQUEST FOR RELIEF AND JURY DEMAND

**COMPLAINT**

1. Souza Baranowski Correctional Center ("SBCC") is a Massachusetts Department of Corrections ("DOC") facility with a long history of guard abuses and violence.

2. The character of SBCC was again brought to light in 2020 when staff at SBCC unleashed a campaign of retaliatory violence against people incarcerated there. The actions described in this complaint were part of that campaign.

3. Derrick Washington is a 38-year-old Black man with asthma who is incarcerated by the DOC.

4. In January 2020, Mr. Washington was housed at SBCC. That month, an altercation between prisoners and staff at SBCC resulted in serious injuries to several guards. Mr. Washington was not involved in the altercation, and he was not suspected of being involved in any way. But in the days and months afterwards, the SBCC guards brutalized Mr. Washington—along with many other prisoners at SBCC—in a campaign of irrational,

vindictive, and often racialized violence.

5. This lawsuit is based on three instances of guard brutality and staff misconduct, which happened to Mr. Washington on January 21, January 23, and March 5, 2020. On those occasions, SBCC guards beat and tased Mr. Washington, causing lacerations and contusions to his face and body. While they beat him, guards shouted slurs, calling Mr. Washington, "black ass," "nigger," "bitch," and "cunt."

6. Guards twice sprayed Mr. Washington with chemical agents—despite knowing that he had asthma. Both times, the chemical agents provoked serious asthma attacks. And both times, DOC medical staff failed to provide Mr. Washington with even basic medical treatment, like an inhaler or an opportunity to shower. As a result, Mr. Washington struggled to breathe for weeks afterwards.

7. These instances of abuse constitute excessive force and deliberate indifference to serious medical needs, in violation of the Eighth Amendment; disability discrimination, in violation of the Americans with Disabilities Act; and assault and battery and intentional infliction of emotional distress, in violation of state tort law.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction over Plaintiff's claims under 42 U.S.C. § 1983 pursuant to 28 U.S.C. § 1331.

9. This Court has supplemental jurisdiction over Plaintiff's claims under Massachusetts law pursuant to 28 U.S.C. § 1367.

10. Venue lies in the District of Massachusetts under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims in this action took place in this District, and the Plaintiff resides in this District.

## PARTIES

Plaintiff

11. Derrick Washington is a 38-year-old Black man, currently imprisoned at SBCC. He has been incarcerated at SBCC since 2018.

Defendants

12. The DOC is an agency of the Commonwealth, which oversees SBCC.

13. Superintendent Kenneway, sued in their individual capacity, was the Superintendent of SBCC who authorized Officer Doe 9 to deploy chemical agents on Mr. Washington on March 5, 2020.

14. Lieutenant Deschene, sued in their individual capacity, is a corrections officer employed by the DOC who assaulted Mr. Washington with chemical agents on January 23, 2020.

15. Lieutenant Forget, sued in their individual capacity, is a corrections officer employed by the DOC who, on the night of January 23, 2020, yanked Mr. Washington's handcuffs so hard his wrists started bleeding, then, along with three other corrections officers, kept Mr. Washington cuffed behind his back for five hours after he was discharged from the medical unit.

16. Sergeant Hellis, sued in their individual capacity, is a corrections officer employed by the DOC who, along with three other corrections officers, kept Mr. Washington cuffed behind his back for five hours after he was discharged from the medical unit the night of January 23, 2020.

17. Sergeant Tocci, sued in their individual capacity, is a corrections officer employed by the DOC who, along with three other corrections officers, kept Mr. Washington cuffed behind his back for five hours after he was discharged from the medical unit the night of

January 23, 2020.

18. Defendant Officer Catalano, sued in their individual capacity, is a correctional officer employed by the DOC who beat and tased Mr. Washington while calling him "nigger" on two separate occasions on January 21, 2020.

19. Officer Gagnon, sued in their individual capacity, is a corrections officer employed by the DOC who, along with other corrections officers, beat and verbally abused Mr. Washington while he was in a strip cage on March 5, 2020, and then beat him again in cell #5 in the K-3 unit later that same day.

20. Nurse Capoccia, sued in their individual capacity, is a nurse who worked at SBCC and failed to decontaminate Plaintiff or provide him with his KOP Inhaler while Plaintiff was under care of the medical unit the morning of January 24, 2020.

21. Officer Does 1–8, sued in their individual capacities, are corrections officers employed by the DOC who also beat, tased, and verbally abused Plaintiff with racial slurs on January 21, 2020.

22. Officer Doe 9, sued in their individual capacity, is a corrections officer employed by the DOC who deployed chemical agents on Mr. Washington on March 5, 2020.

23. Officer Does 10–18, sued in their individual capacities, are corrections officers employed by the DOC who, along with Officer Gagnon, beat and verbally abused Mr. Washington while he was in a strip cage on March 5, 2020.

24. Officer Does 19–23, sued in their individual capacities, are corrections officers employed by the DOC who beat Mr. Washington while he was in cell #5 in unit K-3 on March 5, 2020.

25. Medical Director Doe, sued in their individual capacity, was the Medical Director

of SBCC who authorized Officer Doe 9 to deploy chemical agents on Mr. Washington on March 5, 2020.

26. Nurse Doe, sued in their individual capacity, is employed by the DOC as medical staff at SBCC and failed to decontaminate Plaintiff or provide him with his Keep-On-Person (KOP) Inhaler while Plaintiff was under the medical unit's care on January 23, 2020.

**FACTUAL ALLEGATIONS**

27. Derrick Washington is a 38-year-old Black man currently imprisoned at SBCC. He has been incarcerated at SBCC since September 9, 2018 and imprisoned in DOC custody since February 2007.

28. Mr. Washington often works with others incarcerated at SBCC to advocate for better treatment or larger political rights, such as the right to vote.

29. Mr. Washington has asthma, a condition whose symptoms include difficulty breathing. When Mr. Washington is experiencing symptoms of his asthma, he is unable to recreate, sleep, or do almost anything else—including, most importantly, breathe.

30. His asthma condition is well-documented at SBCC, and he uses a Keep-On-Person ("KOP") Inhaler to manage his asthma on a daily basis.

31. Mr. Washington's condition requires that he regularly use an inhaler and have immediate access to an inhaler at all times.

**SBCC's Culture of Racism and Violence**

32. SBCC is a maximum-security prison with 1,410 beds. On information and belief, as of January 6, 2020, the prison was at about half-capacity, with 795 people incarcerated there.

33. Most of the prisoners at SBCC are Black and Latino, and the guards are overwhelmingly white. In January 2020, DOC reported that approximately two thirds of the

prisoners at SBCC were Black or Latino (37% and 30%, respectively, or 67% total). In contrast, of the approximately 390 officers assigned to SBCC, 82% are white. In DOC as a whole, roughly one-half of the population is Black or Latino (27% Black and 26% Latino, or 53% total).

34. The supervisory ranks of officers at SBCC are even less diverse: of fifty sergeants, forty-three, or 86%, are white. Twenty-one of the twenty-two lieutenants are white—and the one non-white lieutenant is Latino. Only one of the seven captains is non-white, and he is also Latino. There are no Black lieutenants or captains. On information and belief, the racial makeup of SBCC staff in January 2020 was substantially similar.

35. Violence at SBCC is entrenched and pervasive.

36. DOC deployed tactical teams to SBCC at least nineteen times from 2017 through 2020, not including the eight months in 2019 and 2020 during which tactical teams were at the prison for two shifts daily.

37. Conditions at SBCC are harsh and restrictive. Prisoners spend at least 20 hours of each day locked in their cells, with only a thin, unopenable window that offers a view to the outdoors. DOC typically places two individuals in each thirteen-by-seven-foot cell. Education, programming, work assignments, and recreational opportunities are severely limited. SBCC also regularly deprives prisoners of access to scheduled out-of-cell opportunities like yard time, library, classes, work or other programs. Limits on the amount and type of property a person can have, how much one can buy from the prison canteen, and the number of visitors one can have on their visitation list are all extremely restrictive.

38. SBCC is, in short, a violent, racist, and harsh institution—even in the best of times.

**Mr. Washington's Experience of Racism and Violence before January 10, 2020**

39. Since arriving at SBCC in 2018, Mr. Washington has been a vocal advocate for racial justice inside SBCC and has suffered consequences for that advocacy.

40. For example, in May or June 2019, Mr. Washington established a racial justice group called the Black, Latino, Asian Cultural Coalition (BLACC) to support people in prison seeking self-improvement. The group organized a membership, selected a board, and started to hold events and meetings. Prison staff quickly became hostile to the group and undermined BLACC's organizational efforts by harassing members of the group to change the name of the organization and targeting leadership.

41. For example, in November 2019, corrections officers (COs) brought Mr. Washington to a solitary cell and, even though he was cuffed and shackled, slammed him onto the floor of the cell, which was covered in dirt and urine. The COs then removed Mr. Washington's shoes, and left him in the cell, barefoot.

42. Mr. Washington believes that this degrading treatment and violence was retaliation for his involvement in the BLACC program. Eventually the prison banned Mr. Washington from participating in the program, which caused the organization to fizzle out and ultimately dissolve.

**SBCC's Response to the Altercation on January 10, 2020**

43. On the morning of January 10, 2020, there was an altercation between a small number of prisoners and COs in the N1 Unit, during which several COs were injured.

44. SBCC officials immediately transferred prisoners who were involved out of the unit.[1]

---

[1] *See* Scott J. Croteau, *Souza-Baranowski Correctional Center remains on lockdown days after gang members attacked guards*," MASS LIVE (Feb. 20, 2020, 11:13AM),

45. Officials then divided SBCC into two sections, the North Side and South Side—and assigned the remaining prisoners to either side. SBCC imposed severe restrictions on people held on the North Side, which continue to this day. On the North Side of SBCC, people were locked into their cells for 23.5 hours per day with a cellmate and today continue to be locked in their cell for at least 22.5 hours a day. They are not permitted to attend programming or religious services, recreate in the yard or gym, use the library, or have a job. Visits and access to the commissary are severely restricted, as is property: among other things, people on the North Side may not have a television or sneakers. People on the North Side also cannot earn good time, lengthening their overall prison sentence. Prison officials assigned people to the North or South Sides without any process.

46. Mr. Washington was assigned to the North Side in January 2020, without any hearing or process, and remained there until March 2021.

47. Staff violence against prisoners also escalated dramatically after January 10, 2020. In the six weeks following the altercation, there were over 120 complaints of excessive force used by guards, which was three times the number of brutality complaints in the whole year prior.[2]

48. On information and belief, examples of force used by DOC staff include: beating and kicking prisoners; gouging eyes; grabbing testicles; smashing faces into the ground or wall;

---

https://www.masslive.com/worcester/2020/01/souza-baranowski-correctional-center-remains-on-lockdown-days-after-gang-members-attacked-guards.html.

[2] *See* Jackson Cote, *Violence, abuse and retaliation: How a 'toxic culture' within the walls of Souza-Baranowski Correctional Center has turned it into a 'powder keg,'*" MASS LIVE (Mar. 15, 2020, 6:00AM), https://www.masslive.com/police-fire/2020/03/violence-abuse-and-retaliation-how-a-toxic-culture-within-the-walls-of-souza-baranowski-correctional-center-has-turned-it-into-a-powder-keg.html

deploying Taser guns, pepper ball guns, and other chemical agents; ordering K9s to menace and bite prisoners; and excessively tightening handcuffs and forcing prisoners' arms into unnatural and painful positions, among other positional torture tactics. COs subjected prisoners to other dehumanizing, humiliating, and punitive actions, including being strip searched in view of numerous other prisoners and staff; being led barefoot through toilet water and human waste; having personal property destroyed; and being denied medical and mental health care.

49. On information and belief, COs targeted Black and Latino prisoners for especially brutal and degrading treatment. The COs would yank and rip out dreadlocks and braids and shout racist comments and slurs while assaulting Black and Latino prisoners.

50. James Eldridge, the state senator whose district includes SBCC, said after the attack that "[t]here is a toxic culture at the prison."[3]

Assaults on Mr. Washington on January 21, 2020

51. At the time of the January 10, 2020 altercation, Mr. Washington was housed in the L-2 Unit, which was then immediately placed on lockdown and became part of the North Side.

52. Mr. Washington was not involved in the altercation in any way, and SBCC officials did not suspect him of any involvement, but that did not stop SBCC officials from subjecting Mr. Washington to brutal treatment and weeks of irrational, vindictive, and often racialized violence.

53. On January 21, 2020, and in response to the January 10, 2020 altercation, prison officials began a massive operation to reorganize SBCC. The reorganization included moving prisoners from the L-2 Unit, where Mr. Washington was incarcerated, to new housing

[3] *Id.*

assignments.

54. On that morning, tactical officers and other SBCC officials entered the L-2 cellblock. They carried guns, tasers, and shields, and wore masks but no nametags – causing difficulty in identifying the officers. The COs went from cell to cell, ordering prisoners to strip and putting them in handcuffs and shackles.

55. Two COs came to Mr. Washington's cell. They ordered him to strip naked, bend over, spread his legs, and cough. Mr. Washington complied. He was then permitted to put on underwear and a T-shirt, but nothing else, not even his glasses. Mr. Washington was also not permitted to keep his inhaler with him.

56. The COs next ordered Mr. Washington to put his hands behind his back, and Mr. Washington complied. The COs then began twisting his right wrist inwards, in a way that it could not naturally bend. Suddenly, a CO yelled, "Stop resisting!" and tackled Mr. Washington to the floor, causing Mr. Washington's head to hit the edge of the metal bunk bed.

57. Mr. Washington was not resisting.

58. Other COs rushed into the cell and pointed their weapons at Mr. Washington, who was on the ground.

59. The COs put Mr. Washington in handcuffs and leg shackles. The COs then escorted him and the other L-2 prisoners at gunpoint to their new housing assignments.

60. Mr. Washington was taken to the M-2 Unit. Upon entering the M-2 Unit, COs temporarily removed his handcuffs and shackles and placed Mr. Washington on a metal detector seat. The COs then handcuffed and shackled Mr. Washington again and took him to his new cell.

61. When Mr. Washington arrived at the new cell, he saw another prisoner, also

dressed only in his underwear, already inside it. Mr. Washington realized at that moment that the facility had assigned him a cellmate. He had not had a cellmate for the past ten years while in a maximum-security facility and was reasonably afraid of having one. Accordingly, Mr. Washington verbally communicated to the COs present that he did not want to enter the cell.

62. Mr. Washington remained handcuffed, shackled and passive at this time.

63. Without warning, Officer Catalano and Officer Does 1–8 immediately began to tase and beat Mr. Washington. The COs slammed Mr. Washington on the floor. Another CO tased him in the arms and feet during the beating.

64. While beating him, they called him "black ass," "nigger" and "bitch." They also shouted: "This is our base."

65. Officer Catalano and Officer Does 1–8 then escorted Mr. Washington to SBCC's hospital unit, where he was examined by medical staff while one of the officers recorded him on a video camera.

66. The assault caused contusions on two areas of Mr. Washington's face, and a larger contusion to the right side of his forehead. The tasing left Mr. Washington's arm and his leg numb and shaky, symptoms which lasted for months after the assault. The tasing also left lasting bruises on his arm and feet.

67. Officer Catalano and Officer Does 1–8's physical violence and racialized verbal abuse also caused Mr. Washington severe emotional distress. He was humiliated and in fear for his life. The distress manifested as hyperventilation and loss of sleep. He continues to have trouble sleeping because he wakes up at the slightest movement in fear that he will be attacked.

68. For over a year following this attack, Mr. Washington had panic attacks that caused him difficulty breathing, making him feel like he was being choked or suffocated.

69. Mr. Washington told medical staff that he was experiencing unprovoked and targeted violence. Nonetheless, medical staff discharged Mr. Washington, and Officer Catalano and Officer Does 1–8 escorted him out of the hospital unit.

70. Upon discharge, Mr. Washington expected that he would be taken to solitary confinement: the regular process at SBCC when an incarcerated person disputes their cell assignment. Instead, Officer Does 1–8 escorted him back to the cell in M-2, which he had previously declined to enter.

71. At the cell, the officers positioned Mr. Washington with his face against a wall.

72. Officer Catalano ordered another officer to remove Mr. Washington's handcuffs, and he did.

73. Mr. Washington then stood still, facing the wall. The officers ordered him to get in the cell, while pointing assault rifles and red beams at him. Mr. Washington at first did not enter the cell. He was fearful that if he moved at all, one of the COs would assault or kill him.

74. Following this minor delay, immediately and without any warning, Officer Catalano and Officer Does 1–8 tased Mr. Washington multiple times while he was standing facing the wall. Then the officers threw him to the floor and tased him again.

75. Once Mr. Washington was on the floor, Officer Catalano and Does 1–8 repeatedly smashed his face into the ground. He was bleeding, and his blood was on the floor and the walls.

76. While assaulting him, Officer Does 1–8 called him racial slurs. Multiple officers, including Officer Catalano, repeatedly called him "nigger" and told him, "Get your black ass in the cell." Throughout the assault, the officers continued to point assault rifles and red beams at his face and groin.

77. Mr. Washington periodically lost consciousness during this incident from the physical assault and psychological reaction.

78. Mr. Washington was again put in handcuffs and shackles.

79. Four officers, Does 1–4, escorted him back to the SBCC hospital unit a second time. Mr. Washington was readmitted to the SBCC hospital unit about 20 minutes after he had been first discharged.

80. In the hospital unit, Mr. Washington stood on his feet but he was bleeding so profusely that he felt light-headed. He heard a doctor state that Mr. Washington had to be sent to an outside hospital because the doctor could not treat such severe injuries in the prison medical unit.

81. Mr. Washington collapsed on the floor. The escorting officers then picked Mr. Washington up and put him into a hospital bed.

82. When Mr. Washington later regained consciousness, Officer Does 1–4 were standing by his bed. Mr. Washington heard them calling him "bitch" and "cunt." He kept his eyes closed out and pretended to be unconscious, out of concern for his safety. One of the officers was holding a video camera. Mr. Washington heard an officer say, "You didn't record me saying that on camera, did you?" Another officer replied, "I cut it off for that."

83. Mr. Washington was transported in an ambulance to Leominster Hospital in only his underwear and no shoes. Mr. Washington was in and out of consciousness in the ambulance but felt people poking and pulling on his skin as if to check if he was dead.

84. The next time Mr. Washington regained consciousness, he was in Leominster Hospital wearing a neck brace. He heard a doctor say he needed to fix up Mr. Washington's face. The doctor asked Mr. Washington questions but out of fear, Mr. Washington did not

respond: COs were standing next to him, he was handcuffed to the hospital bed, and he was terrified that the COs would retaliate against him with violence if he spoke with the doctor. As a result, Mr. Washington remained silent while the doctor put stitches in his face. When the doctor asked whether anything else was wrong, Mr. Washington again did not speak even though he was in severe pain. After the doctor left, COs started to lift Mr. Washington up out of the hospital bed to put him in a wheelchair, discovering that Mr. Washington had urinated on himself.

85. Officer Catalano's and Does 1–8's abuse caused Mr. Washington severe emotional distress, including humiliation and fear for his life.

86. Mr. Washington experiences flashbacks regularly, which make him feel severe depression and like his life is not worth living. During these flashbacks, he experiences shortness of breath. And he regularly has nightmares. Mr. Washington has difficulty sleeping because the attacks have made him feel as if he needs to be hypervigilant. His heart races and he panics when he hears keys or cells opening or slamming shut. Because the same COs who attacked him continue to work in the facility, he is often reminded of the attacks.

Assaults on January 23–24, 2020

87. Mr. Washington returned from Leominster Hospital to the SBCC hospital unit that evening.

88. On January 23, 2020, tactical officers entered the hospital unit, carrying guns and tactical equipment, and force-moved[4] him to his new housing assignment, cell #13, in the M-2 Unit. The COs forced Mr. Washington into the cell, and then forced Mr. Washington's cellmate

[4] A force-move is a type of use of force in which a tactical team uses shields and tactical equipment to move a prisoner from one space to another space.

into the cell at gunpoint.

89. That same night, at around 9:00PM, Mr. Washington's cellmate became agitated and apparently began experiencing a mental health crisis. The high beam light in cell #13 was malfunctioning and would not turn off, which led Mr. Washington's cellmate to repeatedly ask the M-2 Unit CO to move him to a different cell or to have the light fixed. Nothing was done, and Mr. Washington's cellmate began yelling and dragging his mattress off of the bottom bunk and onto the ground. The cellmate then threw the mattress around the cell, expressing that he could not mentally endure the flashing light and that he needed to exit the cell. Mr. Washington believes his cellmate was designated as "SMI," a prisoner with serious mental illness.

90. Mr. Washington did not join his cellmate in yelling or throwing the mattress around the cell. Instead, Mr. Washington remained lying on the top bunk of his cell, reading, and posed no threat or risk to safety.

91. In response to the cellmate's actions, at about 10:45PM, Lt. Deschene burst into the cell with a canister of chemical agent. Mr. Washington, who is asthmatic, shouted at Lt. Deschene that he had asthma and that the Lieutenant should not use the chemical agents.

92. Lt. Deschene nonetheless aimed the canister at Mr. Washington and his cellmate and deployed chemical agents for a prolonged period. He continued to deploy the chemical agents even though Mr. Washington yelled repeatedly that he was asthmatic.

93. On information and belief, Lt. Deschene did not seek authorization before using chemical agents.

94. Supervisory officers at Lt. Deschene's rank are responsible for knowing prisoners' medical needs, and Mr. Washington's asthma has been well-documented by DOC. Indeed, Mr. Washington obtained a previous court judgment that determined DOC had

improperly used chemical agents against him despite his medical condition.

95. As a result of Mr. Washington's exposure to the chemical agents, he suffered consecutive asthma attacks and severe difficulty breathing. Specifically, Mr. Washington was left gasping for air, sneezing excessively, and with severe throat pain that made it feel like he was swallowing metal.

96. Additionally, the chemical agents made significant contact with Mr. Washington's skin, and his hands in particular when he raised them in an unsuccessful attempt to prevent the chemical agents from getting to his face. The exposure made his skin feel like it was burning, but he was not provided with an opportunity to bathe and wash the chemical agents off of his skin until a week later. Moreover, for days after the chemical agents were deployed, Mr. Washington was not able to touch his face or eyes without causing an intense burning sensation wherever he touched.

97. After Lt. Deschene deployed the chemical agents, at least five additional COs entered the cell and began striking Mr. Washington's cell mate.

98. One CO placed Mr. Washington in handcuffs, and several COs escorted him to the SBCC hospital.

99. While on the way to the hospital, one of the COs who was escorting him called Mr. Washington a "bitch," asserted that Mr. Washington's injuries were his own fault, and additionally blamed other recent incidents in the block on Mr. Washington. During the transport, Mr. Washington felt pain all over his body.

100. When Mr. Washington arrived at the SBCC hospital, he was examined by Nurse Doe. He was still struggling to breathe, feeling dizzy, and showing symptoms of an asthma attack. Despite these obvious symptoms, Nurse Doe failed to decontaminate Mr. Washington or

permit him to have his KOP inhaler. Moreover, Mr. Washington asked directly for a shower and for his KOP inhaler, Nurse Doe denied these requests. Nurse Doe discharged Mr. Washington from the hospital without decontaminating him and without his KOP inhaler.

101. As a result of the failures of Nurse Doe, Mr. Washington continued to experience difficulty breathing and recurrent asthma attacks for another week and a half.

102. Upon discharge, Mr. Washington was brought back to the M-2 Unit and placed into an empty cell, #15. Mr. Washington was not permitted to shower and was left wearing the same clothes that had been contaminated by the chemical agents. The temperature that night was around 35 degrees and the cell was freezing cold, but Mr. Washington was given no blankets, sheets, mattress, or anything else that could keep him warm.

103. At around 11:00PM, Mr. Washington asked CO Logan, who was making the security rounds, for blankets, a sheet, and a mattress, but CO Logan did not give him any. About an hour later, a captain made a security round, and Mr. Washington asked for the same. He also told the captain that he was still experiencing asthma attacks from having been sprayed with chemical agents.

104. Two hours later, at around 2:00AM on January 24, 2020, Lt. Forget, Sgt. Tocci, Sgt. Hellis, and CO Logan came to Mr. Washington's cell and demanded that he "cuff up." Mr. Washington complied. When Defendants then opened the cell gate, Lt. Forget brandished a canister of chemical agents at Mr. Washington's face, and ordered him to go to the back of the cell. Mr. Washington again complied, and Defendants flung a mattress into the cell and quickly closed the gate. Mr. Washington asked Defendants if he would be getting sheets and blankets. One Defendant replied that Mr. Washington was lucky to be getting a mattress and would not be getting anything else.

105. Lt. Forget, with Sgt. Tocci standing by, then told Mr. Washington to put his back against the cell door and insert his hands through the slot in the cell door in order to have the handcuffs removed. Mr. Washington did so, but Lt. Forget did not uncuff him. Instead, he told Mr. Washington to bend over. Mr. Washington complied.

106. Instead of uncuffing Mr. Washington, Lt. Forget then yanked upward on the handcuffs, causing lacerations on Mr. Washington's wrists and bleeding. Lt. Forget asserted—falsely—that Mr. Washington was failing to relinquish the handcuffs. Mr. Washington begged Lt. Forget and Sgt. Tocci to remove the handcuffs, but they did not. Mr. Washington then backed away from the cell door with his hands still in handcuffs after nearly two minutes of waiting for his handcuffs to be removed by Lt. Forget.

107. Lt. Forget and Sgt. Tocci left the cell, joking about how funny it would be to leave Mr. Washington in handcuffs for the entire night.

108. Later that night, Mr. Washington asked CO Logan to remove the handcuffs. He said the handcuffs were rubbing against his bloody, broken skin, and that he needed to urinate. CO Logan refused, and informed Mr. Washington that he call Sgt. Hellis.

109. By the time Sgt. Hellis arrived, Mr. Washington had urinated on himself. Sgt. Hellis looked into Mr. Washington's cell, saw him handcuffed behind the back—in a cold cell with no blankets or sheets, and with a urine stain on his pants—and told him he would stay that way the whole night.

110. For the rest of the night, and while unnecessarily restrained, Mr. Washington suffered significant physical pain, urinated on himself again, and continued to experience difficulty breathing and burning on his skin from his exposure to chemical agents. Mr. Washington additionally experienced significant dizziness because he was having such a hard

time breathing.

111. Due to the handcuffs, Mr. Washington was not able to lie down the entire night. Without blankets, in the cold winter air, Mr. Washington's fingers and toes also went numb.

112. On the morning of January 24, 2020, at around 7:00AM, Mr. Washington was finally uncuffed and examined by RN Capoccia.

113. RN Capoccia was aware that Mr. Washington was asthmatic because his asthma is well-documented, and also because Mr. Washington was still exhibiting obvious symptoms of asthma, including difficulty breathing. But RN Capoccia failed to provide Mr. Washington with his KOP inhaler or wash off the chemical agents.

114. Mr. Washington was moved back to his cell, cell #13, which had not been decontaminated. Still cold, Mr. Washington tried using the blankets in his cell. But he found that his asthma symptoms and the burning sensation on his skin were exacerbated because the blankets and pillow in his cell were still contaminated by the chemical agents. Mr. Washington continued to cough, wheeze and choke due to exposure to those blankets for days.

115. The stress of the incident further prevented Mr. Washington from sleeping for at least three days.

Assaults on March 5, 2020

116. On March 5, 2020, at about 10:30AM, Lt. Nichols came to Mr. Washington's cell and told him that he would be moved from the M-2 Unit back to the L-2 Unit, where he had previously been housed.

117. Mr. Washington was escorted to his new housing assignment in L-2. Upon arriving at the new cell, Mr. Washington learned that he was to have a cellmate. He was afraid that the housing assignment would put him in danger, and that he could be killed by his cellmate.

118. Out of fear, Mr. Washington refused the housing assignment and requested that he be housed in the Restrictive Housing Unit ("RHU") (that is, solitary confinement) instead.

119. Mr. Washington was brought to the non-contact visiting room and kept there for two hours, without being allowed to urinate, eat, or drink water.

120. At around 1:20PM, CO Williams escorted Mr. Washington to RHU and locked him into a strip cage. A strip cage is a small room with metal bars in place of a door.

121. A sergeant then told Mr. Washington that he would be placed in RHU with a cellmate. Mr. Washington still feared having a cellmate, especially in RHU. He again requested to be put in a single cell.

122. Mr. Washington was left in the strip cage for another 3 hours. During that time, he was not fed, given water, or permitted to use the bathroom. At some point, Mr. Washington asked a guard if he could use the bathroom, and the guard told him to "piss on the floor."

123. At about 4:00PM or 5:00PM, a mental health worker named Wendy entered, carrying a camera. She stood next to the strip cage and asked Mr. Washington, "Are you complying?" In response, Mr. Washington asked to speak with her about his mental health, which was deteriorating under the stress of the situation. She didn't answer and walked away without providing any treatment.

124. Sometime after, Officer Gagnon and Officer Does 9–18 gathered outside the door to the strip cage. The officers were not wearing name tags and had on helmets that covered their faces – causing difficulty in identifying them. One CO, Doe 9, was holding a canister of chemical agents, which he pointed at Mr. Washington's face.

125. Mr. Washington put both of his hands above his head and told the officers that he was complying and that he was asthmatic.

126. Mr. Washington also told the officers that they were not following regulations and that they were required to get a hand-held camera. One officer left to get the camera and returned with it, and appeared to be filming. Mr. Washington repeated for the camera that he had asthma.

127. There was a surveillance camera at the back of the strip cage, and—with his hands still raised—Mr. Washington turned to the back of the strip cage to face that camera. He spoke to the camera, repeating that he had asthma and protesting the use of force he was anticipating.

128. Officer Doe 9 deployed the chemical agents through the gate, hitting him in the back of the head and body. Officer Doe 9 deployed so much chemical agent that the spray pooled on the ground.

129. On information and belief, Superintendent Kenneway and Medical Director Doe authorized Doe 9 to use chemical agents, despite the fact that Mr. Washington is asthmatic and has a well-documented history of asthma.

130. The officers then opened the gate and rushed into the strip cage. The officers did not cuff Mr. Washington. Instead, they slammed him into the floor. While he was on the floor, the officers twisted his ankle and his ear, kneed him, kicked him, and finally held him to the floor by placing a knee on his neck. His head was in the pool of chemical agents and his lips were contaminated. He could not breathe.

131. The officers got scissors and cut off all of Mr. Washington's clothes, leaving him dressed only in his boxers.

132. Because Mr. Washington could not walk, a tactical team brought in a gurney. Mr. Washington was lifted up, placed on the gurney, and cuffed to it. He continued to gasp for air and struggle to breathe.

133. Mr. Washington was taken to the SBCC hospital unit. At the unit, medical staff attached him to a nebulizer to restore his breathing. While he was on the nebulizer, Mr. Washington began vomiting and continued struggling to breathe.

134. Mr. Washington was discharged from the SBCC hospital and Officer Gagnon and Officer Does 19–23 carried Mr. Washington to K-3, cell #5, on a gurney. Mr. Washington's hands were cuffed together but not cuffed to the gurney this time. All officers were wearing tactical gear.

135. Upon entering the cell, the officers tipped the gurney to the side and dumped Mr. Washington onto the floor. The officers dragged Mr. Washington—who was still cuffed—to the back of the cell, and slammed his head against the steel bedframe.

136. The officers then uncuffed Mr. Washington and began to beat him. The officers hit Mr. Washington on his back, neck, and head.

137. While Mr. Washington was being assaulted, multiple officers called him a "bitch" and a "fucking bitch."

138. The beating caused Mr. Washington's face to bleed, and he eventually passed out in the middle of the cell by the toilet, in a pool of his own blood.

139. Officer Gagnon and Officer Does 19–23 left him on the floor in a pool of his blood. On information and belief, they did not call for medical treatment.

140. Other prisoners in the K-3 unit banged on their cell doors to call attention to Mr. Washington's condition and in an effort to get Mr. Washington medical treatment for his physical injuries.

141. Mr. Washington regained consciousness. He could not move his legs. He called out for help to officers who were passing by the cell door distributing food on the tier, but was

ignored.

142. Hours later, approximately four officers and medical staff arrived with a gurney. The officers put Mr. Washington back in handcuffs and lifted Mr. Washington onto a stretcher and brought him back to the SBCC hospital.

143. At the hospital, Mr. Washington was put in a hospital bed and suffered bouts of unconsciousness.

144. Mr. Washington was so terrified after the two recent assaults that he could not speak. As a result, a mental health clinician was assigned to him, and he was placed on suicide watch for the night. Staff stripped him naked and put him in a smock, but did not wash off the chemical agents or blood from his face. He was also not given blankets, and not allowed to shower off the chemical agents until March 7th.

145. As a result of the assaults, Mr. Washington suffered injuries to his face and lip. His ribs and midsections were lacerated, and his wrists were swollen from the handcuffs digging into them. He had difficulty breathing for days after the attack because he was not permitted to wash off the chemical agents.

146. Mr. Washington also suffered feelings of humiliation, because of the verbal abuse and because, once placed on suicide watch, he was observed by officers while he was almost naked and freezing. The attacks have caused him to experience constant fear and stress that he could be attacked at any time.

**DOC Policies Governing Use of Force**

147. DOC's written regulations, policies, and procedures closely regulate the use of force. Along with the United States Constitution, these written rules set strict limits on officers' authority to use force against prisoners.

148. Scrupulous adherence to rules governing the use of force is aimed at protecting incarcerated people from abuse. DOC use of force regulations, 103 CMR 505, define "reasonable force" as "the least amount of force necessary in a manner to carry out" a permissible action. Excessive force is defined as any force that exceeds that minimum amount of force necessary. The regulations prohibit the use of excessive force and the use of force as punishment or discipline. The regulations also require that an employee report any excessive force to a supervisor.

149. DOC also has Standard Operating Procedures for the use of force. These include a Pyramid of Force, which provides guidance on how officers must assess the risk with which they are faced and what defensive or offensive actions are permitted based upon that risk. The Pyramid is intended to ensure that all employees use force that is both reasonable and proportional to the risk facing them.

150. DOC policies 103 CMR 505.10 (2) and (3) specifically restrict the use of chemical agents. The policy states that chemical agents shall not be used without prior authorization from both the superintendent and the Medical Director. The Medical Director, in particular, shall review the inmate's medical file to determine if any medical contraindications exist in using chemical agents. All authorizations shall be documented in writing and noted in reports after the incident.

151. DOC has additional requirements that apply to cell extractions, including ordering the prisoner to comply before commencing force (potentially eliminating the need to use force at all), providing medical care as soon as possible for a prisoner injured during a use of force, and immediately decontaminating the prisoner from any chemical agents used. DOC keeps this policy secret from the public and by doing so, shields itself from accountability with

respect to enforcement and implementation of the policy.

152. After force is used, all staff who used or witnessed the force are required, by the end of their shift, to submit a report describing the incident in detail. All incident reports corresponding to a use of force, together with the reporting forms filled out by the higher-ranking staff and administrators and all video and other documents, are compiled into a Use of Force package. To ensure compliance with governing law and policies, the Superintendent must review and approve all Use of Force packages related to his or her prison. The Director of Special Operations must review all Use of Force packages throughout DOC.

153. DOC has additional policies regarding the use of force in certain circumstances that it once again refuses to disclose to the public. These include the Disorder Management Policy, Forced Movement of Inmates, and policies governing the use of the Special Operations tactical and special response teams, and the use of K9s and specialty impact weapons. Commissioner Mici declared a Major Disorder following the incident on January 10, 2020, thus invoking the Disorder Management Policy.

## CLAIMS FOR RELIEF

### COUNT I

### 42 U.S.C. § 1983 – Eighth Amendment – Excessive Use of Force

### Against Defendants Officer Catalano and Does 1–8

154. Mr. Washington incorporates each paragraph of this Complaint as if fully restated here.

155. Defendants Officer Catalano and Officer Does 1–8 violated Mr. Washington's right to be free from "the unnecessary and wanton infliction of pain" through their excessive use of force against Mr. Washington on January 21, 2020. *Hudson v. McMillian*, 503 U.S. 1, 5 (1992)

(quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)).

156. Defendants Catalano and Officer Does 1–8 used more than *de minimis* force against Mr. Washington when they tased, punched, choked, and otherwise beat him. *Wilkins v. Gaddy*, 559 U.S. 34, 39 (2010).

157. Further, Defendants used force maliciously and sadistically, as indicated by, *inter alia*, the facts that: Mr. Washington was not resisting; the force used—namely punching, choking and tasing—was disproportionate to address Mr. Washington's momentary verbal refusal to enter a filthy cell; Defendants were shouting racial slurs, including "black ass" and "nigger," at Mr. Washington during the assaults; and, during the first assault on January 21, 2020, Mr. Washington was handcuffed and shackled.

**COUNT II**

**42 U.S.C. § 1983 – Eighth Amendment – Excessive Use of Force**

**Against Defendant Lt. Deschene**

158. Mr. Washington incorporates each paragraph of this Complaint as if fully restated here.

159. Defendant Lt. Deschene violated Mr. Washington's right to be free from "the unnecessary and wanton infliction of pain" through his excessive use of force against Mr. Washington on January 23, 2020. *Hudson*, 503 U.S. at 5 (quoting *Whitley*, 475 U.S. at 319).

160. Defendant Deschene used more than *de minimis* force when he deployed chemical agents against Mr. Washington on January 23, 2020. *Wilkins*, 559 U.S. at 39.

161. The force used was malicious and sadistic, as indicated by, *inter alia*, the fact that it was unnecessary and disproportionate, because Mr. Washington was on his top bunk and not posing any threat to safety, and in violation of DOC policy 103 CMR 505.10(2)–(3), as Lt.

Deschene did not get clearance from supervisors before deploying chemical agents. Lt. Deschene knew that Mr. Washington was asthmatic, and deployed the chemical agents anyways. He knew Mr. Washington was asthmatic because: Mr. Washington told him so; officers of Lt. Deschene's rank are responsible for knowing prisoners' medical needs, and Mr. Washington's asthma is well-documented; and Mr. Washington also previously sued and won against DOC for using chemical agents against him despite his medical condition.

**COUNT III**

**42 U.S.C. § 1983 – Eighth Amendment – Excessive Use of Force**

**Against Defendants Lt. Forget, Sgt. Tocci, and Sgt. Hellis**

162. Defendants Lt. Forget, Sgt. Tocci, and Sgt. Hellis violated Mr. Washington's right to be free from "the unnecessary and wanton infliction of pain" on the night of January 23, 2020. *Hudson*, 503 U.S. at 5 (quoting *Whitley*, 475 U.S. at 319).

163. Defendants Lt. Forget, Sgt. Tocci, and Sgt. Hellis used more than *de minimis* force against Mr. Washington when they kept him handcuffed behind his back for five hours from January 23 to January 24, 2020. *Wilkins*, 559 U.S. at 39.

164. They applied that force maliciously and sadistically, as indicated by, *inter alia*, the facts that Mr. Washington was inside a secure cell, making handcuffs unnecessary; Defendant Lt. Forget repeatedly yanked on Mr. Washington's wrists so hard they started to bleed; Defendants left Mr. Washington in handcuffs for five hours; and Defendants taunted Mr. Washington and joked about leaving him in handcuffs all night.

**COUNT IV**

**42 U.S.C. § 1983 – Eighth Amendment – Excessive Use of Force**

**Against Defendants Officer Gagnon, Officer Does 9–23, Superintendent Kenneway, and Medical Director Doe**

165. Defendants Officer Gagnon and Officer Does 9–18 violated Mr. Washington's right to be free from "the unnecessary and wanton infliction of pain" on March 5, 2020. *Hudson*, 503 U.S. at 5 (quoting *Whitley*, 475 U.S. at 319).

166. Defendant Officer Doe 9 used more than *de minimis* force against Mr. Washington when he deployed chemical agents against Mr. Washington. *Wilkins*, 559 U.S. at 39. Defendant Officer Doe 9 used force maliciously and sadistically, as indicated by, *inter alia*, the facts that: Mr. Washington was in a secure strip cell, making chemical agents unnecessary; and Defendant knew that Mr. Washington was asthmatic because his asthma is well-documented and because Mr. Washington told him so.

167. Superintendent Kenneway and Medical Director Doe used more than *de minimis* force when they authorized Officer Doe 9 to deploy chemical agents against Mr. Washington. *Id.*; *see also* 103 CMR 505.10(2)–(3) (Superintendent and Medical Director must authorize use of chemical agents). Defendants Kenneway and Medical Director Doe authorized that force maliciously and sadistically, as indicated by, *inter alia*, the facts that: Mr. Washington was in a secure strip cell; he has a well-documented diagnosis of asthma; Defendants knew Mr. Washington was asthmatic; and Defendants nonetheless authorized the use of chemical agents against him.

168. Defendants Officer Gagnon and Officer Does 10–18 used more than *de minimis* force against Mr. Washington when they punched, choked, and otherwise beat him after chemical agents were deployed. Defendants used force maliciously and sadistically, as indicated by, *inter alia*, the facts that: Mr. Washington was restrained in a secure strip cell, making the

force unnecessary; and the force (punching, choking, tasing) was disproportionate to the situation (Mr. Washington was verbally refusing a cell assignment).

169. Defendant Officer Gagnon and Officer Does 19–23 used more than *de minimis* force against Mr. Washington when they punched, choked, and otherwise beat Mr. Washington inside the cell in K-3 after he was returned from the SBCC hospital unit. *Id.* Defendants used force maliciously and sadistically, as indicated by, *inter alia*, the facts that: Mr. Washington was in a secure cell, cuffed behind his back, and not posing any safety threat; Defendants punched Mr. Washington anyways, and to a point of unconsciousness; and Defendants left Mr. Washington, bleeding and unconscious on the floor of his cell, and did not get him medical attention.

**COUNT V**

**Intentional Torts – Assault & Battery**

**Against Defendants Officer Catalano and Officer Does 1–8**

170. Mr. Washington incorporates each paragraph of this Complaint as if fully restated here.

171. Defendants Officer Catalano and Officer Does 1–8 committed the intentional torts of assault and battery when they used intentional, unjustified, and unreasonable force against Mr. Washington on January 21, 2020. *See LaChance v. Town of Charlton*, 368 F. Supp. 3d 231, 245 (D. Mass. 2019); *Dean v. City of Worcester*, 924 F.2d 364, 369 (1st Cir. 1991) ("The standard for determining whether force is reasonable for an assault and battery claim is 'essentially the same' as the standard for determining whether it is reasonable for excessive force claims.").

172. Officer Catalano and Officer Does 1–8 tased, punched, choked, and otherwise

beat Mr. Washington, which is more than *de minimis* force.

173. Defendants were malicious and sadistic, as indicated by, *inter alia*, the facts that: Mr. Washington was not resisting; the force used was disproportionate; Defendants were shouting racial slurs, including "black ass" and "nigger," at Mr. Washington during the assaults; and, during the first assault on January 21, 2020, Mr. Washington was handcuffed and shackled.

**COUNT VI**

**Intentional Torts – Assault & Battery**

**Against Defendant Lt. Deschene**

174. Mr. Washington incorporates each paragraph of this Complaint as if fully restated here.

175. Defendant Lt. Deschene committed the intentional torts of assault and battery when he used intentional, unjustified, and unreasonable force against Mr. Washington on January 23, 2020. *LaChance*, 368 F. Supp. 3d at 245; *Dean*, 924 F.2d at 369.

176. Lt. Deschene used chemical agents, which is more than *de minimis* force.

177. Lt. Deschene was malicious and sadistic, as indicated by, *inter alia*, the fact that the force he used was unnecessary and disproportionate, because Mr. Washington was on his top bunk and not posing any threat to safety, and in violation of DOC policy 103 CMR 505.10(2)–(3), as Lt. Deschene did not get clearance from supervisors first. Lt. Deschene also knew that Mr. Washington was asthmatic, and deployed the chemical agents anyways. He knew Mr. Washington was asthmatic because: Mr. Washington told him so; officers of Lt. Deschene's rank are responsible for knowing prisoners' medical needs, and Mr. Washington's asthma is well-documented; and Mr. Washington also previously sued and won against DOC for using chemical agents against him despite his medical condition.

**COUNT VII**

**Intentional Torts – Assault & Battery**

**Against Defendants Lt. Forget, Sgt. Tocci, and Sgt. Hellis**

178. Mr. Washington incorporates each paragraph of this Complaint as if fully restated here.

179. Defendants Lt. Forget, Sgt. Tocci, and Sgt. Hellis committed the intentional torts of assault and battery when they used intentional, unjustified, and unreasonable force against Mr. Washington from January 23 to 24, 2020. *LaChance*, 368 F. Supp. 3d at 245; *Dean*, 924 F.2d at 369.

180. Defendants Lt. Forget, Sgt. Tocci, and Sgt. Hellis used more than *de minimis* force against Mr. Washington when they kept him handcuffed behind his back for five hours from January 23 to January 24, 2020.

181. They applied that force maliciously and sadistically, as indicated by, *inter alia*, the fact that Mr. Washington was inside a secure cell, making handcuffs unnecessary; Defendant Lt. Forget repeatedly yanked on Mr. Washington's wrists so hard they started to bleed; Defendants left Mr. Washington in handcuffs for five hours; and Defendants taunted Mr. Washington and joked about leaving him in handcuffs all night.

**COUNT VIII**

**Intentional Torts – Assault & Battery**

**Against Defendants Officer Gagnon and Officer Does 9–23**

182. Mr. Washington incorporates each paragraph of this Complaint as if fully restated here.

183. Defendants Officer Gagnon and Officer Does 9–23 committed the intentional

torts of assault and battery when they used intentional, unjustified, and unreasonable force against Mr. Washington on March 5, 2020. *LaChance*, 368 F. Supp. 3d at 245; *Dean*, 924 F.2d at 369.

184. Defendant Officer Doe 9 used more than *de minimis* force against Mr. Washington when he deployed chemical agents against Mr. Washington. He used force maliciously and sadistically, as indicated by, *inter alia*, the facts that Mr. Washington was in a secure strip cell, making chemical agents unnecessary, and also that Doe 9 knew that Mr. Washington was asthmatic because Mr. Washington told him so.

185. Defendants Officer Gagnon and Officer Does 10–18 used more than *de minimis* force against Mr. Washington when they punched, choked, and beat him after chemical agents were deployed. Their use of force was malicious and sadistic, as indicated by, *inter alia*, the facts that: Mr. Washington was restrained in a secure strip cell, and the force used (punching, choking, tasing) was disproportionate to the situation (Mr. Washington was verbally refusing a cell assignment).

186. Defendant Officer Gagnon and Officer Does 19–23 used more than *de minimis* force against Mr. Washington when they punched, choked, and beat Mr. Washington inside the cell in K-3 after he was returned from the SBCC hospital unit. Defendants used force maliciously and sadistically, as indicated by, *inter alia*, the facts that: Mr. Washington was in a secure cell, cuffed behind his back, and not posing any safety threat; Defendants punched Mr. Washington anyways, and to a point of unconsciousness; and Defendants left Mr. Washington bleeding and unconscious on the floor of his cell, and did not get him medical attention.

**COUNT IX**

**Intentional Tort – Intentional Infliction of Emotional Distress**

**Against Defendants Officer Catalano and Officer Does 1–8**

187. Mr. Washington incorporates each paragraph of this Complaint as if fully restated here.

188. Defendant Catalano and Does 1–8 inflicted emotional distress on Mr. Washington on January 21, 2020. Defendants beat Mr. Washington, while calling him "black ass," "nigger," and other slurs.

189. This verbal and physical abuse was "extreme and outrageous," and Defendants intended (or, at the very least) should have known that the combination of threats, slurs, actual physical violence and leaving Mr. Washington for dead would likely cause Mr. Washington emotional distress—as, in fact, it did. *Davignon v. Clemmey*, 322 F.3d 1, 8 n.2 (1st Cir. 2003) (quoting *Agis v. Howard Johnson Co*., 371 Mass. 140, 144–45 (1976)).

190. As a result of Defendants' behavior, Mr. Washington suffered humiliation, fear for his life, hyperventilation, and loss of sleep.

**COUNT X**

**Intentional Tort – Intentional Infliction of Emotional Distress**

**Against Defendants Officer Gagnon and Officer Does 9–23**

191. Mr. Washington incorporates each paragraph of this Complaint as if fully restated here.

192. Defendants Officer Gagnon and Officer Does 9–23 inflicted emotional distress on Mr. Washington on March 5, 2020. Defendants repeatedly assaulted Mr. Washington by spraying him with chemical agents while his hands were up; punching and kneeing his body, kneeling on his neck cutting off his air supply and pressing his face into the pool of chemical agents on the floor; brutally punching him and banging his head on the tile floor while calling

him "bitch" and other slurs, then leaving him unconscious and bleeding out in his cell without calling for medical attention.

193. This verbal and physical abuse was "extreme and outrageous," and Defendants intended or, at the very least, should have known that the combination of threats, slurs, actual physical violence and leaving Mr. Washington for dead would likely cause Mr. Washington emotional distress—as, in fact, it did. *Id*.

194. As a result of Defendants' behavior, Mr. Washington suffered humiliation, fear for his life, hyperventilation, and loss of sleep.

**COUNT XI**

**Section 1983 – Eighth Amendment – Deliberate Indifference**

**Against Defendant Nurse Doe**

195. Mr. Washington incorporates each paragraph of this Complaint as if fully restated here.

196. Defendant Nurse Doe was "deliberate[ly] indifferen[t]" to Mr. Washington's "serious medical needs," subjecting him to "cruel and unusual punishment" in violation of the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976).

197. On January 23, 2020, Mr. Washington—who is asthmatic—was exposed to chemical agents. Nurse Doe examined Mr. Washington at the SBCC hospital and observed him experiencing a severe asthma attack. Despite his well-documented history of asthma and his obvious need for treatment, Nurse Doe discharged Mr. Washington without decontaminating him or permitting him his inhaler. As a result, Mr. Washington continued to experience asthma attacks, and was at substantial risk of even more serious complications related to his condition.

**COUNT XII**

**Section 1983 – Eighth Amendment – Deliberate Indifference**

**Against Defendant Nurse Capoccia**

198. Mr. Washington incorporates each paragraph of this Complaint as if fully restated here.

199. Defendant Nurse Capoccia was "deliberate[ly] indifferen[t]" to Mr. Washington's "serious medical needs," subjecting him to "cruel and unusual punishment" in violation of the Eighth Amendment. *Id*.

200. On the morning of January 24, 2020, Nurse Capoccia examined Mr. Washington, who had been exposed to chemical agents the night before, but had not been provided with an inhaler or decontaminated. Mr. Washington was struggling to breathe and at substantial risk of experiencing further asthma attacks. Despite his well-documented history of asthma and the obvious need for immediate treatment, Nurse Capoccia failed to decontaminate him or provide him with a KOP Inhaler. As a result, Mr. Washington continued to experience asthma attacks, and was at substantial risk of even more serious complications related to his condition.

**COUNT XIII**

**42 U.S.C. § 12102 – Americans with Disabilities Act**

**Against Defendant DOC**

201. Mr. Washington incorporates each paragraph of this Complaint as if fully restated here.

202. DOC (by and through the individual Defendants acting in their official capacities) is a public entity as defined in 42 U.S.C. § 12131(1)(A).

203. Mr. Washington has asthma, a condition whose symptoms include difficulty breathing. When Mr. Washington is experiencing symptoms of his asthma, he is unable to

recreate, sleep, or do almost anything else. His asthma makes him "substantially limited" in "one or more of his major life activities," qualifying him as an individual with a disability within the meaning of the Americans with Disabilities Act. 42 U.S.C. § 12102(1)(A). Specifically, when Mr. Washington experiences symptoms, he is "substantially limit[ed]" in his ability "to perform a major life activity as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(l) (2020).

204. Because of his disability, Mr. Washington was denied equal access to the programs, services, and activities provided by DOC employees at SBCC on January 23, 2020. *See* 42 U.S.C. § 12131(2). Specifically, he was denied equal access to the safe use of force.

205. Lt. Deschene, a DOC employee, deployed chemical agents against Mr. Washington on January 23, 2020, despite Mr. Washington's documented disability and without effort to make accommodations for that disability.

206. DOC violated the ADA by failing to make "reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(7).

207. Lt. Deschene's actions were either in contravention of prison policy, and so constituted an unlawful and discriminatory practice; or their actions were consistent with policy, meaning that the policy is discriminatory and defective.

208. Lt. Deschene, moreover, knew of Mr. Washington's disability because his condition was well-documented in his medical records; because he had previously sued DOC, successfully, for failing to accommodate his disability; and because he told them Lt. Deschene that he was asthmatic when Lt. Deschene exposed him to chemical agents, and Lt. Deschene continued to do so anyways.

209. DOC employees' failure to accommodate Mr. Washington's asthma caused him to suffer asthma attacks, which prevented him from sleeping, breathing, walking, or doing virtually anything else without significant pain.

**COUNT XIII**

**42 U.S.C. § 12102 – Americans with Disabilities Act**

**Against Defendant DOC**

210. Mr. Washington incorporates each paragraph of this Complaint as if fully restated here.

211. DOC (by and through the individual Defendants acting in their official capacities) is a public entity as defined in 42 U.S.C. § 12131(1)(A).

212. Mr. Washington has asthma, a condition whose symptoms include difficulty breathing. When Mr. Washington is experiencing symptoms of his asthma, he is unable to recreate, sleep, or do almost anything else. His asthma makes him "substantially limited" in "one or more of his major life activities," qualifying him as an individual with a disability within the meaning of the Americans with Disabilities Act. 42 U.S.C. § 12102(1)(A). Specifically, when Mr. Washington experiences symptoms, he is "substantially limit[ed]" in his ability "to perform a major life activity as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(l) (2020).

213. Because of his disability, Mr. Washington was denied equal access to the programs, services, and activities provided by DOC employees at SBCC on March 5, 2020, 2020. *See* 42 U.S.C. § 12131(2). Specifically, he was denied equal access to the safe use of force.

214. Officer Doe 9, a DOC employee, deployed chemical agents against Mr. Washington on March 5, 2020, despite Mr. Washington's documented disability and without

effort to make accommodations for that disability.

215. Superintendent Kenneway and Medical Director Doe also authorized Officer Doe 9 to use chemical agents, despite Mr. Washington's documented disability and without providing reasonable accommodations for the use of force. *See* 103 CMR 505.10(2)–(3).

216. DOC violated the ADA by failing to make "reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(7).

217. Officer Doe 9's actions were either in contravention of prison policy, and so constituted an unlawful and discriminatory practice; or their actions were consistent with policy, meaning that the policy is discriminatory and defective.

218. Officer Doe 9, moreover, knew of Mr. Washington's disability because his condition was well-documented in his medical records; because he had previously sued DOC, successfully, for failing to accommodate his disability; and because Mr. Washington told him that he was asthmatic when Officer Doe 9 indicated they were going to deploy chemical agents, but Officer Doe 9 did so anyways.

219. DOC employees' failure to accommodate Mr. Washington's asthma caused him to suffer asthma attacks, which prevented him from sleeping, breathing, walking, or doing virtually anything else without significant pain.

**REQUEST FOR RELIEF**

1. Enter judgment in favor of Plaintiff and against Defendants.
2. Award Plaintiff compensatory damages for physical injury and pain and suffering against all personal capacity Defendants.

3. Award Plaintiff punitive damages against all personal capacity Defendants.

4. Award Plaintiff compensatory damages under the ADA.

5. Award Plaintiff's costs and reasonable attorney's fees as allowed by law.

6. Award any other relief this Court deems just, equitable, and proper.

Dated: January 10, 2023

Respectfully submitted,

/s/ Oren Nimni
Oren Nimni (BBO #691821)
D Dangaran (BBO # 708195)
Amaris Montes *pro hac vice forthcoming*
Sophie Angelis *pro hac vice forthcoming*
RIGHTS BEHIND BARS
416 Florida Avenue, NW #26152
Washington, D.C. 20001
(206) 200-9088
oren@rightsbehindbars.org

/s/ Amber Ashley James
Amber Ashley James *pro hac vice forthcoming*
8549 Wilshire Blvd. No. 2279
Beverly Hills, CA 90211
(323) 508-4167
amber@amberashleyjamesesq.com

*Attorneys for Plaintiff Derrick Washington*