# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
(EASTERN DIVISION - BOSTON)

| | |
|---|---|
| ROBERT SILVA-PRENTICE and DIONISIO PAULINO,<br><br>        Plaintiffs,<br><br>    -against-<br><br>THOMAS TURCO, CAROL MICI, CHRISTOPHER FALLON, PAUL HENDERSON, CHARLES PRIMACK, STEVEN KENNEWAY, JAMES FERREIRA, PATRICK DEPALO, JOSEPH FREITAS, DEAN GRAY, DAVID SHAW, JAMES ALLAIN, PAUL BIRRI, JASON LANPHER, STUART MCCULLOCH, DENNIS BRESLIN, ROBERT D'AMADIO, JAMES MURPHY, MARK O'REILLY, FNU LAWLESS, RAYMOND TURCOTTE, JEFFREY SOUZA, THOMAS MERLINO, RAYMOND HARVEY, EVAN LARANJO, DANIEL PAUL, JAMIE MARCHAND, ROBERT SOUTHWORTH, KATIE APPEL, MICHAEL THOMAS, BRIAN MULVEY, JENNIFER REDD, and DOES 1 through 20, inclusive,<br>        Defendants. | Civil No. Civil No.<br><br>PLAINTIFFS' COMPLAINT AGAINST DEFENDANTS FOR CIVIL RIGHTS VIOLATIONS UNDER 42 U.S.C. §1983 (EIGHTH AMENDMENT AND FIRST AMENDMENT VIOLATIONS); CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS, VIOLATION OF THE MASSACHUSETTS CIVIL RIGHTS ACT, ASSAULT AND BATTERY, INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, CIVIL CONSPIRACY UNDER MASSACHUSETTS LAW, AND FOR DECLARATORY RELIEF, INJUNCTIVE RELIEF, AND DAMAGES<br><br><br>JURY TRIAL DEMANDED |

## **COMPLAINT**

Plaintiffs Robert Silva-Prentice and Dionisio Paulino, state prisoners in custody at Souza-Baranowski Correctional Center, allege as follows for their claims against Defendants:

1

**INTRODUCTION**

On January 10, 2020, a group of Black and Latino prisoners at Souza-Baranowski Correction Center ("SBCC"), the Massachusetts Department of Corrections' ("MA DOC") maximum security prison, engaged in an altercation against four (4) SBCC correction officers when long-simmering tensions on the unit boiled over. The backlash was immediate and harsh: MA DOC and SBCC administrators joined forces with squads of armed and armored MA DOC officers and conspired to retaliate against scores of Black and Latino prisoners who had nothing to do with the January 10th altercation, to send a clear message as to who was "in charge" of SBCC, and to instill a sense of terror and fear of future retaliatory attacks on Black and Latino prisoners.

In furtherance of conspiracies to violate civil rights, target Black and Latino prisoners, and exact revenge, then-Deputy Commissioner Paul Henderson carefully chose a group of armed and armored officers trained to use weapons and other force on prisoners and ordered them to sneak up on the Plaintiffs' cell – located in a well-known blind spot – to use "the element of surprise" to gain "a tactical advantage."

As several MA DOC and SBCC administrators directed, authorized, watched and/or listened, Henderson's squad of at least six (6) armed officers wearing paramilitary uniforms and body armor snuck up on and violently entered the Plaintiffs' cell. The squad members restrained the Plaintiffs, then proceeded to terrorize, beat, taser, and kick them, pull out their hair, and slam them into concrete walls and a metal doorway while hurling racial, ethnic, and sexual slurs.

After they concluded their beatings and Silva-Prentice was escorted away, Commander Mark O'Reilly commanded his dog to attack Paulino, who was cuffed behind his back and under the close escort of two armed officers. O'Reilly's dog charged Paulino, ripped off his underwear, bit him in multiple places, and tore away a chunk of his upper thigh and, all the while, DOC and

2

SBCC administrators stood by, watching, listening, and doing nothing to stop the wholly unjustified and violent attack.

The Defendants well knew that there was no legitimate reason for their surprise, forcible, and violent entry into the Plaintiffs' cell. Indeed, they knew that Paulino and Silva-Prentice had each been safely escorted twice that same day; stripped of all clothing except for t-shirts, boxer shorts, and shower slippers; passed through body scanners; and placed inside a cell that was barren of all property. The Defendants' true goal was to terrorize and beat the Plaintiffs as payback for the acts of other Latino and Black prisoners and to create an atmosphere of terror.

When the Plaintiffs dared to complain by filing grievances and a lawsuit, the Defendants expanded the goals of their conspiracy to include retaliation for these First Amendment activities, discrediting the Plaintiffs, and punishing them with, *inter alia*, false charges, baseless guilty findings, and months-long stays in solitary confinement as part of a massive coverup and to ensure such conduct could occur again in the future with impunity.

Based on the foregoing and the allegations that follow, the Plaintiffs seek compensatory and punitive damages as well as declaratory and injunctive relief.

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction over Counts I to VI in this Complaint pursuant to 28 U.S.C. § 1331 because the claims arise under the laws of the United States, specifically 28 U.S.C. § 1343 (civil rights); 28 U.S.C. § 2201 (declaratory relief); and 42 U.S.C. §§ 1981, 1983, 1985 and 1988.

2. This Court has supplemental jurisdiction over the Massachusetts state law claims brought in Counts VII through X because these claims are so related to Counts I to VI, which are within the original jurisdiction of this Court, that these counts form part of the same case or

controversy as the federal claims within the meaning of 28 U.S.C. § 1367 and involve common questions of fact and related questions of law.

3.      The claims in this action arise under the United States Constitution as applied to state authorities through 42 U.S.C. § 1983.

4.      All relevant events occurred within the Commonwealth of Massachusetts and each of the Defendants resides within this Commonwealth and District and venue is therefore proper in this District under 28 U.S.C. § 1391(b)(1)(a) and (a).

## PARTIES

5.      During all relevant times, Plaintiff Robert Silva-Prentice ("SILVA-PRENTICE") resided, and still resides, at Souza Baranowski Correctional Center ("SBCC") in Shirley, Massachusetts. He is Black and a member of a protected class.  In January 2020, he was twenty-two (22) years old.

6.      During all relevant times, Plaintiff Dionisio Paulino ("PAULINO") resided, and still resides, at SBCC in Shirley, Massachusetts. He is Latino and a member of a protected class. In January 2020, he was twenty-six (26) years old.

7.      During all relevant times, Defendant Thomas Turco ("TURCO" or "SECRETARY TURCO") was the Secretary of the Executive Office of Public Safety and Security ("EOPSS"), which oversees the Massachusetts Department of Corrections ("MA DOC"). SECRETARY TURCO has since retired. He was directly involved in planning the attacks on the Plaintiffs and scores of other SBCC prisoners as well as the continuing coverup of gross government misconduct. Upon information and belief, TURCO watched as other Defendants used excessive force on the Plaintiffs, failed to intervene to stop the abuse, and failed to report other Defendants for their

dereliction of duties. He is a resident of the Commonwealth of Massachusetts and is sued in his individual and official capacities.

8. During all relevant times, Defendant Carol Mici ("MICI" or "COMMISSIONER MICI") was employed by MA DOC as the Commissioner of Corrections, a position which she has held since January 18, 2019. COMMISSIONER MICI is responsible for performing the duties set forth in M.G.L. c. 124, § 1, including the maintenance of safety, security, and order at all state correction facilities, including SBCC. MICI was involved directly in planning the retaliation against Black and Latino prisoners, the First Amendment retaliation, and the continuing coverup of gross government misconduct. She is a resident of the Commonwealth of Massachusetts and is sued in her individual and official capacities.

9. During all relevant times, Defendant Christopher Fallon ("FALLON" or "DC FALLON") was employed by MA DOC as the Deputy Commissioner of Prisons. He denied PAULINO's appeal from a baseless guilty finding on false and retaliatory disciplinary charges, causing PAULINO to serve approximately thirteen (13) months in solitary confinement and to have a disciplinary record which includes a guilty finding of aggravated assault and battery on a correction officer. He is a resident of Massachusetts and is sued in his official and personal capacities.

10. During all relevant times, Defendant James Ferreira ("FERREIRA" or "ADC FERREIRA") was employed by MA DOC as Assistant Deputy Commissioner. Upon information and belief, FERREIRA was involved in planning the surprise attack on the Plaintiffs, watched as other Defendants used excessive force on the Plaintiffs, failed to intervene to stop the abuse, and failed to report other Defendants for their dereliction of duties. He is a resident of the Commonwealth of Massachusetts and is sued in his individual and official capacities.

5

11. During all relevant times, Defendant Paul Henderson ("HENDERSON" or "DC HENDERSON") was employed by MA DOC as the Deputy Commissioner of Field Services, which oversees the squads of armed correction officers known as the Critical Incident Response Team ("CIRT"), the Hostage Rescue Team ("HRT") and the K9 Unit. Members of these squads wear body armor and carry dangerous weapons such as, *inter alia*, Electronic Control Devices ("ECD") (more commonly known as "Tasers"), firearms which shoot "pepper balls" of chemical agents, cannisters of "OC" spray, specialty impact munitions and/or use attack dogs to frighten, intimidate and injure prisoners inside the walls of SBCC. HENDERSON has since retired from his position as Deputy Commissioner and currently holds a union-protected position working with the K9 Unit. On January 22, 2020, DC HENDERSON ordered at least six (6) Defendants to employ the "element of surprise" to gain "a tactical advantage" by sneaking up on and forcibly entering the Plaintiffs' cell without first giving them the opportunity to safely "cuff up." He ordered those Defendants to use force to remove PAULINO, including but not limited to ECDs, pepper ball firearms, specialty impact devices, canisters of OC spray, shod feet, physical force, and attack dogs trained to take down and bite prisoners. HENDERSON watched as the other Defendants carried out his orders, failed to intervene, and failed to report other Defendants for their dereliction of duties. He was also involved directly in planning the retaliation against Black and Latino prisoners, the First Amendment retaliation, and the continuing coverup of gross government misconduct. He is a resident of the Commonwealth of Massachusetts and is sued in his individual and official capacities.

12. During all relevant times, Defendant Patrick DePalo ("DEPALO" or "ADC DEPALO") was employed by MA DOC as the Assistant Deputy Commissioner of Field Services and in that role held supervisory responsibilities over the commanders and members of the CIRT,

6

HRT, and K9 Units. Upon information and belief, DEPALO was involved directly in planning the retaliation against Black and Latino prisoners, the First Amendment retaliation, and the continuing coverup of gross government misconduct. He is a resident of the Commonwealth of Massachusetts and is sued in his individual and official capacities.

13.     During all relevant times, Defendant Charles Primack ("PRIMACK" or "DIRECTOR PRIMACK") was employed by MA DOC as Director of Special Operations. In that role, PRIMACK oversees the CIRT, HRT and the K9 Unit.  DIRECTOR PRIMACK was involved directly in orchestrating and the retaliation against Black and Latino prisoners and the surprise attack on the Plaintiffs. He watched as other Defendants used excessive force on the Plaintiffs, failed to intervene to stop the abuse, and failed to report other Defendants for their dereliction of duties, and is involved in the continuing coverup of gross government misconduct. PRIMACK is a resident of the Commonwealth of Massachusetts and is sued in his individual and official capacities.

14.     During all relevant times, Defendant David Shaw ("SHAW" or "CHIEF SHAW") was employed by MA DOC as the Chief of the Office of Investigative Services ("OIS"). SHAW cleared several Defendants of all wrongdoing during a sham investigation by MA DOC's Internal Affairs Unit ("IAU"), despite clear and compelling evidence that they used excessive force on SILVA-PRENTICE and PAULINO, wrote false reports, and made false statements to IAU investigators.  SHAW is a resident of Massachusetts and is sued in his individual and official capacities.

15.     During all relevant times, Defendant Steven Kenneway ("KENNEWAY" or "SUPERINTENDENT KENNEWAY") was employed by MA DOC as the Superintendent of SBCC.  In that role, KENNEWAY was responsible for the overall operation of SBCC, including

7

the care, custody and control of prisoners housed at SBCC, the physical plant of SBCC, and the safety of prisoners, staff, and visitors. KENNEWAY was involved directly in planning the attack on the Plaintiffs, the retaliation against Black and Latino prisoners, the First Amendment retaliation, and the continuing coverup of gross government misconduct. KENNEWAY also watched the attack on the Plaintiffs, failed to intervene, and failed to report other Defendants for their dereliction of duties. KENNEWAY has since retired from MA DOC. In or around 2003, KENNEWAY served as the commander of an intelligence unit which used attack dogs, torture, stress positions, fear, and intimidation to abuse prisoners at the infamous Abu Ghraib prison in Iraq. KENNWAY is a resident of the Commonwealth of Massachusetts and is sued in his individual and official capacities.

16. During all relevant times, Defendant Dean Gray ("GRAY" or "SUPERINTENDENT GRAY") was employed by MA DOC as the Superintendent of SBCC, a position he held after his predecessor, KENNEWAY, was promoted to an Assistant Deputy Commissioner position. As part of the conspiracy to retaliate for First Amendment activities, GRAY denied SILVA-PRENTICE's appeal from a baseless guilty finding that he had assaulted a correction officer, despite clear and compelling evidence that SILVA-PRENTICE was the victim of excessive force and false disciplinary charges, causing SILVA-PRENTICE to serve five (5) months in solitary confinement and to have a disciplinary record which includes a guilty finding of assault and battery on a correction officer. He is a resident of Massachusetts and is sued in his official and personal capacities.

17. During all relevant times, Defendant Raymond Turcotte ("TURCOTTE" or "COMMANDER TURCOTTE") was employed by the MA DOC as a Captain and the Commander of the HRT. TURCOTTE was involved directly in planning the surprise attack on the Plaintiffs,

8

the retaliation against Black and Latino prisoners, and the continuing coverup of gross government misconduct. He watched as other Defendants used excessive force on the Plaintiffs, failed to intervene to stop the abuse, and failed to report other Defendants for their dereliction of duties. TURCOTTE is a resident of the Commonwealth of Massachusetts. He is sued in his individual and official capacities.

18. During all relevant times, Defendant Joseph Freitas ("FREITAS" or "COMMANDER FREITAS") was employed by MA DOC as a lieutenant and as the Commander of the CIRT. Upon information and belief, FREITAS was involved directly in planning the surprise attack on the Plaintiffs, the retaliation against Black and Latino prisoners and the continuing coverup of gross government misconduct. FREITAS watched as other Defendants used excessive force on the Plaintiffs, failed to intervene to stop the abuse, and failed to report other Defendants for their dereliction of duties. He is sued in his individual and official capacities.

19. During all relevant times, Defendant Mark O'Reilly ("O'REILLY" or "COMMANDER O'REILLY") was employed by MA DOC as a Sergeant and Commander of the K9 Unit, which uses dogs to search for drugs and attack prisoners. O'REILLY commanded his dog to attack and maul PAULINO, watched as other Defendants used excessive force on the Plaintiffs, participated in the First Amendment retaliation, and is directly involved in the ongoing coverup of gross government misconduct. He is a resident of the Commonwealth of Massachusetts and is sued in his individual and official capacities.

20. During all relevant times, Defendant Jeffrey Souza ("SOUZA" or "CAPT. SOUZA") was employed by MA DOC as a Captain and member of the HRT. He watched as other Defendants used excessive force, failed to intervene, failed to report other Defendants for their dereliction of duties, and is involved directly in the First Amendment retaliation and ongoing

9

coverup of gross government misconduct.  SOUZA is a resident of the Commonwealth of Massachusetts. He is sued in his individual and official capacities.

21.     During all relevant times, Defendant Jason L. Lanpher ("LANPHER" or "CAPT. LANPHER") was employed by the MA DOC as a Captain and member of the HRT. He attacked PAULINO without justification, watched as other Defendants used excessive force on the Plaintiffs, failed to intervene, failed to report other Defendants for their dereliction of duties, and is involved directly in the ongoing coverup of gross government misconduct.   He is a resident of the Commonwealth of Massachusetts and sued in his individual and official capacities.

22.     During all relevant times, Defendant James Allain ("ALLAIN" or "LT. ALLAIN") was employed by MA DOC as a Lieutenant and member of the HRT. He attacked the Plaintiffs without justification, watched as other Defendants used excessive force on the Plaintiffs, failed to intervene, failed to report other Defendants for their dereliction of duties, and is involved directly in the First Amendment retaliation and the ongoing coverup of gross government misconduct.  He has since retired from MA DOC. ALLAIN is a resident of the Commonwealth of Massachusetts and is sued in his individual and official capacities.

23.     During all relevant times, Defendant Paul Birri ("BIRRI" or "LT. BIRRI") was employed by MA DOC as a lieutenant and served as a member of the HRT. He attacked SILVA-PRENTICE without justification, watched as other Defendants used excessive force on the Plaintiffs, failed to intervene, failed to report other Defendants for their dereliction of duties, and is involved directly in the ongoing coverup of gross government misconduct.  He is a resident of the Commonwealth of Massachusetts and is sued in his individual and official capacities.

24.     During all relevant times, Defendant Stuart McCulloch ("MCCULLOCH" or "LT. MCCULLOCH") was employed by MA DOC as a lieutenant and member of the HRT. He attacked

10

PAULINO without justification, watched as other Defendants used excessive force on the Plaintiffs, failed to intervene, failed to report other Defendants for their dereliction of duties, and is involved directly in the First Amendment retaliation and ongoing coverup of gross government misconduct. He is a resident of the Commonwealth of Massachusetts and is sued in his individual and official capacities.

25. During all relevant times, Defendant Dennis Breslin ("BRESLIN" or "SGT. BRESLIN") was employed by MA DOC as a sergeant and member of the HRT. He attacked SILVA-PRENTICE without justification, watched as other Defendants used excessive force on the Plaintiffs, failed to intervene, failed to report other Defendants for their dereliction of duties, and is involved directly in the First Amendment retaliation and the ongoing coverup of gross government misconduct. BRESLIN is a resident of the Commonwealth of Massachusetts and is sued in his individual and official capacities.

26. During all relevant times, Defendant Robert D'Amadio ("D'AMADIO" or "SGT. D'AMADIO") was employed by MA DOC as a sergeant and member of the HRT. He attacked PAULINO without justification, watched as other Defendants used excessive force on the Plaintiffs, failed to intervene, failed to report other Defendants for their dereliction of duties, and is involved directly in the First Amendment retaliation and the ongoing coverup of gross government misconduct. He is a resident of the Commonwealth of Massachusetts and is sued in his individual and official capacities.

27. During all relevant times, Defendant James F. Murphy ("MURPHY" or "LT. MURPHY") was employed by MA DOC as a lieutenant and member of the HRT. He attacked SILVA-PRENTICE without justification, watched as other Defendants used excessive force on the Plaintiffs, failed to intervene, failed to report other Defendants for their dereliction of duties,

11

and is involved directly in the ongoing coverup of gross government misconduct. He is a resident of the Commonwealth of Massachusetts and sued in his individual and official capacities.

28. During all relevant times, Defendant FNU Lawless ("LAWLESS") was employed by MA DOC as a correctional officer. He is involved directly in the ongoing coverup of gross government misconduct. He is a resident of the Commonwealth of Massachusetts and is sued in his individual and official capacities.

29. During all relevant times, Defendant Thomas Merlino ("MERLINO" or "SGT. MERLINO") was employed by MA DOC as a Sergeant and member of the HRT. He watched as other Defendants used excessive force on the Plaintiffs, failed to intervene, failed to report other Defendants for their dereliction of duties, and is involved directly in the First Amendment retaliation and the ongoing coverup of gross government misconduct. He is a resident of the Commonwealth of Massachusetts and is sued in his individual and official capacities.

30. During all relevant times, Defendant Raymond Harvey ("HARVEY" or "SGT. HARVEY") was employed by MA DOC as a Sergeant and member of the K9 Unit. He was involved directly in creating a climate of chaos and terror as other Defendants attacked and used excessive force on the Plaintiffs, failed to intervene, failed to report other Defendants for their dereliction of duties, and is involved directly in the First Amendment retaliation and the ongoing coverup of gross government misconduct. He is a resident of the Commonwealth of Massachusetts and is sued in his individual official capacities.

31. During all relevant times, Defendant Evan Laranjo ("LARANJO" or "CO LARANJO") was employed by MA DOC as a correction officer and member of the K9 Unit. He was involved directly in creating a climate of chaos and terror as other Defendants attacked and used excessive force on the Plaintiffs, failed to intervene, failed to report other Defendants for their

dereliction of duties, and is involved directly in the First Amendment retaliation and ongoing coverup of gross government misconduct. He is a resident of the Commonwealth of Massachusetts and is sued in his individual and official capacities.

32. During all relevant times, Defendant Daniel Paul ("PAUL" or "CO PAUL") was employed by MA DOC as a correction officer and member of the K9 Unit. He was involved directly in creating a climate of chaos and terror as other Defendants attacked and used excessive force on the Plaintiffs, failed to intervene, failed to report other Defendants for their dereliction of duties, and is involved directly in the First Amendment retaliation and the ongoing coverup of gross government misconduct. He is a resident of the Commonwealth of Massachusetts and is sued in his individual and official capacities.

33. During all relevant times, Defendant Jamie Marchand ("MARCHAND" or "CO MARCHAND") was employed by MA DOC as a correction officer. He watched other Defendants use excessive force on the Plaintiffs, failed to intervene, failed to report other Defendants for their dereliction of duties, and is involved directly in the First Amendment retaliation and the ongoing coverup of gross government misconduct. He is a resident of the Commonwealth of Massachusetts and is sued in his individual and official capacities.

34. During all relevant times, Defendant Katie Appel ("APPEL" or "SGT. APPEL") was employed by MA DOC as a Sergeant in the Internal Affairs Unit. She was directly involved in the planning and executing the ongoing coverup of gross government misconduct. APPEL has since resigned her position with MA DOC and is now employed as a police officer in Norfolk, Massachusetts. She is a resident of the Commonwealth of Massachusetts and is sued in her individual and official capacities.

13

35.     During all relevant times, Defendant Michael Thomas ("THOMAS" or "SGT. THOMAS") was employed by MA DOC as a Sergeant in the Internal Affairs Unit. THOMAS was directly involved in planning and executing the ongoing coverup of gross government misconduct, the First Amendment retaliation, and failed to report other Defendants for their dereliction of duties. He is a resident of the Commonwealth of Massachusetts and is sued in his individual and official capacities.

36.     During all relevant times, Defendant Robert Southworth ("SOUTHWORTH" or "SGT. SOUTHWORH") was employed by MA DOC as a sergeant. At the behest of DOE Defendants, SOUTHWORTH used excessive force on SILVA-PRENTICE without justification and in retaliation for SILVA-PRENTICE's First Amendment activities. He is a resident of the Commonwealth of Massachusetts and is sued in his individual and official capacities.

37.     During all relevant times, Defendant Brian Mulvey ("MULVEY" or "SDO MULVEY") was employed by MA DOC as a Special Disciplinary Officer. MULVEY participated in the First Amendment retaliation and the ongoing coverup of gross government misconduct by prosecute disciplinary charges against PAULINO and SILVA-PRENTICE that he knew to be false, suppressing exculpatory evidence, and suborning perjury. He is a resident of Massachusetts and is sued in his individual and official capacities.

38.     Defendant Jennifer Redd ("REDD" or "SHO REDD") was employed by MA DOC as a Lieutenant and Special Hearing Officer. REDD was directly involved in planning and executing the ongoing coverup of gross government misconduct, the First Amendment retaliation, and failed to report other Defendants for their dereliction of duties, and. entered findings of guilt against PAULINO and SILVA-PRENTICE despite overwhelming evidence of their innocence.

14

REDD is a resident of the Commonwealth of Massachusetts and is sued in her individual and official capacities.

39. The true names and capacities of Defendants DOES 1 through 20 are presently unknown to Plaintiffs, who therefore sues them by such fictitious names. Plaintiffs are informed and believe that each of the fictitiously named defendants are responsible in some capacity for the matters herein alleged. Plaintiffs will amend this Complaint to state the true names and capacities of DOES 1 through 20 when they are ascertained.

## FACTS RELEVANT TO ALL COUNTS

40. In 1998, the MA DOC opened a new maximum-security prison, the Souza-Baranowski Correctional Center ("SBCC") in Shirley, Massachusetts. SBCC is named after MA DOC employees who were killed by a prisoner at MCI Norfolk in 1972.

41. The SBCC complex has a mid-section of common areas with housing units off to each side: one side is designated as the North Side and the other as the South Side. The complex is designed to hold up to 1,427 male prisoners.

42. In 2018, KENNEWAY took the position of Superintendent of SBCC with the responsibility of overseeing all operational aspects of the facility.

43. In December 2018, TURCO was appointed Secretary of the Executive Office of Public Safety and Security ("EOPSS"), responsible for the policy development and budgetary oversight of agencies involved in crime prevention, including the Massachusetts Department of Corrections ("MA DOC") and its programs.

44. In 2019, MICI was appointed Commissioner of the Massachusetts Department of Corrections, overseeing all sixteen state correction facilities, including SBCC.

15

45.     As of January 9, 2020, SBCC prisoners had been separated on the North and South sides by gang affiliations and known enemies to reduce the number of prisoner-on-prisoner assaults and for the safety and security of SBCC and MA DOC employees, prisoners, vendors, contractors, and visitors.

### The January 10th Altercation

46.     By January 2020, SUPERINTENDENT KENNEWAY knew or should have known that long-simmering tensions between SBCC staff and prisoners on the North Side unit known as "N1" unit had the potential to boil over.

47.     As relevant here, the problems began in or before 2015, when one of the N1 prisoners obtained a court order which required MA DOC to reassign one of the unit officers because of a prior altercation between that officer and prisoner. Despite multiple requests, MA DOC refused to obey the court order and the officer was not reassigned.

48.     The tensions between SBCC prisoners and the N1 unit officers finally reached their breaking point on January 10, 2020. On that day, a spontaneous altercation broke out between approximately sixteen (16) prisoners and four (4) correction officers. LT. BIRRI is one of the N1 officers who responded to the January 10th altercation.

49.     By the time the altercation ended, three officers were injured, two of whom were badly injured and required hospitalization.   Within hours of the assaults, SBCC and MA DOC staff identified the prisoners suspected to be involved in the January 10th altercation and moved them to other facilities.

50.     As the Superintendent of SBCC, KENNEWAY was responsible for investigating and responding to the January 10th altercation.

16

51. On January 10, COMMISSIONER MICI declared that SBCC was in a state of "disorder" and invoked MA DOC's "disorder policy" which, according to MA DOC, is a "private" policy.

52. Citing the "private" "disorder policy," COMMISSIONER MICI ordered SUPERINTENDENT KENNEWAY to institute a 24-hour lockdown; to shut off all prisoner telephones; to exclude attorneys from attorney-client visits with prisoners; and to shut down CorrLinks, the system prisoners use to exchange email messages with their attorneys, friends, and family.

53. Within 24-hours of the January 10th altercation, upon information and belief, SECRETARY TURCO, COMMISSIONER MICI, SUPERINTENDENT KENNEWAY, DC HENDERSON, DIRECTOR PRIMACK, and other MA DOC and EOPSS administrators and employees knew from multiple interviews conducted by SBCC investigators and internal communications that the January 10th altercations were not planned, as MA DOC claimed then and continues to claim now. Rather, the Defendants knew that the altercation was spontaneous and in response to the actions of one of the injured officers and long-simmering tensions on the N1 unit.

**The Conspiracy to Retaliate Against Black and Latino Prisoners**

54. All prisoners later charged for assault on January 10th are Black or Latino.

55. SILVA-PRENTICE is Black. PAULINO is Latino. Neither was involved in the altercation, as the Defendants knew during all relevant times.

56. Within days of the January 10th altercation, SECRETARY TURCO and DEFENDANT MICI ordered more than one hundred (100) MA DOC employees to respond in a paramilitary display of force and intimidation designed to show the SBCC prisoners who was "in charge" of SBCC. These MA DOC employees ordinarily work at MA DOC facilities across the

17

Commonwealth, did not wear nametags, and were largely unknown to SBCC prisoners. They are specially trained to use violence, weapons, and intimidation tactics and who volunteer to serve on the Critical Incident Response Team ("CIRT"), the Hostage Rescue Team ("HRT"), and K9 unit (which acted in combination and collectively as quasi-paramilitary squads at SBCC and are referred to herein as "squads"), all of which fall under MA DOC's Special Operations Division which was headed by DIRECTOR PRIMACK.

57. SECRETARY TURCO and COMMISSIONER MICI gave these squads the green light to respond to the January 10th altercations as they saw fit even though the prisoners responsible for assaulting the N1 unit officers had been moved out of SBCC within hours of the assaults and no one left in the facility had any involvement whatsoever.

58. With the express approval of SECRETARY TURCO, COMMISSIONER MICI, DC HENDERSON, ADC DEPALO and DIRECTOR PRIMACK, the squads took control of SBCC on or before January 21, 2020.

59. In concert with SECRETARY TURCO, COMMISSIONER MICI, DC HENDERSON, ADC DEPALO, DIRECTOR PRIMACK, COMMANDER TURCOTTE, COMMANDER FREITAS, and COMMANDER O'REILLY, the squads created a climate of violence, fear, and intimidation intended to show the scores of remaining Black and Latino prisoners that MA DOC employees were "in charge" of SBCC, not them. These officers wore military-type uniforms, helmets, and body armor and carried an arsenal of weapons, including but not limited to assault-rifle type firearms which shoot "pepper ball" projectiles; canisters of "OC" (a chemical agent painful to the skin); specialty impact devices; and electronic control devices ("ECD"), more commonly known as "tasers." Officers in the K9 Unit patrolled SBCC with dogs to attack and/or terrorize SBCC prisoners.

60.     Under the supervision of DC HENDERSON, ADC DEPALO, DIRECTOR PRIMACK, COMMANDER TURCOTTE, COMMANDER FREITAS, COMMANDER O'REILLY, and SUPERINTENDENT KENNEWAY, the paramilitary squads committed multiple acts of unjustified violence, threats of violence, intimidation, and blatant retribution.

61.     As this officially sanctioned reign of terror was occurring, MA DOC and SBCC officials began publicly asserting that the January 10th altercations were planned and coordinated by leaders of the Latin Kings and other gangs, and that gang members were planning additional staff assaults.  These assertions were knowingly false when made.

62.     On and between January 10 and 20, the squads assaulted dozens of prisoners with their fists, shod feet, ECDs, and chemical weapons, creating an atmosphere rife with fear.

63.     Before, during, and after the calculated and concerted plan to retaliate against Black and Latino prisoners, the Defendants sought to minimize the chance they would be caught by locking out attorneys and cutting off all contact between SBCC prisoners and the outside world.

**The Shakedown**

64.     As ordered by SECRETARY TURCO, COMMISSIONER MICI, DC HENDERSON, ADC DEPALO, DIRECTOR PRIMACK, CAPT. TURCOTTE, LT. FREITAS, and SUPERINTENDENT KENNEWAY, the paramilitary squads began an institution-wide shakedown to search every prisoner, every unit, every cell, and every piece of property owned or used by prisoners.  The shakedown began on January 21 and ended January 24, 2020.

65.     During this same time, COMMISSIONER MICI ordered that SBCC be "reorganized."  Under COMMISSIONER MICI's order, prisoners were no longer separated on the North and South sides by gang affiliations and known enemies. Instead, prisoners who

19

COMISSIONER MICI deemed to present a threat to safety and security were sent to the North Side and the remaining prisoners were sent to the South Side.

66.     During the shakedown and its aftermath, none of the squad members wore nametags, contrary to MA DOC's policies, nor did they record on video their identities and the numbers on their helmets on video, as required by MA DOC's policy on forcible moves of prisoners, 103 DOC 503. The reason for not wearing nametags and not recording helmet numbers on video was to conceal the participating officer's involvement in the civil rights violations described in this Complaint.  As such and as was the intent of the Defendants, many prisoners were unable to identify which squad members forcibly entered their cells, called them racial and ethnic slurs, beat them, kicked them with shod feet, shot and sprayed them with chemical agents, commanded dogs to attack, and/or committed other acts of misconduct.

67.     Members of the K9 unit and their attack dogs patrolled the institution while other squad members, *inter alia*, forcibly entered cells, assaulted numerous prisoners without justification, and generally terrorized hundreds of prisoners, including Plaintiffs SILVA-PRENTICE and PAULINO, who had nothing to do with the January 10th altercation and who had done nothing to warrant any disciplinary action, much less the violence that they were subjected to by these officers.

68.     As the squads entered each unit, a handheld video camera with audio capabilities was placed in a stationary position to record movements within the unit.  These videos are maintained by the MA DOC Internal Affairs Unit ("IAU") on an external hard drive.

69.     Contrary to MA DOC written policies and best corrections practices, the squads routinely failed to use these or other available handheld video cameras to record forcible cell entries and extractions.

20

70. Going cell to cell, the armed squads ordered prisoners to remove their clothing, strip searched them, and provided each prisoner with a white t-shirt, a pair of white boxer-type underwear, and a pair of shower slippers.   Squad members then escorted prisoners to the gymnasium while their cells and property were searched.

71. Squad members placed handheld video cameras with audio capabilities in stationary positions inside the gymnasium. These videos are stored in an external hard drive maintained by IAU.

72. Stationary surveillance cameras also recorded video, but not audio, inside the gymnasiums and on the units, except for blind spots well known to SBCC staff and prisoners. Upon information and belief, these surveillance recordings were and remain preserved.

73. Inside the gymnasiums, the squads ordered prisoners into prolonged stress positions by standing and/or kneeling on the ground with their faces to the wall. Squad members threatened to shoot or assault prisoners who broke or were unable to maintain their stress positions.

74. While the prisoners were in the gymnasium, SBCC correction officers and/or squad members removed all property from their cells, including privileged legal mail and documents. The property was placed into bags and transported to the facilities area where SBCC's stationary surveillance cameras recorded property searches and the sorting and handling of prisoner property, including confidential legal communications and other privileged materials.

75. In the facilities area, MA DOC staff and/or squad members searched every piece of property that had been removed from prisoners' cells by hand and via fluoroscope machines. When contraband was found inside a prisoner's property inside the facilities room, the prisoner

21

was escorted from the gymnasium directly to the Restrictive Housing Unit ("RHU") to wait for a disciplinary report to be issued.

76. These searches provided cover for the rash of violence against prisoners that began on January 21 and ended January 24, 2020.

**The Storming of Cell 15**

77. Before the armed and armored squads started shaking down the Plaintiffs' unit on the second day of the shakedown, January 22, 2020, SILVA-PRENTICE had been living in Cell 21 and PAULINO in Cell 35. They knew each other but were not friends and had never been cellmates.

78. At approximately 10:00 a.m. that day, squad members separately entered Cells 21 and 35 and ordered SILVA-PRENTICE and PAULINO to strip down. They gave SILVA-PRENTICE and PAULINO each a white t-shirt, a pair of white boxer shorts, and a pair of shower slippers, then escorted them to the gymnasium without incident.

79. SBCC staff and/or armed squad members separately escorted SILVA-PRENTICE and PAULINO to the gymnasium. SILVA-PRENTICE and PAULINO obeyed all orders during the escorts, which were completed without incident.

80. While SILVA-PRENTICE and PAULINO were inside the gymnasium, squad members and/or SBCC staff removed every piece of property from their cells, including their legal documents and personal tablets, threw their belongings into bags, and wheeled their property to the SBCC facilities area for hand and fluoroscope searches, where a five-inch homemade knife was found inside PAULINO's property. The knife was removed and inventoried.

81. The squad members and/or SBCC staff conducting searches inside the facilities area lost or misplaced SILVA-PRENTICE's legal documents, including multiple volumes of trial

22

transcripts and a draft of his appellate brief, later causing his court-appointed appellate counsel to delay his direct appeal for months.

82.     Inside the gymnasium, SILVA-PRENTICE and PAULINO, along with dozens of other prisoners, were forced to stand and/or kneel facing the wall for at least two hours with their hands cuffed behind their backs. As the prisoners tried to maintain their stress positions for fear of being shot or mauled by dogs, members of COMMANDER O'REILLY's K9 Unit patrolled the room with their attack dogs. The dogs snuck up on prisoners, sniffed their genitals and buttocks, growled and barked, further contributing to the terrorizing conditions designed and implemented by the Defendants.  In addition, armed squad members pointed their firearms, ECDs and lasers at prisoners, sometimes threatening to shoot if anyone moved or averted their gaze away from the wall.

83.     The climate inside the gymnasium was tense and hostile, as the Defendants designed and intended it to be. Given the threats and the threatening atmosphere described above, SILVA-PRENTICE felt anxious, and fearful that he would be killed by an armed squad member and/or an attack dog.

84.     Approximately two hours after SILVA-PRENTICE arrived at the gymnasium, an unknown squad member shouted to him, "What's your name?"  No other prisoners inside the gym were asked for their names.

85.     Before leaving the gymnasium, SILVA-PRENTICE and PAULINO were cleared through body scanners. When a prisoner clears a body scanner, the squad members know that the prisoner does not possess any contraband or weapons on his person.

**The Defendants Change Plaintiffs' Cell Assignments**

86.     Once SILVA-PRENTICE and PAULINO cleared the body scanners, SBCC staff and/or armed squad members separately escorted them back to the P2 unit.  SILVA-PRENTICE and PAULINO complied with all orders and did not commit or threaten to commit any acts of violence. By then, they had been escorted safely and without incident to and from the gymnasium.

87.     Prisoners of different races are rarely assigned to the same cell, but MA DOC documents show that SILVA-PRENTICE, who is Black, and PAULINO, who is Latino, were assigned to Cell 13 on the P2 unit.  SECRETARY TURCO, DC HENDERSON, DIRECTOR PRIMACK, COMMANDER TURCOTTE, COMMANDER FREITAS, COMMANDER O'REILLY, and/or SUPERINTENDENT KENNEWAY decided instead to put PAULINO in Cell 15, which is well-known by prison staff to be a "shit bag" cell, meaning the cell is in a blind spot which is largely outside the view of unit surveillance cameras, thus making it impossible to record any wrongdoing by correctional officers occurring there.

88.     Approximately an hour after the Defendants put PAULINO in Cell 15, SBCC staff and/or armed squad members brought SILVA-PRENTICE to join PAULINO.  The Defendants knew that neither SILVA-PRENTICE nor PAULINO possessed weapons or contraband of any kind. They also knew that Cell 15 had been thoroughly searched and emptied that same morning and was barren of all property, weapons, and contraband.

**DC HENDERSON Orders the Surprise Attack on PAULINO**

89.     During or prior to the time that PAULINO was inside the gym, DC HENDERSON, ADC DEPALO, DIRECTOR PRIMACK, CAMMANDER TURCOTTE, COMMANDER FREITAS, COMMANDER O'REILLY, and/or SUPERINTENDENT KENNEWAY decided to target PAULINO for retribution for the January 10th altercation on correction officers. At that time, the Defendants knew that PAULINO had nothing to do with the January 10th altercation but

24

targeted him specifically because they believed PAULINO to be a leader of the Latin Kings at SBCC. By targeting PAULINO for a particularly brutal attack, the Defendants intended to send a message to all Black and Latino gang members that they would pay for the perceived sins of other SBCC prisoners.

90. As part of their plan for retribution, DC HENDERSON claimed to be in receipt of "intelligence" from a first-time confidential information ("CI") without any personal knowledge or indicia of reliability who, according to HENDERSON, said that PAULINO was actively planning additional assaults on unidentified MA DOC staff members. After an evidentiary hearing, SHO REDD later determined that the CI was unreliable. Upon information and belief, there is no such CI, or such person is so unworthy of belief that the information attributed to them is fiction used by the Defendants to justify the brutal, illegal, and immoral conduct described within this Complaint.

91. Citing the tip from the alleged CI, TURCO, HENDERSON, PRIMACK, TURCOTTE, FREITAS, O'REILLY, and/or KENNEWAY concocted a plan to terrorize and nearly kill PAULINO. To that end, they hand-selected squads of armed and armored officers, K9 officers, and attack dogs to execute their plan.

92. The squad ordered to forcibly storm Cell 15 and violently remove PAULINO consisted of CAPT. LANPHER, LT. BIRRI, LT. ALLAIN, LT. MCCULLOCH, LT. MURPHY, SGT. D'AMADIO, and SGT. BRESLIN (referred to herein collectively as the "Cell 15 squad"). The K9 component of the Cell 15 squad consisted of SGT. O'REILLY, CO LARANJO, CO PAUL, and their specially trained attack dogs.

93. DC HENDERSON's objective was to show PAULINO and other perceived gang leaders and members who was "in charge" at SBCC and to make sure they understood that MA

DOC leadership would not hesitate before unleashing the armed and armored squads as they saw fit.

94.     HENDERSON ordered the Cell 15 squad to "crack the door" without warning and without first giving PAULINO the opportunity to "cuff up," even though HENDERSON and every other MA DOC employee on the P2 unit knew that there was no property inside Cell 15, that PAULINO had no weapons, and that PAULINO had already been twice escorted without incident that same day. The standard procedure for removing an inmate from his cell is to direct the inmate to "cuff up," meaning turn his back to the door, place his hands through the food slot to his door while the door remains closed, and voluntarily be handcuffed prior to opening the door and exiting the cell.  If PAULINO had been allowed to "cuff up," he would have been restrained before the door to Cell 15 opened and would have been safely escorted to the RHU without the need for violence.

95.     As stated in his and others' incident reports, HENDERSON ordered the surprise forcible entry to give his hand-chosen squad of armed officers a "tactical advantage" and the "element of surprise" on their side.  No such "tactical advantage" or "element of surprise" would have been necessary if HENDERSON and the Cell 15 squad members had followed the procedure to allow PAULINO the opportunity to cuff up and thus be under control from the outset.

96.     At approximately 2:36 p.m., an unknown member of the MA DOC or SBCC administration conveyed the order from HENDERSON to that team: "Crack the door, don't ask 'em!" This order is memorialized on video and audio recordings.

97.     As ordered, the Cell 15 squad snuck up on Cell 15. As shown on video, the climate on the P2 unit was generally calm, with numerous squad members walking around, chatting, and blocking the handheld video camera from recording what was happening near Cell 15.

26

98. At approximately 2:42 p.m., the team of armed guards marched toward Cell 15 and called for a unit officer to "crack the door" to Cell 15.

99. Before the door to Cell 15 opened fully, the Cell 15 squad began to scream, "Stop resisting!" even though they knew that neither PAULINO nor SILVA-PRENTICE were resisting or fighting back in any way.

100. In violation of DOC's policy on forcible moves of prisoners, CAPTAIN LANPHER did not attempt to de-escalate, did not call for an impartial staff member to attempt to de-escalate, did not ask PAULINO or SILVA-PRENTICE to "cuff up," did not warn PAULINO or SILVA-PRENTICE that force would be used if they refused to cuff up, and did not use OC spray to incapacitate PAULINO and SILVA-PRENTICE.

101. If LANPHER had complied with MA DOC's policy on forced moves of prisoners, there would have been no need to use any force on PAULINO or SILVA-PRENTICE.

102. As the door opened, CAPT. LANPHER fired his ECD at PAULINO, who was sitting on the bottom bunk. The ECD probes struck PAULINO on his upper right chest as LANPHER charged toward PAULINO, pulled him off the bottom bunk, and threw him onto the floor of Cell 15.

103. Following LANPHER's lead, LT. MCCULLOCH, SGT. D'AMADIO, LT. BIRRI, LT. ALLAIN, SGT. BRESLIN, and LT. MURPHY stormed into Cell 15, with weapons drawn and lasers pointed at PAULINO.

104. ALLAIN, BRESLIN, and/or BIRRI yanked SILVA-PRENTICE off the top bunk, immediately threw him to the floor and quickly restrained him by cuffing his hands behind his back.

27

105. While SILVA-PRENTICE was restrained with his hands cuffed behind his back and his face to the floor, ALLAIN and BRESLIN each used their ECDs to "drive stun" him to the back and/or back of his right arm. The purpose of using an ECD in "drive stun" mode is to gain compliance by causing intense pain.

106. While the Cell 15 squad violently attacked PAULINO and SILVA-PRENTICE inside Cell 15, the K9 officers – SGT. O'REILLY, CO PAUL, and CO LARANJO – stayed outside the cell with their attack dogs, whose loud barks bounced off the unit walls and echoed throughout the unit, contributing to the ongoing terror for prisoners up and down the unit.

107. As the Cell 15 squad continued their assault inside Cell 15, O'REILLY and his attack dog, Omar, stood immediately outside. Omar is seen and heard on video running in place and lunging, repeatedly, into the doorway to Cell 15.

108. As PAULINO lie on the floor of Cell 15, LANPHER, MCCULLOCH, and D'AMADIO pummeled his head and body with their fists and shod feet. They then dragged him up and threw him face down on the bottom bunk where they continued their assault, throwing elbows, punching his ribs, kicking him, and spitting on him. As all this happened, members of the Cell 15 squad called PAULINO a "Latin Queen" or "Latin Queen Bitch" and a "fucking spic."

109. As LANPHER, MCCULLOCH, and D'AMADIO pummeled PAULINO, SILVA-PRENTICE turned his head to watch. When BIRRI noticed SILVA-PRENTICE looking toward PAULINO, BIRRI kicked SILVA-PRENTICE on the side of his face.

110. While SILVA-PRENTICE was restrained and face down on the floor, LT. BIRRI pulled him to his feet, pushed him into the sink, called SILVA-PRENTICE a "f*gg*t," grabbed him by the hair, pulled a handful of his dreadlocks from his scalp, yanked him to a standing position, and pulled his boxers down, partially exposing his buttocks. As BIRRI attacked, he

28

declared that he, not the prisoners, "run[s] this jail" and called SILVA-PRENTICE a "faggot"

BIRRI pulled out at least 4 to 5 dreadlocks from SILVA-PRENTICE's head, leaving bare spots on the top, side, and back of his head.

111. At approximately 2:44 p.m. and seconds after BIRRI pulled dreadlocks from SILVA-PRENICE's scalp, ALLAIN and BRESLIN escorted SILVA-PRENTICE out of Cell 15. O'REILLY's attack dog lunged for SILVA-PRENTICE but did not make contact.

112. As a direct result of the force ordered by DC HENDERSON and perpetuated by LT. ALLAIN, LT. BIRRI, and SGT. BRESLIN, SILVA-PRENTICE suffered pain and suffering; multiple burns on his back and arm; bruises and lacerations to his legs; bruising and soreness to his face and jaw; pain on his scalp; loss of hair; and emotional distress. In violation of MA DOC's written policies and regulations, SILVA-PRENTICE was denied medical and mental health treatment following the unjustified attack ordered by HENDERSON.

113. Throughout the forcible entry and assaults inside Cell 15, SILVA-PRENTICE feared for his life.

114. Seconds after SILVA-PRENTICE was taken out of the call, MCCULLOCH and D'AMADIO escorted PAULINO – who was cuffed behind his back – out of the cell with a firm grip on each of his arms. MCCULLOCH and D'AMADIO had full control of PAULINO as they exited the cell into the hall, where other squad members, armed and wearing armor, stood within arm's reach.

115. O'REILLY commanded his dog to attack PAULINO as soon as he stepped foot into the hallway. Video of the attack clearly shows that PAULINO was not resisting in any manner and that there was no valid penological or law enforcement reason for the attack.

29

116. At no time did PAULINO break free of his restraints; attempt to break free of his restraints; kick the dog; attempt to kick the dog; or threaten to kill the dog, as squad members later falsely wrote in disciplinary and incident reports. *See below*, at ¶¶ 161 to 192.

117. As soon as PAULINO stepped into the hall, O'REILLY commanded the dog to attack PAULINO, while LARANJO's and PAUL's dogs stood close by, creating a cacophony of barks, growls, and other animal sounds.

118. O'REILLY's attack dog leaped toward PAULINO, bit his right thigh and got ahold of PAULINO's clothes.

119. As O'REILLY's dog attacked PAULINO, LT. MCCULLOCH and SGT. D'AMADIO threw him facedown to the floor. PAULINO was still restrained, with his hands cuffed behind his back.

120. As PAULINO lay helpless, face down on the floor, O'REILLY's dog continued his attack. The dog bit PAULINO's legs, ripping off his boxer shorts, causing deep puncture wounds, and tore a chunk of flesh from his upper left thigh. The officers also kneed and punched PAULINO while the dog was biting him. PAULINO's cries and howls of pain are preserved on the audio from the stationary handheld video recorder. The distress and horror from this attack by the Cell 15 squad and their dogs spread through the previously calm unit causing other prisoners to react in fear and protest by yelling and banging on their cells.

121. During the assaults inside Cell 15 and while O'REILLY's dog mauled him, PAULINO feared that the Cell 15 squad members and their attack dogs would kill him.

122. PAULINO was then pulled up on his feet – with his boxers torn off, naked from the waist down, and bleeding from the dog bites – and pushed against a wall while one of the guards shackled his ankles.

30

123.    LT. MCCULLOCH, LT. ALLAIN and/or SGT. D'AMADIO escorted PAULINO – still naked from the waist down and bleeding badly – past members of the MA DOC and SBCC administrators, superior officers, and female staff members, and to the recreation deck. While awaiting new boxer shorts, the squad members further taunted and mocked PAULINO as he stood injured and exposed. When a new pair of boxers arrived for PAULINO, his cuffs were removed so that he could put on the new boxers. Cell 15 squad members then reapplied his handcuffs and shackles. LT. ALLAIN and at least one other squad member then escorted PAULINO to the SBCC Health Services Unit ("HSU").

124.    In the HSU, PAULINO's escorts announced that his injuries were not severe enough to warrant treatment at an outside hospital and pressured the nurse on duty to clear PAULINO for immediate placement in the SBCC Restrictive Housing Unit ("RHU").  Due to the severity of his injuries, however, the nurse insisted that PAULINO be treated at an outside hospital. PAULINO lay on a gurney pretending to be passed out as he remained in fear the squad members would assault him again.

125.    CO LAWLESS and other SBCC employees escorted PAULINO to and from Leominster Hospital. When the ambulance came to SBCC to transport PAULINO to the hospital, SBCC Property Officer, Sergeant Gill, made PAULINO take off his t-shirt, tauntingly stating "it's nice outside, right?" and making PAULINO walk to the ambulance in the frigid New England January weather in only his boxer shorts while the officers laughed and mocked him.

126.    Attached as **Exhibit A** is a true and accurate copy of color photographs of PAULINO's injuries from January 22, 2020. When hospital staff asked how PAULINO sustained such serious injuries, PAULINO told them he was the victim of an unjustified attack by MA DOC employees and their attack dog. CO LAWLESS heard PAULINO and then pulled the hospital staff

aside and made false statements that PAULINO had kicked or attempted to kick the attack dog and had been involved in an assault on correctional officers at SBCC. The false statements that O'REILLY's dog attacked PAULINO because he had kicked or tried to kick the dog made their way into the medical records and were later used against PAULINO as described below.

127. When PAULINO learned that the doctor gratuitously wrote in medical records that "patient attempted to kick the dog while walking past. The dog took exception and bit his left leg…" and that the patient was "instructed not to attempt to kick police K-9s in the future," PAULINO filed a grievance asking that the false information be removed from his MA DOC medical records. The grievance was denied and LAWLESS's lie remains a part of PAULINO's medical records.

128. Prisoners accused of assaulting staff are normally brought immediately to the RHU to await a disciplinary report. ALLAIN and BRESLIN, however, returned SILVA-PRENTICE to Cell 15.

129. Not a single MA DOC employee accused SILVA-PRENTICE or PAULINO of assaulting them until the next month, on February 17, 2020, when they knew that SILVA-PRENTICE would soon testify in Suffolk Superior Court about what happened inside Cell 15 as described further below.

### The Cell 15 Squad Violated Multiple MA DOC Regulations and Policies

130. Compliance with MA DOC policies and regulations is necessary to ensure that an institution is safe and secure for prisoners, staff, vendors, and visitors, as ADC DEPALO admitted under oath.

131.    Throughout the month of January 2020, however, the squads, MA DOC and SBCC administrators, and correction officers routinely and consistently violated Massachusetts regulations and MA DOC policies, such as:

a.  CAPT. LANPHER, LT. MCCULLOCH, LT. BIRRI, LT. MURPHY, LT. ALLAIN, SGT. BRESLIN and SGT. D'AMADIO failed to use de-escalation techniques to avoid the need to use force to enter Cell 15, in violation of 103 CMR 505. 07(4).

b.  CAPT. LANPHER, LT. MCCULLOCH, LT. BIRRI and SGT. D'AMADIO failed to timely report that they had used force on PAULINO inside Cell 15, in violation of 103 CMR 505.13.

c.  LT. ALLAIN, LT. BIRRI, and SGT.BRESLIN failed to timely report that they had used force on SILVA-PRENTICE inside Cell 15, in violation of 103 CMR 505.13.

d.  CAPTAIN LANPHER did not attempt to de-escalate, did not call for an impartial staff member to attempt to de-escalate, did not ask PAULINO or SILVA-PRENTICE to "cuff up," did not warn PAULINO or SILVA-PRENTICE that force would be used if they refused to cuff up, and did not use OC spray to incapacitate PAULINO and SILVA-PRENTICE, in violation of MA DOC's policy on forcible moves of prisoners, 103 DOC 503.

e.  CAPT. LANPHER, LT. MCCULLOCH, SGT. D'AMADIO, LT. ALLAIN, SGT. BRESLIN, LT. MURPHY and LT. BIRRI used force to punish SILVA-PRENTICE, who is Black, and PAULINO, who is Latino, for the actions of the Black and Latino prisoners involved in the January 10th altercation with SBCC employees, in violation of 103 CMR 505.08(2).

f.  SECRETARY TURCO, DC HENDERSON, ADC FERREIRA, DIRECTOR PRIMACK, COMMANDER TURCOTTE, COMMANDER FREITAS, and SUPERINTENDENT KENNEWAY witnessed the Cell 15 squad commit numerous acts of excessive force yet failed to intervene, in violation of 103 CMR 505.08 and 505.16.

g.  SECRETARY TURCO, DC HENDERSON, ADC FERREIRA, ADC DEPALO, DIRECTOR PRIMACK, DIRECTOR TURCOTTE, DIRECTOR FREITAS, and SUPERINTENDENT KENNEWAY watched as COMMANDER O'REILLY commanded his attack dog to maul PAULINO yet failed to intervene, in violation of 103 CMR 505.08 and 505.16.

h.  SECRETARY TURCO, DC HENDERSON, ADC FERREIRA, ADC DEPALO, DIRECTOR PRIMACK, DIRECTOR TURCOTTE, DIRECTOR FREITAS, and SUPERINTENDENT KENNEWAY failed to timely report that they had witnessed

33

multiple instances of unlawful and excessive force in violation of 103 CMR 505.08 and 505.16.

i. The Cell 15 squad was not debriefed in violation of 103 CMR 505.14.

j. KENNEWAY failed to arrange for medical providers and mental health clinicians to be present on the P2 unit during the shakedown in violation of 103 CMR 505.15 and 103 DOC 561.

k. SILVA-PRENTICE was deprived of medical and mental health care immediately after he was attacked, in violation of 103 CMR 505.15;

l. SBCC and MA DOC administrators failed to assign a squad member to record what happened inside and outside Cell 15 in violation of 103 DOC 503.

### The Shakedown Ends

132. The shakedown concluded on its fourth day, January 24, 2020.

133. More than one hundred (100) prisoners, including PAULINO and SILVA-PRENTICE, filed grievances reporting that on and between January 10 and March 1, 2020, they were the victims of excessive force, racial discrimination and intimidation, sexual assault, and deliberate indifference to their imminent needs for mental health treatment, the latter of which resulted in at least two attempted suicides.

134. MA DOC denied each prisoner grievance that alleged staff misconduct on and between January 10 and March 1, 2020, well knowing that their denials were knowingly false.

### Photographs of SILVA-PRENTICE's Injuries

135. Contrary to MA DOC practice and regulations and as part of the Defendants' conspiracies to retaliate against Black and Latino prisoners and to coverup the mass brutality at SBCC, SUPERINTENDENT KENNEWAY failed to ensure that staff photograph the injuries inflicted upon SILVA-PRENTICE during the violent storming of Cell 15 on January 22, 2020.

136. On February 7 – approximately two weeks after the brutal assault inside Cell 15 and one day after learning that no photographs had been taken – SILVA-PRENTICE's counsel

34

requested that photographs be taken of the injuries inflicted by LT. ALLAIN, LT. BIRRI, and SGT. BRESLIN as provided in MA DOC policies and best corrections practices. The request was denied.

137. Because MA DOC refused to comply with its own policy and best corrections practices which mandate that prisoner injuries be photographed and/or otherwise documented, SILVA-PRENTICE's attorney returned to SBCC with a camera on February 12. By then twenty-one (21) days had passed since LT. ALLAIN, LT. BIRRI, and SGT. BRESLIN inflicted physical injuries upon SILVA-PRENTICE.

138. While accompanied by an officer in SBCC's Inner Perimeter Security ("IPS") department, SILVA-PRENTICE's counsel and the IPS officer photographed SILVA-PRENTICE's remaining injuries.

139. The photographs (true and accurate color copies attached as **Exhibit B**) show several round evenly spaced burns on SILVA-PRENTICE's upper right back and the back of his right arm, the dreadlocks that LT. BIRRI yanked off SILVA-PRENTICE's head, and those areas of SILVA-PRENTICE's scalp where the dreadlocks had been torn. The bruises on his face and leg had faded during the three-week delay in obtaining photographs of injuries which were indisputably inflicted by armed members of the Cell 15 squad.

140. As an expert emergency room physician retained by the New England Innocence Project opined in his affidavit, the small, round and evenly spaced wounds on SILVA-PRENTICE's back and the back of his right arm are, to a reasonable degree of medical certainty, consistent with the type of injuries caused when an ECD is used to drive stun a prisoner. As SGT. BRESLIN would later admit in sworn testimony, the wounds are consistent with SILVA-

35

PRENTICE being drive stunned to the back while lying face-down with his hands cuffed behind his back.

### Plaintiffs' First Amendment Activities

141.    SILVA-PRENTICE and PAULINO engaged in First Amendment activities to report what happened to them on January 22 inside and outside Cell 15 on January 22, 2020.

142.    Shortly after PAULINO was beaten, tasered, kicked, and mauled by SGT. O'REILLY's attack dog, he exercised his constitutional right to petition government by meeting with one or more elected members of the Massachusetts House of Delegates who visited SBCC after hearing reports of the brutality and violence committed by the armed and armored squads. PAULINO reported to them what had occurred, showed them his injuries, and asked for their help.

143.    On January 31, 2020, PAULINO submitted Grievance #106888 (a true and accurate copy attached as **Exhibit C**), which states [sic]:

> On Jan 22, 2020 at Approximately 8:00Am-8:30Am. They did a shakedown in the Housing Unit. where I was placed at (p-2) – in the process of that search they found a home weapon in my property witch was in my cell, where I was a rummer/worker for the Unit. Anyhow, after the shakedown was over. 'Around 11:45AM-1:30pm they did not follow proper procedures. By sending me starting to "SMU." Instead, they brought me back to the Unit (p-2). And put me in cell #15 with a cellmate. And about 40-45 minutes later I was sitting on my bunk while my cellmate was laying down. And then the officers "The tactical Team" [the Cell 15 squad] approached my cell. In a sneaky manner and didn't follow proper procedures. By handcuffing me or my cellmate. Instead, they opened the door, and right away shot me with the tazzer gun. And used intensive force and malice towards me. Assaulted me real bad while saying races things. And since I'm STG labelled a Latin King. They also called me a Latin Queen Bitch. And that all Latin Kings are Bitches. in witch I right away understood why I was being targeted in a Retaliation Fashion when in all reality I did nothing wrong. Then when they escorted me out the cell. They attack me. I was biten by the Dog on the tier. In front of the whole Unit when Dog Ripped my Boxers off. And I was escorted out the Unit naked. While leaving the Unit, I observed the Superintendent and other higher ups being present. After arriving to the HSU, the nurses and doctor had to call an ambulance for an emergency because I was brutally assaulted. And the Dog Bite Wound were serious. I was treated at the "Leomester" Hospital. Where there I was given stitches for the wounds and I was in the HSU after for a whole week. Where I was being

monitored heavy and driking strong medication for the wounds.

144.     Also on January 31, 2020, SILVA-PRENTICE submitted Grievance # 106794 (a true and accurate copy attached as **Exhibit D**), which states:

> On Jan.22.2020 2:30-3:30 pm I was in my cell (15) on P2 on the top bunk when several officers with tazers and guns ran in my cell and ripped me off the top bunk, put me in cuffs and started to pun, kick and tase me several times for no apparent reason I was not a threat to noone. All I had in the cell wher Boxers and shirt so they had no reason to run in my cell. The Dog Bite my cellie while he was in cuffs Also the officers pulled down my Boxers and had my Buttcheeks exposed. Earlier that Day while the unit was in my gym a officer picked me out of everyone and asked me my name. I don't know if that had to do with anything But it seems to me I was setup.

145.     On the same day that he and PAULINO filed their grievances, SILVA-PRENTICE, two other prisoners, the Committee for Public Counsel Services ("CPCS"), and the Massachusetts Association of Criminal Defense Lawyers ("MACDL") filed a complaint for declaratory and injunctive relief against SECRETARY TURCO, COMMISSIONER MICI and SUPERINTENDENT KENNEWAY in Massachusetts Suffolk Superior Court in the case entitled *Larocque, et. al. v. Turco, et al.*, Civil Case No. 2084CV00295 (herein referred to as "*Larocque v. Turco*"). A copy of the *Larocque v. Turco* docket is attached as **Exhibit E**.[1]

146.     On February 13 and 19, 2020, the Suffolk Superior Court (Cannone, J.) conducted a two-day evidentiary hearing in *Larocque* v. *Turco* on SILVA-PRENTICE's and the other plaintiffs' motion for a preliminary injunction, which sought an order directing SECRETARY TURCO, COMMISSIONER MICI, and SUPERINTENDENT KENNEWAY to restore attorney

---

[1]     In the *Larocque v. Turco* case, the plaintiffs allege that their constitutional rights to counsel and access to the courts were violated during the SBCC lockdown in January 2020 as during that time they were deprived of access to their legal paperwork, telephone calls with their attorneys, and attorney contact visits. The plaintiffs seek equitable relief only and have not asserted any claims for damages such as those asserted by SILVA-PRENTICE and PAULINO here.  At the time of the filing of this Complaint, the preliminary injunction is still in effect, but the case is still in the discovery stage and is not yet set for trial or otherwise resolved.

visits, increase out of cell time on the North Side to allow prisoners sufficient time during business hours to call their attorneys, and to compel the Defendants to return thousands of pages of illegally seized, privileged legal documents.

147. On February 28, the Court (Cannone, J.) issued findings of fact and the requested preliminary injunction (a true and accurate copy of which is attached as **Exhibit F**) including findings that the implementation of the restrictions at issue in that case – denial of attorney access – were "an exaggerated response to the serious security concerns" alleged by DOC, that SILVA-PRENTICE testified credibly, and that KENNEWAY's testimony was not credible in certain respects. *See,* Ex. F, Order at pp. 10-12.

**First Amendment Retaliation**

148. The conspiracy to retaliate against Plaintiffs for exercising their First Amendment rights and the associated coverup had its genesis on or about January 31, 2020, when PAULINO and SILVA-PRENTICE submitted their grievances and SILVA-PRENTICE filed suit in *Larocque v. Turco*. From then and at least through the time this Complaint is filed, the Defendants continue to engage in an ongoing conspiracy to retaliate against the Plaintiffs, defeat a federal and/or independent investigation, and to enforce the MA DOC code of silence.

**KENNEWAY and DEPALO's False Testimony**

149. As stated above, SUPERINTENDENT KENNEWAY knew by January 11 that the January 10th assaults were not planned by Latin Kings or anyone else. On February 7, 2020, however, KENNEWAY, gave sworn testimony in *Larocque v. Turco* in the form of an affidavit, falsely attesting as indicated in **bold** below:

> On December 4, 2019, there was an earlier assault on a staff member at SBCC. This assault led to a lockdown of the prison. Intelligence information gathered after this assault determined that the December 4 assault was planned by four inmates. After the December 4 assault, we received multiple credible threats of future planned

38

assaults on staff. Intelligence fathering determined that the assaults on staff "were not over" and were "going to happen again."

**On January 10, 2020, those threats culminated in the vicious and severe assault on four staff members. … Intelligence information gathered after the assaults has shown that the assaults were planned; the inmates even held planning meetings. It did not matter in what block the staff assaults were to occur, just that the inmates involved wanted to severely assault staff.**

150.    In the first day of his live testimony in Suffolk Superior Court on February 13 and in furtherance of the conspiracies to target Black and Latino prisoners, to retaliate for First Amendment activities, and to cover up the mass brutality at SBCC in January 2020, SUPERINTENDENT KENNEWAY knowingly and falsely testified, as indicated in the **bolded** text, as follows:

    a.  "**We had a very significant serious planned assault** on four – on two staff members on the block, and it – it ended up involving four staff members who were viciously assaulted by up to 23 inmates."

    b.  "[The January 10th assault] was a **very significant, serious, well-planned assault**."

    c.  "[The January 10th altercation] was a **deliberate assault, planned and approved by groups within the facility. It involved multiple gangs. Our intelligence suggested that this was an approved assault**."

    d.  "The other intelligence we were receiving focused squarely on the fact that **this is not over, there would be additional assaults on staff. There was an extreme amount of threatening statements made to staff who were still in the units. Anyone who came into the units were threatened. There were threats to rape our staff members. There were threats to murder our staff members. I was threatened to be stabbed in the neck first opportunity that the inmates had. … [M]ost of the people working in that facility [SBCC] had been threatened in some way, shape or form by somebody doing this.**"

    e.  "Our intelligence suggested that the **inmates are still planning assaults**."

    f.  "I haven't seen anything like that in 31 years, where there was **a concerted effort to take out officers.**"

151.    At no time during his testimony on February 13 did SUPERINTENDENT

KENNEWAY allege or even hint that either SILVA-PRENTICE or PAULINO was involved in any way with any of the violence that he described.

152. Immediately after the February 13 hearing and through February 18, DOE defendants illegally seized and reviewed SILVA-PRENTICE's confidential legal notes for the *Larocque v. Turco* case. There was no penological or other justification for this intrusion into SILVA-PRENTICE's attorney-client relationship, confidentiality, and access to courts.

153. On February 19, SILVA-PRENTICE testified about the illegal seizure of his legal paperwork, his inability to call or meet with the attorney handling his direct appeal, and the Cell 15 squad's violence, intimidation, and general misconduct. As the Court would later note in written findings, SILVA-PRENTICE's testimony was truthful, credible, and compelling, unlike certain aspects of KENNEWAY's testimony which the Court would later reject as not credible.

154. After SILVA-PRENTICE concluded his testimony, MA DOC in-house lawyers recalled KENNEWAY to the stand in a failed attempt to discredit SILVA-PRENTICE's compelling and credible testimony.

155. In furtherance of the conspiracies to target Black and Latino prisoners, to retaliate for First Amendment activities, and to cover up the mass brutality at SBCC in January 2020, KENNEWAY accused SILVA-PRENTICE, for the first time and from the witness stand, of assaulting non-specified "staff" inside Cell 15, knowing such accusation to be false.

156. In furtherance of the conspiracies to target Black and Latino prisoners, to retaliate for First Amendment activities, and to cover up the mass brutality at SBCC in January 2020, KENNEWAY knowingly and falsely testified that a disciplinary report accusing SILVA-PRENTICE of assaulting "staff" had been written on or before January 30, when the Plaintiffs

filed their grievances and SILVA-PRENTICE filed suit in *Larocque v. Turco*, and that the disciplinary report was still "pending" on the day of this false testimony. In fact, and as known to SUPERINTENDENT KENNEWAY at the time of his testimony, there was no such "pending" disciplinary report prior to January 31 or even on the day of KENNEWAY's testimony.

157. In furtherance of the conspiracies to target Black and Latino prisoners, to retaliate for First Amendment activities, and to cover up the mass brutality at SBCC in January 2020, and to intimidate SILVA-PRENTICE from pursuing his meritorious claims for declaratory, injunctive, and monetary relief, KENNEWAY further testified that the alleged "pending" disciplinary charges against SILVA-PRENTICE were so severe that they carried the possibility of up to ten (10) years in solitary confinement inside the infamous Department Disciplinary Unit ("DDU") at MCI Cedar Junction in Walpole, Massachusetts.

158. In furtherance of the conspiracies to target Black and Latino prisoners, to retaliate for First Amendment activities, and to cover up the mass brutality at SBCC in January 2020, ADC DEPALO testified falsely at the preliminary injunction hearing on February 19 that MA DOC investigators had obtained "information from various sources that inmates were planning on not only taking hostages, but continuing assaults on staff members," knowing such testimony to be false.

159. The day after his credible and compelling testimony on February 19, SILVA-PRENTICE, through his counsel, wrote to then-United States Attorney Andrew Lelling and requested that his office open a federal investigation. The letter was publicized and known to EOPSS, MA DOC, and SBCC officials.

160. After KENNEWAY's false testimony on February 19 and in furtherance of the conspiracies to target Black and Latino prisoners, to retaliate for First Amendment activities, and

to cover up the mass brutality at SBCC in January 2020, LT. ALLAIN wrote a disciplinary report accusing SILVA-PRENTICE of assaulting "staff."

161. On February 24, 2020, in furtherance of the conspiracies to target Black and Latino prisoners, to retaliate for First Amendment activities, and to cover up the mass brutality at SBCC in January 2020, SGT. THOMAS caused Correction Office Timothy Hedge to send a written referral for criminal prosecution to the Worcester District Attorney's Office, stating that SILVA-PRENTICE had punched "staff" in the head, knowing such accusation to be false and without any factual basis whatsoever.

### Retaliatory and False Reports

162. In violation of the Plaintiffs' federal and state constitutional rights, G.L. c. 268, § 6A, 103 CMR 505.14, and MA DOC policies and in furtherance of the conspiracies to target Black and Latino prisoners, to retaliate for First Amendment activities, and to cover up the mass brutality at SBCC in January 2020, the Defendants agreed to, and did, write and issue false disciplinary and incident reports accusing SILVA-PRENTICE and PAULINO of assaulting unidentified "staff" and other disciplinary offenses.

163. In violation of the Plaintiffs' federal and constitutional rights, G.L. c. 268, § 6A, 103 CMR 505, and MA DOC policies and in furtherance of the conspiracies to target Black and Latino prisoners, retaliate, and cover up the mass brutality at SBCC in January 2020, and to circumvent MA DOC regulations and policies which require use of force incidents to be reported immediately and for employees who witness such force to submit timely written reports about their observations, the Defendants agreed to, and did, falsify the dates and substantive content of disciplinary and incident reports which accuse SILVA-PRENTICE and PAULINO of committing numerous, unfounded MA DOC disciplinary offenses.

164.    In violation of the Plaintiffs' federal and state constitutional rights, G.L. c. 268, § 6A, 103 CMR 505, and MA DOC policies and in furtherance of the conspiracies to target Black and Latino prisoners, retaliate, and cover up the mass brutality at SBCC in January 2020, LT. ALLAIN and SGT. D'AMADIO falsified the dates of their disciplinary reports which, in fact, they did not write until *after* the Plaintiffs filed their grievances, SILVA-PRENTICE filed *Larocque v. Turco*, and SILVA-PRENTICE gave credible testimony on February 19, 2020.

165.    In violation of G.L. c. 268, § 6A, 103 CMR 505.14, and MA DOC policies and in furtherance of the conspiracies to target Black and Latino prisoners, retaliate, and cover up the mass brutality at SBCC in January 2020, the Defendants backdated and falsified their respective incident reports to give the false appearance that they had timely reported legitimate uses of force, knowing that their reports contain false information.

166.    In violation of the Plaintiffs' federal and state constitutional rights, G.L. c. 268, § 6A, 103 CMR 505, and MA DOC policies and in furtherance of the conspiracies to target Black and Latino prisoners, retaliate, and cover up the mass brutality at SBCC in January 2020, the Defendants wrote and issued reports containing and/or repeating multiple material lies told by other Defendants in their respective reports. For example:

    a.  The Defendants uniformly and falsely state in their reports that all of uses of force inside and outside Cell 15 was "spontaneous force." Their description of the force as "spontaneous" directly contradicts MA DOC regulations, which provide that a "spontaneous" use of force occurs when "there is an **immediate need** to control or restrain a person for the protection and safety of all concerned, *e.g.* when the inmate is participating in self harm, for self-defense or the protection of another who is at risk of imminent harm, to prevent an escape, or to prevent property damage which compromises institution safety." 103 CMR 505.07(3)(a). If accurate and truthful, the reports would have stated that the force was "planned," as defined in 103 CMR 505.07(3)(b).[2]

---

[2]    A "planned use of force" occurs "when the level of threat by the inmate is not immediate, e.g., refusal to be put in restraints and exit a cell, threatening behavior, possession of a weapon,

b. The Defendants' reports consistently and falsely state that as soon as the Cell 15 squad began to enter Cell 15, PAULINO took a "fighting stance," refused to comply with orders, and repeatedly attacked the squad members. Each of the Defendants knew at the time they wrote their reports that PAULINO did **not** resist, did not refuse to comply with orders, and did not lay a finger on anyone, and that PAULINO had in fact been sitting on the bottom bunk when the Cell 15 squad started to storm Cell 15, never took a "fighting stance," and never resisted. In fact, and as known to each Defendant, CAPT. LANPHER deployed his ECD on PAULINO before the door to Cell 15 was opened fully and that the other Cell 15 squad members immediately and without justification began to administer a two-minute long beating of a nearly naked, 150-pound man inside an empty cell and who had been escorted peacefully and without incident at least twice that same day.

c. The Defendants' reports consistently and falsely state that when PAULINO exited Cell 15 while his hands were cuffed behind his back, with an armed squad member grasping each arm, and within easy reach of three (3) aggressive attack dogs and numerous armed correction officers, PAULINO continued to resist his restraints and, depending on the report, (i) kicked the attack dog, (ii) attempted to kick the dog, (iii) broke free from SGT. D'AMADIO and LT. MCCULLOCH; and/or (iv) threatened to "kill" COMMANDER O'REILLY's attack dog, knowing such statements to be false.

d. Some of the Defendants' reports include the line "[i]t should be noted" that a 5 inch piece of metal stock sharpened to a point was found in PAULINO's property in a manner giving the impression in the report that the weapon was found in Cell 15 when and where the assault occurred when in fact the weapon was found hours earlier in another cell (Cell 35) in the unit where PAULINO had been housed before the shakedown and had already been removed. BRESLIN's report specifically and falsely states that the weapon was found in "P2 cell 15."

e. The Defendants' reports consistently and falsely assert that SILVA-PRENTICE "assaulted" "staff" from the top bunk of Cell 15.

f. The Defendants' reports consistently and falsely state that their force was necessary to subdue SILVA-PRENTICE, claiming that he was "flailing" his arms and legs to avoid being restrained.

---

and property damage. There is time to activate a team, suit up in full extraction gear, and brief team members on strategy to be used." 103 CMR 505.07(3)(b).

g. The Defendants' reports consistently and falsely state that ALLAIN and BRESLIN used their ECDs in pain compliance mode by pressing them against SILVA-PRENTICE's abdomen and/or hip.

167. In violation of the Plaintiffs' state and federal constitutional rights, G.L. c. 268, § 6A, 103 CMR 505.14, and MA DOC policies, and in furtherance of the conspiracies to target Black and Latino prisoners, retaliate, and cover up the mass brutality at SBCC in January 2020, the Defendants coordinated and aligned the material and false statements in their reports as set forth below.

168. In violation of G.L. c. 268, § 6A, 103 CMR 505.14 and MA DOC policies, LT. ALLAIN falsely states in Incident Report #1894920 that he wrote the report on January 22, 2020 and at the time he wrote his report, ALLAIN knew the following statements to be false: as indicated in **bolded** text:

a. The use of force inside Cell 15 was "**spontaneous**;"

b. **PAULINO "refus[ed] CAPTAIN LANPHER's orders** to get on the ground and **lowered his center of gravity in an attempted physical assault on staff;**"

c. **SILVA-PRENTICE "attempt[ed] to assist PAULINO by punching staff in the back;**"

d. After he threw SILVA-PRENTICE from the top bunk and onto the floor, **SILVA-PRENTICE "attempted to punch and kick" ALLAIN and SGT. BRESLIN;**

e. ALLAIN used his ECD to administer a drive stun to SILVA-PRENTICE's **"abdomen area;"**

f. ALLAIN and BRESLIN used their ECDs on SILVA-PRENTICE "**to stop his physical assault on staff and get him placed in restraints;**"

g. BRESLIN was justified in using his ECD a total of three (3) times to subdue **SILVA-PRENTICE from "his physical assault on staff"** and "**to regain control;**"

45

h. I**t was "a struggle"** and "**difficult to get SILVA-PRENTICE into restraints**;" and

i. **O**ther members of the Cell 15 squad "were told to have [Silva-Prentice] checked medically** due to the use of force and Electronic Control drive stun."

j. "It should be noted that after the removal of property from **the cell** a 5 inch piece of metal stock sharpened to a point was found in inmate PAULINO's property" included at the end of the report as though this was found in Cell 15 rather than found hours earlier in another cell and already removed and inventoried by staff.

169.    In violation of G.L. c. 268, § 6A, 103 CMR 505.14, and MA DOC policies, CAPT.

LANPHER falsely states in Incident Report # 1896055 that he wrote the report on January 22,

2020 and at the time he wrote the report, he knew the following statements to be false:

a. The use of force inside Cell 15 was "**spontaneous**;"

b. As the Cell 15 squad entered the doorway, the cell, "**PAULINO stood up in the center of the cell in a fighters [sic] stance with his fists clenched**;"

c. **LANPHER "ordered … PAULINO several times to get down;"**

d. "**PAULINO refused all orders** and **lowered his center of gravity in a fighters [sic] stance** as [LANPHER] approached;"

e. LANPHER "[b]eliev[ed] that an assault on [him] and [his] team was imminent;"

f. "**SILVA-PRENTICE … assault[ed] staff from behind** resulting in him being taken to the floor inside the cell by team members as he resisted;"

g. After the first ECD cycle, "**PAULINO then began to struggle with staff [sic] throwing punches and kicking at staff** as he attempted to get to his feet" and **continued to violently resist**;"

h. LANPHER had to redeploy his ECD on PAULINO as he **"continued to violently resist**;" and

i. Outside of Cell 15, PAULINO continued "**resisting staff's efforts to control him made threats to 'kill' the K-9 on site and attempted to kick the K-9** exterior of the door."

46

j. "It should be noted that a 5" piece of steel sharpened to a point was recovered by staff during a search of inmate PAULINO's property" included at the end of the report as though this was found in Cell 15 rather than found hours earlier in another cell and already removed and inventoried by staff.

170. In violation of 103 CMR 505.14, COMMANDER O'REILLY waited approximately twenty-six (26) days before writing Incident Report # 1896695, which is February 17, 2020, just two days before SILVA-PRENTICE had been scheduled to, and did, testify at the preliminary injunction hearing in Suffolk Superior Court in *Larocque v. Turco.*

171. At the time he wrote the report and in violation of G. L. c. 268, § 6A, 103 CMR 505.14, and MA DOC policies, O'REILLY knew the following statements in his report to be false:

a. The use of force was "**spontaneous**;"

b. **PAULINO "made threats to assault staff** at the facility and was **believed to be directly involved in ordering" other prisoners to assault SBCC officers on January 10, 2020**;

c. O'REILLY watched "**PAULINO violently resisting the staff members in the cell (closed fist punches and kicks);"**

d. **PAULINO "violently struggle[ed] with escort staff members briefly breaking free of the escort and attempted to kick [O'Reilly's] K-9** partner;"

e. "**PAULINO's actions did cause K-9 Omar to make contact** with … PAULINO's upper left chest area;"

f. "**PAULINO, still violently struggling,** was brought to the ground by staff;"

g. O'REILLY's dog "did secure a bite on … PAULINO's inner left leg **due to the fact that he was still kicking at the K-9**;" and

h. When **PAULINO finally became "compliant with staff members** [sic] **and not struggling**," O'REILLY commanded his attack dog to "to release."

172. In violation of 103 CMR 505.14, LT. MURPHY waited approximately twenty-six (26) days before memorializing his observations in Incident Report # 1896741, which is dated

February 17, 2020, just two days before SILVA-PRENTICE had been scheduled to, and did, testify at the preliminary injunction hearing in Suffolk Superior Court in *Larocque v. Turco.*

173. At the time he wrote the report and in violation of G. L. c. 268, § 6A, 103 CMR 505.14, and MA DOC policies, MURPHY knew the following statements in his report to be false, as indicated in the **bolded** text:

    a. The use of force inside Cell 15 was "**spontaneous**;"

    b. "Credible information had been obtained by the Office of Investigative Services that … **PAULINO was orchestrating future attacks on staff** at SBCC with other inmates housed at the facility;"

    c. "Upon entering the cell [he] observed **[PAULINO and SILVA-PRENTICE] fighting the other officers** as they attempted to control them in order to be placed in restraints" and was "**on the floor wrestling with staff**;"

    d. MURPHY had to use his "arms and body weight" to "prevent [SILVA-PRENTICE] from **further kicking staff**;"

    e. **PAULINO "continued to struggle** as [the TAC Team] tried to remove him from the cell;"

    f. When removed from Cell 15, PAULINO "**attempted to kick K9 Omar resulting in K-9 Omar making contact** with" PAULINO; and

    g. After PAULINO was "brought to the floor," he "**continue[d] kicking causing K-9 Omar to bite the leg**."

174. In violation of 103 CMR 505.14, SGT. BRESLIN waited approximately twenty-six (26) days before memorializing his observations regarding the uses of force on SILVA-PRENTICE and PAULINO in Incident Report # 1896763, which is dated February 17, 2020, just two days before SILVA-PRENTICE had been scheduled to, and did, testify at the preliminary injunction hearing in Suffolk Superior Court in *Larocque v. Turco.*

175. At the time he wrote the report and in violation of G. L. c. 268, § 6A, 103 CMR 505.14, and MA DOC policies, BRESLIN knew the following statements to be false, as indicated in the **bolded** text:

a. The use of force inside Cell 15 was "**spontaneous**;"

b. "Based on intelligence provided by the Office of Investigative Services (OIS), **it was determined that … PAULINO was actively orchestrating future assaults** targeting SBCC staff;"

c. The Defendants "believed that **PAULINO was directly involved in ordering [other prisoners] to carry about future assaults against staff**;"

d. A forcible cell entry was made "**to gain a tactical advantage and to maintain the element of surprise**;"

e. That as soon as "CAPTAIN LANPHER entered the cell, **he began giving orders to PAULINO to get down on the ground**;"

f. **PAULINO refused to comply with CAPTAIN LANPHER's orders and assumed a fighters [sic] stance**;"

g. While on the top bunk, **SILVA-PRENTICE "was attempting to assist PAULINO by punching Officer's [sic] in the back**;"

h. BRESLIN "gave **several orders to SILVA-PRENTICE to cease his assaultive behavior as he attempted to kick and punch LT. ALLAIN and [BRESLIN]**;"

i. "**SILVA-PRENTICE continued his out of control, assaultive behavior as he continued to kick and thrash in an effort to evade restraint application**;"

j. "LT. ALLAIN drew his ECD and did drive stun SILVA-PRENTICE in the **abdomen area to stop his out of control, assaultive behavior and get him into restraints**;

k. SGT. BRESLIN "then drew his ECD and applied **three (3) drive stun application to SILVA-PRENTICE's right hip and upper thigh area**;"

l. Every "time [BRESLIN] applied the drive stun, **SILVA-PRENTICE violently thrashed and moved his body,** thus breaking contact with the ECD;" and

m. BRESLIN handcuffed SILVA-PRENTICE **after "struggling" with him** inside Cell 15.

n. "It should be noted that **after the removal of property from P2 cell 15**, a five (5) inch piece of metal stock sharpened to a point was found in inmate PAULINO's property" when the metal piece was found hours earlier in another cell and already removed and inventoried by staff.

176. In violation of G.L. c. 268, § 6A, 103 CMR 505.14, and MA DOC policies, CAPTAIN SOUZA falsely states in Incident Report #1897099 that he wrote the report on January 22, 2020.

177. At the time he wrote the report and in violation of G. L. c. 268, § 6A, 103 CMR 505.14, and MA DOC policies, SOUZA knew the following statements to be false, as indicated in the **bolded** text:

a. The use of force inside Cell 15 was "**spontaneous**;"

b. As COMMANDDER O'REILLY stood immediately outside Cell 15 with his attack dog, he "continually issu[ed] commands to [PAULINO and SILVA-PRENTICE] to stop **resisting staff**;"

c. Upon exiting the cell, **PAULINO "violently resisted staff**;"

d. COMMANDER O'REILLY commanded his dog to attack PAULINO because **PAULINO attempted to kick" the dog** and that the dog continued to attack while PAULINO was on the ground because **PAULINO "continued to kick.**"

178. In violation of 103 CMR 505.14, CO LARANJO waited at least twenty-seven (27) days before memorializing his observations regarding the use of force on SILVA-PRENTICE and PAULINO in Incident Report #1897164, which is dated February 18, 2020.

179. At the time he wrote the report and in violation of G.L. c. 268, § 6A, 103 CMR 505.14, and MA DOC policies, LARANJO knew the following statements in his report to be false as indicated in the **bolded** text:

a. The use of force inside Cell 15 was "**spontaneous**;"

b. "As staff were escorting … PAULINO out of the cell [LARANJO] witnessed **[PAULINO] struggling and briefly break free of the escorting officers and attempt to kick K9 Omar**;"

c. After COMMANDER O'REILLY's dog attacked, PAULINO "**continu[ed] to struggle**," thus leading other Defendants to take him to the floor;

d. "**During this struggle**, K9 Omar did make contact with … PAULINO's inner left leg;" and

e. "**As soon as … PAULINO was compliant and stopped struggling with staff**, SGT. O'REILLY commanded Omar to release and moved away."

180. In violation of 103 CMR 505.14, SGT. HARVEY waited at least twenty-eight (28) days before memorializing his observations in Incident Report # 1897342, which is dated February 19, 2020, the same day that SILVA-PRENTICE testified in *Larocque v. Turco*.

181. At the time he wrote the report, and in violation of G.L. c. 268, § 6A, 103 CMR 505.14, and MA DOC policies, HARVEY knew that the following statements in his report to be false as indicated in the **bolded** text:

a. The use of force on PAULINO and SILVA-PRENTICE was "**spontaneous**;"

b. **PAULINO "struggl[ed] with" MCCULLOCH and D'AMADIO** as they escorted him out of Cell 15;

c. **PAULINO "briefly broke free of the transport officers and attempted to kick K-9 Omar**;"

d. After COMMANDER O'REILLY's dog attacked, PAULINO "**continu[ed] to struggle**," thus leading other Defendants to take him to the floor; and

e. "As soon as **… PAULINO became compliant and stopped struggling with staff**, SGT. O'REILLY commanded K-9 Omar to release and moved a short distance away."

182. In violation of 103 CMR 505.14, CO PAUL waited approximately twenty-eight (28) days before memorializing his observations in Incident Report # 1897352, which is dated February 19, 2020, the same day that SILVA-PRENTICE testified at the preliminary injunction hearing in *Larocque v. Turco*.

51

183. At the time he wrote the report, and in violation of G.L. c. 268, § 6A, 103 CMR 505.14, and MA DOC policies, PAUL knew the following statements in his report to be false as indicated in the **bolded** text:

   a. The use of force on SILVA-PRENTICE and PAULINO was "**spontaneous;**"

   b. After "SILVA-PRENTICE was clear of the cell #15 …**PAULINO appeared to break free of tactical staff, charge out of the cell, and assault the K9 with a kick;**"

   c. "PAULINO **continued to struggle violently with tactical staff;**"

   d. "**During this violent struggle** the K9 apprehended … PAULINO on the inner left leg;" and

   e. As soon as the Cell 15 squad "**gained control of**" PAULINO, O'REILLY "removed the K9 from [PAULINO]."

184. In violation of G.L. c. 268, § 6A, 103 CMR 505.14, and MA DOC policies, LT. MCCULLOCH falsely states in Incident Report # 1897601 that he wrote his report on January 22, 2020.

185. At the time he wrote the report and in violation of G. L. c. 268, § 6A, 103 CMR 505.14, and MA DOC policies, MCCULLOCH knew the following statements to be false, as indicated in the **bolded** text:

   a. The use of force on SILVA-PRENTICE and PAULINO was "**spontaneous;**"

   b. PAULINO "**had recently made threats and was believed to have ordered [other prisoners] to assault staff** at SBCC;"

   c. The door to Cell 15 "was opened on approach **to gain a tactical advantage;**"

   d. "Upon entry to the cell, … **PAULINO was standing in the middle of the cell with both fists clenched;**"

   e. "PAULINO was given [and **refused] several orders** to get down on the floor and show his hands;"

   f. **SILVA-PRENTICE "began to assault and resist other team members** as they entered and was taken to the floor;"

g. "PAULINO … **began throwing punches at [McCulloch] and another team member**;" and

h. "**PAULINO refused all orders to stop his assaultive behavior and comply with restraint application**."

186.    In violation of G.L. c. 268, § 6A, 103 CMR 505.14, and MA DOC policies, CO MARCHAND falsely states in Incident Report #1897601 that he wrote his report on January 22, 2020.

187.    At the time he wrote the report and in violation of G. L. c. 268, § 6A, 103 CMR 505.14, and MA DOC policies, MARCHAND knew the following statements to be false, as indicated in the **bolded** text:

a. The use of force on PAULINO and SILVA-PRENTICE was "**spontaneous**;" and

b. While being escorted out of the cell, "**PAULINO [was] still resisting staff** [and] **attempted to kick the K-9 dog** at which time the K-9 dog did engaged [sic] … PAULINO in the leg."

188.    In violation of 103 CMR 505.14, SGT. D'AMADIO waited at least twenty-eight (28) days to write Incident Report #1897635, which is dated February 19, 2020, the same day that SILVA-PRENTICE testified in Suffolk Superior Court in *Larocque v. Turco*.

189.    At the time he wrote the report and in violation of G.L. c. 268, § 6A, 103 CMR 505.14, and MA DOC policies, D'AMADIO knew the following statements in his report to be false, as indicated in the **bolded** text:

a. That the use of force on PAULINO was "**spontaneous**;"

b. That "**PAULINO had recently made threats and was believed to have given orders for [other prisoners] to assault staff** at SBCC;"

c. That door to Cell 15 was opened without warning because **the Cell 15 squad required "a tactical advantage**;"

53

d.  That upon entry into Cell 15, **PAULINO was observed standing in the middle of the cell with both fists clenched in a fighting stance**;"

e.  That "**PAULINO was** "engaged with the ECD deployment" because **he had "refused" "multiple directives to get down on the floor;"**

e.  That from the top bunk, **SILVA-PRENTICE "began to assault other team members** that were in the cell;"

f.  That "**PAULINO** then started to get on his feet and began **throwing punches and kicks** at [D'AMADIO] and other team members;"

g.  That it was **necessary to deploy the ECD probes a second time [d]ue to ... PAULINO's assaultive actions**;" and

h.  That **PAULINO "kicked [D'AMADIO]twice** in the upper right thigh."

190.  In violation of 103 CMR 505.14, LT. MERLINO waited approximately thirty-four (34) days before memorializing his observations in Incident Report # 1899123, which is dated February 25, 2020.

191.  At the time he wrote the report and in violation of G.L. c. 268, § 6A, 105 CMR 505.14, and MA DOC policies, MERLINO knew the following statements to be false, as indicated in the **bolded** text:

a.  The use of force was "**spontaneous**;" and

b.  **PAULINO violently resisted** members of the Cell 15 squad throughout the attacks inside and outside Cell 15.

192.  In violation of G.L. c. 268, § 6A, 103 CMR 505.15, and MA DOC policies, ADC FERREIRA falsely states that he wrote Incident Report #1904201 on January 22, 2020.

193.  At the time he wrote the report and in violation of G. L. c. 268, § 6A, 103 CMR 505.14, and MA DOC policies, FERREIRA knew the following statements to be false, as indicated in the **bolded** text:

a.  FERREIRA saw **PAULINO "struggling with correctional officers**;" and

b.   PAULINO **needed to be "brought under control."**

**First Amendment Retaliation Against SILVA-PRENTICE**

194.   In addition to writing and issuing numerous false reports as described above, the Defendants conspired to and did retaliate against SILVA-PRENTICE for exercising his free speech rights under the federal and state constitutions by, *inter alia*, falsely accusing and finding him guilty of assaulting a correction officer; placing him in solitary confinement for approximately five (5) months; and subjecting him to attacks by other prisoners.

195.   In Disciplinary Report # 455339, LT. ALLAIN and SDO MULVEY falsely accused Silva-Prentice of committing several of the most serious disciplinary offenses which carry the possibility of a punitive sentence of up to ten (10) years in the Department Disciplinary Unit ("DDU"), which is more commonly known and referred to as "solitary confinement."[3]

196.   Specifically, Disciplinary Report # 455339 charged SILVA-PRENTICE with, *inter alia*, "aggravated assault on a correction officer," which is defined as "[a]n assault where aggravating factors exist including, but not limited to: use of a weapon; biting; use of a shod foot; multiple participants involved in the assault; seriousness of bodily injury; or any other factors that manifest extreme indifference to life." 103 CMR 530.05.

---

[3]   The DDU is located at MCI-Cedar Junction in Walpole and is a more restrictive environment used to house prisoners found guilty of major disciplinary violations. The DDU houses prisoners individually in concrete cells approximately seven feet by twelve feet illuminated by fluorescent lights. Each cell door is solid steel with a four inch by twenty-six inch window and has two slots. The upper slot is used to serve food to and handcuff the prisoner and the lower slot provides access to the prisoner's ankles so that they may be shackled. Prisoners are shackled and handcuffed any time they leave their cells. Because no two cells face each other, prisoners in their cells in the DDU cannot see one another. A DDU prisoner may not participate in any prison programs or correspondence courses, and he may not have educational materials in his cell. During the first thirty days of a DDU sentence, a prisoner may not have a radio or television and may not make telephone calls or have any visits except with clergy or with his attorney upon the attorney's request.

197.     Contrary to statements and charges set forth in his false Disciplinary Report #455339, LT. ALLAIN later admitted under oath that he had no reason to believe that SILVA-PRENTICE assisted PAULINO in any way or that he would have a reason to do so.

198.     Contrary to false statements in ALLAIN's Disciplinary Report # 455339, SILVA-PRENTICE did not punch or otherwise assault any member of the Cell 15 squad.

199.     On September 4, 2020, SHO REDD held a hearing on ALLAIN's false Disciplinary Report #455339.

200.     Neither LT. ALLAIN's Disciplinary Report #455339 nor any other report identifies the victim of SILVA-PRENTICE's alleged aggravated assault and battery.

201.     In furtherance of the conspiracies to target Black and Latino prisoners, retaliate against SILVA-PRENTICE for his First Amendment activities, and coverup the Cell 15 squad's unlawful, unconstitutional, immoral, and criminal behavior, SDO MULVEY and SHO REDD suppressed from SILVA-PRENTICE and his counsel exculpatory evidence, in violation of 103 CMR 430.01, 430.11, and 430.13(2).

202.     In furtherance of the conspiracies to target Black and Latino prisoners, retaliate against SILVA-PRENTICE for his First Amendment activities, and coverup the Cell 15 squad's unlawful, unconstitutional, immoral, and criminal behavior, SDO MULVEY and SHO REDD unreasonably denied SILVA-PRENTICE's request to call certain witnesses, including the purported victim of his alleged aggravated assault on a correction officer, and to discover relevant evidence, in violation of 103 CMR 430.01, 430.11(2), 430.13(2), and 430.14(4).

203.     In furtherance of the conspiracies to target Black and Latino prisoners, retaliate against SILVA-PRENTICE for his First Amendment activities, and coverup the Cell 15 squad's unconstitutional, immoral, and criminal behavior, ALLAIN and BRESLIN falsely testified during

SILVA-PRENTICE's disciplinary hearing that:

    a.  SILVA-PRENTICE was "combative and assaultive;"

    b.  SILVA-PRENTICE refused orders to comply when ALLAIN and BRESLIN separately tried to restrain him by cuffing his hands behind his back;

    c.  SILVA-PRENTICE violently resisted ALLAIN's and BRESLIN's attempts to restrain and control him;

    d.  SILVA-PRENTICE refused orders to stop resisting;

    e.  ALLAIN used his ECD to drive stun SILVA-PRENTICE to his abdomen;

    f.  BRESLIN used his ECD to drive stun Silva-Prentice to his abdomen and hip;

    g.  ALLAIN and BRESLIN did not drive stun SILVA-PRENTICE while he was lying face down on the floor of Cell 15 with his hands cuffed behind his back;

    h.  ALLAIN and BRESLIN did not drive stun SILVA-PRENTICE to his back or the back of his right arm;

    i.  LT. BIRRI was not inside Cell 15;

    j.  LT. BIRRI did not assault SILVA-PRENTICE;

    k.  No member of the Cell 15 squad kicked SILVA-PRENTICE's face;

    l.  No member of the Cell 15 squad called SILVA-PRENTICE a "f*gg*t" and

    m.  No member of the Cell 15 squad pulled dreadlocks from SILVA-PRENTICE's scalp.

204.    In furtherance of the conspiracies to retaliate against SILVA-PRENTICE for his First Amendment activities and coverup the Cell 15 squad's unconstitutional, immoral, and criminal behavior inside Cell 15, SDO MULVEY and SHO REDD ignored uncontradicted forensic and expert evidence proving that ALLAIN and BRESLIN lied in their reports and in their sworn hearing testimony, in violation of 103 CMR 430.01, 430.10, and 430.13.

205.    In furtherance of the conspiracies to retaliate against SILVA-PRENTICE for his First Amendment activities and coverup the Cell 15 squad's unconstitutional, immoral, and

criminal behavior inside Cell 15, SDO MULVEY and SHO REDD ignored uncontradicted forensic and expert evidence proving SILVA-PRENTICE to be innocent of the disciplinary offenses charged in ALLAIN's false Disciplinary Report #455339, in violation of 103 CMR 430.01, 430.11, and 430.13(2).

206.    SILVA-PRENTICE timely appealed SHO REDD's baseless and retaliatory guilty finding on ALLAIN's Disciplinary Report #455339.

207.    In furtherance of the conspiracies to retaliate against SILVA-PRENTICE for his First Amendment activities and coverup the Cell 15 squad's unconstitutional, immoral, and criminal behavior inside Cell 15, SUPERINTENDENT GRAY denied SILVA-PRENTICE's appeal despite overwhelming evidence of SILVA-PRENTICE's innocence and equally overwhelming evidence that ALLAIN and BRESLIN testified falsely at SILVA-PRENTICE's hearing and multiple Defendants who each falsely accused in their reports that SILVA-PRENTICE had assaulted *other* members of the Cell 15 squad.

208.    In addition to the retaliation described above and in furtherance of the conspiracies to target Black and Latino prisoners, retaliate for SILVA-PRENTICE's exercise of his First Amendment rights and cover up the mass brutality at SBCC in January 2020, SILVA-PRENTICE was subjected to the Defendants' further acts of retaliations as set forth below.

209.    After the first day of the evidentiary hearing on the *Larocque* Plaintiffs' motion for a preliminary injunction on February 13, 2020, DOE Defendants illegally seized, reviewed, and copied SILVA-PRENTICE's confidential legal documents and notes.

210.    After SILVA-PRENTICE credibly testified at the preliminary injunction hearing on February 19, 2020, DOE defendants repeatedly called SILVA-PRENTICE a "snitch" and thereby increased the risk that SILVA-PRENTICE would be attacked by other prisoners.

58

211.    After SILVA-PRENTICE attended the preliminary injunction hearing in *Larocque v. Turco* on February 13 or 19, 2020, JOHN DOE Defendants set up SILVA-PRENTICE to be attacked by one of his known enemies.

212.    IAU SGT. THOMAS began a sham IAU investigation into SILVA-PRENTICE's grievance on February 20, 2020, one day after SILVA-PRENTICE's credible and compelling testimony in Suffolk Superior Court during the preliminary injunction hearing in *Larocque v. Turco*.

213.    THOMAS conducted a sham internal affairs interview of SILVA-PRENTICE on March 4, 2020.

214.    On or about June 8, 2020, CHIEF SHAW cleared ALLAIN, BRESLIN, and MURPHY of using excessive force on SILVA-PRENTICE on January 22 and other misconduct, despite clear and compelling evidence that ALLAIN, BRESLIN, and MURPHY wrote false reports and made false statements to IAU SGT. THOMAS.

215.    Immediately after THOMAS interviewed SILVA-PRENTICE on March 4, DOE defendants illegally seized SILVA-PRENTICE's confidential and privileged legal documents.

216.    In April 2020, as a result of ALLAIN's false Disciplinary Report #455339, after being in the general population for over three months without incident, SILVA-PRENTICE was taken to the RHU (solitary confinement) to await a hearing.

217.    On or about August 14, 2020, the *Larocque v. Turco* Plaintiffs served the MA DOC legal department with a Complaint for Contempt alleging that SECRETARY TURCO, COMMISSIONER MICI, and SUPERINTENDENT KENNEWAY were in continuing breach of the February 28 preliminary injunction.

59

218. On or about August 14 – 16, 2020, DOE Defendants enlisted Defendant SOUTHWORTH to retaliate against SILVA-PRENTICE for filing a Complaint for Contempt in *Larocque* against TURCO, MICI and KENNEWAY two days earlier, by encouraging SOUTHWORTH to retaliate and by spraying OC into the face and eyes of SILVA-PRENTICE, without justification and in violation of 103 CMR 505.

219. As a direct result of SILVA-PRENTICE's counsel's investigation into the ongoing contempt by SECRETARY TURCO, COMMISSIONER MICI, and SUPERINTENDENT KENNEWAY, DOE Defendants caused SILVA-PRENTICE to be attacked by one of his known enemies directly after SILVA-PRENTICE left a meeting with his counsel on September 24, 2020.

### First Amendment Retaliation Against PAULINO

220. In violation of G.L. c. 268, § 6A, 103 CMR 505.14, and MA DOC policies and in furtherance of the conspiracies to target Black and Latino prisoners, retaliate for First Amendment activities, and coverup the mass brutality at SBCC in January 2020, COMMANDER O'REILLY wrote a false and retaliatory disciplinary report against PAULINO.

221. O'REILLY wrote his false and retaliatory disciplinary report against PAULINO on February 19, the same day that SILVA-PRENTICE gave his credible and compelling testimony at the *Larocque v. Turco* preliminary injunction hearing about the violent attack by the Cell 15 squad on January 22, 2020.

222. In violation of G.L. c. 268, § 6A, 103 CMR 505.14, and MA DOC policies and in furtherance of the conspiracies to target Black and Latino prisoners, retaliate for First Amendment activities, and coverup the mass brutality at SBCC in January 2020, O'REILLY made the following false statements:

On January 22, 2020, at approximately 2:44 PM, I, Sergeant Mark O'Reilly, while assigned to the special operations division and conducting a tactical operation at the Souza Baranowski Correctional Center, was involved in a use of force on inmate DIONISIO PAULINO (W103232) in the P2 housing unit cell #15.

Inmate PAULINO had recently made threats to assault staff at the facility and was believed to be directly involved in order other Security Threat Group members to assault staff. I accompanied other Special Operations Division staff members with my K-9 partner, Omar, to the P2 housing unit cell #15 where I took a position outside of the cell while the staff members entered the cell to secure inmate PAULINO in restraints. My job at this point was to prevent the inmate from accessing the flats prior to being placed into restraints. While outside of the cell, I observed inmate PAULINO violently resisting the staff members in the cell (closed fist punches and kicks). After a brief struggle, inmate PAULINO exited the cell violently struggling with escort staff members briefly breaking free from the escort and attempted to kick my K-9 partner. Inmate PAULINO's actions did cause K-9 Omar to make contact with inmate PAULINO's upper left chest area. Inmate PAULINO, still violently struggling, was brought to the ground by staff. During the struggle, K-9 Omar did secure a bite on inmate PAULINO's inner left leg due to the fact that he was still kicking at the K-9. As soon as inmate PAULINO was compliant with staff ordered and not struggling, K-9 Omar was commanded to release and was backed away from staff and inmate.

223. In furtherance of the conspiracies to target Black and Latino prisoners, retaliate for First Amendment activities, coverup the mass brutality, and to protect COMMANDER O'REILLY's continuing employment by MA DOC, Disciplinary Officer Katy Carson dismissed SGT. O'REILLY'S false Disciplinary Report # 455292 on March 5, 2020. Upon information and belief, the Defendants sought to protect O'REILLY due to the demonstrable lies he told to justify his decision to command his dog to attack and maul PAULINO and because O'REILLY was under investigation and/or had been suspended due to his use of excessive force on another prisoner in or around January 2020 and lies to cover it up.

224. PAULINO then received another disciplinary report in early April 2020, Disciplinary Report #457423, in which SGT. D'AMADIO and SDO MULVEY (but not O'REILLY) accused him of committing fifteen (15) disciplinary offenses, ten (10) of which carry possible DDU sentences including the outrageous charge of "Killing of another."

225.    IAU SGT. APPEL was assigned to investigate the allegations made in PAULINO's January 31 grievance.

226.    In violation of DOC 522.03(A), APPEL did not conduct a fair, impartial and unbiased investigation.

227.    In violation of 103 DOC 522.09(B), APPEL failed to investigate or interview SGT. O'REILLY, despite his command to Omar to attack PAULINO. Upon information and belief, IAU failed to investigate or interview O'REILLY because he was under investigation or had already been suspended for engaging in misconduct during the aftermath of the January 10th altercation.

228.    On April 2, 2020, SGT. APPEL closed her investigation into PAULINO's grievance without interviewing a single MA DOC employee who stormed Cell 15, who brought their attack dogs to Cell 15, or who witnessed the force used upon PAULINO. APPEL conducted a single interview and inquired only about the reasons PAULINO was naked from the waist down after O'REILLY unleashed his attack dog on PAULINO.

229.    On or about April 17, 2020, CHIEF SHAW wrote to PAULINO, falsely claiming that upon "full[] review[] of the information available," SHAW found "no independent evidence to support the continuation of an investigation into [PAULINO's] allegations."

230.    Disciplinary Report #457423 falsely states that it was written on January 22, 2020. Upon information and belief, SGT. D'AMADIO did not write this report until March or April 2020.

231.    Disciplinary Report #457423 states, *inter alia*:

On Wednesday, January 22, 2020 at approximately 2:44 p.m., I Sgt D'Amadio was assigned to the Special Operations Unit at the Souza Baranowski Correctional Center.

On the above date and time, I was involved in a spontaneous use of force on Inmate Paulino, Dionisio (W103232) in the P2 unit cell #15.   Through the

Office of Investigative Services, it was made known that inmate Paulino had recently made threats and was believed to have given orders for other Security Threat Group members, specifically Latin Kings, to assault staff at SBCC. The team was instructed by Deputy Commission Henderson to remove inmate Paulino from his cell utilizing force, up to [sic] including Chemical Agent, Electronic Control Device (ECD), Specialty Impact Munitions, and K9 if necessary. In order to gain a tactical advantage, the door was opened as we approached. Once the team entered the cell, inmate Paulino was observed standing in the middle of the cell with both fists clenched in a fighting stance. Inmate Paulino was given multiple directives to get down on the floor all of which he refused. Inmate Paulino was then engaged with the ECD probe deployment from another member of the team and dropped to the floor in the back of the cell. Inmate Paulino then started to get on his feet and began throwing kicks and punches at myself and other team members. I, and other members of the team then took him down to the floor where I attempted to get to gain control of inmate Paulino's legs. Due to Inmate Paulino's assaultive actions, a second cycle of the ECD was given and I held onto his leges are we lifted him onto the bottom bunk of the cell. Once on the bottom bunk, I lost my grip on his legs and inmate Paulino kicked me twice in the upper right thigh. I then managed to hold onto Inmate Paulino's legs while wrist restraints were applied. I then assisted another team member with placing Paulino on his feet by placing both my hands on his upper left arm and escorting him out of the cell. Inmate Paulino was still combative as we escorted him out of the cell and he was made [sic] a threat by saying "I'll kill that fucking dog!" as we escorted him out onto the tier. During the escort onto the tier, Inmate Paulino tried to kick the K9 that was positioned outside the cell. The K9 then engaged Inmate Paulino with bite [sic] to his upper left and I assisted with bringing him to the floor. The K9 was then lifted off Inmate Paulino by the K9 officer[.]

232. SGT. D'AMADIO'S Disciplinary Report #457423 falsely states, like the other incident reports, that PAULINO had recently made threats and given orders for other prisoners to assault SBCC Staff, that when the squad stormed Cell 15, PAULINO took a fighting stance, ignored orders to get down, and punched and kicked officers, and that PAULINO made a threat to kill the dog outside his cell and then attempted to kick the dog.

233. As a result of this disciplinary report, after being in the general population for over two months without incident, PAULINO was taken to the RHU (solitary confinement) to await a hearing.

234.    On October 2, 2020, a disciplinary hearing was held before SHO REDD during which D'AMADIO testified and repeated the same lies including that PAULINO had made threats to order other inmates to assault staff, that upon entry into Cell 15, PAULINO was in fighting stance with his fists up and ignored their orders requiring use of a taser, that thereafter PAULINO continued to assault the officers and kick D'AMADIO in the thigh, that PAULINO exited Cell 15 in a violent manner, threatened the dog outside the cell and threw his leg out to try to kick the dog.

235.    MCCULLOUGH also testified at the disciplinary hearing making similar and coordinated false statements including that PAULINO was in a fighting stance with fists clenched upon their entry into Cell 15 and refused to comply with orders to get down on the floor and only then was the taser gun deployed causing PAULINO to fall to the back of the cell, that PAULINO jumped back up and started throwing punches at the officers, that PAULINO mule kicked D'AMADIO, that PAULINO threatened to kill the dog and outside the cell he attempted to kick the dog, and that the use of force was not planned but was necessary. Like at SILVA-PRENTICE's hearing, and in furtherance of the conspiracies to target Black and Latino prisoners, retaliate against PAULINO for his First Amendment activities, and coverup the Cell 15 squad's unlawful, unconstitutional, immoral, and criminal behavior, SHO REDD credited only the correctional officers' testimony and their reports despite independent evidence – video recordings – establishing some of their statements as false.

236.    In furtherance of the conspiracies to target Black and Latino prisoners, retaliate against PAULINO for his First Amendment activities and coverup the Cell 15 squad's unlawful, unconstitutional, immoral, and criminal behavior, SDO MULVEY and SHO REDD suppressed from PAULINO and his counsel exculpatory evidence, unreasonably denied PAULINO's reasonable request to call certain witnesses, and unreasonably denied PAULINO's reasonable

requests to discovery of relevant evidence for his defense, all in violation of 430.01, 430.11(4), 430.13, and 430.14(4).

237. As stated above, MA DOC regulations define an "aggravated assault" on a correction "[a]n assault where aggravating factors exist including, but not limited to: use of a weapon; biting; use of a shod foot; multiple participants involved in the assault; seriousness of bodily injury; or, any other factors that manifest extreme indifference to life."103 CMR 530.05.

238. In furtherance of the conspiracies to target Black and Latino prisoners, retaliate against PAULINO for his First Amendment activities and coverup the Cell 15 squad's unlawful, unconstitutional, immoral, and criminal behavior, SHO REDD found PAULINO guilty of aggravated assault and battery despite an utter lack of evidence that PAULINO used a weapon, bit anyone, used a shod foot; coordinated an assault with any other person; inflicted any injuries, and displayed no indifference to life.

239. In furtherance of the conspiracies to target Black and Latino prisoners, retaliate against PAULINO for his First Amendment activities and coverup the Cell 15 squad's unlawful, unconstitutional, immoral, and criminal behavior, SHO REDD found PAULINO guilty of "attempting to assault an animal."

240. The video recording viewed by SHO REDD clearly shows that the dogs outside Cell 15 were very agitated – barking and running in place – before either prisoner was escorted outside the cell. When SILVA-PRENTICE is escorted out of the cell, O'REILLY's dog, Omar, lunges at him unprovoked and while SILVA-PRENTICE is restrained. When PAULINO is escorted out the cell door, his hands are handcuffed behind his back and his arms remain held by two officers, one on each arm, as he takes a few steps through the doorway when the dog

immediately lunges and bites him. The video clearly shows that the claims by some of the officers that PAULINO broke free from his escort and attempted to kick the dog are not true.

241. Yet, after viewing this evidence and stating, falsely and without explanation, that the clearly revealing video is "inconclusive," SHO REDD then makes findings crediting the officers clearly false statements, e.g., REDD found "to be factual" the incident reports of LANPHER, O'REILLY, MURPHY, SOUZA, LARANJA, HARVEY, PAUL, MCCULLOCH, D'AMADIO, and MARCHAND, even though their reports state that COMMANDER O'REILLY's dog attacked because PAULINO was actively resisting the officers and/or broke free of his escorts upon exiting Cell 15, then attempted to, or did, kick the dog.

242. SHO REDD likewise found "to be factual" DC HENDERSON's memorandum in which HENDERSON states that as PAULINO was escorted from Cell 15, PAULINO raised one of his legs in preparation for kicking COMMANDER O'REILLY's dog.

243. SHO REDD likewise found "to be factual" DIRECTOR PRIMACK's memorandum that he observed PAULINO being escorted out of the cell at which time he observed PAULINO make a quick motion in the direction of the dog.

244. SHO REDD also found "factual" the statements in the medical report made by LAWLESS to hospital staff at UMass Memorial Health Care, where PAULINO was treated for his injuries. Based on LAWLESS's false statements, PAULINO's medical records state, "Apparently, the patient was being let out of his cell and a canine was positioned outside of the cell. The patient attempted to kick the dog while walking past. The dog took exception and bit his left leg, causing the patient to fall and hit his head on the ground."

245. As noted above, when PAULINO saw LAWLESS's false statement included in the hospital records, he filed his Grievance #109673, complaining that SBCC staff lied to the hospital

staff in furtherance of the conspiracy to coverup the brutality inflicted upon him by COMMANDER O'REILLY and the Cell 15 squad's wrongful assault but his grievance was denied and thereafter not considered by SHO REDD.

246. SHO REDD also credited the officers' testimony and reports that PAULINO assaulted D'AMADIO with multiple kicks in his shower shoes.

247. Thus, SHO REDD found PAULINO guilty of two of the fifteen charges: aggravated assault on a staff member and guilty of attempting to assault an animal and sentenced him to eighteen (18) months in DDU with nine (9) months credit and nine (9) months to serve. The rest of the charges were dismissed as being duplicative or unsupported.

248. SHO REDD also specifically found that the burden "regarding the charge that PAULINO engaged in, encouraged, recruited or pressured others to engage in security threat group activities" finding that "there was no corroborating evidence of an assault, the informant, according to the checklist, was never used prior and did not have personal knowledge."

249. PAULINO filed a timely appeal on October 24, 2020.

250. In furtherance of the conspiracies to retaliate against PAULINO for his First Amendment activities and coverup the Cell 15 squad's unconstitutional, immoral, and criminal behavior inside Cell 15, DC FALLON denied PAULINO"s appeal despite overwhelming evidence of PAULINO's innocence and equally overwhelming evidence that D'AMADIO and MCCULLOCH testified falsely and multiple Defendants, including COMMANDER O'REILLY, falsely wrote in their reports that PAULINO had broken free of D'AMADIO and MCCULLOCH as they escorted him from Cell 15, kicked or attempted to kick O'REILLY's attack dog, and/or threatened to kill O'Reilly's attack dog.

67

251.  PAULINO served thirteen (13) months in solitary confinement for the false disciplinary charges on which he was falsely convicted as part of the Defendants' retaliation and conspiracy to cover up their own wrongdoing, all in violation of his rights as secured by the First and Fourteenth Amendment to the United States Constitution.

252.  While PAULINO was in DDU, MA DOC refused to allow him to make confidential calls to his attorney.

253.  While PAULINO was in DDU, he lost significant weight, remained in fear of further retaliation by MA DOC staff, and developed severe depression as a result of the trauma inflicted by the Cell 15 squad. He had no prior history of depression and did not have an open mental health case prior to the storming of Cell 15.

## CAUSES OF ACTION

### COUNT I

**Violation of the Eighth Amendment to the United States Constitution
Cruel and Unusual Punishment (42 U.S.C. § 1983)**

**SILVA PRENTICE and PAULINO Against Defendants ALLAIN, BIRRI, MCCULLOCH, O'REILLY, BRESLIN, D'AMADIO, MURPHY, LANPHER**

254.  Plaintiffs repeat and reallege each and every allegation set forth in the paragraphs 1 through 253 as if separately pleaded herein in their entirety and incorporate them by reference.

255.  The U.S. Constitution's Eighth Amendment, as incorporated against States via the Fourteenth Amendment, guarantees that prisoners may not be subjected to cruel and unusual punishment by State actors.

256.  Here, Defendants LT. ALLAIN, LT. BIRRI, LT. MCCULLOCH, COMMANDER O'REILLY, SGT. BRESLIN, SGT. D'AMADIO, LT. MURPHY, and CAPT. LANPHER

(collectively, "Count I Defendants"), state actors, used unjustified and excessive force against SILVA-PRENTICE and PAULINO in violation of the Eighth Amendment.

257. As described above in detail, the Count I Defendants, without justification, stormed into Cell 15 without allowing the opportunity for Plaintiffs to cuff up and be escorted from the cell peacefully.

258. Before the door to Cell 15 was opened fully, Defendant LANPHER immediately and without justification fired his ECD at PAULINO and then charged and threw PAULINO from the bottom bunk to the floor of Cell 15.

259. While PAULINO was defenseless and lying on the floor to Cell 15, Defendants LANPHER, MCCULLOCH, and D'AMADIO repeatedly kicked and punched PAULINO in the head and all over his body, including his ribs, and spit on him while hurling racial and ethnic slurs, such as "Latin Queen Bitch" and "fucking spic."

260. Immediately upon entry into Cell 15, Defendant ALLAIN pulled SILVA-PRENTICE off the top bunk, threw him to the floor, and restrained him by cuffing his hands behind his back.

261. While SILVA-PRENTICE was restrained and lying face down on the floor, Defendants ALLAIN and BRESLIN used their ECD weapons to drive stun SILVA-PRENTICE on his back and the back of his right arm.

262. While lying face down on floor in handcuffs, SILVA-PRENTICE turned his head to observe what the Cell 15 squad was doing to PAULINO. Each time he turned his head, BIRRI kicked SILVA-PRENTICE in the face, called him a "f*gg*t," pushed him into the sink, and ripped a handful of dreadlocks from SILVA-PRENTICE's scalp.

69

263. After beating PAULINO for two (2) minutes, Defendants LANPHER, MCCULLOCH, and D'AMADIO restrained PAULINO by cuffing his hands behind his back, yanked him to his feet, and began to walk him out of Cell 15 when they slammed PAULINO's head against the wall.

264. As Defendants MCCULLOCH and D'AMADIO held each of PAULINO's arms while his hands were cuffed behind his back and immediately upon exiting Cell 15, Defendant COMMANDER O'REILLY launched his attack dog onto PAULINO without justification.

265. After COMMANDER O'REILLY's attack dog tore PAULINO's boxer shorts from his body, Defendants MCCULLOCH and D'AMADIO slammed PAULINO face down to the floor immediately outside Cell 15. While PAULINO was restrained and lying face down, Defendant O'REILLY's dog continued to attack PAULINO and bite his bare legs, causing multiple lacerations and tearing off a chunk of his back left inner thigh. Throughout the vicious and unjustified dog attack, PAULINO screamed and howled in pain.

266. As COMMANDER O'REILLY's dog attacked and mauled PAULINO, Defendants MCCULLOCH and D'AMADIO continued to assault PAULINO by kneeing and punching him simultaneous to the dog attack and while PAULINO was lying face down on the floor with his hands cuffed behind his back.

267. After O'REILLY allowed his dog to bite PAULINO repeatedly and rip open his flesh, O'REILLY finally commanded his dog to release PAULINO. Instead of bringing PAULINO, who was bleeding profusely, for medical treatment, Defendants MCCULLOCH and D'AMADIO pulled PAULINO to his feet, threw him against the wall, and shackled his ankles. Defendants MCCULLOCH and D'AMADIO then paraded PAULINO, who was bloody and naked

from the waist down, through the unit while MA DOC employees, including females, other Defendants, and members of the MA DOC and SBCC administrators stood watching.

268. As the Defendants paraded PAULINO down the unit as a warning to other Latino and Black prisoners on the P2 unit, ALLAIN, BIRRI, and/or BRESLIN returned SILVA-PRENTICE to Cell 15 and denied his pleas for medical and mental health treatment.

269. As described above, there was no justification for this use of force as there was no credible information or evidence that justified Count I Defendants reasonably perceiving either SILVA-PRENTICE or PAULINO as a threat, both SILVA-PRENTICE and PAULINO had been escorted from a cell to the gym and then to Cell 15 without incident the same day, neither threatened or assaulted the Count I Defendants, neither had weapons in Cell 15, and there was otherwise no disturbance or security threat requiring use of force.

270. Rather, the Count I Defendants acted maliciously and unjustifiably and in furtherance of their conspiracies to target Black and Latino prisoners, and to target the Plaintiffs specifically, by unnecessarily and wantonly inflicting pain, all in violation of SILVA-PRENTICE and PAULINO's constitutional rights.

271. For the sole purpose of covering up their unlawful, immoral, and criminal conduct, the Count I Defendants thereafter fabricated false disciplinary and incident reports accusing both SILVA-PRENTICE and PAULINO of assaulting staff and engaging in other disciplinary offenses.

272. The Count I Defendants caused harm to SILVA-PRENTICE in the form of burns, abrasions, bruises, cuts, and loss of hair, as well as distress, trauma, fear, and depression resulting from the physical injuries inflicted by the Defendants.

273. The Count I Defendants caused harm to PAULINO in the form of abrasions, bruises, cuts, and burns to his face and body, multiple dog bites, deep and painful dog bite wounds,

and significant bleeding, requiring MA DOC to transport PAULINO to an outside hospital for evaluation, treatment, stitches and a tetanus shot. PAULINO has a permanent deformity and scarring to his legs from the bites along with suffering the distress, trauma, fear, and depression resulting from his physical injuries from Defendants' conduct.

274. As a result of Count I Defendants' conduct, SILVA-PRENTICE and PAULINO suffered and are each entitled to recover compensatory damages pursuant to 42 U.S.C. ¶1983 in an amount to be proved at trial and punitive damages for Defendants' willful and/or malicious conduct and are each entitled to equitable relief including expungement of their disciplinary records related to these events.

## COUNT II

**Violation of the Eighth Amendment to the United States Constitution
Cruel and Unusual Punishment – Failure to Protect / Failure to Intervene
(42 U.S.C. § 1983)**

**SILVA-PRENTICE and PAULINO Against Defendants ALLAIN, BIRRI, MCCULLOCH, O'REILLY, BRESLIN, D'AMADIO, MURPHY, LANPHER HENDERSON, PRIMACK, TURCOTTEE, KENNEWAY, FERREIRA, FREITAS, SOUZA, HARVEY, LARANJO, PAUL, and MARCHAND**

275. Plaintiffs repeat and reallege each and every allegation set forth in the paragraphs 1 through 274 as if separately pleaded herein in their entirety and incorporate them by reference.

276. For more than two (2) minutes, Defendants ALLAIN, BIRRI, MCCULLOCH, O'REILLY, BRESLIN, D'AMADIO, MURPHY, LANPHER, DC HENDERSON, DIRECTOR PRIMACK, COMMANDER TURCOTTE, COMMANDER FREITAS, SUPERINTENDENT KENNEWAY, ADC FERREIRA, CAPT. SOUZA, CO HARVEY, CO LARANJO, CO PAUL, and CO MARCHAND, (collectively, "Count II Defendants") were present during and observed the beating of SILVA-PRENTICE and PAULINO, listened as SILVA-PRENTICE and PAULINO

screamed in fear and pain, and watched and listened as COMMANDER O'REILLY's dog attacked PAULINO and tore away his flesh.

277. The Count II Defendants each had the realistic opportunity to intervene and prevent the unjustified use of force.

278. The Count II Defendants each were obligated to intervene and protect SILVA-PRENTICE and PAULINO from the excessive force that unfolded before their eyes and ears by Defendants ALLAIN, BIRRI, MCCULLOCH, O'REILLY, BRESLIN, D'AMADIO, MURPHY, and LANPHER as an officer has a duty to intervene to protect an inmate when he sees another officer using excessive force against a prisoner.

279. The non-intervention of Count II Defendants violated the Eighth Amendment rights of SILVA-PRENTICE and PAULINO by failing to protect them from excessive force and their inaction manifested deliberate indifference to a substantial risk of serious harm and actual infliction of serious harm as described above.

280. As a result of Count II Defendants' conduct, SILVA-PRENTICE and PAULINO suffered and are each entitled to recover compensatory damages pursuant to 42 U.S.C. ¶1983 in an amount to be proved at trial and punitive damages for Defendants' willful and/or malicious conduct and are each entitled to equitable relief including expungement of their disciplinary records related to these events.

### COUNT III

**Violation of the Eighth Amendment to the United States Constitution
Cruel and Unusual Punishment – Failure to Properly Train and Supervise
(42 U.S.C. § 1983)**

**SILVA-PRENTICE and PAULINO Against Defendants TURCO, MICI, HENDERSON, PRIMACK, TURCOTTE, KENNEWAY, DEPALO, and FREITAS**

281. Plaintiffs repeat and reallege each and every allegation set forth in the paragraphs 1 through 280 as if separately pleaded herein in their entirety and incorporate them by reference.

282. Defendants SECRETARY TURCO, COMMISSIONER MICI, DC HENDERSON, DIRECTOR PRIMACK, DIRECTOR TURCOTTE, SUPERINTENDENT KENNEWAY, ADC DEPALO, and COMMANDER FREITAS (collectively, the "Count III Defendants") violated the Eighth Amendment rights of SILVA-PRENTICE and PAULINO by failing to properly train and supervise the Count I Defendants and Count II Defendants in their duties to provide care and custody to SBCC prisoners and to use only reasonable and appropriate force and by failing to properly supervise and enforce proper procedures in the forcible cell entry and extraction of SILVA-PRENTICE and PAULINO from Cell 15.

283. In violation of their duties, the Count III Defendants directly enabled and sanctioned the use of excessive force in violation of and with deliberate indifference to the Plaintiffs' Eighth Amendment rights

284. Based on the facts known and observed by DC HENDERSON, including that SILVA-PRENTICE and PAULINO had been escorted from their cells to the gymnasium and then back to the P2 unit without incident, were known not to possess any contraband or weapons, and that there was no property inside Cell 15, Defendant HENDERSON was not justified in authorizing a surprise entry into Cell 15 rather than requiring the squad to follow MA DOC policies, including those related to the use of force, forcible cell entries, and forcible moves of prisoners, as well as the standard procedure of ordering prisoners to turn around and cuff up before entry.

285. Rather than providing the Count I and Count II Defendants with proper training and supervision, the Count III Defendants allowed and/or authorized to continue the unspoken policy

or custom at SBCC whereby SBCC officers assault SBCC prisoners as a means of retaliation; failed to take appropriate remedial measures against correctional officers who perpetuate the unspoken policy or custom of committing assaults on prisoners as a means of retaliation; and otherwise allowed to continue and flourish a climate at SBCC in which correctional officers at SBCC believe they can use unnecessary force with impunity.

286. The unspoken policy or custom described above pervades and corrupts MA DOC's prisoner grievance process such that prisoners who use the grievance process to complain about MA DOC staff misconduct, including the use of excessive force, are not properly investigated, inculpatory evidence against correctional officers is suppressed or discounted, and the testimony of correctional officers is automatically credited without proper corroboration or justification.

287. The unspoken policy or custom described above pervades and corrupts MA DOC's prisoner disciplinary process such that prisoners who use the grievance process to complain about MA DOC staff misconduct, including the use of excessive force, are improperly and without factual justification charged and found guilty of MA DOC disciplinary offenses as further means of retaliation, discrediting prisoners, and preventing prisoners from exercising their right of access to courts in pursuit of civil remedies.

288. The Count I and Count II Defendants perpetuated, and the Count III Defendants allowed and authorized, the execution of the above-described policy or custom, against SILVA-PRENTICE and PAULINO as described above.

289. As a result of the Count III Defendants' conduct, SILVA-PRENTICE and PAULINO suffered the physical, mental, and emotional injuries described above, their grievances were not properly investigated, and they were wrongfully found guilty of false disciplinary charges and punished with time in solitary confinement.

290.     As a result of the Count III Defendants' conduct, SILVA-PRENTICE and PAULINO suffered and are each entitled to recover compensatory damages pursuant to 42 U.S.C. ¶1983 in an amount to be proved at trial and punitive damages for Defendants' willful and/or malicious conduct and are each entitled to equitable relief including expungement of their disciplinary records related to these events.

## COUNT IV

**Violation of the First Amendment to the United States Constitution –
Retaliation for Exercising First Amendment Rights
(42 U.S.C. § 1983)**

**SILVA-PRENTICE and PAULINO Against Defendants FALLON, KENNEWAY, GRAY,
THOMAS, ALLAIN, LANPHER, O'REILLY, D'AMADIO, MURPHY, BRESLIN,
SOUZA, LARANJO, HARVEY, PAUL, MCCULLOCH, MARCHAND, MERLINO,
FERREIRA, MULVEY, REDD, and SOUTHWORTH**

291.     Plaintiffs repeat and reallege each and every allegation set forth in the paragraphs 1 through 290 as if separately pleaded herein in their entirety and incorporate them by reference.

292.     Following the assault described above, SILVA-PRENTICE exercised his First Amendment right to petition the prison for redress by filing a grievance through the SBCC grievance process complaining of the unjustified and excessive use of force against him as described above.

293.     SILVA-PRENTICE further exercised his First Amendment right to petition and right of access to the courts by filing a civil lawsuit with other plaintiffs against SECRETARY TURCO, COMMISSIONER MICI, and SUPERINTENDENT KENNEWAY (*Larocque v. Turco*, Suffolk Superior Court Case No. 2084CV00295) and testified at a preliminary injunction hearing in that case as described above.

294.     Following the assault described above, PAULINO exercised his First Amendment right to petition elected officials for their help and to petition the prison for redress by filing a

76

grievance through the SBCC grievance process complaining of the unjustified and excessive use of force against him.

295. For engaging in this constitutionally protected conduct, SUPERINTENDENT KENNEWAY testified falsely concerning before the Suffolk Superior Court in *Larocque v. Turco* and was involved in directing or authorizing the drafting of false incident reports against SILVA-PRENTICE and PAULINO and directed or approved of referring SILVA-PRENTICE for criminal prosecution based on false claims.

296. For engaging in this constitutionally protected conduct, Defendant THOMAS caused SILVA-PRENTICE to be referred to the Worcester District Attorney for criminal prosecution, knowing such referral and the statements therein to be false, retaliatory, and without justification.

297. Defendants ALLAIN, LANPHER, O'REILLY, D'AMADIO, MURPHY, BRESLIN, SOUZA, LARANJO, HARVEY, PAUL, MCCULLOCH, MARCHAND, MERLINO, FERREIRA, HENDERSON, and PRIMACK took adverse action against SILVA-PRENTICE and PAULINO by, *inter alia,* writing and filing false incident reports, false disciplinary reports and/or testifying at disciplinary proceedings to falsely accuse SILVA-PRENTICE and/or PAULINO of assault and other alleged disciplinary offenses.

298. Defendant MULVEY took adverse action against SILVA-PRENTICE and PAULINO by prosecuting the false disciplinary charges against each of them during which he made false representations, suppressed evidence, and offered false testimony from other officers to support the charges as described above.

299. Defendant REDD took adverse action against SILVA-PRENTICE and PAULINO by finding both SILVA-PRENTICE and PAULINO guilty after their respective disciplinary

hearings in poorly reasoned, factually inaccurate, and retaliatory decisions that did not meet the required standard of substantial evidence, credited correctional officers' testimony that was clearly discredited by independent video and documentary evidence and unjustifiably ignored the weight of evidence in favor of SILVA-PRENTICE and PAULINO.

300. Defendant GRAY took adverse action against SILVA-PRENTICE for his First Amendment activities and coverup the Cell 15 squad's unconstitutional, immoral, and criminal behavior inside Cell 15 by denying SILVA-PRENTICE's timely appeal from REDD's poorly reasoned, factually inaccurate, and retaliatory decisions that did not meet the required standard of substantial evidence, credited correctional officers' testimony that was clearly discredited by forensic and expert evidence, and unjustifiably ignored the weight of evidence in favor of SILVA-PRENTICE.

301. Defendant FALLON took adverse action against PAULINO by denying his appeal from REDD's poorly reasoned, factually inaccurate, and retaliatory decisions that did not meet the required standard of substantial evidence, credited correctional officers' testimony that was clearly discredited by independent video and documentary evidence and unjustifiably ignored the weight of evidence in favor of PAULINO.

302. DOE Defendants took adverse action against SILVA-PRENTICE by illegally seizing, holding, and reviewing SILVA-PRENTICE's confidential legal notes for the *Larocque v. Turco* case on and between February 13 and 18, 2020, without a valid penological or other justification and in violation of SILVA-PRENTICE's attorney-client relationship, confidentiality, and access to courts.

303. DOE Defendants took adverse action against SILVA-PRENTICE by illegally setting him up to be attacked other prisoners on February 13 or 19, March 5, and August 19, 2020.

304. At the direction of DOE Defendants, SBCC SGT. SOUTHWORTH took adverse action against SILVA-PRENTICE when he reached into SILVA-PRENTICE's cell, unprovoked and without lawful justification, and sprayed OC into SILVA-PRENTICE's eyes and all over his face just two days after MA DOC was served with the complaint for contempt in the *LaRocque v. Turco* case.

305. These Count IV Defendants acted with the intent to retaliate against both SILVA-PRENTICE and PAULINO for engaging in protected activity intending to discredit SILVA-PRENTICE for reporting excessive force and to cover-up and attempt to justify their illegal conduct.

306. SILVA-PRENTICE would not have been assaulted by other prisoners and SGT. Southworth; had his privileged legal notes seized, held, and reviewed; would not have faced disciplinary charges; would not have been found guilty of assaulting a correction officer; and would not have served the months in solitary confinement but for Defendants' retaliatory motive to shut him up and cover up their own wrongdoing, as there was no valid independent, permissible reason for Count IV Defendants' conduct, as described above.

307. PAULINO would not have faced disciplinary charges nor served 13 months in DDU (solitary confinement) but for Count IV Defendants' retaliatory motive to shut him up and cover up their own wrongdoing as there was no valid independent, permissible reason for Count IV Defendants' conduct, as described above.

308. As a result of Count IV Defendants' conduct, SILVA-PRENTICE and PAULINO are each entitled to recover compensatory damages pursuant to 42 U.S.C. ¶1983 in an amount to be proved at trial and punitive damages for Defendants' willful and/or malicious conduct and are

79

each entitled to equitable relief including expungement of their disciplinary records related to these events.

**COUNT V**

**Conspiracy to Interfere with Civil Rights**
**(42 U.S.C. § 1983)**

**SILVA-PRENTICE and PAULINO Against ALL DEFENDANTS**

309. Plaintiffs repeat and reallege each and every allegation set forth in the paragraphs 1 through 308 as if separately pleaded herein in their entirety and incorporate them by reference.

310. As shown above, Defendants acted in concert to use unjustified and excessive force, to cover up the assault of SILVA-PRENTICE and PAULINO through false incident reports, false disciplinary charges, and false testimony and retaliate against them in violation of SILVA-PRENTICE and PAULINO's Eighth Amendment and First Amendment rights.

311. Defendants acted in a preplanned and coordinated effort to put Plaintiffs in a cell off view from cameras and then charge in unannounced, beat, and tase Plaintiffs, use attack dogs to threaten and instill fear in both Plaintiffs and then to attack PAULINO. Defendants then continued their conspiracy to cover up their conduct and further deprive Plaintiffs of their constitutional rights by coordinating to fabricate incident reports and disciplinary charges against Plaintiffs.

312. Defendants TURCO, HENDERSON, PRIMACK, TURCOTTE, FREITAS, KENNEWAY, ALLAIN, BIRRI, MCCULLOCH, O'REILLY, BRESLIN, D'AMADIO, MURPHY, and LANPHER participated in the conspiracy through their planning and execution of unjustified and excessive use of force against both SILVA-PRENTICE and PAULINO.

313. Defendants HENDERSON, PRIMACK, TURCOTTE, KENNEWAY, SOUZA, FERREIRA, HARVEY, LARANJO, PAUL, and MARCHAND participated in the conspiracy by

observing the above Defendants assault Plaintiffs and purposely standing by and failing to intervene.

314. Defendants TURCO, MICI, HENDERSON, PRIMACK, TURCOTTE KENNEWAY, DEPALO, and FREITAS participated in the conspiracy by authorizing the assaults and thus failing to properly train and supervise Defendants named in Counts I and II in their duties to provide care and custody to inmates and not use excessive force and by failing to properly supervise and enforce proper procedures in the transport of SILVA-PRENTICE and PAULINO from Cell 15.

315. Defendants ALLAIN, LANPHER, O'REILLY, D'AMADIO, MURPHY, BRESLIN, SOUZA, LARANJO, HARVEY, PAUL, MCCULLOCH, MARCHAND, MERLINO, FERRIERA, HENDERSON, and PRIMACK participated in the conspiracy by preparing false incident reports and/or disciplinary reports and/or testifying at disciplinary proceedings to falsely accuse SILVA-PRENTICE and/or PAULINO of assault and other violations as part of the cover-up and retaliation for filing grievances.

316. Defendants KENNEWAY and DEPALO participated in the conspiracy by participating in the planning of the attack against Plaintiffs in Cell 15 and through false testimony before the Superior Court in *Larocque v. Turco* to attempt to discredit SILVA-PRENTICE and PAULINO and cover-up the unjustified use of force against them.

317. Defendant MULVEY participated in the conspiracy against SILVA-PRENTICE and PAULINO by prosecuting the false disciplinary charges against each of them during which he made false representations, suppressed evidence, and offered false testimony from other officers to support the charges as described above.

318. Defendant REDD participated in the conspiracy against SILVA-PRENTICE and PAULINO by finding both SILVA-PRENTICE and PAULINO guilty after their respective disciplinary hearings in poorly reasoned, factually inaccurate, and retaliatory decisions which fail to meet the required standard of substantial evidence, credited correctional officers' testimony that was clearly discredited by independent video and documentary evidence and unjustifiably ignored the weight of evidence in favor of SILVA-PRENTICE and PAULINO.

319. Defendants FALLON and GRAY participated in the conspiracy against SILVA-PRENTICE and PAULINO by denying their appeals from REDD's poorly reasoned, factually inaccurate, and retaliatory decisions that did not meet the required standard of substantial evidence, credited correctional officers' testimony that was clearly discredited by independent video and documentary evidence and unjustifiably ignored the weight of evidence in favor of SILVA-PRENTICE and PAULINO.

320. THOMAS participated in the conspiracy against SILVA-PRENTICE by intentionally and purposely conducting a sham investigation to protect the Count I Defendants, to discredit SILVA-PRENTICE, and to allow the retaliatory disciplinary charges to proceed.

321. Defendant APPEL participated in the conspiracy against PAULINO by conducting a sham investigation to intentionally and purposely protect the Count I Defendants, to discredit PAULINO, and to allow the retaliatory disciplinary charges to proceed.

322. Defendant SHAW participated in the conspiracy against SILVA-PRENTICE and PAULINO by conducting a sham investigation to intentionally and purposely protect the Count I Defendants, to discredit SILVA-PRENTICE and PAULINO, and to allow the employment of the Count I Defendants to proceed without adverse consequence.

323.    Defendant LAWLESS participated in the conspiracy against PAULINO by making false statements to hospital staff that PAULINO had kicked or attempted to kick the attack dog and had been involved in an assault on correctional officers at SBCC after LAWLESS overheard PAULINO tell hospital staff that PAULINO was the victim of an unjustified attack by correctional officers and their attack dog.  The false statements that PAULINO had suffered injuries because he kicked or tried to kick the dog and then just fell down resulting in his injuries made their way into the medical records and were then used against him in his disciplinary proceeding.

324.    Defendant SOUTHWORTH participated in the conspiracy against SILVA-PRENTICE when he reached into SILVA-PRENTICE's cell, unprovoked and without lawful justification, and sprayed OC into SILVA-PRENTICE's eyes and all over his face just two days after and in retaliation for MA DOC being served with the complaint for contempt in the *LaRocque v. Turco* case.

325.    As a result of Defendants' conduct, SILVA-PRENTICE and PAULINO are each entitled to recover compensatory damages pursuant to 42 U.S.C. ¶1983 in an amount to be proved at trial and punitive damages for Defendants' willful and/or malicious conduct and are each entitled to equitable relief including expungement of their disciplinary records related to these events.

## COUNT VI

**Conspiracy to Interfere with Civil Rights – Deprivation of Equal Protection Under the Law (42 U.S.C. § 1985(3))**

**SILVA PRENTICE and PAULINO Against ALL DEFENDANTS**

326.    Plaintiffs repeat and reallege each and every allegation set forth in the paragraphs 1 through 325 as if separately pleaded herein in their entirety and incorporate them by reference.

327.    As shown above, Defendants acted in concert to use unjustified and excessive force and to cover up their assault of SILVA-PRENTICE and PAULINO through false incident reports,

false disciplinary tickets, and false testimony and retaliate against them in violation of SILVA-PRENTICE and PAULINO's Eighth Amendment and First Amendment rights.

328. Because the prior January 10th assault against correctional officers happened to involve Black and Latino inmates, on information and belief, Defendants specifically targeted Black and Latino prisoners in their revenge beatings on and around January 22, 2020.

329. SILVA-PRENTICE is Black with a Latino-sounding name. PAULINO is Latino.

330. Defendants acted in a preplanned and coordinated effort to put Plaintiffs in a cell off view from cameras and then charge in, beat, and tase Plaintiffs, use K-9s to threaten and instill fear in both Plaintiffs, attack the Plaintiffs, and then continued their conspiracy to deprive Plaintiffs of their constitutional rights by coordinating to fabricate their incident reports and disciplinary tickets against Plaintiffs.

331. Defendants acted with the specific purpose to beat and physically injure Plaintiffs, in violation of the Eighth Amendment, as payback for their fellow correctional officers that were beaten by different inmates in the weeks prior, to send a message to all the inmates that they could all suffer for the actions of any one inmate.

332. During the beating in Cell 15, one of the Defendants said to PAULINO "Latin King Nation, huh? Go back to your country you fucking spic!" and called him a "Latin Queen Bitch."

333. Grievances filed by other prisoners after the institution-wide shakedown also reflect racist statements directed against Latino and Black inmates.

334. Defendants also acted with the specific purpose to cover up their unjustified use of force against Latino and Black prisoners by coordinating false incident reports and disciplinary tickets to accuse Plaintiffs of being the assailants and posing a danger to the officers as part of their cover up to justify their conduct.

335. Each of the Defendants participated in this conspiracy through their specific conduct alleged above in Count V above and is adopted and incorporated herein.

336. As a result of Defendants' conduct, SILVA-PRENTICE and PAULINO are each entitled to recover compensatory damages pursuant to 42 U.S.C. ¶1985(3) in an amount to be proved at trial and punitive damages for Defendants' willful and/or malicious conduct and are each entitled to equitable relief including expungement of their disciplinary records related to these events.

**COUNT VII**

**Violation of the Massachusetts Civil Rights Act (Mass. Gen. Laws ch. 12, § 11)**

**SILVA PRENTICE and PAULINO Against Defendants ALLAIN, LANPHER, O'REILLY, D'AMADIO, MURPHY, BRESLIN, SOUZA, LARANJO, HARVEY, PAUL, MCCULLOCH, MARCHAND, MERLINO, FERREIRA, HENDERSON and PRIMACK**

337. Plaintiffs repeat and reallege each and every allegation set forth in the paragraphs 1 through 336 as if separately pleaded herein in their entirety and incorporate them by reference.

338. As shown above, Defendants' conduct interfered with SILVA-PRENTICE and PAULINO's Eighth Amendment to be free from unjustified physical assaults and their First Amendment right to petition for redress of the harm they suffered at the hands of correctional officers.

339. Defendants further interfered and/or attempted to interfere with Plaintiffs' exercise or enjoyment of these constitutional rights by threats, intimidation, or coercion.

340. Specifically, as to SILVA-PRENTICE, Defendants ALLAIN, LANPHER, O'REILLY, D'AMADIO, MURPHY, BRESLIN, SOUZA, LARANJO, HARVEY, PAUL, MCCULLOCH, MARCHAND, MERLINO, and FERREIRA filed false reports and a false disciplinary ticket against him to cover up their actions and deter him from pursuing grievances,

from pursuing his rights in court in *Larocque v. Turco*, Suffolk Superior Court Case No. 2084CV00295, and from pursuing his right to pursue redress for their conduct. Their false reports and testimony resulted in the denial of SILVA-PRENTICE's grievances and in SILVA-PRENTICE spending approximately five (5) months in solitary confinement while awaiting the resolution of ALLAIN's and MULVEY's Disciplinary Report #455339.

341. Defendants also continued a scheme of harassment against SILVA-PRENTICE by repeatedly placing him in danger among other prisoners who harmed him, as described above.

342. These Defendants' actions were tactics of threat and intimidation to make SILVA-PRENTICE fearful and/or apprehensive of further harm and thus to attempt to deter him from holding the other Defendants accountable for assaulting him and violating his constitutional rights.

343. As to PAULINO, Defendants ALLAIN, LANPHER, O'REILLY, D'AMADIO, MURPHY, BRESLIN, SOUZA, LARANJO, HARVEY, PAUL, MCCULLOCH, MARCHAND, MERLINO, FERREIRA, HENDERSON, and PRIMACK filed false reports and false disciplinary tickets against him to likewise cover up their actions and deter him from pursuing grievances and pursuing redress for their conduct. Their false reports and testimony as part of their scheme of harassment resulted in the denial of PAULINO's grievances and in PAULINO spending 13 months in DDU during which time he was denied unmonitored attorney calls. Any time he spoke to his lawyer while at DDU, the calls were monitored and recorded, so PAULINO could not speak confidentially with counsel about Defendants.

344. These Defendants' actions were tactics of threat and intimidation to make PAULINO fearful or apprehensive of further harm and thus to attempt to deter him from holding them accountable for assaulting him and violating his constitutional rights.

345.    Defendants ALLAIN, LANPHER, O'REILLY, D'AMADIO, MURPHY, BRESLIN, SOUZA, LARANJO, HARVEY, PAUL, MCCULLOCH, MARCHAND, MERLINO, FERRIERA, HENDERSON and PRIMACK thus interfered and/or attempted to interfere with SILVA-PRENTICE and PAULINO's enjoyment of their First and Eighth Amendment rights in violation of the Massachusetts Civil Rights Act.

346.    As a result of Count VII Defendants' conduct, SILVA-PRENTICE and PAULINO are each entitled to recover damages in an amount to be proved at trial.

## COUNT VIII

### Assault and Battery

**SILVA-PRENTICE and PAULINO Against Defendants ALLAIN, BIRRI, MCCULLOCH, O'REILLY, BRESLIN, D'AMADIO, MURPHY, LANPHER, and O'REILLY**

347.    Plaintiffs repeat and reallege each and every allegation set forth in the paragraphs 1 through 346 as if separately pleaded herein in their entirety and incorporate them by reference.

348.    On January 22, 2020, SILVA-PRENTICE and PAULINO had already been strip searched and removed from their cells with their personal belongings prior to being placed in Cell 15. SILVA-PRENTICE and PAULINO were thus both only wearing t-shirts, boxers, socks, and shower slippers. Cell 15 had already been searched and cleared of all property and only contained bunks with mattresses that had been cleared through x-ray scanners before being returned to Cell 15.   SILVA-PRENTICE and PAULINO had both separately been removed from their cells, escorted to the gym for the strip search, and then escorted from the gym to Cell 15 without incident. SILVA-PRENTICE and PAULINO had no weapons in their possession and neither had made any threats or attempted any assault of any staff or other inmates.

349.    Defendants ALLAIN, BIRRI, MCCULLOCH, BRESLIN, D'AMADIO, MURPHY, LANPHER bum-rushed Cell 15 on the knowingly false pretense that SILVA-

87

PRENTICE and PAULINO were a threat to the safety of correctional officers and SBCC. They did so intentionally, with the motive, approved by their supervisors, to beat Plaintiffs in retaliation for other inmates assaulting other correctional officers earlier that month.

350. Defendant LANPHER immediately shot PAULINO with a taser gun without justification and threw him off the bunk and to the ground. Defendants LANPHER, MCCULLOCH, and D'AMADIO then kicked and punched PAULINO in the head and body as well as kicked him in his ribs and spit on him.

351. Defendant ALLAIN pulled SILVA-PRENTICE off the top bunk and he, along with Defendants BIRRI and BRESLIN punched and kicked SILVA-PRENTICE without justification. Defendant BIRRI ripped dreadlocks out of SILVA-PRENTICE's head while Defendants ALLAIN and BRESLIN used their stun guns on SILVA-PRENTICE's back and back of his arm as he lay face down on the ground during the assault.

352. Defendants ALLAIN, BRESLIN, and BIRRI then cuffed SILVA-PRENTICE and picked him up off the ground, and then slammed his head against the wall of the cell as they walked him out of the cell door.

353. After beating him, Defendants LANPHER, MCCULLOCH, and D'AMADIO cuffed PAULINO, got him to his feet, and then slammed his head against the wall as they walked him out of the cell.

354. As Defendants MCCULLOCH and D'AMADIO held each of PAULINO's handcuffed arms, immediately upon PAULINO exiting Cell 15, dazed from the beating, Defendant O'REILLY launched his attack dog onto PAULINO without justification. After the dog bit at PAULINO's clothes, Defendants MCCULLOCH and D'AMADIO slammed PAULINO to the ground face down and Defendant O'REILLY had his dog continue to attack, biting PAULINO's

88

bare legs causing multiple lacerations and tearing off a chunk of his left inner thigh while PAULINO screamed in pain. Defendants MCCULLOCH and D'AMADIO also kneed and punched PAULINO while the dog bit him and ripped his boxer shorts off.

355. Defendant O'REILLY finally commanded his dog to release from PAULINO and Defendants MCCULLOCH and D'AMADIO pulled PAULINO to his feet, put him against the wall, and shackled his feet while he was bleeding significantly from the dog bites. Defendants MCCULLOCH and D'AMADIO then paraded PAULINO down the unit, naked from the waist down and bleeding, in front of superior officers and other officers including women before taking him to the recreation deck and providing new boxers and then taking him for medical treatment.

356. SILVA-PRENTICE was returned to Cell 15 and denied the medical and mental health treatment he requested for his injuries.

357. This use of force was intentional, unreasonable, and unjustified as described above.

358. Both SILVA-PRENTICE and PAULINO suffered significant physical injuries from this attack and are entitled to damages in an amount to be proved at trial.

**COUNT IX**

**Intentional Infliction of Emotional Distress**

**SILVA-PRENTICE and PAULINO Against ALL DEFENDANTS**

359. Plaintiffs repeat and reallege each and every allegation set forth in the paragraphs 1 through 358 as if separately pleaded herein in their entirety and incorporate them by reference.

360. Defendants had a duty to protect SILVA-PRENTICE and PAULINO from violence.

361. In breach of their duty and in violation of the Constitution, as described above, Defendants planned and intended to inflict physical and emotional injury upon SILVA-

89

PRENTICE and PAULINO. They planned to and did beat them in Cell 15, off-camera, intended to and attempted to cover it up by falsely claiming their conduct was justified when, in fact, this was a revenge beating intended to retaliate against the Plaintiffs for the actions of Black and Latino prisoners who participated in the January 10th altercation, to show them who is "in charge" of SBCC, to intimidate and to instill fear of future beatings at the whim of the Defendants and/or other MA DOC employees.

362.    SILVA-PRENTICE and PAULINO enjoy the constitutional right to be free from cruel and unusual punishment, including the execution of excessive force, while incarcerated,

363.    Well aware of SILVA-PRENTICE and PAULINO's rights, Defendants participated in a conspiracy whereby they arranged and executed this beating and cover-up which included sending SILVA-PRENTICE and PAULINO to solitary confinement in DDU for false allegations that each of them had assaulted the correctional officers involved when the officers were the assailants.

364.    Defendants intended to and did inflict emotional distress, specifically, fear for their lives, suffering from the physical beating, fear of further unjustified punishment and beatings sanctioned and allowed by supervisors, and the anxiety, stress, depression, and hopelessness that accompanies time in solitary confinement not only based on charges for which they were innocent but also when they themselves were the actual victims of illegal conduct by those charged with a duty to protect and maintain the safety of Plaintiffs.

365.    Defendants' intentional conduct qualifies as extreme and outrageous, and the resulting physical injuries and severe emotional distress suffered by Plaintiffs and intended by Defendants entitles Plaintiffs to damages in an amount to be proven at trial.

## COUNT X

## Civil Conspiracy – Massachusetts State Law

### SILVA-PRENTICE and PAULINO Against ALL DEFENDANTS

366. Plaintiffs repeat and reallege each and every allegation set forth in the paragraphs 1 through 365 as if separately pleaded herein in their entirety and incorporate them by reference.

367. As shown above, Defendants acted in concert to use unjustified and excessive force and to cover up their assault of SILVA-PRENTICE and PAULINO through false incident reports, false disciplinary tickets, and false testimony and retaliate against them in violation of SILVA-PRENTICE and PAULINO's Eighth Amendment and First Amendment rights.

368. Defendants acted in a preplanned and coordinated effort to put Plaintiffs in a cell off view from cameras and then charge in, beat, and tase Plaintiffs, use attack dogs to threaten and instill fear in both Plaintiffs and then to attack PAULINO and then continued their conspiracy to deprive Plaintiffs of their constitutional rights by coordinating to fabricate their incident reports and disciplinary tickets against Plaintiffs.

369. Each of the Defendants participated in this conspiracy through their specific conduct alleged above in Count V above, which is adopted and incorporated herein.

370. As a result of Defendants' conduct, SILVA-PRENTICE and PAULINO are each entitled to recover damages in an amount to be proved at trial.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs SILVA-PRENTICE and PAULINO respectfully demand relief as follows:

1. Enter judgment in favor of SILVA-PRENTICE and against Defendants on each of the counts in this Complaint;

91

2. Enter judgment in favor of PAULINO and against Defendants on each of the counts in this Complaint;

3. Award compensatory damages in favor of SILVA-PRENTICE in an amount to be proved at trial of not less than $500,000.00, for all losses, plus interest.

4. Award of compensatory damages in favor of PAULINO in an amount to be proved at trial of not less than $750,000.00, for all losses, plus interest.

5. Award punitive and exemplary damages in favor of SILVA-PRENTICE of at least $2,000,000.00.

6. Award punitive and exemplary damages in favor of PAULINO of at least $3,000,000.00.

7. Award SILVA-PRENTICE and PAULINO attorney's fees, including as permitted under 42 U.S.C. § 1983 and the Massachusetts Civil Rights Act, including expert witness fees.

8. Award to SILVA-PRENTICE and PAULINO their reasonable costs and expenses of this action.

9. Equitable remedies including ordering that: the disciplinary record of SILVA-PRENTICE be expunged of the guilty finding of assaulting a correction officer and that the disciplinary record of PAULINO be expunged of the guilty finding of aggravated assault on a correctional officer and of attempted assault on a DOC attack dog.

10. Such other and further relief at law or in equity to which the Plaintiffs may be justly entitled.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

Dated: September 27, 2021                          Respectfully submitted,

| | |
|---|---|
| */s/ Patricia A. DeJuneas* | */s/ Bridget A. Zerner* |
| Patricia A. DeJuneas (BBO #652997) | Bridget A. Zerner (BBO #669468) |
| Sibbison, DeJuneas & Allen, LLP | Markham Read Zerner LLC |
| One Commercial Wharf West | One Commercial Wharf West |
| Boston, MA 02110 | Boston, MA 02110 |
| Tel: (617) 529-8300 | Tel: (617) 523-6329 |
| Fax: (617) 742-8604 | Fax: (617) 742-8604 |
| dejuneas@sda-legal.com | bzerner@markhamreadzerner.com |
| *Counsel for Plaintiff Robert Silva-Prentice* | *Counsel for Plaintiff Dionisio Paulino* |