# EXHIBIT G

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LUIS GRAULAU and JOSE COLLAZO, <br><br> Plaintiffs, <br><br> -against- <br><br> THOMAS TURCO, CAROL MICI, PAUL HENDERSON, CHARLES PRIMACK, STEVEN KENNEWAY, JAMES FERREIRA, PATRICK DEPALO, JOSEPH FREITAS, DAVID SHAW, JAMES ALLAIN, JASON LANPHER, STUART MCCULLOCH, DENNIS BRESLIN, ROBERT D'AMADIO, DONALD DENOMME, ANTHONY CATALANO, CHRISTOPHER ALMEIDA, KEITH ALMEIDA, BRIAN ARSENAULT, JAMES MURPHY, MARK O'REILLY, PATRICK DONOVAN, RAYMOND TURCOTTE, KATIE APPEL, MICHAEL THOMAS, and DOES 1 through 20, inclusive, <br><br> Defendants. | Civil No. Civil No. <br><br> PLAINTIFFS' COMPLAINT AGAINST DEFENDANTS FOR CIVIL RIGHTS VIOLATIONS UNDER 42 U.S.C. §1983 (EIGHTH AMENDMENT AND FIRST AMENDMENT VIOLATIONS); CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS, VIOLATION OF THE MASSACHUSETTS CIVIL RIGHTS ACT, ASSAULT AND BATTERY, INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, CIVIL CONSPIRACY UNDER MASSACHUSETTS LAW, AND FOR DECLARATORY RELIEF, INJUNCTIVE RELIEF, AND DAMAGES <br><br> JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiffs LUIS GRAULAU and JOSE COLLAZO, at all relevant times state prisoners in custody at Souza-Baranowski Correctional Center, allege as follows against Defendants:

## INTRODUCTION

On January 10, 2020, a group of Black and Latino prisoners at Souza-Baranowski Correction Center ("SBCC"), the Massachusetts Department of Corrections' ("MA DOC") maximum security prison, engaged in an altercation against four (4) SBCC correction officers

1

when long-simmering tensions on the unit boiled over. The backlash was immediate and harsh: MA DOC and SBCC administrators joined forces with squads of armed and armored MA DOC officers and conspired to retaliate against scores of Black and Latino prisoners who had nothing to do with the January 10th altercation, to send a clear message as to who was "in charge" of SBCC, and to instill a sense of terror and fear of future retaliatory attacks on Black and Latino prisoners.

In furtherance of conspiracies to violate civil rights, target Black and Latino prisoners, and exact revenge, then-Deputy Commissioner Paul Henderson carefully chose a group of armed and armored officers trained to use weapons and other force on prisoners and ordered them to sneak up on the Plaintiffs' cell – located in a well-known blind spot – to use "the element of surprise" to gain "a tactical advantage."

As several MA DOC and SBCC administrators directed, authorized, watched and/or listened, Henderson's squad of at least six (6) armed officers wearing paramilitary uniforms and body armor snuck up on and violently entered the Plaintiffs' cell. The squad members restrained the Plaintiffs, then proceeded to terrorize, beat, taser, and kick them, pull out their hair, and slam them into concrete walls and a metal doorway while hurling racial, ethnic, and sexual slurs.

The Defendants well knew that there was no legitimate reason for their surprise, forcible, and violent entry into the Plaintiffs' cell. Indeed, they knew that Plaintiffs had been safely escorted earlier that same day; stripped of all clothing except for t-shirts, boxer shorts, and shower slippers; passed through body scanners; and placed inside cells that were barren of all property. The Defendants' true goal was to terrorize and beat the Plaintiffs as payback for the acts of other Latino and Black prisoners and to create an atmosphere of terror.

When the Plaintiffs dared to complain by filing grievances, the Defendants expanded the goals of their conspiracy to include retaliation for these First Amendment activities, discrediting

the Plaintiffs, and punishing them with, inter alia, false charges, baseless guilty findings, and solitary confinement, all as part of a massive coverup and to ensure such conduct could occur again in the future with impunity.

Based on the foregoing and the allegations that follow, the Plaintiffs seek compensatory and punitive damages as well as declaratory and injunctive relief.

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction over Counts I to VI in this Complaint pursuant to 28 U.S.C. § 1331 because the claims arise under the laws of the United States, specifically 28 U.S.C. § 1343 (civil rights); 28 U.S.C. § 2201 (declaratory relief); and 42 U.S.C. §§ 1981, 1983, 1985 and 1988.

2.      This Court has supplemental jurisdiction over the Massachusetts state law claims brought in Counts VII through X because these claims are so related to Counts I to VI, which are within the original jurisdiction of this Court, that these counts form part of the same case or controversy as the federal claims within the meaning of 28 U.S.C. § 1367 and involve common questions of fact and related questions of law.

3.      The claims in this action arise under the United States Constitution as applied to state authorities through 42 U.S.C. § 1983.

4.      All relevant events occurred within the Commonwealth of Massachusetts and venue is therefore proper in this District under 28 U.S.C. § 1391(b)(1)(a) and (a).

## PARTIES

5.      During all relevant times, Plaintiff Luis Graulau ("GRAULAU") resided at SBCC in Shirley, Massachusetts. He is Latino and a member of a protected class.

3

6. During all relevant times, Plaintiff Jose Collazo ("COLLAZO") resided at SBCC in Shirley, Massachusetts. He is Latino and a member of a protected class.

7. During all relevant times, Defendant Thomas Turco ("TURCO" or "SECRETARY TURCO") was the Secretary of the Executive Office of Public Safety and Security ("EOPSS"), which oversees the Massachusetts Department of Corrections ("MA DOC"). SECRETARY TURCO has since retired. He was directly involved in planning the attacks on the Plaintiffs and scores of other SBCC prisoners as well as the continuing coverup of gross government misconduct. Upon information and belief, TURCO watched as other Defendants used excessive force on the Plaintiffs, failed to intervene to stop the abuse, and failed to report other Defendants for their dereliction of duties. He is a resident of the Commonwealth of Massachusetts and is sued in his individual and official capacities.

8. During all relevant times, Defendant Carol Mici ("MICI" or "COMMISSIONER MICI") was employed by MA DOC as the Commissioner of Corrections, a position which she has held since January 18, 2019. COMMISSIONER MICI is responsible for performing the duties set forth in M.G.L. c. 124, § 1, including the maintenance of safety, security, and order at all state correction facilities, including SBCC. MICI was involved directly in planning the retaliation against Black and Latino prisoners, the First Amendment retaliation, and the continuing coverup of gross government misconduct. She is a resident of the Commonwealth of Massachusetts and is sued in her individual and official capacities.

9. During all relevant times, Defendant James Ferreira ("FERREIRA" or "ADC FERREIRA") was employed by MA DOC as Assistant Deputy Commissioner. Upon information and belief, FERREIRA was involved in planning the surprise attack on the Plaintiffs.  He is a

4

resident of the Commonwealth of Massachusetts and is sued in his individual and official capacities.

10. During all relevant times, Defendant Paul Henderson ("HENDERSON" or "DC HENDERSON") was employed by MA DOC as the Deputy Commissioner of Field Services, which oversees the squads of armed correction officers known as the Critical Incident Response Team ("CIRT"), the Hostage Rescue Team ("HRT") and the K9 Unit. Members of these squads wear body armor and carry dangerous weapons such as, *inter alia*, Electronic Control Devices ("ECD") (more commonly known as "Tasers"), firearms which shoot "pepper balls" of chemical agents, canisters of "OC" spray, specialty impact munitions and/or use attack dogs to frighten, intimidate and injure prisoners inside the walls of SBCC. HENDERSON has since retired from his position as Deputy Commissioner and currently holds a union-protected position working with the K9 Unit under COMMANDER O'REILLY. On January 22, 2020, DC HENDERSON ordered at least six (6) Defendants to employ the "element of surprise" to gain "a tactical advantage" by sneaking up on and forcibly entering the Plaintiffs' cell without first giving them the opportunity to safely "cuff up." He ordered those Defendants to use force to remove GRAULAU and COLLAZO, including but not limited to ECDs, pepper ball firearms, specialty impact devices, canisters of OC spray, shod feet, physical force, and attack dogs trained to take down and bite prisoners. HENDERSON was involved directly in planning the retaliation against Black and Latino prisoners, the First Amendment retaliation, and the continuing coverup of gross government misconduct. He is a resident of the Commonwealth of Massachusetts and is sued in his individual and official capacities.

11. During all relevant times, Defendant Patrick DePalo ("DEPALO" or "ADC DEPALO") was employed by MA DOC as the Assistant Deputy Commissioner of Field Services

and in that role held supervisory responsibilities over the commanders and members of the CIRT, HRT, and K9 Units. Upon information and belief, DEPALO was involved directly in planning the retaliation against Black and Latino prisoners, the First Amendment retaliation, and the continuing coverup of gross government misconduct. He is a resident of the Commonwealth of Massachusetts and is sued in his individual and official capacities.

12. During all relevant times, Defendant Charles Primack ("PRIMACK" or "DIRECTOR PRIMACK") was employed by MA DOC as Director of Special Operations. In that role, PRIMACK oversees the CIRT, HRT and the K9 Unit. DIRECTOR PRIMACK was involved directly in orchestrating and the retaliation against Black and Latino prisoners and the surprise attack on the Plaintiffs. Upon information and belief, he watched as other Defendants used excessive force on the Plaintiffs, failed to intervene to stop the abuse, and failed to report other Defendants for their dereliction of duties, and is involved in the continuing coverup of gross government misconduct. PRIMACK is a resident of the Commonwealth of Massachusetts and is sued in his individual and official capacities.

13. During all relevant times, Defendant David Shaw ("SHAW" or "CHIEF SHAW") was employed by MA DOC as the Chief of the Office of Investigative Services ("OIS"). SHAW cleared several Defendants of all wrongdoing during a sham investigation by MA DOC's Internal Affairs Unit ("IAU"), despite clear and compelling evidence that they used excessive force, wrote false reports, and made false statements to IAU investigators. Further, he explicitly refused to allow internal affairs officers to conduct certain investigations into obvious staff misconduct. SHAW is a resident of Massachusetts and is sued in his individual and official capacities.

14. During all relevant times, Defendant Steven Kenneway ("KENNEWAY" or "SUPERINTENDENT KENNEWAY") was employed by MA DOC as the Superintendent of

6

SBCC. In that role, KENNEWAY was responsible for the overall operation of SBCC, including the care, custody and control of prisoners housed at SBCC, the physical plant of SBCC, and the safety of prisoners, staff, and visitors. KENNEWAY was involved directly in planning the attack on the Plaintiffs, the retaliation against Black and Latino prisoners, the First Amendment retaliation, and the continuing coverup of gross government misconduct. Upon information and belief, KENNEWAY watched the attack on the Plaintiffs, failed to intervene, and failed to report other Defendants for their dereliction of duties. KENNEWAY has since retired from MA DOC. In or around 2003, KENNEWAY served as the commander of an intelligence unit which used attack dogs, torture, stress positions, fear, and intimidation to abuse prisoners at the infamous Abu Ghraib prison in Iraq. KENNWAY is a resident of the Commonwealth of Massachusetts and is sued in his individual and official capacities.

15. During all relevant times, Defendant Raymond Turcotte ("TURCOTTE" or "COMMANDER TURCOTTE") was employed by the MA DOC as a Captain and the Commander of the HRT. TURCOTTE was involved directly in planning the surprise attack on the Plaintiffs, the retaliation against Black and Latino prisoners, and the continuing coverup of gross government misconduct. He watched as other Defendants used excessive force on the Plaintiffs, failed to intervene to stop the abuse, and failed to report other Defendants for their dereliction of duties. TURCOTTE is a resident of the Commonwealth of Massachusetts. He is sued in his individual and official capacities.

16. During all relevant times, Defendant Joseph Freitas ("FREITAS" or "COMMANDER FREITAS") was employed by MA DOC as a lieutenant and as the Commander of the CIRT. Upon information and belief, FREITAS was involved directly in planning the surprise attack on the Plaintiffs, the retaliation against Black and Latino prisoners and the continuing

7

coverup of gross government misconduct. He is sued in his individual and official capacities and is a resident of the Commonwealth of Massachusetts.

17. During all relevant times, Defendant Mark O'Reilly ("O'REILLY" or "COMMANDER O'REILLY") was employed by MA DOC as a Sergeant and Commander of the K9 Unit, which uses dogs to search for drugs and attack prisoners. O'REILLY watched as other Defendants used excessive force on the Plaintiffs, wrote false reports, participated in the First Amendment retaliation, and is directly involved in the ongoing coverup of gross government misconduct. He is a resident of the Commonwealth of Massachusetts and is sued in his individual and official capacities.

18. During all relevant times, Defendant Jason L. Lanpher ("LANPHER" or "CAPT. LANPHER") was employed by the MA DOC as a Captain and member of the HRT. He attacked the Plaintiffs without justification, watched as other Defendants used excessive force on the Plaintiffs, failed to intervene, wrote false reports, failed to report other Defendants for their dereliction of duties, and is involved directly in the ongoing coverup of gross government misconduct. He is a resident of the Commonwealth of Massachusetts and sued in his individual and official capacities.

19. During all relevant times, Defendant James Allain ("ALLAIN" or "LT. ALLAIN") was employed by MA DOC as a Lieutenant and member of the HRT. He attacked GRAULAU without justification, watched as other Defendants used excessive force on the Plaintiffs, failed to intervene, failed to report other Defendants for their dereliction of duties, wrote false reports, and is involved directly in the First Amendment retaliation and the ongoing coverup of gross government misconduct. ALLAIN is a resident of the Commonwealth of Massachusetts and is sued in his individual and official capacities.

8

20.     During all relevant times, Defendant Stuart McCulloch ("MCCULLOCH" or "LT. MCCULLOCH") was employed by MA DOC as a lieutenant and member of the HRT. He attacked the Plaintiffs without justification, watched as other Defendants used excessive force on the Plaintiffs, failed to intervene, failed to report other Defendants for their dereliction of duties, wrote false reports, and is involved directly in the First Amendment retaliation and ongoing coverup of gross government misconduct. He is a resident of the Commonwealth of Massachusetts and is sued in his individual and official capacities.

21.     During all relevant times, Defendant Dennis Breslin ("BRESLIN" or "SGT. BRESLIN") was employed by MA DOC as a sergeant and member of the HRT. He attacked the Plaintiffs without justification, watched as other Defendants used excessive force on the Plaintiffs, failed to intervene, failed to report other Defendants for their dereliction of duties, wrote false reports, and is involved directly in the First Amendment retaliation and the ongoing coverup of gross government misconduct. BRESLIN is a resident of the Commonwealth of Massachusetts and is sued in his individual and official capacities.

22.     During all relevant times, Defendant Robert D'Amadio ("D'AMADIO" or "SGT. D'AMADIO") was employed by MA DOC as a sergeant and member of the HRT. He attacked GRAULAU without justification, watched as other Defendants used excessive force on the Plaintiffs, failed to intervene, failed to report other Defendants for their dereliction of duties, and is involved directly in the First Amendment retaliation and the ongoing coverup of gross government misconduct.   He is a resident of the Commonwealth of Massachusetts and is sued in his individual and official capacities.

23.     During all relevant times, Defendant James F. Murphy ("MURPHY" or "LT. MURPHY") was employed by MA DOC as a lieutenant and member of the HRT. He attacked

9

GRAULAU without justification, watched as other Defendants used excessive force on the Plaintiffs, failed to intervene, failed to report other Defendants for their dereliction of duties, and is involved directly in the ongoing coverup of gross government misconduct. He is a resident of the Commonwealth of Massachusetts and sued in his individual and official capacities.

24.     During all relevant times, Defendant Brian Arsenault ("ARSENAULT" or "CO ARSENAULT") was employed by MA DOC as a correction officer. He watched other Defendants use excessive force on GRAULAU, failed to intervene, failed to report other Defendants for their dereliction of duties, wrote false reports, and is involved directly in the First Amendment retaliation and the ongoing coverup of gross government misconduct. He is a resident of the Commonwealth for Massachusetts and is sued in his individual and official capacities.

25.     During all relevant times, Defendant Donald Denomme ("DENOMME" or "CAPT. DENOMME") was employed by the MA DOC as a Captain and member of the HRT. He attacked GRAULAU without justification, watched as other Defendants used excessive force on GRAULAU, failed to intervene, failed to report other Defendants for their dereliction of duties, wrote false reports, and is involved directly in the ongoing coverup of gross government misconduct. He is a resident of the Commonwealth of Massachusetts and sued in his individual and official capacities.

26.     During all relevant times, Defendant Anthony Catalano ("CATALANO" or "LT. CATALANO") was employed by MA DOC as a lieutenant. He attacked GRAULAU without justification, watched other Defendants use excessive force on GRAULAU, failed to intervene, failed to report other Defendants for their dereliction of duties, wrote false reports, and is involved directly in the First Amendment retaliation and the ongoing coverup of gross government

10

misconduct. He is a resident of the Commonwealth for Massachusetts and is sued in his individual and official capacities.

27.     During all relevant times, Defendant Christopher Almeida ("C. ALMEIDA") was employed by MA DOC as a correction officer. He watched other Defendants use excessive force on GRAULAU, failed to intervene, failed to report other Defendants for their dereliction of duties, wrote false reports, and is involved directly in the First Amendment retaliation and the ongoing coverup of gross government misconduct. He is a resident of the Commonwealth of Massachusetts and is sued in his individual and official capacities.

28.     During all relevant times, Defendant Keith Almeida ("K. ALMEIDA") was employed by MA DOC as a correction officer. He participated in the attack GRAULAU without justification, watched as other Defendants used excessive force on GRAULAU, failed to intervene, failed to report other Defendants for their dereliction of duties, wrote false reports, and is involved directly in the ongoing coverup of gross government misconduct.   He is a resident of the Commonwealth of Massachusetts and sued in his individual and official capacities.

29.     During all relevant times, Defendant Patrick Dononvan ("DONOVAN") was employed by MA DOC as a correction officer. He watched other Defendants use excessive force on GRAULAU, failed to intervene, failed to report other Defendants for their dereliction of duties, wrote false reports, and is involved directly in the First Amendment retaliation and the ongoing coverup of gross government misconduct. He is a resident of the Commonwealth of Massachusetts and is sued in his individual and official capacities.

30.     During all relevant times, Defendant Katie Appel ("APPEL" or "SGT. APPEL") was employed by MA DOC as a Sergeant in the Internal Affairs Unit. She was directly involved in the planning and executing the ongoing coverup of gross government misconduct. APPEL has

11

since resigned her position with MA DOC and is now employed as a police officer in Norfolk, Massachusetts. She is a resident of the Commonwealth of Massachusetts and is sued in her individual and official capacities.

31. During all relevant times, Defendant Michael Thomas ("THOMAS" or "SGT. THOMAS") was employed by MA DOC as a Sergeant in the Internal Affairs Unit. THOMAS was directly involved in planning and executing the ongoing coverup of gross government misconduct, the First Amendment retaliation, wrote false reports, and failed to report other Defendants for their dereliction of duties. He is a resident of the Commonwealth of Massachusetts and is sued in his individual and official capacities.

32. The true names and capacities of Defendants DOES 1 through 20 are presently unknown to Plaintiffs, who therefore sues them by such fictitious names. Plaintiffs are informed and believe that each of the fictitiously named defendants are responsible in some capacity for the matters herein alleged. Plaintiffs will amend this Complaint to state the true names and capacities of DOES 1 through 20 when they are ascertained.

<u>**FACTS RELEVANT TO ALL COUNTS**</u>

33. The Souza-Baranowski Correctional Center ("SBCC") is a maximum-security prison located in Shirley, Massachusetts. The complex is designed to hold up to 1,427 male prisoners.

34. The SBCC complex has a mid-section of common areas with housing units off to each side: one side is designated as the North Side and the other as the South Side.

35. In 2018, KENNEWAY took the position of Superintendent of SBCC with the responsibility of overseeing all operational aspects of the facility.

36.     In December 2018, TURCO was appointed Secretary of the Executive Office of Public Safety and Security ("EOPSS"), responsible for the policy development and budgetary oversight of agencies involved in crime prevention, including the Massachusetts Department of Corrections ("MA DOC") and its programs.

37.     In 2019, MICI was appointed Commissioner of the Massachusetts Department of Corrections, overseeing all sixteen state correction facilities, including SBCC.

38.     As of January 9, 2020, SBCC prisoners had been separated on the North and South sides by gang affiliations and known enemies to reduce the number of prisoner-on-prisoner assaults and for the safety and security of SBCC and MA DOC employees, prisoners, vendors, contractors, and visitors.

### The January 10th Altercation

39.     By January 2020, SUPERINTENDENT KENNEWAY knew or should have known that long-simmering tensions between SBCC staff and prisoners on the North Side unit known as "N1" unit had the potential to boil over.

40.     As relevant here, the problems began in or before 2015, when one of the N1 prisoners obtained a court order which required MA DOC to reassign one of the unit officers because of a prior altercation between that officer and prisoner. Despite multiple requests, MA DOC refused to obey the court order and the officer was not reassigned.

41.     The tensions between SBCC prisoners and the N1 unit officers finally reached their breaking point on January 10, 2020. On that day, a spontaneous altercation broke out between approximately sixteen (16) prisoners and four (4) correction officers.

42.     By the time the altercation ended, three officers were injured, two of whom were badly injured and required hospitalization.   Within hours of the assaults, SBCC and MA DOC

13

staff identified the prisoners suspected to be involved in the January 10th altercation and moved them to other facilities.

43. As the Superintendent of SBCC, KENNEWAY was responsible for investigating and responding to the January 10th altercation.

44. On January 10th, COMMISSIONER MICI declared that SBCC was in a state of "disorder" and invoked MA DOC's "disorder policy" which, according to MA DOC, is a "private" policy.

45. Citing the "private" "disorder policy," COMMISSIONER MICI ordered SUPERINTENDENT KENNEWAY to institute a 24-hour lockdown; to shut off all prisoner telephones; to exclude attorneys from attorney-client visits with prisoners; and to shut down CorrLinks, the system prisoners use to exchange email messages with their attorneys, friends, and family.

46. Within 24-hours of the January 10th altercation, upon information and belief, SECRETARY TURCO, COMMISSIONER MICI, SUPERINTENDENT KENNEWAY, DC HENDERSON, DIRECTOR PRIMACK, and other MA DOC and EOPSS administrators and employees knew from multiple interviews conducted by SBCC investigators and internal communications that the January 10th altercations were not planned, as MA DOC claimed then and continues to claim now. Rather, the Defendants knew that the altercation was spontaneous and in response to the actions of one of the injured officers and long-simmering tensions on the N1 unit.

### The Conspiracy to Retaliate Against Black and Latino Prisoners

47. All prisoners later charged for assault on January 10th are Black or Latino.

48.     GRAULAU and COLLAZO are Latino. However, neither GRAULAU nor COLLAZO was involved in the January 10th altercation, which the Defendants knew during all relevant times.

49.     Within days of the January 10th altercation, SECRETARY TURCO and DEFENDANT MICI dispatched more than one hundred (100) MA DOC employees to SBCC as a display of force and intimidation designed to show the SBCC prisoners who was "in charge" of SBCC.   These MA DOC employees ordinarily work at MA DOC facilities across the Commonwealth, did not wear nametags and, therefore, were largely unknown to SBCC prisoners. They are specially trained to use violence, weapons, and intimidation tactics and who volunteer to serve on the Critical Incident Response Team ("CIRT"), the Hostage Rescue Team ("HRT"), and K9 unit (which acted in combination and collectively as quasi-paramilitary squads at SBCC and are referred to herein as "squads"), all of which fall under MA DOC's Special Operations Division which was headed by DIRECTOR PRIMACK.

50.     SECRETARY TURCO and COMMISSIONER MICI gave these squads the green light to respond to the January 10th altercations as they saw fit even though the prisoners responsible for assaulting the N1 unit officers had been moved out of SBCC within hours of the assaults and no one left in the facility had any involvement whatsoever.

51.     With the express approval of SECRETARY TURCO, COMMISSIONER MICI, DC HENDERSON, ADC DEPALO and DIRECTOR PRIMACK, the squads took control of SBCC on or before January 21, 2020.

52.     In concert with SECRETARY TURCO, COMMISSIONER MICI, DC HENDERSON, ADC DEPALO, DIRECTOR PRIMACK, COMMANDER TURCOTTE, COMMANDER FREITAS, and COMMANDER O'REILLY, the squads created a climate of

15

violence, fear, and intimidation intended to show the scores of remaining Black and Latino prisoners that MA DOC employees were "in charge" of SBCC, not them. These officers wore military-type uniforms, helmets, and body armor and carried an arsenal of weapons, including but not limited to assault-rifle type firearms which shoot "pepper ball" projectiles; canisters of "OC" (a chemical agent painful to the skin); specialty impact devices; and electronic control devices ("ECD"), more commonly known as "tasers." Officers in the K9 Unit patrolled SBCC with dogs to attack and/or terrorize SBCC prisoners.

53. Under the supervision of DC HENDERSON, ADC DEPALO, DIRECTOR PRIMACK, COMMANDER TURCOTTE, COMMANDER FREITAS, COMMANDER O'REILLY, and SUPERINTENDENT KENNEWAY, the paramilitary squads committed multiple acts of unjustified violence, threats of violence, intimidation, and retribution.

54. As this was occurring, MA DOC and SBCC officials made knowingly false claims to the public that the January 10th altercations were planned and coordinated by leaders of the Latin Kings and other gangs, and that gang members were planning additional staff assaults.

55. On and between January 10 and 22, the squads assaulted dozens of prisoners with their fists, shod feet, ECDs, and chemical weapons, creating an atmosphere rife with fear.

56. Before, during, and after the calculated and concerted plan to retaliate against Black and Latino prisoners, the Defendants sought to minimize the chance they would be caught by locking out attorneys and cutting off all contact between SBCC prisoners and the outside world.

**The Shakedown**

57. As ordered by SECRETARY TURCO, COMMISSIONER MICI, DC HENDERSON, ADC DEPALO, DIRECTOR PRIMACK, CAPT. TURCOTTE, LT. FREITAS, and SUPERINTENDENT KENNEWAY, the paramilitary squads began an institution-wide

shakedown to search every prisoner, every unit, every cell, and every piece of property owned or used by prisoners.  The shakedown began on January 21 and ended January 24, 2020.

58.      During this same time, COMMISSIONER MICI ordered that SBCC be "reorganized."  Under COMMISSIONER MICI's order, prisoners were no longer separated on the North and South sides by gang affiliations and known enemies. Instead, prisoners who COMMISSIONER MICI deemed to present a threat to safety and security were sent to the North Side and the remaining prisoners were sent to the South Side.

59.      During the shakedown and its aftermath, none of the squad members wore nametags, contrary to MA DOC's policies, nor did they record on video their identities and the numbers on their helmets on video, as required by MA DOC's policy on forcible moves of prisoners, 103 DOC 503. The reason for not wearing nametags and not recording helmet numbers on video was to conceal the participating officer's involvement in the civil rights violations described in this Complaint.  As such and as was the intent of the Defendants, many prisoners were unable to identify which squad members forcibly entered their cells, called them racial and ethnic slurs, beat them, kicked them with shod feet, shot and sprayed them with chemical agents, commanded dogs to attack, and/or committed other acts of misconduct.

60.      Members of the K9 unit and their attack dogs patrolled the institution while other squad members, *inter alia*, forcibly entered cells, assaulted numerous prisoners without justification, and generally terrorized hundreds of prisoners, including Plaintiffs GRAULAU and COLLAZO, who had nothing to do with the January 10th altercation and who had done nothing to warrant any disciplinary action, much less the violence that they were subjected to by these officers.

17

61.     As the squads entered each unit, a handheld video camera with audio capabilities was placed in a stationary position to record movements within the unit.   These videos are maintained by the MA DOC Internal Affairs Unit ("IAU") on an external hard drive.

62.     Contrary to MA DOC written policies and best corrections practices, the squads routinely failed to use these or other available handheld video cameras to record forcible cell entries and extractions.

63.     Going cell to cell, the armed squads ordered prisoners to remove their clothing, strip searched them, and provided each prisoner with a white t-shirt, a pair of white boxer-type underwear, and a pair of shower slippers.

64.     Stationary surveillance cameras also recorded video, but not audio, inside the gymnasiums and on the units, except for blind spots well known to SBCC staff and prisoners. Upon information and belief, some of these surveillance recordings were, but the surveillance recordings of COLLAZO's cell extraction were deliberately destroyed.

65.     Inside the gymnasiums, the squads ordered prisoners into prolonged stress positions by standing and/or kneeling on the ground with their faces to the wall. Squad members threatened to shoot or assault prisoners who broke or were unable to maintain their stress positions.

74. While the prisoners were in the gymnasium, SBCC correction officers and/or squad members removed all property from their cells, including privileged legal mail and documents.

75. In the facilities area, MA DOC staff and/or squad members searched every piece of property that had been removed from prisoners' cells by hand and via fluoroscope machines. When contraband was found inside a prisoner's property inside the facilities room, the prisoner was

18

escorted from the gymnasium directly to the Restrictive Housing Unit ("RHU") to wait for a disciplinary report to be issued.

76. These searches provided cover for the rash of violence against prisoners that began on January 21 and ended January 24, 2020.

66. DC HENDERSON, ADC DEPALO, DIRECTOR PRIMACK, COMMANDER TURCOTTE, COMMANDER FREITAS, COMMANDER O'REILLY, and/or SUPERINTENDENT KENNEWAY decided to target GRAULAU and COLLAZO for retribution for the January 10th altercation on correction officers. At that time, the Defendants knew that GRAULAU and COLLAZO had nothing to do with the January 10th altercation but targeted them specifically because they believed both were leaders of the Latin Kings at SBCC. By targeting them for attack, the Defendants intended to send a message to all Black and Latino gang members that they would pay for the actions of other SBCC prisoners.

67. As part of their plan for retribution, DC HENDERSON claimed to be in receipt of "intelligence" that GRAULAU and COLLAZO were actively planning additional assaults on unidentified MA DOC staff members, as allegedly ordered by fellow SBCC prisoner Dionisio Paulino, who was viciously attacked and bitten by O'Reilly's attack dog on the same day that Defendants attacked GRAULAU and COLLAZO. Upon information and belief, there is no such credible "intelligence." Instead, this claim was a fiction used by the Defendants to justify the brutal, illegal, and immoral conduct described within this Complaint.

68. Citing the "intelligence" TURCO, HENDERSON, PRIMACK, TURCOTTE, FREITAS, O'REILLY, and/or KENNEWAY concocted a plan to terrorize and attack PLAINTIFFS. To that end, they hand-selected squads of armed and armored officers, K9 officers, and attack dogs to execute their plan.

19

69.     What followed on January 22, 2020 was a pattern of conduct by the Defendants that would repeat itself during multiple forced cell extractions of dozens of inmates. HENDERSON ordered the Defendants to enter the Plaintiffs' cells without warning to gain a "tactical advantage."  In violation of DOC's policy on forcible moves of prisoners, the Defendants did not attempt to de-escalate, did not call for an impartial staff member to attempt to de-escalate, did not ask GRAULAU or COLLAZO to "cuff up," did not warn GRAULAU or COLLAZO that force would be used if they refused to cuff up, and did not use OC spray to incapacitate GRAULAU or COLLAZO.  These DOC policies are designed to avoid the use of force and would have avoided the use of force against GRAULAU and COLLAZO.

## ASSAULTS ON GRAULAU

70.     On January 22, 2020, GRAULAU was living in the P-2 Unit, Cell #32.  GRAULAU was housed alone in Cell #32.

71.     That morning, at about 10:00 a.m., MA DOC tactical team member, including MCCULLOCH, BRESLIN, D'AMADIO, ARSENAULT, CATALANO, KEITH ALMEIDA, CHRISTOPHER ALMEIDA and DONOVAN arrived at Cell #32, purportedly to remove GRAULAU from his cell for cell reassignment.

72.     Without warning, the door to Cell #32 was opened.  Tactical team members, including MCCULLOCH, BRESLIN, D'AMADIO, ARSENAULT, CATALANO and K. ALMEIDA, stormed into the cell and pointed laser guided weapons at GRAULAU.  The tactical team ordered GRAULAU to move to the back of his cell and face the wall.  GRAULAU complied with the orders.

73.     Without provocation or justification, D'AMADIO punched GRAULAU in the mouth, causing GRAULAU to collapse onto his bed.  GRAULAU attempted to curl up on the bed

20

to protect himself as staff members continued to administer additional blows.  While GRAULAU was restrained, BRESLIN and MCCULLOCH discharged multiple taser shots into GRAULAU.

74.     ARSENAULT and K. ALMEIDA later applied restraints to GRAULAU.  Once GRAULAU was handcuffed, D'AMADIO grabbed GRAULAU by the hair and slammed GRAULAU'S head against the lip of the metal-framed bed, opening a large cut on GRAULAU'S forehead.  At no time did GRAULAU resist or disobey an order.  At no time did GRAULAU act in a threatening manner toward staff members.

75.     C. ALMEIDA and DONOVAN stood outside the cell and failed to intervene and stop the assault on GRAULAU.

76.     Tactical team members eventually removed GRAULAU from his cell and transported him to the HSU.  Once in the HSU, GRAULAU cleared the BOSS chair, which is a metal detector that screens for weapons.  No weapons or other contraband were found on GRAULAU.

77.     ARSENAULT took GRAULAU to the nurse's station for treatment.  GRAULAU informed the nurse on duty that he was feeling dizzy and had been vomiting, which the nurse dismissed.  The nurse on duty also suggested to GRAULAU that he caused the cut to himself.  After having his cut bandaged, GRAULAU was moved to the L-3 Unit, Cell #6.  While in the Cell #6, GRAULAU reported to staff that he was still feeling nauseous and requested a medical evaluation.

78.     While he was waiting in his cell, GRAULAU heard at least one barking dog in the hallway.  GRAULAU could also hear staff members bragging about having just assaulted another inmate.  GRAULAU heard staff members approach his cell.  Shortly before 4:00 p.m., without

warning or announcing themselves, tactical team members opened the door to Cell #6 and stormed into his cell for the second time that day.

79. The purpose of this entry was to administer additional beatings to GRAULAU and to intimidate him into silence about the earlier beating.

80. The tactical team involved in this second beating included DENOMME, LANPHER, ALLAIN, MURPHY, O'REILLY, D'AMADIO, MCCULLOCH, and BRESLIN. Once they entered the cell, DENOMME immediately tased GRAULAU in the back, causing him to drop to the floor. Tactical team members, including DENOMME, LANPHER, ALLAIN and MURPHY repeatedly kicked, punched and tased GRAULAU. The brutal force of this beating caused the gash on GRAULAU's head to reopen and bleed. Tactical team members then grabbed GRAULAU by the hair and smeared his face in the blood on the floor.

81. O'REILLY, with his K-9, MCCULLOCH, BRESLIN and D'AMADIO aided and abetted the assault on GRAULAU by standing watch outside of Cell #6. Both failed to intervene and stop the assault on GRAULAU, in violation of DOC policy.

82. At no time did GRAULAU resist or disobey an order. At no time did GRAULAU act in a threatening manner toward staff members.

83. After this second beating, GRAULAU was transported to the nurse's station. While in the nurse's station, and after the nurse had left the room, a tactical team member threatened GRAULAU not to report his beatings and to "shut the fuck up" and "keep your mouth shut." Another team member threatened GRAULAU that they would return to beat GRAULAU again and again if he did not keep quiet about the beatings.

84. As a result of Defendants' intentional and repetitive conduct, GRAULAU suffered physical injuries and severe emotional distress.

85.     The squad members' use of force against GRAULAU was excessive, unnecessary and wanton.  The use of force was applied maliciously, sadistically and solely for the purpose of inflicting pain on GRAULAU. The tactical team members' actions were not justified by any valid penological purpose.

86.     Contrary to DOC policy and regulations, staff members did not take photographs of GRAULAU's injuries.  The failure to photograph GRAULAU's injuries was intentional and designed to conceal the Defendants' conduct throughout SBCC on January 22.  The failure to photograph GRAULAU's injuries was consistent with the failure to photograph multiple inmate injuries resulting from forced cell extractions on January 22.

### ASSAULTS ON COLLAZO

87.     On January 22, 2020, COLLAZO was housed in the P-2 housing unit when a tactical team entered his cell.  COLLAZO shared the cell with another prisoner.

88.     HENDERSON ordered tactical team members to extract COLLAZO from his cell by force and without warning.  The tactical team members involved in COLLAZO's forced cell extraction included LANPHER, BRESLIN, MCCULLOCH and O'BRIEN. The tactical team members included individuals from the group of over 100 MA DOC employees that SECRETARY TURCO and DEFENDANT MICI dispatched to SBCC as a display of force and intimidation.

89.     The tactical team entered COLLAZO's P2 cell without warning and with tasers drawn, ordering COLLAZO to lie face down on his bed.  Tactical team members stood over COLLAZO, pointing the taser at his face.

90.     Team members strip-searched COLLAZO in his cell.  They did not find any weapons on COLLAZO.  Team member handcuffed COLLAZO and removed him from his cell

wearing nothing but a shirt, boxers and shower slippers. COLLAZO was then escorted to the BOSS chair, which confirmed what the strip search had already confirmed, COLLAZO was not carrying any items on his person.

91. Thereafter, team members placed COLLAZO in an empty cell in the L-2 Unit – Cell #3. Prior to COLLAZO's placement in Cell #3, MA DOC employees searched and cleared the cell of all items. The only item in the cell was a roll of toilet paper. From the time COLLAZO left the P-2 housing unit until the time he was placed in Cell #3, he did not leave the sight of the team members that transported him.

92. At some point thereafter, tactical team members, commenced a forced cell extraction of COLLAZO from Cell #3.

93. Tactical team members, including LANPHER, BRESLIN and MCCULLOCH entered the cell to commence a forced cell extraction that was ordered and authorized by HENDERSON. O'REILLY stood watch outside the cell with his K-9.

94. Defendants decided not to use a handheld video recorder to document the attacks on Plaintiffs, in violation of DOC rules and regulations. The decision not to record the forced cell extraction was intentional, as MA DOC staff did not want a video record of the premeditated and unjustified assault on COLLAZO. The decision was designed to conceal the squad members' premeditated illegal assault. It also provided the tactical team members an opportunity to further conceal their conduct by filing false reports concerning the extraction.

95. Squad members, including LANPHER, BRESLIN and MCCULLOCH entered Cell #3 without warning. Once in the cell, LANPHER immediately fired his taser at COLLAZO, who offered no resistance and already had his hands up and was facing the back of the cell wall. The taser probes hit COLLAZO on his backside and COLLAZO dropped to the floor. LANPHER

24

activated his taser a second time without cause. Once on the floor, tactical team members, including LANPHER, BRESLIN and MCCULLOCH, kicked, kneed and punched COLLAZO.

96. Team members also intentionally ripped out COLLAZO hair braids. This was not an accident. Nor was there any valid penological purpose for pulling on COLLAZO's hair with such force that it would come out of his scalp. The ripping out of COLLAZO's hair braids was done intentionally, maliciously and sadistically. It was designed solely to inflict pain on COLLAZO and to humiliate, degrade and demean him.

97. Indeed, ripping out the dreadlocked or braided hair of Black and Latino inmates was a common practice on January 22, 2020. Indeed, MA DOC employees considered hair pieces as a trophy souvenir of the inmates they violently assaulted. MA DOC employees bragged about their contest to see who could scalp the longest dreadlock or braid from an inmate.

98. At no time during this confrontation did COLLAZO disobey any orders from tactical team member, who acted without warning. At no time during this confrontation did COLLAZO threaten tactical team members nor take a threatening stance toward tactical team members. At no time during this confrontation did COLLAZO resist the tactical teams' efforts to restrain him.

99. LANPHER did not attempt to de-escalate, did not call for an impartial staff member to attempt to de-escalate, did not ask COLLAZO to "cuff up," did not warn COLLAZO that force would be used if they refused to cuff up, and did not use OC spray to incapacitate COLLAZO, all in violation of DOC's policy on forcible moves of prisoners. If LANPHER had complied with MA DOC's policy on forced moves of prisoners, use of any force on COLLAZO would have been unnecessary.

100. O'REILLY aided and abetted the assault on COLLAZO by standing watch outside of Cell #3 with his K-9. O'REILLY failed to intervene and stop the assault on COLLAZO, in violation of DOC policy.

101. Following the assault, several members of the tactical team, including LANPHER, BRESLIN, MCCULLOCH, and O'REILLY with his K-9, escorted COLLAZO to the Health Services Unit ("HSU"). COLLAZO was placed in the BOSS chair room where tactical team members again assaulted him. Video cameras were positioned in a manner that the interior of the room was not videoed.

102. Team members, including LANPHER, BRESLIN and MCCULLOCH, escorted COLLAZO, while handcuffed, to a bathroom in a waiting room, which was yet another blind spot from video cameras. While in the bathroom, team members kicked in the back of COLLAZO's legs and forced onto his knees.

103. Thereafter, LANPHER, BRESLIN and MCCULLOCH brought COLLAZO to an exam room, which also did not have a video camera. While in the exam room, team members made crude comments about COLLAZO's vulnerable position and made threats of sexually assaulting him.

104. At the HSU, staff did not take pictures of COLLAZO's injuries, in violation of DOC rules and regulations. COLLAZO was never asked to have photos of his injuries taken on January 22, 2020. The failure to take pictures was intentional as MA DOC staff did not want a record of COLLAZO's injuries.

105. As a result of the assault that HENDERSON ordered and LANPHER, BRESLIN, MCCULLOCH and O'REILLY carried out, COLLAZO suffered injuries to his back, knees, head

and scalp.  COLLAZO has continued to suffer emotional distress from the assault, including severe sleeplessness, depression and anxiety.

106.    The tactical team members' use of force against COLLAZO was excessive, unnecessary and wanton.  The use of force was applied maliciously, sadistically and solely for the purpose of inflicting pain on COLLAZO. The tactical team members' actions were not justified by any valid penological purpose.

107.    Following the assault, staff took COLLAZO's legal materials and personal items, including letters from his deceased mother.  As of this date, those items have not been returned to COLLAZO.

## FIRST AMENDMENT ACTIVITIES

108.    More than one hundred (100) prisoners, including GRAULAU and COLLAZO, filed grievances reporting that on and between January 10 and March 1, 2020, they were the victims of excessive force, racial discrimination and intimidation, sexual assault, and deliberate indifference to their imminent needs for mental health treatment, the latter of which resulted in at least two attempted suicides.

109.    MA DOC denied each prisoner grievance that alleged staff misconduct on and between January 10 and March 1, 2020, well knowing that their denials were knowingly false.

110.    On about January 29, 2020, GRAULAU filed grievances related to the assaults in P-2, Cell #32 and L-3, Cell #6 described above. Upon receipt, the grievances were transferred it to internal affairs, where SHAW assigned APPEL to conduct a sham investigation.

111.    On February 11, 2020, APPEL began a sham inquiry in which she began with a presumption that the MA DOC employees were telling the truth and GRAULAU was lying.  At no time did APPEL shift from that presumption.

27

112.    On about February 12, 2020, COLLAZO filed a grievance concerning his assault on January 22, 2020. TOCCI received the grievance and referred it to internal affairs.  SHAW received the grievance and assigned THOMAS to investigate it.

113.    THOMAS began a sham inquiry on February 19, 2020.   In an effort to conceal the actions of MA DOC employees, THOMAS credited the false statements of LANPHER, BRESLIN, MCCOLLUCH nor O'REILLY during his investigation of COLLAZO's grievance. On about May 27, 2020, THOMAS dismissed the grievance.

114.    As a form of retaliation, and as part of an effort to discourage and interfere with future grievances, THOMAS issued COLLAZO a disciplinary report for making a false allegation against staff members.

## DEFENDANTS' FALSE REPORTS AND COVER-UP

115.    Staff members attempted to justify their actions by making false claims against GRAULAU and COLLAZO.

116.    In violation of the Plaintiffs' federal and constitutional rights, G.L. c. 268, § 6A, 103 CMR 505, and MA DOC policies and in furtherance of the conspiracies to target Black and Latino prisoners, retaliate, and cover up the mass brutality at SBCC in January 2020,  and to circumvent MA DOC regulations and policies which require use of force incidents to be reported immediately and for employees who witness such force to submit timely written reports about their observations, the Defendants agreed to, and did, falsify the dates and substantive content of disciplinary and incident reports which accuse GRAULAU and COLLAZO of committing numerous, unfounded MA DOC disciplinary offenses.

117.    In violation of G.L. c. 268, § 6A, 103 CMR 505.14, and MA DOC policies and in furtherance of the conspiracies to target Black and Latino prisoners, retaliate, and cover up the

mass brutality at SBCC in January 2020, the Defendants backdated and falsified their respective incident reports to give the false appearance that they had timely reported legitimate uses of force, knowing that their reports contain false information.

118. In violation of the Plaintiffs' federal and state constitutional rights, G.L. c. 268, § 6A, 103 CMR 505, and MA DOC policies and in furtherance of the conspiracies to target Black and Latino prisoners, retaliate, and cover up the mass brutality at SBCC in January 2020, the Defendants wrote and issued reports containing and/or repeating multiple material lies told by other Defendants in their respective reports.

119. In violation of the Plaintiffs' state and federal constitutional rights, G.L. c. 268, § 6A, 103 CMR 505.14, and MA DOC policies, and in furtherance of the conspiracies to target Black and Latino prisoners, retaliate, and cover up the mass brutality at SBCC in January 2020, the Defendants coordinated and aligned the material and false statements in their reports as set forth below.

### A. Reports Concerning the GRAULAU Assault in P-2, Cell #32

120. With respect to the assault on GRAULAU in P-2, Cell #32, MCCULLOCH and BRESLIN falsely claiming that GRAULAU appeared to reach for D'AMADIO's pepperball launcher. D'AMADIO falsely claimed that GRAULAU actually grabbed the barrel of his pepperball launcher, which required D'AMDADIO to give multiple orders to release it. These claims were knowingly false when they were made.

121. D'AMADIO admitted to striking GRAULAU in the face. His justification was to get GRAULAU to release the pepperball launcher.

122. D'AMADIO, MCCULLOCH, BRESLIN, CATALANO, ARSENAULT, C. ALMEIDA and K. ALMEIDA backdated their incident reports and falsely claimed that

GRAULAU had reached for D'AMDAIO's pepperball launcher. These claims were knowingly false when they were made.

123. In addition, despite D'AMADIO's admission that he punched GRAULAU in the face for actually grabbing his pepperball launcher, neither MCCULLOCH, BRESLIN, CATALANO, ARSENAULT, C. ALMEIDA, nor K. ALMEIDA reported D'AMADIO's punch in their incident reports. The failure to report D'AMADIO's conduct was part of a coordinated effort to conceal D'AMADIO's conduct because they knew D'AMADIO's conduct was unjustified and illegal.

124. In violation of G.L. c. 268, § 6A, 103 CMR 505.14, and MA DOC policies and in furtherance of the conspiracies to target Black and Latino prisoners, retaliate for First Amendment activities, and coverup the mass brutality at SBCC in January 2020, D'AMADIO issued a disciplinary report to GRAULAU for this alleged act, wherein he falsely claimed that GRAULAU assaulted him and attempted to grab his pepperball launcher during the forced cell extraction of GRAULAU from Cell #32. D'AMADIO also backdated the report January 22, 2020. Indeed, FREITAS signed off on the disciplinary report on March 3, 2020, over a month after GRAULAU had filed his January 29 grievance and almost a month after APPEL began her inquiry into GRAULAU's grievance. Despite the seriousness of such an allegation, the disciplinary report was "administratively closed" without explanation.

### B. Reports Concerning Assault on GRAULAU in L-3, Cell #6

125. With respect to the assault on GRAULAU in the L-3 Unit, Cell #6, DENOMME, LANPHER, ALLAIN and MURPHY falsely claimed that the Office of Special Investigative Services ("OIS") had learned that GRAULAU had threatened staff and was believed to be directly involved in ordering staff assaults. In fact, OIS had no credible information or sources to support

30

this allegation. This allegation was knowingly false and fabricated in an attempt to justify their illegal use of force on GRAULAU.

126. In an effort to justify the assault in Cell #6, DENOMME and ALLAIN, falsely claimed that GRAULAU reached for an item from a desk in Cell #6. This was a knowingly false claim. GRAULAU had been searched and cleared of weapons before he was placed in Cell #6. Cell #6 had also previously been searched and cleared of any weapons. Neither DENOMME nor ALLAIN could identify the alleged item. Moreover, no item was secured from the cell following the assault on GRAULAU.

127. The false claim that GRAULAU attempted to arm himself during the cell entry fits a pattern of false claims staff members made throughout the day in an effort to justify their gratuitous beatings of inmates. In each instance, the claim was made after an inmate was removed from his cell, searched and placed in a new cell that had been cleared of any potential weapons.

128. In violation of G.L. c. 268, § 6A, 103 CMR 505.14, and MA DOC policies and in furtherance of the conspiracies to target Black and Latino prisoners, retaliate for First Amendment activities, and coverup the mass brutality at SBCC in January 2020, ALLAIN issued a disciplinary report falsely claiming that GRAULAU verbally threatened staff, assaulted staff and caused the deployment of a taser during the forced cell extraction of GRAULAU from Cell #6. In the disciplinary report, ALLAIN repeated the false claim that GRAULAU reached for an unknown object from his desk. ALLAIN also falsely claimed that the incident was referred to the District Attorney, in order to create the appearances of legitimacy to his false report and to pressure GRAULAU to plead to the false charges.

129. ALLAIN's disciplinary report was backdated to January 22, 2020. Indeed, the report was signed off by ALLAIN's supervisor on February 20, 2020, almost a month after

GRAULAU's January 29 grievance and nine days after APPEL began her inquiry into GRAULAU's grievance.

130.    Claims of previously searched inmates reaching for unidentified objects in previously cleared cells was a common claim on January 22, 2020.  In every instance, no item was discovered in or secured from the cell.  As set forth below, the identical claim was made against COLLAZO in reports the Defendants wrote following their assault on COLLAZO.

### C.  Reports Concerning Assault on COLLAZO

131.    LANPHER, BRESLIN, MCCOLLUCH and O'REILLY submitted false, backdated incident reports and made false statements to investigators as part of a coordinated effort with other tactical team members to hide their illegal assault.  Each falsely claimed, without any support, that COLLAZO threatened to assault staff members and that COLLAZO was believed to have been involved in ordering future assaults on staff members. Each claimed that this was the basis for COLLAZO's forced cell extractions on January 22, 2020.

132.    In addition, LANPHER, BRESLIN, MCCOLLUCH and O'REILLY, in an effort to justify their assault, falsely claimed that COLLAZO reached for an item from a desk in Cell #3.  COLLAZO had been strip searched and cleared of weapons before he was placed in the previously searched and cleared Cell #3. Neither LANPHER, BRESLIN, MCCOLLUCH nor O'REILLY could identify the alleged item.  Moreover, no item was secured from the cell following the assault on COLLAZO.

133.    In violation of G.L. c. 268, § 6A, 103 CMR 505.14, and MA DOC policies and in furtherance of the conspiracies to target Black and Latino prisoners, retaliate for First Amendment activities, and coverup the mass brutality at SBCC in January 2020, BRESLIN issued a backdated disciplinary report falsely claiming that COLLAZO, among other things, threatened and assaulted

staff during his forced cell extraction from Cell #3.  In the disciplinary report, BRESLIN repeated the false claim that COLLAZO reached for an unknown object from his desk.  BRESLIN's disciplinary report was backdated to January 22, 2020.  Indeed, the report was signed off on March 3, 2020, weeks after COLLAZO's February 12 grievance and the commencement of THOMAS's inquiry on February 19.

## CAUSES OF ACTION

### COUNT I

**Violation of the Eighth Amendment to the United States Constitution
Cruel and Unusual Punishment (42 U.S.C. § 1983)**

**GRAULAU and COLLAZO Against Defendants MCCULLOCH, BRESLIN, D'AMADIO, ARSENAULT, CATALANO, K. ALMEIDA, C. ALMEIDA, ALLAIN, MCCULLOCH, BRESLIN, D'AMADIO, LANPHER, O'REILLY, DONOVAN, and DENOMME**

134.    Plaintiffs repeat and reallege each and every allegation set forth in the paragraphs 1 through 133 as if separately pleaded herein in their entirety and incorporate them by reference.

135.    The U.S. Constitution's Eighth Amendment, as incorporated against States via the Fourteenth Amendment, guarantees that prisoners may not be subjected to cruel and unusual punishment by State actors.

136.    Here, Defendants MCCULLOCH, BRESLIN, D'AMADIO, ARSENAULT, CATALANO, K. ALMEIDA, C. ALMEIDA, ALLAIN, MCCULLOCH, BRESLIN, D'AMADIO, LANPHER, O'REILLY, DONOVAN, and DENOMME (collectively, "Count I Defendants"), state actors, used unjustified and excessive force against PLAINTIFFS in violation of the Eighth Amendment.

137.    As described above in detail, the Count I Defendants, without justification, stormed PLAINTIFFS' cells without allowing them the opportunity to cuff up and be escorted from the

33

cell peacefully, violently attacked PLAINTIFFS, failed to report excessive force, failed to intervene, and falsified reports regarding such unconstitutional and unlawful conduct.

138. As described above, there was no justification for this use of force as there was no credible information or evidence that justified Count I Defendants reasonably perceiving either GRAULAU or COLLAZO as a threat, neither threatened or assaulted the Count I Defendants, neither had weapons in their cells, and there was otherwise no disturbance or security threat requiring use of force.

139. Rather, the Count I Defendants acted maliciously and unjustifiably and in furtherance of their conspiracies to target Black and Latino prisoners, and to target the Plaintiffs specifically, by unnecessarily and wantonly inflicting pain, all in violation of PLAINTIFFS' constitutional rights.

140. For the sole purpose of covering up their unlawful, immoral, and criminal conduct, the Count I Defendants thereafter fabricated false disciplinary and incident reports accusing both GRAULAU and COLLAZO of assaulting staff and engaging in other disciplinary offenses.

141. The Count I Defendants caused harm to PLAINTIFFS in the form of lacerations, abrasions, bruises, cuts, and loss of hair, as well as distress, trauma, fear, and depression resulting from the physical injuries inflicted by the Defendants.

142. As a result of Count I Defendants' conduct, GRAULAU and COLLAZO suffered and are each entitled to recover compensatory damages pursuant to 42 U.S.C. ¶1983 in an amount to be proved at trial and punitive damages for Defendants' willful and/or malicious conduct and are each entitled to equitable relief including expungement of their disciplinary records related to these events.

## COUNT II

**Violation of the Eighth Amendment to the United States Constitution
Cruel and Unusual Punishment – Failure to Protect / Failure to Intervene
(42 U.S.C. § 1983)**

**GRAULAU and COLLAZO Against Defendants ALLAIN, CATALANO, K. ALMEIDA,
C. ALMEIDA, MCCULLOCH, O'REILLY, BRESLIN, D'AMADIO, MURPHY,
LANPHER, HENDERSON, PRIMACK, TURCOTTEE, KENNEWAY, FREITAS,
DONOVAN and DENOMME**

143.    Plaintiffs repeat and reallege each and every allegation set forth in the paragraphs 1 through 142 as if separately pleaded herein in their entirety and incorporate them by reference.

144.    For more than two (2) minutes, Defendants ALLAIN, CATALANO, K. ALMEIDA, C. ALMEIDA, MCCULLOCH, O'REILLY, BRESLIN, D'AMADIO, MURPHY, LANPHER, DONOVAN and DENOMME and, upon information and belief, HENDERSON, PRIMACK, TURCOTTEE, KENNEWAY, and FREITAS (collectively, "Count II Defendants") were present during and observed the beating of GRAULAU and COLLAZO.

145.     The Count II Defendants each had the realistic opportunity to intervene and prevent the unjustified use of force.

146.    The Count II Defendants each were obligated to intervene and protect GRAULAU and COLLAZO from the excessive force that unfolded before their eyes and ears by the Count II Defendants, each of whom has a duty to intervene to protect an inmate when he sees another officer using excessive force against a prisoner.

147.    The non-intervention of Count II Defendants violated the Eighth Amendment rights of GRAULAU and COLLAZO by failing to protect them from excessive force and their inaction manifested deliberate indifference to a substantial risk of serious harm and actual infliction of serious harm as described above.

35

148. As a result of Count II Defendants' conduct, GRAULAU and COLLAZO suffered and are each entitled to recover compensatory damages pursuant to 42 U.S.C. ¶1983 in an amount to be proved at trial and punitive damages for Defendants' willful and/or malicious conduct and are each entitled to equitable relief including expungement of their disciplinary records related to these events.

**COUNT III**

**Violation of the Eighth Amendment to the United States Constitution
Cruel and Unusual Punishment – Failure to Properly Train and Supervise
(42 U.S.C. § 1983)**

**GRAULAU and COLLAZO Against Defendants TURCO, MICI, HENDERSON,
PRIMACK, TURCOTTE, KENNEWAY, DEPALO, SHAW and FREITAS**

149. Plaintiffs repeat and reallege each and every allegation set forth in the paragraphs 1 through 148 as if separately pleaded herein in their entirety and incorporate them by reference.

150. Defendants SECRETARY TURCO, COMMISSIONER MICI, DC HENDERSON, DIRECTOR PRIMACK, DIRECTOR TURCOTTE, SUPERINTENDENT KENNEWAY, CHIEF SHAW, ADC DEPALO, and COMMANDER FREITAS (collectively, the "Count III Defendants") violated the Eighth Amendment rights of GRAULAU and COLLAZO by failing to properly train and supervise the Count I Defendants and Count II Defendants in their duties to provide care and custody to SBCC prisoners and to use only reasonable and appropriate force and by failing to properly supervise and enforce proper procedures in the forcible cell entries described above.

151. In violation of their duties, the Count III Defendants directly enabled and sanctioned the use of excessive force in violation of and with deliberate indifference to the Plaintiffs' Eighth Amendment rights

36

152.    Based on the facts known and observed by him, HENDERSON was not justified in authorizing a surprise entry into PLAINTIFFS' cells rather than requiring the squad to follow MA DOC policies, including those related to the use of force, forcible cell entries, and forcible moves of prisoners, as well as the standard procedure of ordering prisoners to turn around and cuff up before entry.

153.    Rather than providing the Count I and Count II Defendants with proper training and supervision, the Count III Defendants allowed and/or authorized to continue the unspoken policy or custom at SBCC whereby SBCC officers  assault SBCC prisoners as a means of retaliation; failed to take appropriate remedial measures against correctional officers who perpetuate the unspoken policy or custom of committing assaults on prisoners as a means of retaliation; and otherwise allowed to continue and flourish a climate at SBCC in which correctional officers at SBCC believe they can use unnecessary force with impunity.

154.    The unspoken policy or custom described above pervades and corrupts MA DOC's prisoner grievance process such that prisoners who use the grievance process to complain about MA DOC staff misconduct, including the use of excessive force, are not properly investigated, inculpatory evidence against correctional officers is suppressed or discounted, and the testimony of correctional officers is automatically credited without proper corroboration or justification.

155.    The unspoken policy or custom described above pervades and corrupts MA DOC's prisoner disciplinary process such that prisoners who use the grievance process to complain about MA DOC staff misconduct, including the use of excessive force, are improperly and without factual justification charged and found guilty of MA DOC disciplinary offenses as further means of retaliation, discrediting prisoners, and preventing prisoners from exercising their right of access to courts in pursuit of civil remedies.

37

156.     The Count I and Count II Defendants perpetuated, and the Count III Defendants allowed and authorized, the execution of the above-described policy or custom, against GRAULAU and COLLAZO as described above.

157.     As a result of the Count III Defendants' conduct, GRAULAU and COLLAZO suffered the physical, mental, and emotional injuries described above, their grievances were not properly investigated, and they were wrongfully found guilty of false disciplinary charges and punished with time in solitary confinement.

158.     As a result of the Count III Defendants' conduct, GRAULAU and COLLAZO suffered and are each entitled to recover compensatory damages pursuant to 42 U.S.C. ¶1983 in an amount to be proved at trial and punitive damages for Defendants' willful and/or malicious conduct and are each entitled to equitable relief including expungement of their disciplinary records related to these events.

## COUNT IV

### Violation of the First Amendment to the United States Constitution – Retaliation for Exercising First Amendment Rights
### (42 U.S.C. § 1983)

### GRAULAU and COLLAZO Against Defendants SHAW, THOMAS, APPEL, HENDERSON, KENNEWAY, ALLAIN, LANPHER, O'REILLY, D'AMADIO, MURPHY, BRESLIN, MCCULLOCH, DONOVAN, DENOMME, ARSENUALT, K. ALMEIDA, C. ALMEIDA, AND CATALANO

159.     Plaintiffs repeat and reallege each and every allegation set forth in the paragraphs 1 through 158 as if separately pleaded herein in their entirety and incorporate them by reference.

160.     Following the assault described above, PLAINTIFFS exercised their First Amendment rights to petition the prison for redress by filing grievances through the SBCC grievance process complaining of the unjustified and excessive use of force against them as described above.

38

161. The Count I and II took adverse action against GRAULAU and COLLAZO by, *inter alia,* writing and filing false incident reports, false disciplinary reports and/or testifying at disciplinary proceedings to falsely accuse them of lying and/or assaulting staff, as well as other alleged disciplinary offenses.

162. As a result of Count IV Defendants' conduct, GRAULAU and COLLAZO are each entitled to recover compensatory damages pursuant to 42 U.S.C. ¶1983 in an amount to be proved at trial and punitive damages for Defendants' willful and/or malicious conduct and are each entitled to equitable relief including expungement of their disciplinary records related to these events.

## COUNT V

### Conspiracy to Interfere with Civil Rights
### (42 U.S.C. § 1983)

### GRALAU and COLLAZO Against ALL DEFENDANTS

163. Plaintiffs repeat and reallege each and every allegation set forth in the paragraphs 1 through 162 as if separately pleaded herein in their entirety and incorporate them by reference.

164. As shown above, Defendants acted in concert to use unjustified and excessive force, to cover up the attacks on GRAULAU and COLLAZO through false incident reports, false disciplinary charges, and false testimony and retaliate against them in violation of PLAINTIFFS' Eighth Amendment and First Amendment rights.

165. Defendants acted in a preplanned and coordinated effort to put Plaintiffs in cells out of camera view and then charge in unannounced, beat, and tase Plaintiffs, and to use attack dogs to threaten and instill fear in both Plaintiffs. Defendants then continued their conspiracy to cover up their conduct and further deprive Plaintiffs of their constitutional rights by coordinating to fabricate incident reports and disciplinary charges against Plaintiffs.

166. Defendants MCCULLOCH, BRESLIN, D'AMADIO, ARSENAULT, CATALANO, K. ALMEIDA, C. ALMEIDA, ALLAIN, MCCULLOCH, BRESLIN, D'AMADIO, LANPHER, O'REILLY, DONOVAN, and DENOMME participated in the conspiracy through their planning and execution of unjustified and excessive use of force against both GRAULAU and COLLAZO.

167. Upon information and belief, HENDERSON, PRIMACK, TURCOTTE, KENNEWAY, SOUZA, and FREITAS participated in the conspiracy by observing the above Defendants assault Plaintiffs and purposely standing by and failing to intervene, by authorizing the assaults and thus failing to properly train and supervise Defendants named in Counts I and II in their duties to provide care and custody to inmates and not use excessive force and by failing to properly supervise and enforce proper procedures in the extraction and transport of PLAINTIFFS.

168. Defendants ALLAIN, LANPHER, O'REILLY, D'AMADIO, MURPHY, BRESLIN, MCCULLOCH, K. ALMEIDA, C. ALMEIDA, ARSENAULT, DENOMME, DONOVAN, and CATALANO participated in the conspiracy by preparing false incident reports and/or disciplinary reports and/or testifying at disciplinary proceedings to falsely accuse GRAULAU of assault, COLLAZO of lying, and other violations as part of the cover-up and retaliation for filing grievances.

169. THOMAS participated in the conspiracy by intentionally and purposely conducting a sham investigation to protect the Count I and Count II Defendants, to discredit COLLAZO, and to allow the retaliatory disciplinary charges to proceed.

170. Defendant APPEL participated in the conspiracy against GRAULAU by conducting a sham investigation to intentionally and purposely protect the Count I Defendants, to discredit GRAULAU, and to allow the retaliatory disciplinary charges to proceed.

171. Defendant SHAW participated in the conspiracy against PLAINTIFFS by conducting a sham investigation to intentionally and purposely protect the Count I Defendants, to discredit PLAINTIFFS, and to allow the employment of the Count I Defendants to proceed without adverse consequence.

172. As a result of Defendants' conduct, GRAULAU and COLLAZO are each entitled to recover compensatory damages pursuant to 42 U.S.C. ¶1983 in an amount to be proved at trial and punitive damages for Defendants' willful and/or malicious conduct and are each entitled to equitable relief including expungement of their disciplinary records related to these events.

## COUNT VI

**Conspiracy to Interfere with Civil Rights – Deprivation of Equal Protection Under the Law (42 U.S.C. § 1985(3))**

**GRAULAU and COLLAZO Against ALL DEFENDANTS**

173. Plaintiffs repeat and reallege each and every allegation set forth in the paragraphs 1 through 172 as if separately pleaded herein in their entirety and incorporate them by reference.

174. As shown above, Defendants acted in concert to use unjustified and excessive force and to cover up their assault of PLAINTIFFS through false incident reports, false disciplinary tickets, and false testimony and retaliate against them in violation of PLAINTIFFS' Eighth Amendment and First Amendment rights.

175. Because the prior January 10th assault against correctional officers happened to involve Black and Latino inmates, on information and belief, Defendants specifically targeted Black and Latino prisoners in their revenge beatings on and around January 22, 2020.

176. GRAULAU and COLLAZO are both Latino.

177. Defendants acted in a preplanned and coordinated effort to put Plaintiffs in a cell off view from cameras and then charge in, beat, and tase them, use K-9s to threaten and instill fear

41

in both Plaintiffs, attack the Plaintiffs, and then continued their conspiracy to deprive Plaintiffs of their constitutional rights by coordinating to fabricate their incident reports and disciplinary tickets against Plaintiffs.

178. Defendants acted with the specific purpose to beat and physically injure Plaintiffs, in violation of the Eighth Amendment, as payback for their fellow correctional officers that were beaten by different inmates in the weeks prior, to send a message to all the inmates that they could all suffer for the actions of any one inmate.

179. Grievances filed by other prisoners after the institution-wide shakedown also reflect racist statements directed against Latino and Black inmates.

180. Defendants also acted with the specific purpose to cover up their unjustified use of force against Latino and Black prisoners by coordinating false incident reports and disciplinary tickets to accuse Plaintiffs of being the assailants and posing a danger to the officers as part of their cover up to justify their conduct.

181. Each of the Defendants participated in this conspiracy through their specific conduct alleged above in Count V above and is adopted and incorporated herein.

182. As a result of Defendants' conduct, GRAULAU and COLLAZO are each entitled to recover compensatory damages pursuant to 42 U.S.C. ¶1985(3) in an amount to be proved at trial and punitive damages for Defendants' willful and/or malicious conduct and are each entitled to equitable relief including expungement of their disciplinary records related to these events.

**COUNT VII**

**Violation of the Massachusetts Civil Rights Act (Mass. Gen. Laws ch. 12, § 11)**

**GRAULAU and COLLAZO Against All Defendants**

183. Plaintiffs repeat and reallege each and every allegation set forth in the paragraphs 1 through 182 as if separately pleaded herein in their entirety and incorporate them by reference.

184. As shown above, Defendants' conduct interfered with PLAINTIFFS' Eighth Amendment to be free from unjustified physical assaults and their First Amendment right to petition for redress of the harm they suffered at the hands of correctional officers.

185. Defendants further interfered and/or attempted to interfere with Plaintiffs' exercise or enjoyment of these constitutional rights by threats, intimidation, or coercion.

186. Defendants' actions were tactics of threat and intimidation to make PLAINTIFFS fearful and/or apprehensive of further harm and thus to attempt to deter him from holding the other Defendants accountable for assaulting him and violating his constitutional rights.

187. Defendants thus interfered and/or attempted to interfere with GRAULAU's and COLLAZO's enjoyment of their First and Eighth Amendment rights in violation of the Massachusetts Civil Rights Act.

188. As a result of Count VII Defendants' conduct, GRAULAU and COLLAZO are each entitled to recover damages in an amount to be proved at trial.

## COUNT VIII

### Assault and Battery

**GRAULAU and COLLAZO Against Defendants ALLAIN, BRESLIN, MCCULLOCH, O'REILLY, BRESLIN, D'AMADIO, MURPHY, LANPHER, DENOMME, CATALANO, K. ALMEIDA, C. ALMEIDA, and DONOVAN**

189. Plaintiffs repeat and reallege each and every allegation set forth in the paragraphs 1 through 188 as if separately pleaded herein in their entirety and incorporate them by reference.

190. This use of force was intentional, unreasonable, and unjustified as described above.

191. Both COLLAZO and GRAULAU suffered significant physical injuries from this attack and are entitled to damages in an amount to be proved at trial.

## COUNT IX

### Intentional Infliction of Emotional Distress

### GRAULAU and COLLAZO Against ALL DEFENDANTS

192. Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 191 as if separately pleaded herein in their entirety and incorporate them by reference.

193. Defendants had a duty to protect COLLAZO and GRAULAU from violence.

194. In breach of their duty and in violation of the Constitution, as described above, Defendants planned and intended to inflict physical and emotional injury upon COLLAZO and GRAULAU.

195. COLLAZO and GRAULAU enjoy the constitutional right to be free from cruel and unusual punishment, including the execution of excessive force, while incarcerated,

196. Defendants participated in a conspiracy whereby they arranged and executed these beatings and cover-up which included disciplining COLLAZO and GRAULAU on false allegations that each of them had attempted to assault correctional officers.

197. Defendants intended to and did inflict emotional distress.

198. Defendants' intentional conduct was extreme and outrageous and likely to result in severe emotional distress.

199. The resulting physical injuries and severe emotional distress suffered by Plaintiffs and intended by Defendants entitles Plaintiffs to damages in an amount to be proven at trial.

## COUNT X

### Civil Conspiracy – Massachusetts State Law

### GRAULAU and COLLAZO Against ALL DEFENDANTS

200.    Plaintiffs repeat and reallege each and every allegation set forth in the paragraphs 1 through 199 as if separately pleaded herein in their entirety and incorporate them by reference.

201.    Defendants acted in concert to use unjustified and excessive force and to cover up their assault of COLLAZO and GRAULAU through false incident reports, false disciplinary tickets, and false testimony and retaliate against them in violation of Plaintiffs' Eighth Amendment and First Amendment rights.

202.    Defendants continued their conspiracy to deprive Plaintiffs of their constitutional rights by coordinating to fabricate their incident reports and disciplinary tickets against Plaintiffs.

203.    Each of the Defendants participated in this conspiracy through their specific conduct alleged above in Count V above, which is adopted and incorporated herein.

204.    As a result of Defendants' conduct, GRAULAU and COLLAZO are each entitled to recover damages in an amount to be proved at trial.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs GRAULAU and COLLAZO respectfully demand relief as follows:

1. Enter judgment in favor of GRAULAU and against Defendants on each of the counts in this Complaint;

2. Enter judgment in favor of COLLAZO and against Defendants on each of the counts in this Complaint;

3. Award of compensatory and punitive damages in favor of GRAULAU for all losses, plus interest;

4. Award compensatory and punitive damages in favor of COLLAZO for all losses, plus interest;

5. Award GRAULAU and COLLAZO attorney's fees, including as permitted under 42 U.S.C. § 1983 and the Massachusetts Civil Rights Act, including expert witness fees;

6. Award GRAULAU and COLLAZO their reasonable costs and expenses of this action;

7. Grant GRAULAU and COLLAZO such other relief as the Court deems just and proper.

### JURY DEMAND

Plaintiffs hereby demand a jury trial on all claims so triable.

LUIS GRAULAU and JOSE COLLAZO
By their attorney,

/s/ Matthew D. Thompson
Matthew D. Thompson
BBO No. 655225
BUTTERS BRAZILIAN LLP
699 Boylston Street
Boston, Massachusetts 02116
617-367-2600
Dated: January 19, 2023          thompson@buttersbrazilian.com