# EXHIBIT K

COMMONWEALTH OF MASSACHUSETTS

Worcester, ss.

Superior Court
No. 20 CV 415 C

Tony B. Gaskins, Joseph Gomes,
Michael Collins, Alfred Andrews,
Tamik Kirkland, Rakeem Young,
Emmitt Perry, Derrick Washington,
Sahr Josiah, Rolando Stockton,
Larry Ahart, Gregory Janowicz, Damante Burrell,
Andre J. McNeil,

Verified Civil Complaint
and Jury Demand

    Plaintiffs,

v.

Carol Mici, Commissioner of Correction;
Steven Kenneway, Superintendent of
Souza Baranowski Correctional Center;
Thomas Turco, III, Secretary of Public
Safety; (23) John Does, Correctional
Officers; (10) Jane Doe, Correctional
Officer,

    Defendants.



FILED
MAR 24 2020
ATTEST: _____ CLERK

## I. INTRODUCTION

The Plaintiffs bring this civil action against the Defendants for multiple violations of their civil rights, for Prison Rape Elimination Act ("PREA") violations, for being placed under harsh conditions for retaliatory purposes at the Souza Baranowski Correctional Center (hereinafter "SBCC"), and for subjecting them to cruel and unusual punishment conditions in violation of state and federal laws.

## II. JURISDICTION

Jurisdiction is invoked upon this court pursuant to G.L.c. 30A, §§ 1-8, G.L.c. 231A, § 2, and 42 U.S.C. § 1983.

-2-

1. The Plaintiff, Tony Gaskins, is and was at all times relevant to this complaint, whose address is: SBCC, 1 Harvard Road, Shirley, Ma..01464.

2. The Plaintiff(s), Joseph Gomes, Emmitt Perry, Michael Collins, Alfred Andrews, Tamik Kirkland, Rakeem Young, Derrick Washington, Sahr Josiah, Rolando Stockton, Larry Ahart, Damante Burrell, Gregory Janowicz, and Andre J. McNeil, and others similarly situated, whose address is: SBCC, 1 Harvard Road, Shirley, Ma. 01464, is and was at all times relevant to this complaint.

3. The Defendant, Carol Mici, is the Commissioner of Correction, whose business address is: Department of Correction, 50 Maple Street, Suite 3, Milford, Ma. 01757, is and was at all times relevant to this complaint, and is being suied in her individual capacity.

4. The Defendant, Steven Kenneway, is the Superintendent of SBCC, whose business address is: SBCC, 1 Harvard Road, Shirley, Ma. 01464, is and was at all times relevant to this complaint, and is being sued in his individual capacity.

5. The Defendant, Thomas Turco, III, is the Secretary of Public Safety and Security, whose business address is: Office of Public Safety, One Ashburton Place, Room 2133, Boston, Ma. 02108, is and was at all times relevant to this complaint, and is being sued in his individual capacity.

-3-

6. The Defendant(s), (23) John Doe(s), are correctional officers who are employed by the Department of Correction, and worked on the "Tactical Team" on January 22, 2020, when the PREA violation occurred on Plaintiff Tony Gaskins, whose work addresses are unknown.

7. The Defendants, (10) Jane Does, are correctional officers who are employed by the Department of Correction, and worked on the "Tactical Team" on January 22, 2020, when the PREA violation occurred on Plaintiff Tony Gaskins, whose work address is unknown.

IV. STATEMENT OF FACTS

8. In December 1998, SBCC opened and housed 500 prisoners on the South Side of the facility from the Southeastern Correctional Center ("SECC"), and 500 prisoners on the North Side of the facility from MCI-Cedar Junction. The entire facility was single cells.

9. In 2008, then Commissioner of Correction, Harold Clarke, doubled up all cells in SBCC of the flats of every block, excluding the handicap cells. All top tier cells were single cells.

10. From the years 1998 until January 22, 2020, all prisoners within the L1, L2, M1, M2, P1, P2, N1, N2, K2, H2, G2, G1 came out of cell for an average of four hours per day. The J2 block was converted into a "long termers" block, and was out of cell from 9 a.m. to 11 a.m, 1 p.m.

-4-

to 4 p.m., and 6:30 p.m. to 9:30 p.m.

11. In 1998 until the late 2000's, all prisoners in all blocks ate their food in the prison dining hall. In particular, in 1998 through about 2006, prisoners from the North Side would eat in the chow hall, and when the South Side was ready to eat, they would enter the chow hall as the North Side was finishing up, and both sides would have access to one another without incident.

12. The visiting room area had always been split by the South Side and North Side. However, it was not split due to enemy situations. It was just the way the facility was being ran when it was opened in 1998.

13. The prison had always had a mixture of groups on both sides of the facility. The administration had separated the groups in or around 2010, where the South Side was split into where the Crips, Gangster Disciples, LaFamilia, H-Block, and Columbia Point were placed; and the North Side was split into where the Bloods, Latin Kings, Outlaws, etc. Before this split, all groups lived together without major incidents. It was not until they split the groups up is when the level of violence increased.

14. From 1998 until around 2013, prisoners were allowed to work with one another from both sides of the facility. This occurred without incident. The administration thereafter split the workers up and would let the North Side only work

-5-

with North Side prisoners, and that was the same policy for the South Side, although there was no problem for them to have worked together as had been done prior.

15. Now, whether if its work or programs, they are all set up into two movements and work calls. The Barbershop Program only allows the North Side workers to work on separate days than the South Side prisoners, although prior to that practice, they all worked in the barbershop together.

16. In 2019, Defendant Kenneway became the superintendent at SBCC, Defendant Mici became the Commissioner of Correction, and Defendant Turco became the Secretary of Public Safety.

17. Defendants Kenneway, Mici and Turco allowed guards to come into the facility with weapons openly walking around intimidating prisoners with in violation of the use of force regulations.

18. Defendant Kenneway, Mici and Turco brought into the facility a scanning machine that is the equivalent of a cavity search device, and are doing body cavity searches on prisoners without a valid warrant before intruding into their bodies with said machine. The inner body is protected under search and seizure laws.

19. Defendant Kenneway shut down the prison dining area and made all prisoners eat within their cells as if they are being punished or in a segregation unit, and not

-6-

a general population where they must be allowed to eat in the prison dining area that was designed for such purposes.

20. Defendants Mici and Kenneway have a policy where they are forcing prisoners/plaintiffs to have their incoming money sent to a third party vendor (Access Correction) instead of being deposited directly into their accounts as mandated by law and the regulations.

21. Plaintiff Gaskins had his sister send him $50 on 9/16/19, and the facility at MCI-Concord sent it to St. Louis for deposit into Access Corrections account instead of depositing it, and Access Corrections sent it back to Mr. Gaskins sister without depositing it. See. Exhibit A.

22. Then, Plaintiff Gaskins had his sister, Sindey Hayes send him another $50, and it, too, was sent to St. Louis instead of being directly deposited into his account as mandated by the regulation which has the force of law. See. Exhibit B.

23. Defendant Mici and Defendant Kenneway has instituted a policy that Plaintiffs and others similarly situated are not allowed to send out money from their accounts to family or friends in contrast to the regulation mandating such. It even states that Plaintiffs and other prisoners can have money sent out of their accounts in the Handbook recently written by Defendant Kenneway, but its not being implemented. See Exhibit C, at p. 30.

-7-

24.   The Defendants Mici and Kenneway are attempting to circumvent the rules where the prisoners and staff must eat the same foods by using Culinary Arts as a way to eat better foods than the prison population in violation of the food policy.   The Defendants even went as far as attempting to change the policy on 3/1/20 to reflect this circumvention. See Exhibit D.

25.   Prior to that date, it was the policy since the DOC's inception for prisoners and staff to eat the same foods. The Culinary Arts program must be constituted into the main prison kitchen where not only the population can eat the same food as staff, but for the kitchen workers to receive the proper skills and training to acquire gainful employment in the Culinary field upon release from custody.

26.   Defendant Kenneway implemented a policy where he is no longer providing shaving razors to the prison population in violation of state and federal laws.   He is forcing prisoners/plaintiffs to purchase electric razors from Access Corrections at prices most cannot afford for two different types of electric razors, when the shaving razors purchased through Keefe Canteen cost an average of .20¢ per razor. This act constitutes cruel and unusual punishment.

RETALIATORY CONDITIONS

27.   On 1/10/20 a fight broke out between staff and prisoners in the N-1 block at the facility.   The facility went into a two week long lockdown on that date.

-8-

28.  On January 21, 2020, around 20 prisoners in the L-2 Block were stripped down by the Tactical Team, all of their property removed from their cells and placed in a cart and taken to property, while they were all walked out of the block in their boxer shorts, t-shirts and shower slippers at gunpoint.

29.  On January 22, 2020, the Tactical Team accosted plaintiffs out of their respective beds early in the morning hours at gunpoint, stripped all of them down to their bare skin, and at the same time, had three weapons pointed at them, a Taser Gun, Tommy Gun Bean Bag, and a Pellet Gun, all with lasers on them.

30.  In particular, Plaintiff Gaskins was stripped in the presence of a female (Jane Doe), along with two other male staff (John Does), where he was naked and lifted his balls, bent over and spread his butt cheeks, stuck his fingers in his mouth, and then allowed to put on only a pair of boxers, t-shirt and to wear his shower shoes. He was handcuffed and walked at gunpoint to the gym area, where his penis was potruding through his boxers for everyone (women staff included) to see. When he got to the gym, he was made to stand against the wall for two hours before being brought back to his cell #49 in the L-2 block.

-9-

31. He was completely humiliated and embarrassed. Plaintiff Gaskins was being retaliated against by Defendant Kenneway and Mici for the actions that occurred on N-1 that he had no involvement in. This goes for the other plaintiffs too.

32. Defendants Mici and Kenneway were in L-2 where Gaskins and other plaintiffs witnessed Mici and Kenneway sanctioned the assault of prisoners within the block by the Tactical Team, who did not use any cameras during their use of force practice, nor were they wearing any identification on their clothing so they could not be identified by prisoners as they exact vengeful abuse upon all plaintiffs and others similarly situated.

33. When the plaintiffs were brought back to their respective cells, all of their property was removed. The mattress and pillow had no pillow case or sheets and blankets. The cells were stripped bare and none of their property was returned to them from 1/22/20 until 1/24/20 for those who were placed on the South Side. Those on the North Side went without any property for weeks, if not a month or so. And some of the plaintiffs who were moved to the South Side are still missing some of their property, never to be returned to them.

34. Through the direction and supervision of Kenneway, the Inner Perimeter Security team ("IPS") decided who stayed on the North Side and who went to the South Side of the prison.

-10-

35.   Plaintiff Washington was physically assaulted by the Tactical Team on 1/24/20, where he was Tased and physically beaten while he was in restraints inside his cell. This was not done in accordance with use of force procedures, rules and regulations. This was retaliatory in nature against the entire prison population for what had occurred in N-1 that Plaintiff Washington had no involvement in.

36.   Plaintiffs who live on the North Side (Grey side) do not have nay of their property with the exception of their Tablets. Their televisions, all electrical appliances, sneakers and other property were confiscated from them and they were provided blue "BoBo" sneakers that is deficient to wear on their feet. This was all done to punish them. The North Side canteen purchase was reduced to $35 in purchase from the $50 (that was recently dropped from $85 for the entire population as retaliatory measures against the population).

37.   The North Side plaintiffs can only come out of their respective cells and recreate six prisoners at a time; six in the block area, and six on the recreation deck area. The prisoners on the recreation deck cannot come back in until the hour recreation period is up.

38.   The North Side plaintiffs can no longer participate in programs, attend religious services, attend the main prison law library or library. All activities are done inside

-11-

their respective blocks.  And Defendant Kenneway has now implemented a policy where all North Side prisoners are now receiving "Media" disciplinary sanctions, where their media access on their tablets are shutdown.  This basically shut off all outside communication access via emails with loved ones, and to be able to watch the movies on their tablets soince they have been denied to access their televisions.

39.  All Plaintiffs on the North Side of the facility are under DSU-type conditions that are much worse than what the DSU regulations permit DSU-prisoners to possess while living under such conditions.

40.  None of the plaintiffs or similarly situated prisoners on the North Side were not placed under those conditions in accordance with the DSU regulations.

41.  Plaintiffs who were moved to the South Side were informed that they would be placed in general population, and that the conditions will be the same as before the lockdown.  Instead, plaintiffs on the South Side were placed under DSU-type conditions in a manner similar to what the Supreme Judicial Court found violated the DSU regulations.

42.  Each block with the exception of H-1 (Program Block), and J-2 (Long Termers Block), are separated into two blocks, a "High Side" block and a "Low Side" block, each having its

-12-

own movement and activities out of cell separate from the other side of the same block.  There is no physical inter-action whatsoever.

43.  Each Block, K-2, H2, G2, J-1, K-1 have separate yards, gym periods, programs, schooling access, etc.  When one side of the block is out for recreation and the prisoner from the other side of the block has to make a movement, the entire side of the other side of the block that is out, must either lock back into their respective cells or be locked out on the recreation deck area while that individual makes his movement.  Once that person has left the block, they are all let back out for recreation to continue.  This is a quasi DSU setting and all plaintiffs and others similarly situated were placed under these conditions without the due process procedural protections as required in the DSU regu-lation.

44.  For a couple weeks after 1/24/20, plaintiffs on the South Side were getting out of their cells for one hour in the morning from either 9 a.m. to 10 a.m., or 10 a.m. to 11 a.m., and from 1 p.m. to 2:30 p.m., and from 2:30 p.m. to 4 p.m.  Than around some time in late February, Defendant Kenneway changed the entire schedule as retaliatory purposes and cutback drastically on out of cell time.

-13-

45. In all of the South Side blocks, with the exception of J-2 and maybe H-1, the morning recreation time schedule has been cutback from one hour to 45 minutes, from 9 a.m. to 9:45 a.m., and 9:45 a.m. to 10:30 a.m.

46. In the afternoon, time has been cutback to 12:45 p.m. to 1:30 p.m., and 1:30 p.m. to 2:15 p.m. Then the night recreation period differs in the side who comes out first for that day, will come out at night from 6:00 p.m. to 8:00 p.m., and the second side recreation period will be from 8:15 p.m. to 9:30 p.m.

47. This schedule creates a serious risk of disturbance and safety amongst the prison population in each block ran in such a manner. If every block is operating at full capacity, it will contain 50 prisoners maximum on each side of the block. You will then have fifty prisoners coming out during diminished recreation pperiods trying to access 8 showers, and using 11 phones. The phone calls are in 20 minute time periods, and 45 minutes is not enough time for a reasonable amount of prisoners to use the phone.

48. Prisoners are unable to call their attorneys anymore at reasonable time periods, because Defendant Kenneway told staff not to let anyone out of their cells to use the phone if it is not their recreation time and period. So, if a plaintiff has to call an attorney at 5:00 p.m., he will not be able to do so. And that goes for as well if the call has to be made at 2:30, 3:00, 3:30, 4:00, etc.

-14-

49. The double bunking at the facility is causing privation and hardships amongst the plaintiffs, whereas they have been forced into a cell with another prisoner due to the retaliatory policy implemented by Defendant Kenneway.

50. Every cell on the North Side are doubled with the exception of the two handicap cells. No prisoner is allowed to live in the single cells on the second tiers in the M1, N1, P1, L1, L2, M2, N2, P2, and N2 blocks on the North Side of the prison.

51. Plaintiffs Collins, Gomes, Perry, Josiah, Washington, Ahart, McNeil, and Janowicz, and Stockton were all placed into cells with other prisoners. The plaintiffs living in double cells are locked in between 23, 21½ to 22 hours a day, making their conditions unconstitutional. This hardship was placed on them deliberately and intentionally in retaliation for the 1/10/20 incident they had no involvement in.

52. Staff are now stating that their jobs are easier where they don't have to do much work anymore. Plaintiff Gaskins was told by a Sergeant, "Fuck the guys on the North Side, they get nothing!" Then, Plaintiff Gaskins heard the I.P.S. Officer state to the G-2 block officer that work is easier for them now.

53. Plaintiffs on the South Side of the facility are now being denied access to shower in the morning and afternoon

when they either come back from the yard or gym during those hours.  When plaintiffs come back from the morning or afternoon gym or yard, they are required to lock into their cells with their cellmates, stinking, sweaty under unsaniatry conditions.  This is the new policy implemented by Defendant Kenneway in retaliation for the 1/10/20 incident.  This constitutes cruel and unusual punishment to deny prisoners showers upon return from yard recreation and/or gym recreation.

54.  The blocks plaintiffs are living in are filthy and the administration are not requiring them to be cleaned properly, whether by staff or prison workers.  The showers are filthy and not cleaned properly in some instances not cleaned at all.

55.  The block where plaintiffs are required to recreate in, the floors are filthy, the tables are filthy and never cleaned, and the seats have all kinds of filth on them due to them never being cleaned.  The plaintiffs are living in an environment that is a serious risk to their health and safety.

56.  The I.P.S. are confiscating legal documents upon court return trips and holding them before returning them.

## V. CAUSE OF ACTION

Plaintiffs realleges and reaffirms paragraphs 1-56, and incorporates them into this cause of action.

## DOUBLE BUNKING VIOLATION

Defendants Turco, Mici, and Kenneway double bunking policy is unconstitutional, where plaintiffs and similarly situ-

-16-

ated prisoners are being housed in cells with other prisoners for 23, 22, and 21½ hours with a very limited amount of out-of-cell time, in violation of the 8th Amendment to the United States Constitution, 14th Amendment, Article 26 of the Massachusetts Declaration of Rights, G.L.c. 30A, §§ 1-8, G.L.c. 12, §§ 11H, 11I, G.L.c. 231A, § 2, Article 12 of the Massachusetts Declaration of Rights, and acting under color of law, violated 42, U.S.C. § 1983. Also being violated is G.L.c. 127, § 22, where it is not permitted to double bunk prisoners in the State of Massachusetts.

INTENTIONAL HARDSHIPS

Defendants Turco, Mici and Kenneway has placed intentional hardships on plaintiffs and other similarly situated prisoners, where they were placed intentionally under more restrictive conditions of confinement for retaliation purposes, where their out-of-cell time was cutback, which creates an undue burden on the prison population in regards to access to phones and showers, where fifty prisoners must vie for phone and shower access within a 45 minute time period. This violates the 8th and 14th Amendments to the United States Constitution, Articles 12 and 26 of the Massachusetts Declaration of Rights, G.L.c. 30A, §§ 1-8, G.L.c. 231A, § 2, G.L.c. 12, §§ 11H, 11I, and 42 >.S.C. § 1983.

-17-

NORTH SIDE DSU-TYPE CONDITIONS

Defendants Kenneway, Mici, and Turco, after the 1/10/20 incident, instituted DSU-type conditions amongst the entire prison population at SBCC with the exception of J-2 and H-1 blocks, where all of the plaintiffs and similarly situated prisoners living on the North Side had all of their property taken from them, and given only their Tablets (if they own one), or a radio (if they own one), took their sneakers purchased through the commissary, replacing them with state-issued "BoBo" sneakers that are defective for footwear, cut-back their out off cell time to one hour per day, and they must recreate in six man recreation periods, where a group of six will be locked on the recreation deck area while the other six group of prisoners will be allowed to recreate indoors inside the block. They are not alllowed any movement outside the block to attend religious services, law library or library access, gym access, or main prison yard access. This was done in retaliation for the 1/10/20 incident, and without any procedural protections as mandated in 103 CMR 421.00, et seq. and <u>Haverty v. Commissioner of Correction</u>, 437 Mass. 737 (2001). The plaintiffs and similarly situated prisoners on the North Side are living under conditions worse than described in <u>Haverty,</u> and this violates Artciles 12 and 26 of the Massahcusetts Declaration of Rights,

-18-

8th and 14th Amendments to the United States Constitution, G.L.c. 30A, §§ 1-8, G.L.c. 231A, § 2, G.L.c. 12, §§ 11H, 11I, and acting under color of law, violated 42 U.S.C. § 1983.

SOUTH SIDE DSU-TYPE CONDITIONS

On 1/24/20 Defendants Kenneway and Mici devised a policy for the South Side being ran as a so-called "population" side, however, the conditions are of a DSU. The blocks are divided into halves, a "low side" and "high side." Each block functions as two blocks in one, whereas prisoners on the low side of the block has no interaction outside the cells with anyone on the high side of the block. Each side has its own movements, as if they were divided by "North Side" and "South Side" of the prison. Plaintiffs and similarly situated prisoners were told that they would be placed in the South Side blocks, and that they were to be ran like they were before the lockdown. But all plaintiffs and similarly situated prisoners go to school and programs separated by which side they live on, and that goes for accessing the yard, gym, etc., with the exception of visiting periods. More importantly, the time out of cell has been cutback from 4 hours, to an average of $2\frac{1}{2}$ hours of out of cell time per day. These conditions are no different than  what was deemed a violation of procedural due process protections articulated

-19-

in Haverty v. Commissioner of Correctinn, 437 Mass. 737
(2001), and violates 103 CMR 421.00, et seq., as well as
the 14th Amendment to the United States Constitution, and
Article 12 of the Massachusetts Declaration of Rights, G.L.c.
231A, § 2, G.L.c. 30A, §§ 1-8, and 42 U.S.C. § 1983.

## DENIAL OF SHAVING RAZORS

Defendant Kenneway instituted a policy where he took
away the ability for plaintiffs and similarly situated pri-
soners to have razors, and is forcing plaintiffs and simi-
larly situated prisoners to either purchase electric shaving
equipment from Access Correction/Keefe Corp., or go without,
because he is not providing everyone with a loaner electric
razor. This is unconstitutional to deny prisoners access
to razors. This constitutes cruel and unusual punishment,
where everyone cannot afford to purchase the expensive electric
shaving equipment, and therefore, must go without shaving
altogether in violation of Articles 12 and 26 of the Massa-
chusetts Declaration of Rights, 8th and 14th Amendments to
the United States Constitution, G.L.c. 30A, §§ 1-8, G.L.c.
12, §§ 11H, 11I, G.L.c. 231A, § 2, and 42 U.S.C. § 1983.

## INCOMING FINANCES VIOLATION

Defendant Mici and Kenneway have a policy that goes
against the regulation where the plaintiff(s) and similarly
situated prisoners are having money sent into them via mail,
and the treasurer, at the direction of the superintendent
and commissioner, are sending the money order(s)/checks all

-20-

to St. Louis for depositing into a third party vendor's account instead of directly into plaintiffs and other similarly situated prisoners accounts as required under the regulations, that have the force of law, in violation of G.L.c. 231A, § 2, G.L.c. 30A, §§ 1-8, G.L.c. 12, §§ 11H, 11I, Article 12 of the Massachusetts Declaration of Rights, 14th Amendment to the United States Constitution, and 42 U.S.C. § 1983.

DENIAL OF EATING IN DINING AREA

Defendant Kenneway put in place a policy where he had completely shut down the prison dining area where population prisoners are supposed to eat out of, instead of eating in their cells as if they are in segregation and being punished. The administration under Defendant Kenneway did this in order for him to be able to run prison "easier." This cannot be done and violates G.L.c. 231A, § 2, G.L.c. 30A, §§ 1-8, Article 12 of the Massachusetts Declaration of Rights, 14th Amendment to the United States Constitution, and 42 U.S.C. § 1983.

NOT ALLOWING MONEY TO BE SENT TO FAMILY OR FRIENDS

Defendant Mici implemented a policy system-wide where plaintiffs and similarly situated prisoners are not permitted to send money out from their prison accounts home to their loved ones or friends in violation of the regulation, 103 CMR 405.12, although it is recognized in the Defendant Kenneway's 2020 Handbook (see Exhibit C), where it states that prisoners can send out money to family or friends, however, the Defendants are refusing to do so, violating Article 12 of the Massachusetts Declaration of Rights, 14th Amendment

-21-

to the United States Constitution, G.L.c. 30A, §§ 1-8, G.L.c. 231A, § 2, G.L.c. 12, §§ 11H, 11I, and 42 U.S.C. § 1983.

USE OF FORCE VIOLATIONS

Defendants Turco, Mici and Kenneway have guards walking around inside the facility with weapons "openly", where in the State of Massachusetts does not permit prison guards to walk around inside a facility openly with weapons.  The guards with these weapons are walking around intimidating the prison population, they are wearing no name tags to identify who they are, and they are not using any videos when they use the weapons on the plaintiffs/prison population, all in violation of 103 CMR 505.12, G.L.c 30A, §§ 1-8, G.L.c. 231A, § 2, Article 12 of the Massachusetts Declaration of Rights, 14th Amendment to the United States Constitution, and 42 U.S.C. § 1983.

USE OF FORCE VIOLATION OF DERRICK WASHINGTON

Defendants Turco, Mici, and Kenneway sanctioned the Tactical Team to assault prisoners/plaintiffs during the lockdown and transition periods, where on 1/24/20, Plaintiff Washington was stripped down to his boxer shorts, t-shirt and shower shoes at gunpoint and then physically assaulted by the Tactical Team while in restraints by being physically beaten and tased by a Taser Gun, causing him to have to go to an outside hospital to take care of his wounds and injuries.

-22-

The guards followed no proper use of force protocols, they wore no name tags, and the incident was never de-escalated or videotaped. It was an intentional act committed upon him and Defendants Kenneway and Mici were all present in the block when this incident occurred. The Defendants actions constituted cruel and unsual punishment in violation of Article 12 and 26 of the Massachusetts Declaration of Rights, 8th and 14th Amendment to the United States Constitution, G.L.C. 12, §§ 11H, 11I, G.L.c. 231A, § 2, G.L.c. 30A, §§ 1-8, and 42 U.S.C. § 1983.

UNSANITARY PRISON CONDITIONS

During the lockdown plaintiffs and other similarly situated prisoners were denied the ability to clean out their cells. And after the lockdown, plaintiffs and other similarly situated prisoners are living in filthy blocks, where the showers are filthy and not being cleaned properly, the recreation deck area(s) are filthy and not being cleaned at all, and the block(s) are not properly cleaned, where the tables are dirty and never cleaned and the seats are filthy where plaintiffs and others are made to sit. This violates Article 26 of the Massachusetts Declaration of Rights, 8th Amendment to the United States Constitution, G.L.c. 231A, § 2, and 42 U.S.C. § 1983.

-23-

NO ACCESS TO SHOWERS ALL DAY

Defendants Turco, Mici and Kenneway's new policy in the facility are arbitrarily denying plaintiffs and other similarly situated prisoners access to showers all day. The North Side prisoners are only permitted showers during their recreation period which is one hour per day. The South Side prisoners/plaintiffs are no longer permitted to shower during the morning or afternoon recreation periods if they attend the yard or gym. This constitutes cruel and unusual punishment in violation of Articles 12 and 26 of the Massachusetts Declaration of Rights, 8th and 14th Amendments to the United States Constitution, G.L.c. 231A, § 2, G.L.c. 12, §§ 11H, 11I, G.L.c. 30A, §§ 1-8, and 42 U.S.C. § 1983.

I.P.S. ILLEGALLY SEARCHING AND WITHHOLDING LEGAL DOCUMENTS

Defendant Kenneway has instituted a policy where the Inner Perimeter Security ("I.P.S.") are confiscating legal documents when plaintiffs and other similarly situated prisoners return from outside court trips, where they are keeping and reading the documents, holding onto them for days before returning them, in violation of Article 12 of the Massachusetts Declaration of Rights, 14th Amendment to the United States Constitution, G.L.c. 30A, §§ 1-8, G.L.c. 231A, § 2, G.L.c. 12, §§ 11H, 11I, and 42 U.S.C. § 1983.

-24-

## PREA VIOLATIONS

During the forced moves committed upon plaintiff(s) on 1/21/20, 1/22/20, and 1/24/20, Defendants Turco, Kenneway and Mici violated the Prison Rape Elimination Act ("PREA") when they had plaintiff(s) stripped down to their bare skin, placed in boxers and t-shirts with showers shoes in the presence of female staff. This was a humiliating experience intentionally done to the plaintiffs and the prison population all in retaliation for the 1/10/20 incident that they had no involvement in. This constitutes cruel and unusual punishment, in violation of Article 26 of the Massachusetts Declaration of Rights, 8th Amendment to the United States Constitution, G.L.c. 231A, § 2, G.L.c. 12, §§ 11H, 11I, and 42 U.S.C. § 1983.

## SCANNING MACHINE/CAVITY SEARCH VIOLATION

Defendants Turco, Mici and Kenneway have a scanning machine that all prisoners are required to go through that scans the inside of the body in the form of what would constitute a cavity search. By law any looking inside the body of a human being, no matter their status, can only be done with a warrant unless exigent circumstances exists by law. This applies to any law enforcement entity which the Department of Correction under the division of "public safety," is. This constitutes an intrusion into the body and violates

Articles 12 and 14 of the Massachusetts Declaration of Rights, 4th and 14th Amendments to the United States Constitution, G.L.c. 231A, § 2, G.L.c. 12, §§ 11H, 11I, G.L.c. 30A, §§ 1-8, and 42 U.S.C. § 1983.

## FOOD SERVING VIOLATIONS

The Defendants Mici and Kenneway are trying to circumvent the policy where both prisoners and staff must eat the same foods. They are doing this by using Culinary Arts for them only to eat from and serving prisoners different foods. The Culinary Arts program should be ran out of the main prison kitchen area where the entire kitchen work population can gain the skills articulated in 103 DOC 760.00 (Food Policy). However, the Defendants (plaintiffs just noticed) tried to change the language exempting them from eating the same foods as the prison population. This violates G.L.c. 231A, § 2, G.L.c. 30A, §§ 1-8.

## VI. PRAYER FOR RELIEF

Wherefore, the Plaintiffs pray that this court grants them the following relief:

A) Grant them a Declaratory Judgment declaring their rights, and ORDER:

1. Plaintiffs and other similarly situated prisoners must have access to showers all day in population and not at specific times of the day. Showers must be provided during

-26-

every recreation period.

2. Plaintiffs and other similarly situated prisoners are constitutionally entitled to shave and must be provided with shaving razors by the prison administration, or prisoners must be allowed to purchase razors from the prison commissary.

3. Plaintiffs and other similarly situated prisoners who are being double-celled, must be provided with at least 14 hours of out of cell time, if double bunking is to continue at the Souza Baranowski Correctional Center. The time in cell is unconstitutional for double bunking.

4. The Tactical Team openly walking around within the maximum security facility daily with weapons must cease, whereas it endangers both staff and prisoners, where a prisoner can attempt to disarm an officer and if successful, the weapon could then be used against prison staff and other prisoners. This would not be in accordance with 103 CMR 505 regulations.

5. The Department of Correction is enjoined from housing all inmates in both the South Side and North Side of the Souza Baranowski Correctional Center under DSU-type conditions who were placed under those conditions without the procedural protections of 103 CMR 421.00, et seq., and the provisions outlined in Haverty v. Commissioner of Correction, 437 Mass. 737 (2001).

-27-

6.   Defendants are enjoined from depriving Plaintiffs and other similarly situated prisoners living on the North Side of their personal property and must immediately return to them their televisions, radios, footwear(s), and any other property items that were seized under the recent policy by Defendants Kenneway and Mici.

B)   Award Plaintiff(s) each $100 per day they were forced to live under the DSU-type conditions without the procedural protections of 103 CMR 421.00, et seq.

C)   Award Plaintiff(s), jointly and severally, against each Defendant(s), punitive damages in the amount of $200,000 each for the PREA violation(s).

D)   Award Plaintiffs, jointly and severally, against each Defendant(s), punitive damages in the amount of $40,000 each for the unlawful conditions of confinement they were subjected to by the Defendants.

E)   Award Plaintiff, Derrick Washington, jointly and severally, against each Defendant(s), for being physically assaulted by the Tactical Team while in full restraints, where he was Tased and beaten, in the amount of $100,000 for the physical injuries sustained by the defendants.

F)   Award Plaintiff Gaksins, jointly and severally, against each Defendant(s) involved in the PREA violation

-28-

where he was stripped searched in the presence of a female guard, and then made to walk through the facility in only a pair of boxer shorts, a t-shirt, and shower slippers past multiple female staff and guards, where his penis was potruding through the boxers, in the amount of $50,000.00.

G)   Award all Plaintiffs nominal damages.

H)   Award all Plaintiff(s) compensatory damages, jointly and severally, against each Defendant(s) in the amount of $35,000 for subjecting them to harsh and cruel conditions in retaliation for the assault that occurred between staff and prisoners in a different block that had nothing to do with them.

I)   Grant Plaintiffs any other relief this court deems just and equitable.

J)   Award Plaintiffs court costs and attorney fees.

K)   Plaintiffs demands a jury trial.

### VERIFICATION

We, the undersigned, verify under the penalties of perjury that the facts stated herein this complaint are true and accurate.

Respectfully Submitted,

Tony B. Gaskins, pro se
SBCC
P.O. Box 8000
Shirley, Ma. 01464

Tamik Kirkland, pro se
SBCC
P.O. Box 8000
Shirley, Ma. 01464

Joseph Gomes, pro se
SBCC
P.O. Box 8000
Shirley, Ma. 01464

Alfred Andrews, pro se
SBCC
P.O. Box 8000
Shirley, Ma. 01464

Michael Collins, pro se
SBCC
P.O. Box 8000
Shirley, Ma. 01464

Rakeem Young, pro se
SBCC
P.O. Box 8000
Shirley, Ma. 01464

Derrick Washington, pro se
SBCC
P.O. Box 8000
Shirley, Ma. 01464

Emmitt Perry, pro se
SBCC
P.O. Box 8000
Shirley, Ma. 01464

Gregory Janowicz, pro se
SBCC
P.O. Box 8000
Shirley, Ma. 01464

Sahr Josiah, pro se
SBCC
P.O. Box 8000
Shirley, Ma. 01464

Rolando Stockton, pro se
SBCC
P.O. Box 8000
Shirley, Ma. 01464

Larry Ahart, pro se
SBCC
P.O. Box 8000
Shirley, Ma. 01464

Andre J. McNeil, pro se
SBCC
P.O. Box 8000
Shirley, Ma. 01464

Damante Burrell, pro se
SBCC
P.O. Box 8000
Shirley, Ma. 01464

Dated: 3/17/20

EXHIBIT A

Case 1:23-cv-10063-MRG   Document 177-11   Filed 03/24/26   Page 33 of 119

*Mailed 9/16/19*



# MONEY ORDER/CHECK DEPOSIT FORM
FORMA DE DEPOSITO CON GIRO DE DINERO/CHEQUE

## Instructions: Instrucciones:
*When filling out the deposit slip, please:*
*Al llenar la forma de depósito, por favor:*

- Type or write in black or blue ink.
  *Escriba en tinta de color negro o azul.*
- Write clearly to avoid any delays in processing your transaction.
  *Escriba con claridad para evitar cualquier retraso en el proceso de su transacción.*
- Verify that the offender's name and ID are entered correctly on the money order/check deposit slip.
  *Verifique que el nombre del preso y ID se han introducido correctamente en el talón de depósito.*
- Do not include any letters, stamps, photos or notes with your deposit—they will be discarded.
  *No incluya ninguna letra,*
- Detach the deposit
  **Do not send cash**
  order to deposit sli
  *Separe el talón de depósit*
  *No envíe dinero en efec*
- Please make sure t
  "ACCESS SECURE
  *Por favor, asegúrese de qu*
- We accept money
  (with a 10 day hold
  *Aceptamos giros postales*
  *(con una retención de 10 d*
- Mail deposit slip a
  *Envíe el talón con el giro p*
  Secure Depo
  P.O. Box 124
- The daily amount
  *La cantidad diaria depositada no puede exceder $1000.00*
- We only accept money orders drawn from US banks.
  *Sólo aceptamos giros de dinero provenientes de un banco estadounidense.*

Notice: All money orders must be issued in U.S. Funds. If proper recipient cannot be determined, funds will be returned to the sender. Money order deposit slip MUST BE INCLUDED with money order to process funds and avoid delay.
*Aviso: Todos los giros de dinero pago deben ser emitidos en dólares americanos. Si destinatario apropiado no puede ser determinado, los fondos serán devueltos al remitente. El talón de depósito DEBE DE SER INCLUIDO junto con el giro para procesar los fondos y evitar demoras.*

*Fill out the information and detach the slip below, then send in with your money order.*
*Complete la información y despegue el talon de abajo y envíe junto con el giro de dinero.*

## Choose a faster way to
### MAKE A DEPOSIT!



**SMART DEVICES**

---

*(Money order image)*

UNITED STATES POSTAL SERVICE®    POSTAL MONEY ORDER

Serial Number: 25940986571
Year Month Day: 2019-09-06    Post Office: 021311    U.S. Dollars and Cents: $50.00

Fifty Dollars and 00/100 *****************

Pay to: Mr. Tony Gaskins
Address: PO Box 43
Norfolk, Ma 02056
Memo: W52145 Tony Gaskins

# W52145    Clerk 2

From: S.A. Hayes
Address: 15 Blue ledge Terr

SEE REVERSE WARNING • NEGOTIABLE ONLY IN THE U.S. AND POSSESSIONS

©2008 United States Postal Service. All Rights Reserved.

⑈:000000800 2⑈:    259409865711⑈

DOLLAR GENERAL    FAMILY DOLLAR

**Providing you ACCESS to your loved one.**
*Facilitando el ACCESO a su ser querido.*
AccessCorrections.com | (866) 345-1884

---

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - ✂ - - - -

## Massachusetts DOC Money Order/Check Deposit Slip
*Talón de Depósito de Giro de Dinero/Cheque Massachusetts DOC*

**Mail to:** *Secure Deposits - Massachusetts DOC, P.O. Box 12486, St. Louis, MO 63132*
*Envíe a: Secure Deposits-Massachusetts DOC, P.O. Box 12486, St. Louis, MO 63132*

**Amount of Money Sent** (Do not exceed $1000.00)  *Cantidad de Dinero Enviado (No exceda $1000.00)*

$50.00

**Offender's ID #** *ID Preso*

W52145

**Offender's Name** (First and Last)  *Nombre del Preso (Nombre y Apellido)*

Tony Gaskins

**Sender's Name** (First and Last)  *Nombre del Remitente (Nombre y Apellido)*

S.A. Hayes

**Sender's Date of Birth** *Fecha de Nacimiento del Remitente*

N/A

**Sender's Phone Number** *Número de Telefono del Remitente*

N/A

**Sender's Address:** *Required
*Domicilio del Remitente: *Necesario*

15 Blue Ledge Terr.

**City:** Roslindale,
*Ciudad:*

**State:** MA    **Zip:** 02131-4819
*Estado:*    *Código Postal:*

**Email:** N/A
*Email:*
*(A digital receipt will be sent to the email address provided)*
*(Un recibo digital será enviado a la dirección de email)*



EXHIBIT B

Mrs. Sindey Hayes
15 Blue Zedge Terrace
Rosslindale, Ma 02131

MA
ONLY
50

Mr. Tony Hayes
P.O. Box 8000
Shirley, Ma 01464

01464-8000

62

GAVE

Attachment I

COMMONWEALTH OF MASSACHUSETTS
DEPARTMENT OF CORRECTION
INFORMAL COMPLAINT FORM

MAR 06 2020

0957

Inmate Name _Tony Gaskins_ Commitment # _W52195_ Incident Date _2/27/20_
Institution _NBCC_ Housing Unit _G2_

---

CHECK OFF AREA OF CONCERN  (one issue per form allowed)

____ HOUSING ASSIGNMENT/STATUS      ____ LAUNDRY       ____ PROGRAMS       ____ MAIL      ____ FOOD

____ CLOTHING/LINEN EXCHANGE        ____ RELIGION      ____ PROPERTY       ____ VISITS

____ LEGAL EXCHANGE                 ____ LIBRARY       ____ PHONE          _X_ OTHER: _Money_

---

State completely, but briefly, the single issue of concern and your requested resolution _My sister sent me a $50 money order. Instead of depositing the money directly into my account as required pursuant to 103 CMR 405.11(a), (25), (4)(a)-(d), and as it states in the 2020 Handbook at XXI (B)(2), you sent it to St. Louis to be deposited. First of all, I never gave you consent to credit my incoming money to a third party vendor, and the rules and regulations grants no such authority. I want the $50 mailed in to me by Shirley Hayes to be directly deposited into my account._

List any previous steps you have taken to resolve your concern _Grievances have already been filed concerning this matter._

(Use other side of page if more space is needed)

Inmate Signature _Tony Gaskins_      Date _2/28/20_

*Note: If you follow instructions in preparing your request, it can be addressed more readily.  Your complaint will be reviewed and replied to within ten (10) business days from the date of receipt.*

DO NOT WRITE BELOW THIS LINE (Reserved for Staff Response)

Received By _JOB_      Date Received _03-06-20_

DECISION

Resolution:   Granted____   Partially Granted____   Denied____   Alternate Resolution Offered____   N/A_X_

Comments _Please see attached Memo dated March 9 2019 sent to all inmates regarding secure deposit services_

Decision By _Susie Holt_      Date _03-06-20_

*Denied informal complaints may be appealed to the Institution Grievance Coordinator within ten (10) business days.

**An inmate shall not be required to submit a step 1 informal complaint form prior to filing an emergency grievance, allegations of staff misconduct, or for allegations of sexual assault/abuse.





The Commonwealth of Massachusetts
Executive Office of Public Safety & Security
Department of Correction
50 Maple Street, Suite 3
Milford, MA 01757
Tel: (508) 422-3300
www.mass.gov/doc

**CHARLES D. BAKER**
*Governor*

**KARYN E. POLITO**
*Lieutenant Governor*

**DANIEL BENNETT**
*Secretary*

**THOMAS A. TURCO III**
*Commissioner*

**JOHN A. O'MALLEY**
*Chief of Staff*

**PAUL DIETL**
**BRUCE L GELB**
**MICHAEL G. GRANT**
**CAROL A. MICI**
*Deputy Commissioners*

**PAUL J. HENDERSON**
*Acting Deputy Commissioner*

To:    All Inmates

From:  Thomas Turco III, Commissioner

Date:  March 9, 2018

Re:    Secure Deposit Services

The Department of Correction (DOC) will start transitioning to Access Corrections Secure Deposits ("Secure Deposits") services for friends and family beginning on March 26, 2018. Implementing Secure Deposits will increase the options available for those who wish to send money to Inmates.

### Fee Deposit Services

Secure Deposits allows for deposits via the Intranet at ACCESSCORRECTIONS.COM by utilizing the ACCESSCORRECTIONS.com app on a smart device; and deposits by telephone by calling 866-345-1884. Deposits are made using a credit or debit card and are available to deposit funds to inmates 24 hours a day, 7 days a week. The fee schedule for these services is as follows:

| Gross Amount Deposited | Credit/Debit card deposit via Website | Credit/Debit card deposit via Telephone |
|---|---|---|
| $0.01 - $19.99 | $2.95 | $3.95 |
| $20.00 - $99.99 | $5.95 | $6.95 |
| $100.00 - $199.99 | $7.95 | $8.95 |
| $200.00 - $300.00 | $9.95 | $10.95 |

Cash deposits can be made at Dollar General and Family Dollar stores by first registering at CashPayToday.com. The walk-in cash deposit fee at these stores is $5.95 for up to the $999.99 maximum deposit amount.

Funds utilizing the fee deposit services are processed each business day and are available to the inmate the next day.



agency Search
Select state
Massachusetts
Select agency
Massachusetts Dept. Corre
MAR 06 20
095

# SEND MONEY YOUR WAY!

## ¡Envie Dinero a Su Manera!

Choose the most convenient way to send money to your loved one.
Escoja la manera más conveniente de enviar dinero a un ser querido.

 **SMART DEVICES** (24/7)
   

 **ACCESSCORRECTIONS.com** (24/7)
 

**Handling charges starting at $2.95.**
Cargos de manejo comenzando desde $2.95.*

 **866-345-1884** (24/7)
Live bilingual agents available 24/7.
Agentes bilingües disponibles 24/7.
 

MASSACHUSETTS DOC
PO BOX 12486
ST LOUIS MO 63132

 BY MAIL: US POSTAL SERVICE

No handling charge.
Sin cargos de manejo.

 **CASH WALK-IN** PAGO EN EFECTIVO EN LOCACIÓN


CashPay
TODAY

To make a cash walk-in deposit, visit **CashPayToday.com** to enroll.
1. Register yourself and the recipient before visiting a walk-in location.
2. Download or print your bar code. The bar code is required for **Dollar General** and **Family Dollar** locations. At this time Family Dollar only accepts printed bar codes. Most stores are available 8a.m. to 9p.m., some 24/7. For all other locations use your Customer ID.
3. For more information and to find participating locations near you, visit **CashPayToday.com** or call 844-340-CASH (2274).

Para hacer un depósito en persona de dinero en efectivo, visite CashPayToday.com para registrarse.
1. Registre al beneficiario y a usted mismo antes de visitar una locación.
2. Descargue o imprima su código de barras. El código de barras es requerido para todas las locaciones de Dollar General y Family Dollar. En este momento Family Dollar solo acepta código de barras impresos. La mayoría de las tiendas están abiertas de 8a.m. a 9p.m., otras 24/7. Para todas las

In order to allow for the transition to the new Secure Deposit Services, the DOC will continue to accept checks and money orders by mail and by drop off at the facility through the end of May 2018. However, as of June 1, 2018, checks and money orders can no longer be dropped off at, or mailed to, facilities. Checks or money orders must be mailed with the deposit slip to the Secure Deposits lock box service.

**ACCESS CORRECTIONS® SECUREDEPOSITS $**

**MONEY ORDER/CHECK DEPOSIT FORM**
FORMA DE DEPOSITO CON GIRO DE DINERO/CHEQUE

MAR 06 2020

0952

AGENCY SEARCH:
MASSACHUSETTS
SELECT AGENCY:
MASSACHUSETTS DEPT OF CORRECTIONS

## Choose a faster way to MAKE A DEPOSIT!

### Instructions: Instrucciones:
*When filling out the deposit slip, please:*
*Al llenar la forma de depósito, por favor:*

- **Type or write in black or blue ink.**
  Escriba en tinta de color negro o azul.
- **Write clearly to avoid any delays in processing your transaction.**
  Escriba con claridad para evitar cualquier retraso en el proceso de su transacción.
- **Verify that the offender's name and ID are entered correctly on the money order/check deposit slip.**
  Verifique que el nombre del preso y ID se han introducido correctamente en el talón de depósito.
- **Do not include any letters, stamps, photos or notes with your deposit – they will be discarded.**
  No incluya ninguna letra, sellos, fotos o notas con su depósito –, estos serán descartados.
- **Detach the deposit slip and mail it with your money order or personal check. Do not send cash, and please do not staple, paper clip or tape money order to deposit slip.**
  Separe el talón de depósito y envíelo por correo con su giro de dinero o cheque personal. No envíe dinero en efectivo, y por favor no grape ó pegue el giro de dinero al talón.
- **Please make sure the money order or check is payable to "ACCESS SECURE DEPOSITS."**
  Por favor, asegúrese de que el giro ó cheque se pague a "ACCESS SECURE DEPOSITS."
- **We accept money orders, cashier's checks and personal checks (with a 10 day hold on personal checks).**
  Aceptamos giros postales, cheques bancarios y cheques personales (con una retención de 10 días en los cheques personales).
- **Mail deposit slip and money order or check to:**
  Envíe el talón con el giro postal o cheque:

  Secure Deposits - Massachusetts DOC
  P.O. Box 12486, St. Louis, MO 63132

- **The daily amount deposited cannot exceed $300.00**
  La cantidad diaria depositada no puede exceder $300.00

Notice: All money orders must be issued in U.S. Funds. If proper recipient cannot be determined, funds will be returned to the sender. Money order deposit slip MUST BE INCLUDED with money order to process funds and avoid delay.
Aviso: Todos los giros de dinero pago deben ser emitidos en dólares americanos. Si destinatario apropiado no puede ser determinado, los fondos serán devueltos al remitente. El talón de depósito DEBE DE SER INCLUIDO junto con el giro para procesar los fondos y evitar demoras.

*Fill out the information and detach the slip below, then send in with your money order.*
*Complete la información y despegue el talon de abajo y envíe junto con el giro de dinero.*



### SMART DEVICES
[iTunes] [Google Play]



AccessCorrections.com [VISA] [MasterCard]



(866) 345-1884 [VISA] [MasterCard]
Live bilingual agents available 24/7.
Agentes bilingües disponibles 24/7.

### CASH WALK-IN [$]
< Most Stores Available 8am to 9pm, some 24/7 >
< La mayoría de las tiendas disponibles de 8am a 9pm, algunas 24/7 >

**CashPay TODAY**
Visit CashPayToday.com to enroll and find locations near you.
For more information call 844-340-CASH (2274)
Visite CashPayToday.com para registrarse y encontrar localidades cerca de usted. Para más información llame al 844-340-CASH (2274)
DOLLAR GENERAL · FAMILY DOLLAR

**Providing you ACCESS to your loved one.**
Facilitando el ACCESO a su ser querido.
AccessCorrections.com | (866) 345-1884

---

## Massachusetts DOC Money Order/Check Deposit Slip
Talón de Depósito de Giro de Dinero/Cheque Massachusetts DOC

**Mail to:** *Secure Deposits - Massachusetts DOC, P.O. Box 12486, St. Louis, MO 63132*
Envíe a: *Secure Deposits-Massachusetts DOC, P.O. Box 12486, St. Louis, MO 63132*

Amount of Money Sent (Do not exceed $300.00)  Cantidad de Dinero Enviado (No exceda $300.00)

Offender's ID #  ID.Preso

Offender's Name (First and Last)  Nombre del Preso (Nombre y Apellido)

Sender's Name (First and Last)  Nombre del Remitente (Nombre y Apellido)

Sender's Date of Birth  Fecha de Nacimiento del Remitente

Sender's Phone Number  Número de Teléfono del Remitente

Sender's Address: *Required
Domicilio del Remitente: *Necesario

City:
Ciudad:

State:
Estado:

Zip:
Código Postal:

Email:
(A digital receipt will be sent to the email address provided)
(Un recibo digital será enviado a la dirección de email)



MAR 06 2020

0952

## Free Deposit Service

Secure Deposits also offers a **Lock Box** service for checks and money orders at no fee. Checks or money orders are mailed with a completed Money Order/Check deposit slip to:

Secure Deposits - Massachusetts DOC, PO Box 12486, St. Louis, MO 63132

Checks and money orders are processed within 48 hours of receipt but typically within 24 hours, if not the same day of receipt, with the exception of weekends and holidays.

The deposit of money order funds sent to the DOC for crediting to the inmate's account via a nightly process, with those funds available to the inmate the next day.

All check funds are subject to a **10-day hold** by the vendor after the transaction is processed before being sent to the DOC for crediting to the inmate's account via the nightly process. The funds are then available to the inmate the next day.

See the attachment for a copy of the Money Order/Check Deposit form and instructions. The Money Order/Check deposit form will be available at the start of the service in facility lobbies, and will always be available for users to print off the internet at ACCESSCORRECTIONS.com.

In order to allow for the transition to the new Secure Deposit Services, the DOC will continue to accept checks and money orders by mail and by drop off at the facility through the end of May 2018. However, as of June 1, 2018, checks and money orders can no longer be dropped off at, or mailed to, facilities. Checks or money orders must be mailed with the deposit slip to the Secure Deposits lock box service.

## Government and Institutional check discretion

The Department of Correction may, on a case-by-case basis, at its discretion, accept for deposit Federal Government and/or State Government checks, or checks issued by commercial entities sent directly by the issuer to an inmate at a Department of Correction facility. Such checks must contain sufficient documentation to identify the issuer, the payee, the source of the funds, and the eligibility of the inmate to receive the funds. Checks that do not meet the criteria will be returned to the sender. Dual payee checks will not be accepted and will be returned to the sender.

Thank you for your attention to this matter.

MAR 06 2020

0957

El Departamento de Corrección (DOC) iniciará la transición a *Access Corrections Secure Deposits* ("Depósitos Seguro ") un servicios para amigos y familiares, a partir del 26 de marzo, 2018. Implementando el servicio de Depósitos Seguro aumentará las opciones disponibles para aquellos que deseen enviar dinero a los presos.

## Tarifa de Servicios de Depósito

Depósitos Seguro permite depósitos a través de la internet yendo al sitio web **accesscorrections.com**, utilizando la app en un teléfono inteligente; y depósitos por teléfono llamando al 866-345-1884. Los depósitos realizados mediante tarjeta de crédito o débito están disponibles para depositar fondos a los presos las 24 horas del día, 7 días a la semana. Las tarifas para estos servicios es como sigue:

| Cantidad Depositada | Depósito con tarjeta de crédito/débito a través del Web | Depósito con tarjeta de crédito/débito a través del teléfono |
|---|---|---|
| $0.01 - $19.99 | $2.95 | $3.95 |
| $20.00 - $99.99 | $5.95 | $6.95 |
| $100.00 - $199.99 | $7.95 | $8.95 |
| $200.00 - $300.00 | $9.95 | $10.95 |

Depósitos en efectivo pueden ser realizados en las tiendas Dollar General y Family Dollar despues de primero registrarse en CashPayToday.com. La tarifa para depósitar dinero en efectivo en estas tiendas es $5.95 hasta la máxima cantidad de depósito que son $999.99.

Los fondos utilizando los servicios de depósito se procesan cada día laborable y están disponibles para el preso al día siguiente.

## Servicio de Depósito Gratis

Depósitos Seguro también ofrece un servicio de caja de seguridad para los cheques y los giros postales sin costo. Cheques o giros postales son enviados por correo con un formulario de depósito de Cheques/Giros Postales (Money Order/Check Deposit Form) a:

Secure Deposits - Massachusetts DOC, PO Box 12486, St. Louis, MO 63132

Los cheques y los giros postales son procesados dentro de 48 horas de ser recibido, pero normalmente dentro de las 24 horas, si no el mismo día de ser recibido, con la excepción de los fines de semana y día de fiesta.

El depósito de los fondos de giro postales enviados al DOC para acreditar a la cuenta del preso es procesado
a través de un proceso nocturno, con los fondos disponibles para el preso al día siguiente.

Todos los fondos de cheques están sujetos a 10 días de retención por el vendedor despues que la transacción es procesada antes de ser enviadas al DOC para acreditar a la cuenta del preso a través de un proceso nocturno. Los fondos estarán disponibles para el preso al día siguiente.

MAR 06 2020

0957

Consulte el documento adjunto para ver una copia del formulario de depósito Giro Postal/Cheque (Money Order/Check Deposit Form) e instrucciones. El formulario de depósito Giro Postal/Cheque estará disponible al inicio del servicio en el lobby de las prisiónes, y siempre estará disponible para que los usuarios puedan imprimir desde el internet **accesscorrections.com.**

A fin de permitir la transición a los nuevos servicios de depósito seguro, el DOC seguirá aceptando los cheques y los giros postales por correo y se pueden dejar en la prisión hasta finales de mayo de 2018. **Sin embargo, a partir del 1 de junio de 2018, los cheques y los giros postales ya no podran ser enviados por correo ni dejado en la prisión.** Los cheques o giros postales debieran ser enviados con un formulario de depósito de Cheques/Giros Postales (Money Order/Check Deposit Form) al servicio de la caja de seguridad de Depósitos Seguro.

### Discreción de Cheques del Gobierno e Institucionales

El Departamento de Corrección, sobre una base de caso por caso, a su discreción, aceptar depósitos de cheques del Gobierno Federal, gobiernos estatales y/o cheques emitidos por entidades comerciales enviados directamente por el emisor a un preso del Departamento de Corrección. Tales cheques deben contener documentación suficiente para identificar al emisor, el beneficiario, la fuente de los fondos, y la elegibilidad del preso para recibir los fondos. Cheques que no cumplan con los criterios serán devueltos al remitente. No se aceptarán cheques de beneficiarios dobles y se devolverán al remitente.

Gracias por su atención a este asunto.

Access Corrections



NEW!! Try our new, mobile friendly Deposits and Payments website now! Log in with your existing account, or for new users create an account.



Home  Registration  Contact Us  Help

Select your Language:

| English |
| Spanish |
| Vietnamese |

### Friends & Family Contact Us

Email: customerservice@accesscorrections.com

Phone: (866)345-1884

### Correctional Facilities & Agencies Contact Us

Visit: KeefeGroup.com

For those making deposits at Texas Facilities ONLY: If you are making a deposit at a Texas facility and have a complaint, first contact the consumer assistance division of Keefe Commissary Network, L.L.C. at 1-866-345-1884 or customerservice@accesscorrections.com . If you still have an unresolved complaint regarding the company's money transmission or currency exchange activity, please direct your complaint to: Texas Department of Banking, 2601 North Lamar Boulevard, Austin, Texas 78705, 1-877-276-5554 (toll free), www.dob.texas.gov.

For Colorado Customer Complaints ONLY:
COLORADO DIVISION OF BANKING, COLORADO MONEY TRANSMITTERS ACT CUSTOMER NOTICE
Entities other than FDIC insured financial institutions that conduct money transmission activities in Colorado, including the sale of money orders, transfer of funds and other instruments for the payment of money or credit are required to be licensed by the Colorado Division of Banking pursuant to the Money Transmitters Act, Title 12, Article 52, Colorado Revised Statutes.

If you have a Question about or Problem with YOUR TRANSACTION - THE MONEY YOU SENT:
You must contact the Money Transmitter who processed your transaction for assistance. The Division of Banking does not have access to this information.

If you are a Colorado Resident and have a Complaint about the MONEY TRANSMITTER - THE COMPANY THAT SENT YOUR MONEY, ALL complaints must be submitted in writing. Please fill out the Complaint Form provided on the Colorado Division of Banking's website and return it and any documentation supporting the complaint via mail or email to the Division of Banking at: Colorado Division of Banking, 1560 Broadway, Suite 975, Denver, CO 80202. Email: DORA_BankingWebsite@state.co.us. Website: www.dora.colorado.gov/dob. .

For Keefe Commissary Network, L.L.C., d/b/a Access Corrections customers in the State of California
If you have complaints with respect to any aspect of the money transmission activities conducted at this location, you may contact the California Department of Business Oversight at its toll-free telephone number, 1-800-622-0620, by email at consumer.services@dbo.ca.gov, or by mail at the Department of Business Oversight, Consumer Services, 1515 K Street, Suite 200, Sacramento, CA 95814.

Nevada Residents

For questions or complaints about Keefe Commissary Network, L.L.C. dba Access Corrections, contact:

State of Nevada, Department of Business & Industry, Financial Institutions, 702-486-4120, www.fid.nv.gov and/or Consumer Financial Protection Bureau, 855-411-2372, 855-729-2372 (TTY/TDD), www.consumerfinance.gov.

Maryland Residents

The Commissioner of Financial Regulation for the State of Maryland will accept all questions or complaints from Maryland residents regarding Keefe Commissary Network, L.L.C., money transmission services at: Commissioner of Financial Regulation, Attention: Complaint Unit, 500 North Calvert Street, Suite 402, Baltimore, Maryland 21202 You may also contact Maryland via telephone at: (888) 784-0136.

New York Residents

New York Department of Financial Services

Keefe Commissary Network LLC. is licensed and regulated as a money transmitter by the New York State Department of Financial Services. New York customers can direct unresolved complaints to:

Consumer Assistance Unit
NYS Department of Financial Services
One Commerce Plaza
Albany, NY 12257
Tel: 1-877-BANK-NYS (1-877-226-5697)
Website: http://www.dfs.ny.gov/consumer/fileacomplaint.htm

Privacy Policy    User Agreement    Terms and Conditions    Contact Us    Help    Fraud Alert

Copyright © 2018 Access Corrections. All rights reserved.

EXHIBIT C



FEB 07 2020

E Y: **0175**

# SOUZA-BARANOWSKI CORRECTIONAL CENTER

# INMATE HANDBOOK

Approved: _____    Date: 2/7/20
              Superintendent

**MAILED** 02-07-20

| Section | Table of Contents | Page |
|---|---|---|
| I. | Introduction | 1 |
| II. | Orientation | 1 |
| III. | Unit Team System | 1 |
| IV. | Americans With Disability Act (ADA) | 2 |
| V. | Institutional Rules and Regulations | 2 |
| | Counts | 2 |
| | Inmate Movement | 2 |
| | Satellite Meal Procedure | 3 |
| | Dining Hall Movement/Rules/Regulations (When Applicable) | 3 |
| | Housing Unit Rules and Regulations | 4 |
| | Cell Décor | 5 |
| | Dress Code | 6 |
| | Inmate Showers | 6 |
| VI. | Searches | 6 |
| VII. | Substance Abuse Testing | 6 |
| VIII. | DNA Testing | 6 |
| IX. | Inmate Identification Cards | 7 |
| X. | Inner Perimeter Security (IPS) | 7 |
| XI. | Security Threat Groups | 7 |
| XII. | Medication Misuse and Fermented Fruits (Homebrew) | 8 |
| XIII. | Emergency Evaluation Plans | 8 |
| XIV. | Release Preparation Documents | 8 |
| XV. | Inmate Discipline | 8 |
| XVI. | Grievance Procedure | 11 |
| XVII. | Mail Procedures | 13 |
| XVIII. | Inmate Telephone | 16 |
| XIX. | Visitation | 17 |
| XX. | Canteen Procedures | 25 |
| XXI. | Inmate Finances (103 CMR 405) | 27 |
| XXII. | Inmate Property | 30 |
| XXIII. | Inmate Laundry | 33 |
| XXIV. | Work Assignment (103 DOC 450) | 34 |
| XXV. | Parole Functions | 37 |
| XXVI. | Sentencing Information | 37 |
| XXVII. | Health Services Unit (HSU) | 37 |
| XXVIII. | Program/Treatment/Education | 40 |
| XXIX. | Inmate Library Access | 42 |
| XXX. | Chaplin | 42 |
| XXXI. | Spectrum Programming | 42 |
| XXXII. | Chapter 127: Section 38B Assaults Upon Guards; Bodily Substances; Penalty | 46 |
| XXXIII. | Staff Access | 46 |

# SOUZA-BARANOWSKI CORRECTIONAL CENTER

FEB 07 2020



## INMATE ORIENTATION HANDBOOK

## I.   INTRODUCTION

The Souza-Baranowski Correctional Center (SBCC) is a double bunked, maximum-security prison within the Department of Correction (DOC). All inmates designated for placement at this facility will be the result of either their sentence structure or past adjustment at lower security facilities.

This orientation handbook is designed to provide you with specific information regarding SBCC. This handbook will inform you of what staff and Administration's expectations are of you as an inmate within the DOC. You are strongly encouraged to read this handbook and utilize it as a resource and reference guide. Since it is not feasible to provide an answer for every issue or scenario you will encounter at the facility, you are encouraged to meet with your assigned Correction Program Officer (CPO) for assistance. A DOC policy manual will be made available to you in the Inmate Library.

## II.   ORIENTATION

All incoming inmates will be initially assessed and placed accordingly within the facility. All inmates, regardless of their status, shall attend and/or be given a presentation of the institutional orientation program.   This program is designed to brief inmates on institutional rules, regulations, programs, classification, education/vocation programs, work assignments, medical/mental health services, canteen, inmate funds, and other pertinent information necessary for a successful adjustment at SBCC. This weekly orientation program is mandatory and shall be documented. Inmates who refuse to participate in the program will be subject to disciplinary action.

The orientation process should be considered one of the most important aspects of an inmate's incarceration.  It is during this program that all inmates will be made aware of programs/services available throughout their incarceration at SBCC. The orientation coordinator shall document each inmate's completion of orientation by having the inmate sign the orientation checklist. The checklist shall be forwarded to the Record's Department to become a permanent document in the inmate's institutional folder.

During an inmate's initial few weeks at SBCC, Administration will actively work with the Unit Team and security staff to determine an appropriate housing placement based on institutional need, an inmate's disciplinary history, length of time to serve and prior institutional adjustment.

## III.   UNIT TEAM SYSTEM

At SBCC, we utilize the Unit Team System.  Each unit team is composed of a unit CPO, a housing unit Correctional Officer (CO), a Unit Team Sergeant and a Unit Team Captain all with whom the inmate will be in contact with throughout their incarceration at SBCC. An inmate's first avenue to the resolution of any problem they may encounter with their account, account transfer requests, property, clothing, canteen issues, classification process, program plan, etc. is through their unit CPO and/or housing unit Officer.

MAILED 02-07-20

## IV.   AMERICAN WITH DISABILITY ACT (ADA)

The Deputy Superintendent of Reentry is designated as SBCC's ADA Coordinator for the purpose of coordinating and monitoring activities and procedures related to reasonable accommodations and/or access to programming for inmates with disabilities.

**An inmate's request for reasonable accommodations may be initiated by either:**

1. Request to or from medical staff for a medically prescribed accommodation or,
2. Submitting a completed Request for Reasonable Accommodation form to the Deputy Superintendent of Reentry.

## V.   INSTITUTIONAL RULES AND REGULATIONS

A.   All inmates housed at SBCC will be required to adhere to general rules and regulations specifically designed for this institution.

B.   An inmate will be considered attempting to escape at the point when he enters the "no man zone" without proper notification and authorization by the superintendent or his/her designee. The "no man zone" shall be the area between two (2) security barriers; which separates the inner perimeter from the outer perimeter of the facility. Upon entering the "no man zone" the inmate shall be considered a threat to public safety and will invoke the "shoot to stop" procedures.

C.   Smoking, possession or other use of tobacco related products is strictly prohibited at all DOC facilities. Inmates found in possession of such items will be subject to formal disciplinary action.

D.   Inmate use and or possession of any type of cell phone or cell phone paraphernalia, to include cell phone chargers, SIM cards, and any other related products, is strictly prohibited and considered a serious security issue. Inmates found in possession of such items will be subject to formal disciplinary action. Use and/or possession of cell phones or cell phone related paraphernalia will be considered a CATEGORY 2 disciplinary infraction as a cell phone is determined to be an item utilized in a plan for escape.

E.   Counts

Counts are extremely important in the proper running of a correctional institution. Subsequently, infractions of the count procedures will be considered very serious and dealt with accordingly.

Counts are held six (6) times per day. It shall be the responsibility of each inmate to stand by the end of his bed in plain view face to face with the counting officer, clearly visible to the officers standing at the cell door for the following *standing counts: 7:10am, 11:10am, 4:20pm and 10:00pm*. Making unnecessary movements, attempting to distract the counting officer by conversation or refusing to stand for count shall result in disciplinary action.

When an emergency count is necessary, you will report to your assigned cell and remain there until the count is verified. During all p.m. counts, your cell lights must be turned on.

F.   Inmate Movement



FEB 07 2020
0175

Outside of Unit Movement:

1. Inmates are responsible for having their inmate Identification (ID) card on their person and available for staff to view at all times in order to move outside of their housing unit.
2. All inmates must wear both tops and bottoms of their color-coded scrubs whenever they leave their assigned unit to include the nurse protocol room.
3. No Inmate will be allowed to enter a unit other than their own unit unless otherwise specified.
4. All inmates are required to pass through the walkthrough metal detectors located in level corridors. This includes all inmate workers who move throughout the institution.

G.    Satellite Meal Procedures

1. Three (3) meals a day will be served: breakfast, lunch, and dinner.
2. **South-side SBCC inmates** will eat in their cells. Inmates will come out of their cells, obtain their meal tray from staff, remove the hard cover from the tray, return the cover to staff, and then return to their cells.
3. **North-side SBCC inmates** will be fed in their cells through the food/cuff slot in the door unless otherwise specified. Unit staff will remove the food tray cover prior to placing it onto the cell door wicket. In approximately thirty (30) minutes, staff will collect and inspect every tray for damages.
4. Meals served will be the same throughout the institution, except for those with approved special diets.
5. Alternate Feeding Standard food services shall be made available to inmates, providing their participation is consistent with the safety and security of the institution and its employees. Any inmate who becomes disruptive of assaultive by throwing food, food trays or containers, or by utilizing food or drink containers to assault staff, may be placed on alternate feeding status as a result of such actions.

H.    Dining Hall Movement/Rules/Regulations **(when Applicable, currently closed)**

**South-side SBCC inmates:** Once the unit is called to eat, sufficient time will be granted to allow you to leave the unit for the dining room (approximately two (2) minutes). After the two (2) minutes have elapsed, the Unit Officer will call last call. You will have one (1) more minute in which to leave the unit for your meal. Once this time has elapsed, no one will be allowed out of the unit until the next movement is called.

The following rules are in effect and should be adhered to by all inmates:

1. All inmates must wear sneakers to the dining hall.
2. All inmates coming to the dining hall will go through the food line and receive their food items
3. No one is permitted to come back through the serving line.
4. Scrub tops and bottoms must be worn to the dining hall. No hats, gloves, or coats are allowed to be worn to the dining hall. ID's must be on person.



MAILED
02-07-20

Page 53 of 56

5. All inmates are subject to search upon entering or leaving the dining hall.

6. There is no loitering. Inmates must leave as soon as their meal is consumed.

7. Nothing is permitted to be carried in or out of the dining hall with the exception of a Staff Access Pass.

8. In addition inmates whom have medically approved food items may leave the dining hall with the approved items.

9. No moving from table to table is allowed.

10. Those inmates who go through the designated diet line for medical or religious diets must show their inmate ID card to the officer assigned to monitor the process and sign for the meal prior to receiving their meal. Inmates who do not access their religious meal or are witnessed taking a mainline meal shall after three (3) reported occurrences within a thirty (30) day period will be removed from the religious meal list. Inmates may request for reconsideration after a sixty (60) day period, however, if a second infraction occurs within a twelve (12) month period the inmate shall be barred from the approved religious meal list. Inmates shall receive notification from the Superintendent regarding removal from the approved Religious Diets. All inmates are required to clean their tables and return their tray.

11. All inmates will be given a sufficient amount of time to eat; Up to (25) minutes from the time that they leave their unit until they return to the unit.

I.  Housing Unit Rules and Regulations

1. No inmate is allowed to enter into a cell other than their assigned cell.

2. Inmates are not allowed on the 2nd (upper) tier during tier time without permission of the Unit Officer.

3. Nothing is permitted to be placed in front of the cell door at any time.

4. There is no eating in the common area.

5. Inmates will not have in their possession any property that does not belong to them. All property will be clearly marked in a legible manner.

6. No inmates are allowed to congregate near the officer's desk nor authorized behind the Officer's station, unless supervised for cleaning purposes.

7. Inmates will be required to place any and all trash in barrels located on the flats. Paper and plastic shall be placed in the respective recycling bins. Paper bags will be issued as needed for trash within the cell. No plastic bags are authorized for retention in a cell.

8. Only authorized recreation activities will take place in the units. Horseplay, martial arts, or shadow boxing will not be allowed.

9. There will be no tampering with or blocking any locking device, door, gate, or window.

10. Coats and non-religious headwear will not be worn inside the institution.

11. Inmates on the recreation decks are not allowed to hang on the fence or step beyond the red Out-Of-Bounds line.

12. There shall be no curtains or clotheslines hung in the cell.

13. There shall be no clothing or other items placed covering the bunk which obstructs the view of the bunk from the door.

FEB 07 2020

0175

14. Pictures and photos shall be hung only in the designated area of the cell and there shall be no sexually suggestive material/photos allowed.

J.    Cell Décor

1.  All cells are to be clean and in complete compliance with all listed cell decorum regulations twenty-four (24) hours a day.
2.  Inmates will be responsible for the cleanliness of their cells, including bed being made by 8:30 a.m. Inmates will not be allowed to be under the sheets/blankets between 8:30 a.m. and 7:00 p.m. Anytime an inmate leaves the cell; the cell needs to be in order and appliances shut off.
3.  At no time shall any items be covering either the rear window or cell door window.
4.  No vents in the cells or unit will be covered at any time. Nothing may be hung or tied from the vent or sprinkler system.
5.  Providing they comply with 103 DOC 400.02, the following items shall be permitted to be displayed within the 2' x 3' outlined square on the cell wall located below the light;
    a.  Photographs;
    b.  Cards;
    c.  Magazine/newspaper pictures and articles;
    d.  Drawings; and
    e.  Calendars.
6.  The following items are not permitted to be displayed;
    a.  Anything that is prohibited by 103 CMR 481, Inmate Mail;
    b.  Semi-Nude, scantily clad, and/or sexually suggestive material;
    c.  Material that may be considered offensive or otherwise discriminatory in the workplace;
    d.  Material that is deemed to be divisive between groups or individuals; and
    e.  Material that supports or promotes any violation of the 103 CMR 430 Disciplinary Proceedings.
7.  No items are permitted on top of your footlockers. When footlockers are not being used, they are to remain closed. Nothing may be attached to the outside of the footlocker. All personal effects shall be kept in the footlocker/under bunk drawer. Footwear may be stored under the bunk, at the end of the bed, or under the desk against the wall. Cosmetics shall be placed in the footlocker/under bunk drawer or on the assigned cosmetic shelf in an orderly, neat manner. If the footlocker/under bunk drawer are full, excess items may be stored next to the desk against the wall in a neat and orderly fashion.
8.  Inmate property items shall not exceed the allowable amounts per the 103 DOC 403, Inmate Property Policy.
9.  Dirty laundry will be kept in the laundry bag. No clotheslines or strings are permitted. No laundry to be done in the cell.
10. Inmates will be required to use a headset or jack while their radio, tablet, and/or TV are in use. Homemade speakers are not permitted. ALL appliances must be turned off before leaving the cell. Spliced wires are not allowed. All wiring must be U.L. approved and in the condition it was manufactured. Spliced wires are not allowed. All wiring must be U.L. approved and in the condition it was manufactured.
11. NO State or Personal Property is to be used as a floor mat in the cell or to block the doorway

of a cell <u>AT ANYTIME</u>.

12. There will be <u>NO</u> boxes or plastic bags of any kind allowed in the cells. All plastic bags that canteen is delivered in, as well as plastic bags utilized for moving will be turned into the officer for disposal.

13. No more than one (1) empty beverage container is permitted to be retained in a cell. This container shall not exceed 20oz in size.

K.   <u>Dress Code</u>

1. Scrub bottoms or sweatpants and t-shirts must be worn on the flats at all times.
2. Shorts or sweatpants and sweatshirts may be worn on the recreation deck, and after entering the yard, gym, and weight room.
3. Scrub tops, bottoms, and footwear must be worn when outside the unit and in the interview rooms inside the unit.
4. Bathrobe, scrub bottoms or sweatpants and t-shirts must be worn to and from the shower.
5. Clothing is to be properly fitted, climatically suitable, durable, and presentable.
6. When leaving your assigned housing unit, scrubs and appropriate footwear are to be worn. Undergarments (T-shirts and Underwear) are not to be exposed.
7. Headgear will not be worn inside of the institution, unless you are authorized to possess a Muslim Kufi or a Skull Cap from the Jewish Faith by the Property Department.
8. Any alteration or compromising of the original intent of an item, appliance, or medical prosthesis will be subject to a disciplinary offense.

L. <u>Inmate Showers</u>: Shall be permitted during tier time and for inmates returning from work/recreation as determined by the Unit Team Sergeant.

## VI.   <u>SEARCHES</u>

At any given time or place, you are subject to a search of your person, living quarters, or place of work. Many searches are routine in nature in an attempt to control contraband (i.e. materials or articles not authorized). The fact that you are asked to submit to a search does not mean you are under suspicion. Searches may include both personal/pat searches and unclothed searches. Refusal to submit to a search will result in disciplinary action.

## VII.   <u>SUBSTANCE ABUSE TESTING</u>

At any given time or place, you may be requested to provide a urine sample for drug or alcohol testing. Failure to provide a urine sample within a given time as directed by a staff member will result in disciplinary action.

## VIII.   <u>DNA TESTING</u>

The DOC collects DNA samples in accordance with 103 DOC 487, DNA Sample Collections, from Inmates who have been found guilty of an offense as outlined in the law "An Act Relative to the Enhancement of Forensic Technology". Failure to provide a DNA as required by law may result in a fine of up to 1,000 dollars or incarceration in a jail or the House of Correction for up to six (6) months or

FEB 07 2020

0175

both. You may also be subject to disciplinary action. When notified of your need to provide a DNA sample, you will be provided with the identified offenses by an Inner Perimeter Security (IPS) staff.

## IX. INMATE IDENTIFICATION CARDS

A. When leaving your unit, *your inmate ID card must be in your possession at all times.*

B. You must not use your ID card fraudulently, such as attempting to obtain goods or services to which you are not entitled.

C. You must not lose, misplace, destroy or damage your identification card in any way. Loss, mutilation and/or destruction of an issued ID card by an inmate shall be subject to disciplinary action and shall be required to reimburse the Institution for the cost of replacing the ID card which is ($3.00).

D. Your ID card is valid at all Massachusetts DOC facilities. You are to take the card with you except when you are paroled, discharged, transferred to a county, or out of state facility.

E. Lack of an ID card will result in losing all privileges of movement. Inmates will be confined to their unit and allowed to move to the HSU under escort only.

F. In the event that an inmate misplaces their state issued ID card, the unit officers should be notified and be provided with a money slip signed by the Inmate and request from the Inmate for a new I.D.

    1. The unit officer shall notify the unit CPO. The unit CPO will then complete and sign a charge slip for three ($3.00) dollars; he/she will forward it to the appropriate Unit Team Sergeant.

    2. Once the Unit Team Sergeant receives the signed charge slip, he/she will forward it to the Booking/Property Department for replacement.

G. Failure to abide by any of the above rules will result in disciplinary action.

## X. INNER PERIMETER SECURITY (IPS)

The purpose of the IPS Team is to ensure a safer environment for staff and inmates at SBCC. IPS attempts to accomplish this goal through the elimination of contraband and other illicit activities. They are frequently involved in shakedowns and investigations into activities, which threaten the security of the institution.

All information received by IPS is held in the strictest confidence and the names of people providing information are withheld from reports. *IPS information line 978-514-6532*

## XI. SECURITY THREAT GROUPS

A Security Threat Group (STG) is defined as groups, gangs, or inmate organizations that have been determined to be acting in concert so as to pose a threat or potential threat to the safety of the public, staff, secure and orderly running of an institution, or are predatory upon other inmates.

Upon arrival, all inmates will be monitored for evidence of STG activity. Any inmate who has been identified as an STG member will be notified in writing by the department, and is subject to transfer and/or placement in the Disciplinary Detention Unit (DDU) if deemed a "Leader" or are involved in disruptive behavior.

It is incumbent upon you as an inmate to stay clear of all STG activities during your incarceration.

02-07-20



Should you be approached or pressured by any STG member in joining or participating in an activity, you should report such to your Housing Unit Officer, Unit Team Sergeant, unit CPO, or any member of the IPS team.

## XII.    MEDICATION MISUSE AND FERMENTED FRUITS (HOMEBREW)

Any inmate(s) who use(s) medication illicitly, or found in possession of homebrew or items to manufacture homebrew will only be authorized Non-Contact Visits by Administration staff and are also subject to disciplinary action.

## XIII.    EMERGENCY EVACUATION PLAN

Emergency evacuation plans are posted in all living areas and throughout the facility. In the event of an emergency evacuation, follow direction from staff, proceed in an orderly manner, evacuate the area to a designated location where you shall remain until further directed by staff.

## XIV.    RELEASE PREPARATION DOCUMENTS

Proper documentation of one's identity at the point of discharge from the Massachusetts DOC    and/or classification to a Pre-Release facility is necessary for successful reentry to your community. Documents such as a State-issued ID, Social Security card, Birth and Marriage Certificates, Military release documents (DD214) and educational credentials are necessary to access or activate services/benefits upon release. These documents are often necessary to secure housing, open a bank account, secure employment and access health benefits. You have likely entered the DOC without these documents. Securing these documents prior to release or classification to a Pre-Release facility should be a priority as these documents may be difficult or time consuming to obtain. Please begin planning for this as early as possible. These documents will be secured in a manila envelope in the Records Department to be made available to you at Pre-Release or at discharge.

## XV.    INMATE DISCIPLINE - SANCTIONS AND PROCEDURES (103 CMR 430)

The entire disciplinary policy, 103 CMR 430, Inmate Discipline, is available in the inmate law library. The following is a code of offenses, which are subject to discipline:

### Category 1

| | |
|---|---|
| 1-1 | Killing of another. |
| 1-2 | Aggravated assault on a staff member, contract employee, or volunteer. |
| 1-3 | Aggravated assault on another inmate. |
| 1-4 | Aggravated assault on a visitor. |
| 1-5 | Taking or holding any person hostage. |
| 1-6 | Escape or attempted escape. |
| 1-7 | Possession, manufacture or introduction of an explosive device or any ammunition, or any components of an explosive device or ammunition. |
| 1-8 | Possession, manufacture or introduction of any gun, firearm, weapon, sharpened instrument, knife or poison or any component thereof. |
| 1-9 | Sexual assault on a staff member, contract employee, or volunteer. |
| 1-10 | Sexual assault on another inmate. |
| 1-11 | Sexual assault on visitor. |

FEB 07 2020

0175

1-12    Rioting.
1-13    Inciting others to riot.
1-14    Setting a fire.
1-15    Introduction, distribution or transfer of any narcotic, controlled substance, illegal drug, unauthorized drug or drug paraphernalia.
1-16    Engaging in or inciting an organized work stoppage.
1-17    Fighting with, assaulting or threatening another person, due to security threat group activities or gang activities.
1-18    Engaging, encouraging, recruiting or pressuring others to engage in security threat group activities.
1-19    Attempting to commit any of the above offenses, making plans to commit any of the above offenses or aiding another person to commit any of the above offenses shall be considered the same as the commission of the offense itself.

**Category 2**

2-1     Unauthorized possession of items or material likely to be used in an escape.
2-2     Causing a valid threat of transmission of a contagious disease to any person due to intentional or reckless action.
2-3     Assault on a staff member, contract employee, or volunteer.
2-4     Assault on another inmate.
2-5     Assault on a visitor.
2-6     Making a bomb threat.
2-7     Fighting with another person.
2-8     Refusing to submit to a urinalysis, breathalyzer, or other standard sobriety test or failure to provide a urine sample when ordered to do so by a staff member without medical or mental health justification.
2-9     Refusing or failing to submit to testing required by statute, or order, such as DNA blood tests, when ordered to do so by a staff member.
2-10    Engaging in or inciting a group demonstration or hunger strike.
2-11    Unauthorized use or possession of drugs, narcotics, illegal drugs, unauthorized drugs or drug paraphernalia.
2-12    Possession, manufacture or introduction of unauthorized keys.
2-13    Indecent exposure.
2-14    Receiving a positive test for use of unauthorized drugs, alcohol, or other intoxicants.
2-15    Interfering with staff members, medical personnel, firefighters, or law enforcement personnel in the performance of their duties during an emergency.
2-16    Tampering with, damaging, blocking or interfering with any locking or security device or window.
2-17    Impersonating any staff member, contract employee, volunteer or visitor.
2-18    Causing an inaccurate count by means of unauthorized absence, hiding, concealing oneself or other form of deception or distraction.
2-19    Making, introducing or transferring intoxicants and alcohol, or possession of ingredients, equipment, formula, or instructions that are used in making intoxicants and alcohol.
2-20    Possession of the clothing of a staff member or contract employee, or visitor.
2-21    Causing injury to another person by resisting orders, resisting forced movement or physical efforts to restrain.
2-22    Making a false fire alarm or tampering with, damaging, blocking or interfering with fire alarms, fire extinguishers, fire hoses, fire exits, or other firefighting equipment or devices.
2-23    Counterfeiting, committing forgery, altering or unauthorized reproduction of any document,

MAILED
02-07-20

article of identification, money, security, or official paper.

2-24    Conduct which interferes with the security or orderly running of the institution.

2-25    Wearing or displaying colors or any type of emblem, insignia or logo suggesting possible membership or affiliation with a gang, group party or other association whenever such wearing or display may, when the Superintendent has reasonable cause to believe, pose a threat to the security, good order or safety of the institution.

2-26    Possessing, wearing or using security threat group paraphernalia or photographs.

2-27    Failure to timely report to a location or program assignment resulting in a declaration of escape status.

2-28    Distribution or sale of tobacco.

2-29    Attempting to commit any of the above offenses, making plans to commit any of the above offenses or aiding another person to commit any of the above offenses shall be considered the same as the commission of the offense itself.

**Category 3**

3-1    Lying to or providing false information to a staff member.

3-2    Engaging in sexual acts with another.

3-3    Unauthorized possession of any alcoholic or intoxicating beverage.

3-4    Threatening another with bodily harm or with any offense against another person, property or family.

3-5    Refusing a direct order by any staff member.

3-6    Impersonating another inmate.

3-7    Refusing a transfer to another institution.

3-8    Extortion, blackmail, or demanding or receiving money or anything of value in return for protection against others, or under threat of informing.

3-9    Throwing objects, materials, substances or spitting at another.

3-10    Theft of property or possession of stolen property.

3-11    Unauthorized accumulation/misuse of prescribed medication.

3-12    Possession, manufacture or introduction of an unauthorized tool.

3-13    Organizing or participating in an unauthorized group activity or meeting.

3-14    Giving, selling, borrowing, lending, or trading money or anything of value to, or accepting or purchasing money or anything of value from another inmate or an inmate's friend(s) or family.

3-15    Flooding a cell or other area of the institution.

3-16    Refusing a cell or housing assignment.

3-17    Causing an individual to be penalized or proceeded against by providing false information.

3-18    Gambling and/or possession of gambling paraphernalia.

3-19    Giving, receiving or offering any person a bribe or anything of value for an unauthorized favor or service.

3-20    Being tattooed while incarcerated, tattooing another, or possessing tattoo paraphernalia and/or body piercing.

3-21    Fraud, embezzlement, or obtaining goods, services, money or anything of value under false pretense.

3-22    Creating an emergency by feigning illness or injury.

3-23    Possession of tobacco products and/or an incendiary device.

3-24    Being out of place or in an unauthorized area.

3-25    Communicating, directly or indirectly with any staff member or contract employee, volunteer, or a member of their family at their home address or home telephone number, or for non-official business.

3-26    Use of obscene, abusive or insolent language or gesture.

FED 07 2020
0175

3-27    Conduct which disrupts the normal operation of the facility or unit.
3-28    Possession of an altered appliance.
3-29    Attempting to commit any of the above offenses, making plans to commit any of the above offenses or aiding another person to commit any of the above offenses shall be considered the same as the commission of the offense itself.

## Category 4

4-1    Receipt or possession of contraband.
4-2    Mutilating, defacing or destroying state property or the property of another person.
4-3    Unauthorized possession of money or other negotiable items.
4-4    Use of mail or telephone in violation of established rules or regulations.
4-5    Telephoning or sending written communications to any person contrary to previous written warnings and/or documented disciplinary action.
4-6    Possession of any photographic, or hand drawn material and/or unauthorized publication that depicts sexually explicit acts, and/or nudity.
4-8    Misuse or waste of issues supplies, goods, services, or property.
4-9    Failure to maintain acceptable hygiene.
4-10    Failure to maintain acceptable hygiene or appearance of a housing area.
4-11    Violating any departmental rule or regulation, or any other rule, regulation, or condition of an institution or community based program.
4-12    Failure to comply with standing count procedures.
4-13    Being out of place or an unauthorized area.
4-14    Possession of an altered appliance.
4-15    Attempting to commit any of the above offenses, making plans to commit any of the above offenses or aiding another person to commit any of the above offenses shall be considered the same as the commission of the offense itself.

## XVI.    GRIEVANCE PROCEDURE

### A. Informal Complaint Resolution

You are required to utilize Step one (1) Informal Complaint Resolution process to address issues of concern prior to filing a Formal Grievance. The Informal Complaint Form must be filed within (5) business days of the actual incident or within five (5) business days of becoming aware of the incident or situation. Utilization of the informal process may result in quicker response and/or resolutions to your issues. It is important that the inmate attempt to address their issues at the lowest institutional level possible and to express their concerns in a respectful, constructive manner. Additionally, utilization of the Step 1 Informal Resolution/Communication process will not prevent you from filing a formal grievance if you are not satisfied with the Informal Complaint outcome/decision received.

Utilization of the Step 1 Informal Complaint Resolution process is not required for the following: Emergency grievances, which shall be submitted and processed pursuant to 103 CMR 491.18, allegations of staff misconduct, or allegations for sexual assault/abuse which shall be filed and reviewed administratively.

### B. Inmate Grievances

You are required to utilize the institutional informal resolution/communication process to address

issues of concern prior to filing a formal grievance except in the situations stated above. The grievance process is a mechanism intended to address legitimate inmate complaints and is not the appropriate forum to make routine requests. A routine request is the process of asking for something that you are entitled to as a matter of policy, procedure or otherwise. Requests should be made through established procedures and not through the grievance process. A grievance is a formal complaint pertaining to conditions of confinement affecting you personally.

C. Forms

Step 1 Informal Complaint, grievance, and grievance appeal Forms are available through institution library, on all housing units, the Institutional Grievance Coordinator (ICG), and through any member of the unit team. These forms are available to you in English and Spanish however, if you are unable to complete the form due to a language/literacy barrier or any other problem, you may contact your unit CPO for assistance.

D. All grievances must be filed within the established timeframes unless time limits to file a grievance are waived by the IGC. All inmates shall have unimpeded access to the inmate grievance process in order to address legitimate concerns or complaints.

E. Completed grievance forms must be submitted within ten (10) business days from receiving an answered Informal Complaint Form in which you are unsatisfied with the decision, ten (10) business days from the date of the incident or situation for which an Informal Complaint Form was not required, or within ten (10) business days from becoming aware of the incident or situation for which an Informal Complaint Form was not required. All completed forms shall be submitted by depositing the form in the locked mailbox utilized for outgoing mail or handed directly to the IGC.

F. Completed grievance forms may be returned to you for improper filing if:

1. The grievance form submitted was incomplete;
2. The grievance was filed on behalf of another inmate;
3. The grievance was submitted on behalf of a group of inmates or by a group of inmates;
4. The grievance was filed relative to more than one subject matter;
5. The grievance was filed as an "Emergency" but has been determined not to be an emergency
6. Failure to file an Informal Complaint Form prior to submitting a Formal Grievance where applicable.
7. An answered Informal Complaint Form was not attached to the Formal Grievance.

G. If a grievance or grievance appeal is returned to you for improper filing, you shall be notified of the reason in writing and you will be granted three (3) business days to resubmit your grievance in the appropriate format. Failure to do so will result in the termination of your grievance.

H. You should not utilize the grievance process to address disciplinary or classification matters to include sex offender identification, as these processes have their own appeal mechanism and are

FEB 07 2020

0175

considered non-grievable. Additionally, medical/mental health treatment/diagnosis and therapeutic diet concerns are non-grievable, as the contracted medical provider has its own medical grievance process however access to medical treatment is considered a non-grievance issue.

I. The IGC shall acknowledge your submitted grievance by generating a receipt from the Inmate Management System (IMS). The IGC will then have ten (10) business days from receipt to render a decision on your grievance. The IGC may issue you a written extension if more time is required to adequately investigate/review your grievance. Once a decision has been rendered by the IGC, you will have ten (10) business days from receipt of the grievance decision to file a grievance appeal with the Superintendent. The Superintendent will have thirty (30) business days to render a decision on your appeal. Furthermore, the Superintendent may issue you written extensions if more time is needed to appropriately review/investigate the issue.

J. An "Emergency" grievance may be filed by you if there is a sudden occurrence of a serious and urgent nature that requires immediate attention. Some examples may include but are not limited to; fear for one's life, fear for the life of another, and access to court issues where meeting deadlines are in jeopardy. In such urgent instances it is important to immediately notify staff so timely action can be taken to address your concerns. The submission and processing of an "Emergency" grievance shall occur in the same manner as other grievances except for processing time frames. If the grievance is determined to be an emergency it will be responded to within 3 business days from receipt. Emergency grievance appeals will be responded to by the Superintendent within 5 business days from receipt. Additional information relative to the inmate grievance process can be obtained by reviewing 103 CMR 491, Inmate Grievances, which is available for your review in the libraries.

## XVII.  MAIL PROCEDURES

### A. Privileged Mail

Privileged mail will be delivered and will be opened and inspected for contraband in the presence of the inmate. Inmates shall be permitted to mail to and receive letters from the following persons in accordance with the procedures set forth in 103 CMR 481, Inmate mail policy Section 481.11:

1. Any officer of a court of the United States or of the Commonwealth of Massachusetts (judge, attorney, or clerk, parole board members, probation or parole officers).
2. The President or Vice President of the United States or the Governor of the Commonwealth of Massachusetts.
3. Any member of the Congress of the United States or any member of the General Court of the Commonwealth of Massachusetts.
4. The Attorney General of the United States or the Attorney General of the Commonwealth of Massachusetts. The Director or any agent of the Federal Bureau of Investigation or the Commissioner of the Massachusetts Department of Public Safety.
5. The Superintendent of the state correctional institution in which an inmate is confined, an Associate or Deputy Commissioner of Correction or the Commissioner of the Massachusetts DOC.

MAILED
02-07-20



Inmates and persons with whom inmates may correspond as provided in 103 CMR 481.11 (1) shall not use or permit others to use authorized privileged mail for personal non-legal or non- official correspondence, the transmission of contraband, or the transmittal of communications to be given or forwarded to persons not specified in 103 CMR 481.11 (1). Persons receiving unauthorized privileged mail, correspondence intended for a party other than the addressee, or letters or packages for forwarding should submit such communications or materials to the Superintendent of the institution in which the inmate is confined. Inmates who fail to submit such communications or materials to the Superintendent shall be subjected to disciplinary action.

B. Incoming Mail

All incoming non-privileged inmate mail shall be opened, photocopied including the envelope, and stored in accordance to SOP 103 CMR 481, Inmate Mail Policy section II, subsection I (a)-(f). No items from the original correspondence shall be delivered to the inmate. Mail will be delivered six (6) days per week, excluding Sundays and Holidays. Mail will be distributed by your Unit Officer during the 3x11 shift and will be hand delivered to each inmate.

All publications received through the mail must be received from an approved publisher and must be in brand new condition. Publications through any third-party vendor and Amazon will be considered contraband. No Collection-on-delivery (COD) letters or packages of any kind shall be sent or accepted for an inmate. Incoming mail containing any of the following shall be considered contraband:

1. Any unknown substances;
2. Whiteout, tape, glue, glitter, or any artwork created with crayon, marker, colored pencils or paint;
3. Perfume or lipstick;
4. STG references;
5. Nudity/sexually explicit photos;
6. Local maps or escape information;
7. Mail that describes how to make weapons, drugs or alcohol; and
8. Excess of 5 pages of printed or photocopied materials per day.

Mail may normally be delivered within twenty-four (24) hours of receipt from the post office. The use of your identification number on the envelope will facilitate its delivery.

C. Outgoing Mail

1. Letters without an inmate's name and return address will not be forwarded to the Post Office. The return address is:

    Souza-Baranowski Correctional Center
    P.O. Box 8000
    Shirley, MA 01464

2. Inmates will deposit their outgoing mail into the housing unit locked mail box. The locked boxes shall be brought to the Mailroom by the 3x11 shift Monday through Saturday evenings at end of shift.

3. When applicable, all outgoing mail should be placed in the appropriate marked mailbox located in front of the Dining Hall during movement to the Dining Hall. Mail will be collected daily (Monday – Saturday except holidays) from these boxes at approximately 7:00am by Mailroom Staff.

4. All mail must have postage stamps, unless a charge slip has been filled out and authorized by a staff member for indigent inmates.

5. All outgoing mail shall be stamped on the reverse side of the envelope with language indicating that the correspondence is sent from a correctional institution. Mail shall be stamped in blue ink only; the stamp shall read as follows:

*"This correspondence is forwarded from a Massachusetts Correctional Institution. The contents may not have been evaluated and the Department of Correction is not responsible for the substance or content of the enclosed material."*

D. Free Postage for Indigent Inmates

1. Indigent inmates may be permitted to mail three (3) letters, not to exceed standard postage, each week at the institution's expense. In addition, an indigent inmate may be permitted, where necessary, to send an unlimited number of letters of any weight to any court official at the institution's expense.

2. Treasurer staff will make a determination regarding indigence according to 103 CMR 481, Inmate Mail Policy.

3. Inmates who are not considered indigent according to policy and who have not placed stamps on their mail will have their mail returned to them.

E. Prohibited Correspondence

An inmate may be prohibited by the Superintendent from corresponding with a particular person if that person or the persons parent(s) (or legal guardian in the case of a minor), has requested in writing that such correspondence from the inmate be terminated. Whenever such correspondence is not mailed, the inmate shall be notified. Such notice shall satisfy the requirements of 103 CMR 481, Inmate Mail.

When the inmate bears the mailing cost, there is no limit on the volume of letters the inmate can send or receive or on the length, language, content or source of mail or publications except when there is reasonable belief that limitation is necessary to protect public safety, institutional order, and security.

Inmates may receive a maximum of five (5) pages per day, except Sundays and Postal holidays, of a portion extracted, photocopied, or clipped from such items as an attachment to personal correspondence as long as the material is not otherwise prohibited by the 103 CMR 481, Inmate Mail. (I.e. if an inmate receives a piece of mail with fifteen (15) pages of internet printing along with a personal letter, ten (10) of the internet pages shall be handled according to contraband mail guidelines). However, there is no limit on the amount of incoming mail an inmate receives. This shall not apply to Privileged mail (SBCC 481, Inmate Mail Procedure).

F. Inmate to Inmate Correspondence-

When an inmate requests an inmate to inmate correspondence form for either family correspondence, or pre-existing legal issues, it is approved by both Superintendents, a copy of this document shall be placed in Section III of each Inmate's six-part folder and a copy shall be maintained in the mailroom of each inmate's institution.

The prohibition in inmate to inmate correspondence applies only to DOC inmates incarcerated in a DOC or county facility in Massachusetts. Disciplinary action may be taken for violations of this rule.

G. In-House Mail

All in-house mail to be forwarded to staff must have inmates name and identification number on it or your mail **will not** be forwarded. Institutional mail leaving the facility must be sent via United States Postal Service (USPS).

## XVIII. INMATE TELEPHONE

A. Telephone Access (103 CMR 482)

In order for you to make telephone calls, you must fill out a Telephone System Number Request Form and return it to your unit CPO. You will be assigned a Personal Identification Number (PIN) which you must use in order to make calls. Your PIN is your confidential code. You must not share it with anyone else.

You are limited to ten (10) approved telephone numbers, plus up to five (5) attorney telephone numbers. You should choose those ten (10) personal telephone numbers, which are the most important to you. In addition, all inmates will have access to the following numbers without putting them on their lists:

| | |
|---|---|
| Mass. Correctional Legal Services | (877) 249-1342 |
| Harvard Prisoners Legal Assistance | (617) 495-3127 |
| Northeastern Univ. Legal Assistance | (617) 373-3660 |
| Committee Public Counsel | (800) 882-2095 |
| Mass Disability Law Center | (617) 557-9167 |
| Disabled Persons Protection Comm. | (800) 426-9009 |
| IPS Hot Lines | (978) 514-653 |

The attorney telephone numbers must be business numbers only, which will be verified through the Bar Directory. Attorney calls will not be recorded or monitored.

The duration of each call will be limited to twenty (20) minutes, after which you will be automatically disconnected. However, you will be able to make an unlimited number of shorter phone calls within those twenty (20) minutes if you wish.

**Please note that making or participating in "3 way" calling is a violation of the phone policy and is subject to disciplinary actions.**

You will be able to make changes on your list during the first week of January, April, July, and

FEB 07 2020
C, 0175

October.

You are entitled to make unmonitored and unrecorded collect telephone calls to your designated and pre-approved ordained clergyman and to your pre-approved and licensed psychologist, social worker, and/or mental health and human service professional. In order to complete the pre-approval process; you must submit the following to the institution telephone Site Administrator:

1.   The designation of the clergyman or professional you wish to call;

2.   A letter from the clergyman or professional attesting to the professional relationship that exists between you. The Superintendent may require additional documentation, as necessary.

3.   No clergyman or professional employed by the DOC or those contracted to provide services on behalf of the department may not be designated by you, nor will such individuals be pre-approved.

B.  International Language Line Service

The Language Line will provide over the phone interpretation, twenty-four (24) hours a day, seven days a week for designated areas. The service can provide translation of one hundred and forty (140) different languages to any NON-ENGLISH speaking inmate. For more information please contact your unit CPO.

C.  TTY Service Line

Hearing impaired inmates in need of the TTY phone should send a written request to the Deputy Superintendent of Reentry for this service.

## XIX.   VISITATION

A.  Inmate Visits and Conduct:

1.   All inmates are allowed three (3)-visiting periods per week with only one period allowed per day. A maximum of two (2) adults, with four (4) visitor's total, may visit an inmate at any one time. For example, the following combinations are authorized; (1) adult and up to (3) children or (2) adults and up to (2) children.

2.   **South-side SBCC inmates**: All visits will be **contact** with the exception of those on restricted visiting privileges.

3.   **North-side SBCC inmates**: All visits will be **non-contact** with the exception of visits from attorneys, law students, paralegals and/or private investigator visits.

4.   Non-contact visitation

a.  **Please note: FOR SEATING PURPOSES ONLY**, in the Non-Contact Visiting area, person(s) that are the age of thirteen (13) or older will be considered an adult. Small children should sit on the lap of an adult. If a child is too large to sit on a lap, he/she may stand. Only

02-07-20

 one (1) child will be permitted to stand at a time.

  b.  The Superintendent or his/her designee may at their discretion, restrict the visiting privilege of an inmate to the non-contact area. The inmate shall be notified of this action in writing.

  c.  Non-contact visitation will continue until such time as the Superintendent or his/her designee determines that resuming contact visiting privileges is appropriate. Review of non-contact visitation for **south-side SBCC inmates** will occur monthly.

  d.  This specific section is not intendent to address non-contact visiting restrictions that are the result of a sanction imposed by the disciplinary hearing officer.

5.  Attorney visits shall be in accordance with 103 CMR 486, Attorney Access at Massachusetts Correctional Institutions. Attorneys shall be permitted to visit inmates during institutional visiting hours for inmates and upon one (1) hour notice at any other time between 8:30AM and 8:30PM. If not accompanied by an attorney, law students, paralegals and private investigators shall be permitted to visit inmates during institutional visiting hours for those inmates.

6.  Any variation to the authorized number of visitors must be approved in writing as a special visit request. Such requests must be submitted to the ***Deputy Superintendent of Operations.***

7.  The first visiting period will begin at 1:00 p.m. and end at 4:00 p.m. The second visiting period will begin at 5:50 p.m. and end at 8:35 p.m. Five (5) minutes prior to the ending of a visiting period, the visiting room officer shall announce a 5-minute warning. All visitors and inmates will end their visits during this time period.

8.  If the visiting room or non-contact area becomes crowded, the visits that commenced first will be terminated, however, visits will be at least one (1) hour in duration.

9.  Visitors will not be allowed to gain entrance after 2:30 p.m. and after 8:00 p.m. The last visitor processed must be in the Pedestrian Trap by 2:30 p.m. to be allowed entrance for the 1:00 p.m. – 4:00 p.m. visiting session.

10. Inmates will be allowed visits according to their housing assignment as indicated below:

| NORTH-SIDE HOUSING | SOUTH-SIDE HOUSING |
| --- | --- |
| Sunday | Tuesday (NO Evening Visits) |
| Wednesday (No Evening Visits) | Thursday |
| Friday | Saturday |

   *** Tuesday 8:30 am–11:00am will alternate as an additional visiting period between the North and South-side Housing Units.***

11. There are no visits on Monday unless a holiday falls on that date. Holiday visits will be charged to the inmate's weekly visiting allowance. North-side and South-side Holiday visits will alternate

from the first visiting period, 1:00pm – 3:30pm and the second visiting period 6:00pm – 8:30pm, the Reentry Unit will be *9:00 a.m.-11:00 a.m., and the* Special Housing Unit is from 11:00 a.m.- 1:00p.m. each holiday. Notices are posted in the Reception/Lobby and Housing Units prior to the Holiday with the times.

12. ***Please Note-*** South-side visits are designated as limited contact. The inmate and visitor are allowed a very brief welcoming and departing embrace and closed mouth kiss. The inmate and visitor will sit face to face with their feet flat on the floor, maintaining a correct, upright posture with their backs against the chair. Rubbing of arms or legs of the other shall not be permitted. Conversational voice volume is to be used distracting loudness will not be permitted to disturb other visitors.

B. <u>Pre-approval Visiting Process</u>

1. Each inmate shall only be allowed a maximum of eight (8) pre-approved adult visitors, in accordance to 103 CMR 483. Although minors do not require pre-approval, the guidelines outlined in the policy must be met prior to the allowance of minor visitation.

2. Pre-approved visitors may consist of a combination of immediate family members and/or friends. This list may be revised upon an inmate's request every one hundred and twenty (120) days within the first fifteen (15) days of the month (March, July, and November), during the institution's designated change period. Requests for changes shall be submitted on the Inmate Visitor Listing form (103 CMR 483 Attachment 3) available at each inmate library. Requests for changes shall be submitted to the Director of Security for processing.

3. Members of the clergy, as authorized by the Chaplain or Superintendent, need not be placed on the Approved Visitors List.

4. Attorneys, law students, paralegals and/or private investigators need not be placed on the Approved Visitors List.

5. Once the inmate submits their list of desired visitors, prospective visitors shall complete and submit a visitation application (103 CMR 483, Attachment 1), along with a copy of a current photo identification card to SBCC's Director of Security. Any medical documentation must also be submitted at this time.

6. If the prospective visitor has been approved or denied, the name shall be entered on the inmate's visitor listing. If the prospective visitor is the victim, family member of a victim, or registered to receive notification concerning an inmate currently incarcerated, the Victim Service Unit shall be informed to provide additional information and guidance on the proper course of action. The Superintendent or designee shall make the final decision when a prospective visitor is initially denied.

C. Visiting for Inmates Housed in HSU:

Inmates housed in the Health Services Unit shall receive visits in the Visiting Room if medically approved. The visiting periods shall coincide with that of the unit they were assigned to prior to HSU placement. Visitors will be required to schedule an appointment for these visits, on the appropriate day, at least twenty-four (24) hours in advance by calling the HSU Sergeant between the hours of 10:00 a.m. and 2:00 p.m. Monday through Saturday. Visiting periods cannot be scheduled more than ten (10) days in advance. Scheduling appointments requires availability staff due to the inmate residing apart from the general housing units. Refer to section XIX (A) (1) of this handbook for allowable visitation periods and number of visitors.

D. Dress Code for Visits:

Inmate Dress Code:

Inmates are permitted to wear one scrub top, one scrub bottom, one T-shirt, and one pair of boxer underwear with socks and appropriate footwear to the Visiting Room. "Double Layers", thermal tops, thermal bottoms, gym shorts or watches are not permitted. Inmates are permitted to bring into the visiting room: ID Card, wedding band, medical alert necklace/bracelet, one religious medal, and headwear that is religious in nature.

Visitor Dress Code:

The following restrictions shall apply to all visitors, as defined in the 103 DOC 483(14), entering SBCC. **The following items are NOT ALLOWED to be worn:**

1. Boots worn above the knee (exception – boots below the knee will be permitted October 15 – April 15)
2. Work boots will never be permitted.
3. Bare feet
4. Bathing suits, shorts, any clothing with excessive pockets, metal, drawstrings, excessively baggy or tight clothing, hooded clothing, sheer, excessively revealing or transparent clothing, bodysuits of any type or wrap around shirts. (Children age 8 and younger may wear shorts).
5. With the exception of undergarments, spandex or spandex type clothing is not allowed.
6. Any clothing that displays a gang affiliation or    is in any way attributable to gang culture; additionally, clothing that is obscene, racist or displays sexual content is not allowed.
7. Any clothing similar to that issued to inmate or uniformed personnel to include nursing scrubs, police, postal and utility (Class A active military uniforms are allowed).
8. Fatigue or camouflage clothing.
9. Double layered clothing on the bottom half of their person (e.g. two (2) pairs of pants, or skirt and slacks, etc.)
10. Bibbed clothing of any type: shorts, dress, pants, overalls, jumper etc. (allowable for age 8 and younger).
11. Hair accessories that cannot be easily removed to be searched.
12. Bobby pins, barrettes and ribbons. .
13. Umbrellas, jackets, coats, vests or outerwear of any type.

FEB 07 2020

0175

14. Visitors may not wear any type of blue or black jeans into an institution. (Allowable for age 8 and younger)

15. Earrings, facial/body jewelry, necklaces, bracelets and watches are not allowed. The only exception regarding jewelry is a traditional engagement ring/wedding band, religious medallion and medical alert jewelry.

16. Dresses, skirts and skirt slits will not exceed 3"above the knee when standing. No wrap-around style skirts are allowed unless worn for religious reasons.

17. Tank tops, halter tops, muscle shirts, or clothing that reveals the midriff or excessively exposes the back. Tube tops of any type are not allowed. Sleeveless clothing is not allowed unless covered by an article of clothing, such as a sweater, that shall not be removed.

18. Sweatshirts, sweatpants, wind pants and exercise clothing (allowable for age 8 and younger).

19. Clothing with zippers that go the full length of the garment with the exception of outerwear. (Allowable for age 8 and younger).

20. Colored T-shirts are allowed in. T-shirts with offensive logos are not allowed.

21. Leg warmers.

22. Hats and head coverings of any type, unless worn for religious or medical reasons; however they must be searched prior to entering the institution.

23. No electronic communication devices or those capable of storing information are allowed (i.e. cell phones, electronic devices).

24. No wearing or possession of any type of glitter make-up materials to include Chap Stick or lip balms, facial makeup, nail polish, eye shadow, etc.

Requirements for all Visitors:
1. Undergarments must be worn
2. Clothing shall not be ripped, torn, have holes or missing buttons.

**The following are exceptions to the visitor dress code:**

1. Sweaters may be worn;
2. Hair pieces (i.e., toupees, wigs, extensions, weaves) may be worn but must be searched. It shall be the responsibility of the visitor to inform the officer that they are wearing a hairpiece during the search processing;
3. Garments with elastic waists may be worn.
4. Jackets or blazers may be worn as part of a suit or outfit by students participating in a clinical/internship program.

*Any visitor who does not conform to appropriate visiting regulations may be barred for the day. Visitors will have the opportunity to change into appropriate clothing that they may have in the vehicle, etc.; however, they shall be processed last.*

E. Misc. Restrictions and Limitations:
1. Visitors are only allowed to visit one (1) inmate housed at SBCC. Exception will be if the visitor is immediate family (i.e., brother, father, or step-parent). Visitors will be required to request permission from the Superintendent in writing if they choose to visit another inmate.


MAILED
02-07-20



2.  Visitors are allowed to enter the visiting room once a day. Once a visitor leaves the visiting room and/or institution, they will not be permitted re-entry.

3.  Visitor Medication or Medical Devices:

    a.  Visitors who maintain life-saving medication or who utilize medical devices to include: nitroglycerine, inhalers, and glucose tablets, automatic implantable cardioverter/defibrillator and/or pacemaker, wheelchairs, prosthetic devices, insulin pumps, casts, braces, medically necessary shoes, canes, walkers, guide dogs etc., or requiring the use of oxygen tanks shall obtain prior approval from the Superintendent to visit with such medication/device(s).

    b.  The visitor shall submit written evidence signed by a medical doctor documenting the need for such device(s) to the Superintendent for review. Written evidence shall include an anticipated end date for the use of all devices that are necessary for a limited time period (e.g. cane, cast) due to temporary medical conditions.

    c.  Once substantiated, the Superintendent shall provide written approval to allow the visitor to enter the institution with the device(s); the Superintendent shall authorize an alternate search if deemed appropriate due to the visitor being unable to submit to a metal detection search due to physical limitations or the presence of the device(s).

    d.  The visitor shall be required to declare the device(s) and produce the written approval by the Superintendent every time they visit. If an alternative search is approved, the visitor shall be subject to a personal search every time they visit the institution.

    e.  If this is a first time visit to a correctional facility by the visitor, the Shift Commander shall be notified for authorization to enter with the necessary device(s) provided the visitor has agreed to a personal search prior to entering. This one time approval shall be documented via an incident report and made available to processing staff. The visitor shall be advised that they must obtain the required approval prior to their next visit.

    f.  Visitors who have life-saving medication shall keep it on their person all times.

    g.  The officer shall note all medication or medical device(s) upon entry into the IMS visitor screen and on the visiting pass and verify upon exit of the visiting room.

F.  Infant allowable items for visits:

Visitors entering with infants will be allowed to enter with the following items:
1.  Two (2) clear plastic bottles with formula, milk, water or juice;
2.  One (1) empty sippy cup;
3.  Two (2) infant diaper diapers and infant wipes in a clear plastic bag;

4. One (1) receiving blanket;
5. One (1) pacifier;
6. Two (2) plastic, sealed jars/ pouches of baby food;
7. One (1) plastic spoon; and
8. One (1) bib.

FEB 07 2020
**0175**

G. Children Visitation Guidelines:

1. Children younger than 18 years old may visit without being on the inmate's approved visitor list, provided they are accompanied by a parent, legal guardian having physical custody and who is on the inmate's approved visiting list. Originals or copies of birth certificates or of official hospital records verifying the birth of the child, the date of birth of the child, and parent information, are required for children younger than 18 years old;

2. An adult who is not the parent or guardian having physical custody of the minor must submit a completed Minor Consent Form (available at www.mass.gov/doc, and at each inmate library, attached as Attachment 2 to 103 CMR 483.00). The adult shall also provide the Superintendent copies of the minor's birth certificate or of an official hospital record verifying the birth of the child, the date of birth of the child, and parent information and obtain the Superintendent's approval prior to visiting with the minor.

3. Adults entering with a minor shall have the minor's original or a copy of the minor's birth certificate or an official hospital record verifying the birth of the child, the date of birth of the child, and parent information, and if the adult is not the parent or guardian, a copy of the approved Minor Consent Form with them each time they visit. An inmate may sign the minor consent form if he or she is noted as the parent on the child's birth certificate.

4. **NO MINOR SHALL BE LEFT UNATTENDED IN ANY AREAS ON STATE PROPERTY (I.E. VEHICLES, RECEPTION/LOBBY, ETC.).**

H. Funds/Mail

Money deposits may be mailed to the inmate at the Institution or be dropped off during visiting hours by depositing the funds in the appropriate box located in the main lobby. Cashier's checks, money orders or postal orders are preferable; however, personal checks will be accepted. There is a seven (7) day hold on all personal checks. **Please do not send cash.**

We are not responsible for lost cash. Also credit or debit card money deposits may be made through "Secure Deposits" services via the internet at ACCESSCORRECTIONS.COM or by telephone (866) 345-1884. Cash deposits are available at Dollar General or Family Dollar stores by first registering at CashPayToday.com. Money deposits such as Cashier's checks, money orders or postal orders shall be mailed to:

      MASS DOC
      P.O. Box 12486
      St. Louis, MO 63132



MAILED
02-07-20

I. Restroom Facilities for Visitors/Inmates:

1. Visitors shall notify the Visiting Room officer prior to using the restroom facilities and sign the visitor search logbook consenting to a personal/pat search after usage. Infants and Children under the age of ten (10) must be accompanied by the parent/legal guardian other than the inmate..

2. The officer will unlock the bathroom door and allow the visitor to enter. The officer will remain outside the bathroom door. In the event that a visitor needs to change an infant's diaper a staff member shall monitor the procedure within the immediate area however affording the visitor privacy.

3. All visitors have a personal/pat search inside the restroom before being allowed back into the visiting room. Visitors are expected to keep the restroom areas clean.

4. The restroom facilities are available for use at the discretion of the Officer-in–Charge (OIC). If in the event the visitor is unable to wait until such time that restroom facilities are available, the visitor has the option to end the visit and leave the institution. The visitor will not be allowed to re-enter the institution for the remainder of the day.

5. Visitors will not be allowed to use the restrooms during shift change and from half-hour prior to the end of visits until the visiting period is over.

6. Inmates are not authorized to use restrooms within the visiting room. Inmates may leave the visiting room to use the facilities in his housing unit. He will not be permitted to return to the visiting room, the visit shall be terminated.

J. Violation of Visiting Room Rules:

1. Any violation of visiting rules by inmates may result in disciplinary action and/or loss of visiting privilege.

2. Any violation of visiting rules may result in termination of the visit and loss/suspension of visiting privilege to include contact visitation.

K. Visitors Access to Rules and Regulations:

A copy of the institutional visiting rules and procedures shall be made available to any visitor who requests one. A copy of the visiting rules and regulations is also located in the main lobby for review.

L. Public Transportation for Visitors:

Visits can utilize Public Transportation to the facility via the Fitchburg/South Acton Commuter Rail (7) days per week including holidays (1-800-392-6100) and/or local taxi services at (978) 537-6331 or (978) 534-9655.

M. Special Visits:

Exceptions to the visiting schedule, duration of visits, number of people allowed visiting at one time, and/or other requests can be approved under special circumstances. Such requests must be submitted in writing to the Deputy Superintendent of Operations. Special visit approval will be documented in

writing and a copy will be sent to the requesting visitor, the inmate, Outer Control, Captains and Visitor Processing.

N. Directions to the Facility for Visitors:

Souza-Baranowski Correctional Center
Harvard Road
P.O. Box 8000
Shirley, MA 01464
(978) 514-6500

From Boston - Take Storrow Drive West to Alewife Brook Parkway and Rte. 2 West. Take Rte. 2 West to Exit 36 (Shirley.) Bear right off exit ramp. Turn left at the stop sign. Take your next right at sign saying MCI-Shirley. SBCC is the first large facility on your right.

From the North - Take Rte. 495 South to Exit 29B (Rte. 2 West.) Follow Rte. 2 to     Exit 36 (Shirley.) Bear right off exit ramp. Turn left at stop sign. Take your right immediately at sign saying MCI Shirley. SBCC is the first large facility on your right.

From the South - Take Rte. 495 North to Exit 29B (Rte. 2 West.) Follow Rte. 2 to Exit 36 (Shirley.) Bear right off exit ramp. Turn left at stop sign. Take your right immediately at sign saying MCI Shirley. SBCC is the first large facility on your right.

From the East - Take Rte. 2 West to Exit 36 (Shirley.) Bear right off exit ramp. Turn left at stop sign. Take your right immediately at sign saying MCI Shirley. SBCC is the first large facility on your right.
From the West - Take Rte. 2 East to Exit 36 (Shirley.) Bear right off exit ramp going over Rte. 2. Take first right - sign saying MCI Shirley. SBCC is the first large facility on your right.

## XX.  CANTEEN PROCEDURES 103 DOC 476

A. Distribution of Canteen: All canteen orders will be distributed on Tuesdays unless modified by the vendor.

B. Ordering of Canteen:

The SBCC utilizes the pre-bag system for inmate canteen processing. Inmates will enter their canteen order utilizing kiosks located in each housing unit. Orders may be edited (additions or deletions made) until lock-in Thursday evening of each week, when the inmate's account is debited the amount for their order. Those inmates who do not have access to kiosks (i.e. HSU/RHU) will fill out an original Commissary order bubble form which will be collected by the Canteen Officer the day after delivery of canteen items each week. In the event of an Institutional lock down for the duration of more than (1) one day, SBCC reserves the right to utilize the original canteen bubble sheets, which will be collected by the Canteen Officer, and will void any kiosk orders made for that week. Commissary order forms must be filled out completely and correctly in order for them to be scanned by Canteen Contractor. The information necessary to process is:
1. Date;

2. Inmate's commitment number;

3. Housing Unit and cell number;

4. Inmate name must be legible, first and last names printed **(Signature required)**;

5. Quantity and code number of item must be filled in correctly; and

6. Forms must not be folded, bent, torn, stapled, taped or wet.

C. Staff (canteen officers) will pick up the Commissary Order Forms each Wednesday for the following week's canteen process. The Canteen Contractor, in conjunction with the Information Resource Division of Technology Services, debits the inmate accounts on Fridays. Sealed canteen bags are distributed each Tuesday in clear plastic wrap for easier searching. Canteen can be ordered only one time per week and, unless otherwise authorized, cannot exceed the specified amount (by housing assignment) per week.

| Housing Unit | Units | Weekly Permitted Canteen Amount | Misc. Information |
|---|---|---|---|
| North-Side Housing Units | L1, L2, M2, N1, N2, P1, P2 | $30.00 | No appliances EXCEPT Walkman or Tablet and electric razor. |
| South-Side Housing Units | G1, G2, H1, H2, J1, J2, K1, K2 | $50.00 | |
| Restrictive Housing Units | L3, J3, K3 | $25.00 | Limited canteen items. No appliances EXCEPT Walkman or Tablet and electric razor. |

The Deadline for money to be deposited into an inmate's personal account for canteen expenditures is Wednesday of the week prior to placing the order. When an inmate does not have sufficient money to cover his order, The Canteen Contractor (computer system) will delete items based on the sequence in which they are ordered (the last item ordered would be the first item deleted) until the items purchased do not exceed the actual money available. Inmates should put their most important or needed items at the top of their order. Canteen privileges can be suspended as a disciplinary sanction.

D. Canteen Restrictions:

The following procedure is to be followed for inmates who are on canteen restriction. This does not concern those inmates who have frozen accounts. Inmates on canteen restriction may purchase cosmetics/stationary only, on a monthly basis.

1. The inmate will fill out the Keefe Commissary Restricted Commissary Form/Request for cosmetics/stationary only. The Restricted Commissary Form contains the items and quantity allowed for purchase while on restriction.

2. A list of those inmates who need a canteen restriction lifted must be submitted by the unit team and submitted to the Treasurer's Office when Keefe Commissary Order Form is dropped off.

FEB 07 2020
0175

3.  This process will be done one time per month on the last Thursday of each month. All slips and the attached list must be turned into the Treasurer's office the preceding Tuesday.

4.  The Treasurer's Office will be responsible for lifting the canteen restriction prior to the canteen process and for replacing the restriction on the inmates account once the canteen deduction has been processed.

## XXI.  INMATE FINANCES (103 CMR 405)

A.  Money Credited to Accounts:

The Treasurer's office will maintain two accounts for each inmate via the Department computer system. The personal account is used for such items as canteen supplies, or authorized purchases from outside sources. The savings account is maintained in order that an inmate will have an accumulated amount of money to assist him upon release to the community. Money in this account cannot be withdrawn without permission from the Superintendent and for the purpose of a compelling need. Except for inmates serving Life sentences, the Superintendent cannot approve a withdrawal from savings which would result in a balance of less than $100.00 in the savings account.

B.  Canteen and the Treasurer's Office:

Since the canteen has been privatized, Keefe Corp takes the money from your account for your weekly canteen, not the Treasurer's Office. If you are due a refund, they (Keefe Corp) send us a list of inmates to give refunds to. If you are not on the list that they send us, you will not get a refund. If you believe that they owe you a refund that you did not get, you must write to the "Treasurer's Office." Please be patient, it may take up to two weeks for a refund.

The Treasurer's Office handles the clothing and appliance orders only. First, you must give your completed clothing/appliance order to your housing unit CPO. The unit CPO will forward the paperwork to Treasurer's Office, who then shall take the money from your account on Friday and send the information to Keefe Corp. When Keefe Corp fills the order they send it to Property, who is in charge of getting it to you. If you should get transferred before your clothing or appliance order is delivered to you here, it will be forwarded to the Property Department at your new institution to be delivered to you there.

*An example of how money is taken from your account for a canteen order: if you spend $50.00 per week on your regular canteen order. Keefe Corp can run a list showing how much each inmate is allowed to spend each week. They don't take the $50.00 and then put back the change; they take only what your order adds up to. For instance, if you can spend $50.00, but only spend $40.00, your slip shows previous Balance $50.00, new Balance $20.00. All they actually take from your account is the $40.00. The $20.00 in New Balance is showing the change from that order only. It means that you could have spent $50.00, but instead spent $40.00. If you had $100.00 in your personal account before you had a $40.00 canteen, you will have $50.00 left in your personal account after canteen. Remember the New Balance shown is from that week's order. You do not have a separate canteen account; you have a personal account only.*

MAILED
02-07-20

If you want to know what your balance is in your personal account, write to the Treasurer's Office, ask for a printout from your housing unit CPO, or check the kiosk located in each housing unit.

Money may be credited to these accounts by the following procedures:

1. Inmates having an institutional work assignment will have half of their wages placed in their personal account and half placed in their savings account.
2. Money orders and personal checks will be accepted via the U.S. Mail. All personal checks will have a (10) day hold placed on them as well as all money orders over $200.00. Cash is not accepted for deposit.
3. Access Correction Secured Deposits: Funds can be electronically debited to the inmates account via credit card. Inmate friends and family can visit www.accesscorrections.com for more information.
4. Any freeze placed on previous accounts or loans taken at other institutions follow inmates throughout the system until they are paid.
5. Inmates transferring from other institutions should expect from three to five (3-5) days for their money to transfer.

C. Statements:

Statements are issued weekly to inmates for wages earned. Statements will be issued monthly to inmates for interest on personal or savings accounts. Inmates who wish to request an account printout may this from their housing unit CPO. You must include your name, housing unit, inmate identification number and the date you would like the print out to run from. There is a form for this procedure, which you can obtain from the unit CPO.

D. Reimbursement for Damages or Costs:

1. The personal account of an inmate who has been found guilty through the disciplinary process in accordance with 103 CMR 430: Inmate Discipline and has been ordered to make restitution as a sanction, will be automatically frozen upon the entering of the sanction in the disciplinary module of IMS. The freeze placed upon an inmate's account shall be in the amount of the ordered restitution. While an inmates account if frozen only the balance of the personal account exceeding the amount of the freeze shall be expended by the inmate.
2. The Treasurer may withdraw all funds available in the inmate's personal account until full restitution is made. The inmate may, at any time, request to expend available savings money in order to pay restitution. Such requests will be made in accordance with 103 CMR 405.07 (3). All restitution collected shall be returned to the General Fund of the Commonwealth or to the institutions operating budget as required.
3. In any case where the disciplinary process has resulted in an order of restitution as a sanction for costs incurred by the Commonwealth, the Superintendent may, at his discretion, reduce the amount of restitution to the extent he or she deems appropriate.

E. Transfers from Savings to Personal Account:

1. An inmate who wishes to transfer money from his savings to personal account should obtain the

FEB 07 2020

0175

appropriate form from the unit team

2. Consideration will be given to those requests that demonstrate a legitimate need.
3. Canteen orders will be limited to appliances or legal related items such as paper, stamps, and pens.
4. A minimum balance of one hundred ($100.00) dollars must be maintained in your savings account at all times
5. All transfers from savings to personal account forms will be processed by the unit team and forwarded to the Superintendent for his final approval. They are due to your unit CPO by Wednesday of each week.

F. Charge Slips:

In order for a charge slip to be processed through the Treasurer's office you must present the completed charge slip to your unit CPO along with your Inmate Identification card.

If an inmate wishes to purchase items (via mail) outside of the institution, he must fill out a charge slip. The charge slip must be dated, with amount indicated, the amount paid to, and signed by the unit CPO prior to it reaching the Treasurer's Office. If the form is not filled out properly and signed by the appropriate unit team staff member, it will not be processed.

An IPS officer must countersign slips that are $75.00 or more. If the IPS officer feels the charge slip is any way questionable, it is his privilege to deny such request. NOTE: All charge slips leaving the institution must be accompanied by an addressed stamped envelope.

The Superintendent is the final reviewing authority on all disbursements from inmate account.

G. Victim Witness Fee:

Inmates may be required to pay a victim witness fee or various other court-imposed fees to the court. If an inmate does not have available funds, a freeze will be placed on his account. The Treasurer's Office will notify the inmate when the assessment has been paid.

If the amount debited from an inmate's account is insufficient to satisfy the restitution order, the Superintendent may order a freeze on the inmate's accounts for the remaining amount of restitution owed. The order shall be in writing and shall specify the offense for which the forfeiture is being imposed. During the period of the freeze, no account funds may be spent by the inmate. The Superintendent may continue to withdraw one-half of the money earned by an inmate while incarcerated or any unearned funds as they accumulate until full restitution is made.

H. Transfers from Savings to Personal Account:

1. An inmate who wishes to transfer money from his savings to personal account should obtain the appropriate form from the unit team.
2. Consideration will be given to those requests that demonstrate a legitimate need.
3. Canteen orders will be limited to appliances or legal related items such as paper, stamps, and pens.
4. A minimum balance of one hundred ($100.00) dollars must be maintained in your savings account at all times
5. All transfers from savings to personal account forms will be processed by the unit team and

MAILED
02-07-20



forwarded to the Superintendent for his final approval.   They are due to your unit CPO by Wednesday of each week.

I.   Charge Slips:

In order for a charge slip to be processed through the Treasurer's office you must present the completed charge slip to your unit CPO along with your Inmate Identification card.

If an inmate wishes to send money home or purchase items (via mail) outside of the institution, he must fill out a charge slip.  The charge slip must be dated, with amount indicated, the amount paid to, and signed by the unit CPO prior to it reaching the Treasurer's Office.  If the form is not filled out properly and signed by the appropriate unit team staff member, it will not be processed.

An IPS officer must countersign slips that are $75.00 or more.  If the IPS officer feels the charge slip is any way questionable, it is his privilege to deny such request.  NOTE: All charge slips leaving the institution must be accompanied by an addressed stamped envelope.

XXII.   **INMATE PROPERTY** (103 CMR 403)

Property allowed for inmate retention complies with 103 CMR 403, Inmate Property. Inmates may purchase items from the DOC approved vendor via the property department. Inmates may obtain a clothing or appliance order form from their unit CPO. Inmates are only allowed to order every 90 days.

A.   Maximum Property Authorized for Retention by Inmates Housed on the **North-side units at SBCC:**

| ITEMS: CLOTHING | NORTH-SIDE | ITEMS: | NORTH-SIDE |
|---|---|---|---|
| (3) Scrub Bottoms | X | * (1) Walkman/MP3 Player) | X |
| (3) Scrub Tops | X | (1) Earbuds | X |
| (7) Undershorts | X | MISCELLANEOUS | |
| (7) Undershirts | X | (1) Religious Book | X |
| (7) Pair Socks | X | (1) Religious Item (As approved) | X |
| (7) Undershirts/Bras/panties (GID/female only) | X | (1) Mirror | X |
| (2) Sweatpants | X | (200) Sheets of Paper | X |
| (2) Sweatshirts | X | (50) Stamps | X |
| (2) Gym Shorts | X | (24) Colored Pencils | X |
| (1) Winter Hat | X | (10) Flex Pens/Graphite Pencils | X |
| (1) State Issue Coat | X | (5) Books | X |
| | | (1) Cubic Foot - Personal Letters/Photos/ News clippings/ Magazines/Newspapers/ Internet Copies | X *refer to section XIII. of this SOP |
| (2) Thermal Tops | X | (1) Cubic Foot - Legal Documents | X |
| (2) Thermal Bottoms | X | (15) Toiletries | X |
| (1) Pair of state Issued Footwear | X | (1) Deck of Playing Cards | X |
| (1) Pair of shower shoes | X | (2) Eyeglasses | X |
| LINEN | | (1) Sunglasses | X (Medically prescribed only) |
| (1) Pillow | X | (1) Dentures | X |
| (1) Mattress | X | (1) Mouth Guard (as prescribed) | X |

FEB 07 2020
0175

| ITEMS: | NORTH SIDE |
|---|---|
| (2) Sheets | X |
| (1) Blanket | X |
| (1) Pillow Case | X |
| (2) Towels | X |
| (2) Washcloths | X |
| (1) Laundry Bag | X |
| **JEWELRY** | |
| (1) Wedding Band (if applicable) | X |
| (1) Medical Alert (bracelet/necklace) | X |
| (1) Religious Medallion w/Chain | X |
| **APPLIANCES/ACCESSORIES** | |
| * (1) Electric Razor | X |
| * (1) Tablet with Case | X |

| ITEMS: | NORTH SIDE |
|---|---|
| Orthopedic/Prosthetic Device (as prescribed) | X |
| (1) 12 oz. Cup | X |
| (1) 24 oz. Bowl | X |
| (1) Emory Board | X (One for One exchange) |
| (1) Watch | X |
| **COURT/PAROLE CLOTHING** | *** Upon Written request *** |
| (1) Suit Jacket/Sports Coat | X |
| (1) Dress Shirts/Blouse | X |
| (1) Dress Trousers | X |
| (1) Ties (clip on only) | X |
| (1) Pair Dress Shoes | X |
| (1) Pair Dress Socks | X |
| (1) Belt | X |

### B.  Maximum Property Authorized for Retention by Inmates Housed on the **South-side units at SBCC**:

| ITEMS: CLOTHING | SOUTH SIDE |
|---|---|
| (3) Scrub Bottoms | X |
| (3) Scrub Tops | X |
| (10) Undershorts | X |
| (10) Undershirts | X |
| (10) Pair Socks | X |
| (10) Undershirts/Bras/panties (GID/female only) | X |
| (2) Sweatpants | X |
| (2) Sweatshirts | X |
| (2) Gym Shorts | X |
| (1) Hat | X (1) Winter Only |
| (1) Bathrobe | X |
| () Coat | X State Only |
| (2) Thermal Tops | X |
| (2) Thermal Bottoms (White only) | X |
| (5) Handkerchiefs | X |
| (3) Pair Footwear (including shower shoes) | X    (1) shower shoes    (2) pair of footwear |
| (3) Work Uniforms (institution approved) | X |
| **COURT/PAROLE CLOTHING** | *** Upon Written request *** |
| (1) Suit Jacket/Sports Coat | X |
| (1) Dress Shirts/Blouse | X |
| (1) Dress Trousers | X |
| (1) Ties (clip on only) | X |
| (1) Pair Dress Shoes | X |
| (1) Pair Dress Socks | X |

| ITEMS: APPLIANCES/ACCESSORIES | SOUTH SIDE |
|---|---|
| * (1) Television | X |
| * (1) AM/FM Radio | X |
| * (1) Tablet with Case | X |
| * (1) Walkman/MP3 Player) | X |
| (1) Walkman Pouch | X |
| (2) Headphones | X |
| (2) Earbuds | X |
| (1) Mono Adapter | X |
| (1) Headphone Extension | X |
| * (1) Typewriter | X |
| (1) Coaxial Cable (3') | X |
| (1) Double Male Connector (coaxial) | X |
| (1) Right Angle Adapter (coaxial) | X |
| *(1) Digital TV Converter Box w/AC Adapter | X |
| (1) Three Way Outlet Adapter Plug | X |
| **MISCELLANEOUS** | |
| Religious Items  (as approved) | X |
| (1) Mirror | X |
| (200) Sheets of Paper | X |
| (50) Stamps | X |
| (24) Colored Pencils | X |
| (10) Pens/Graphite Pencils | X |
| (10) Books | X |
| (1) Cubic Foot - Personal Letters/Photos/ | X *refer to section XIII. of |

02-07-20



| ITEMS: | SOUTH SIDE | ITEMS: | SOUTH SIDE |
|---|---|---|---|
| | | News clippings/ Magazines/Newspapers/ Internet Copies | this SOP |
| (1) Belt | X | (1) Cubic Foot – Legal Documents | X |
| **LINEN** | | (15) Toiletries | X |
| (1) Pillow | X | (3) Games | X (Yahtzee and Cribbage not allowed) |
| (1) Mattress | X | (2) Eyeglasses | X |
| (2) Sheets | X | (1) Sunglasses | X (Medically prescribed only) |
| (1) Blanket | X | (1) Dentures | X |
| (1) Pillow Case | X | (1) Mouth Guard (as prescribed) | X |
| (2) Towels | X | Orthopedic/Prosthetic Device (as prescribed) | X |
| (2) Washcloths | X | (1) Wallet | X |
| (1) Laundry Bag | X | (1) 12 oz. Cup | X |
| **JEWELRY** | | (1) 24 oz. Bowl | X |
| (1) Wedding Band | X | (1) 1.6 Quart Bowl | X |
| (1) Medical Alert (bracelet/necklace) | X | (1) Emory Board | X (one for one exchange) |
| (1) Religious Medallion w/Chain | X | (1) Watch | X |

C.  **CLOTHING:**

1.  **Approved Clothing Items:** All clothing items, which are approved for retention, will be available for inmates to purchase through the Canteen. Inmates will be allowed to purchase canteen clothing every (90) days.

2.  **Obtaining Clothing Items**
    a.  In order to purchase clothing from the canteen, inmates must obtain two (2) forms; a Canteen Order Form and a Money Charge Slip.
    b.  The inmate can obtain these forms/slips through the housing unit CPO.
    c.  The inmate is to completely fill out both forms and forward them to the unit CPO for approval. The Treasurer will review each form to ensure that they are completed correctly.
    d.  If the Money Transfer Slip or Canteen Order Form is not signed or the inmate's commitment number is not placed on the slips, both forms will be returned to the inmate via institutional mail stating the reason why the transaction was not approved.
    e.  If, when requisitioning an item(s) for purchase, the inmate is already at his limit, the inmate will be notified of such. Property Staff will make notations indicating what amount of that particular item(s) must be returned in order for the inmate to receive the new item(s). The notation will be made on the approved slip with directions for the inmate to turn in the old item(s) upon receipt of the new.
    f.  All Approved religious on-person or in cell property must be purchased via Faith Group Catalog. The Catalog is available in the Inmate Library, through the Director of Treatment, and Chaplains.

3.  **State Issued Requests**
    a.  New Arrivals:
        Upon a new inmate's arrival at SBCC, the inmate is to be given standard issue clothing consisting of three complete sets of outer and undergarments, and footwear only if inmate does not have (3) complete sets of undergarments in ditty bag.
    b.  State Issue Request:
        Once the inmate's property arrives at SBCC from the sending institution, the inmate may then fill out a State Issue Request Form if necessary to obtain additional clothing.

FED 07 2020

0175

    c. An inmate may fill out a State Issue Request Form in order to obtain the following articles of State clothing:

        Underwear

        T-shirts

        Socks

        Footwear

        Bras (GID/Female only)

    d. Unit Team Responsibilities:

    The inmate may request a State Issue Request Form from the unit CPO. Exchanges are only made on a one for one basis as needed.

    e. Property Department Responsibilities:

    Prior to approving State Issue Requests, the Property staff will review the inmate's property status, and the amount of property legitimately owned by the inmate.

4. **Delivery of Inmate Property/ State Issued Clothing**

Property is delivered to the housing unit, utilizing the following schedule, *which is subject to change due to institutional needs*:

| Monday | Tuesday | Wednesday | Friday |
|--------|---------|-----------|--------|
| G1 | L2 | G2 | L1 |
| H1 | M2 | H2 | M1 |
| J1 | N2 | J2 | N1 |
| K1 | P2 | K2 | P1 |
|    | RHU | RHU | RHU |

## XXIII.  INMATE LAUNDRY

When an inmate arrives at SBCC through the Booking Area, the inmate will receive an initial linen package.

Upon an inmate's release from SBCC (Parole, Transfer, Release, etc.) he will be required to turn in his state issue linen to the Property Department. This will include one pillowcase, one face cloth, two towels, one blanket, two sheets, pillow and mattress. For each item not turned in, the inmate will be responsible for restitution to SBCC.

The following Laundry Schedule is to be strictly adhered to:

Monday       2nd Floor; NORTH, SOUTH, HSU, N RHU, and STP (White Only)
Tuesday      1ST Floor; NORTH, SOUTH, S RHU, and HSU (Whites Only)
Wednesday   2nd Floor; NORTH and SOUTH, HSU (Colors Only)
Thursday    1st Floor; NORTH, SOUTH, S RHU and HSU (Colors Only)
Friday         N RHU/STP (Colors Only) HSU (Whites Only), and J2 (Whites Only);

1. A laundry schedule will be posted in each Housing Unit pertaining to the hours for drop off and pick up of laundry bags. An inmate may only drop off one laundry bag to be cleaned, and may only pick



MAILED
02-07-20



up his own laundry bag. If the inmate damages the laundry bag, tie or tag, the inmate will be responsible for restitution to SBCC.

2. Inmates can have their State Issue Blankets laundered on their laundry day.

3. The laundering of Kitchen and Culinary Arts white uniforms will be done on Friday or as needed upon request of the Food Service Director and Culinary Arts Instructor. These uniforms will be picked up in the units between 8:15 a.m. and 8:30 a.m. They will be delivered back to the units upon completion of washing and drying.

4. When a holiday occurs during the week, laundry will be behind one day.

5. Any laundry bags wired with paper clips **will not** be washed. Inmates are responsible for having their laundry in the laundry cart in the unit after the breakfast meal on the designated day for the unit.

6. All laundry will be kept in bags. It will be picked up by the laundry workers under the supervision of the laundry officer no later than 9:00am. Once complete the laundry shall be returned to the housing unit by the laundry workers under the supervision of the Laundry Officer. **SBCC IS NOT RESPONSIBLE FOR LOST, STOLEN, OR DAMAGED LAUNDRY.**

## XXIV.  <u>WORK ASSIGNMENT (103 DOC 450)</u>

Work assignments are generally given to an inmate on a seniority basis (i.e. date which is signed off by IPS on the job application). In an effort to promote positive behavior, inmates must demonstrate an ability to abide by the rules and regulations of the facility to be eligible for employment. Therefore, in order to be eligible to apply for a job at SBCC, you must meet the following criteria:

1. Inmates who are found guilty of a Category 1 D-report due to a weapon shall be ineligible to apply for a job for nine (9) months. All other category 1 offenses, inmates are ineligible to apply for a job for six (6) months.

2. Inmates who are found guilty of a Category 2 D-report shall be ineligible to apply for a job for three (3) months.

3. Inmates who are found guilty of a Category 3 or 4 D-report are ineligible to apply for a job at the discretion of the work assignment officer.

The unit CPO shall conduct the initial screening for employment. The application shall then be forwarded to the Assignment Office. IPS will conduct the final clearance for all areas, including housing units. Inmates wishing to work in Voc-Ed must also be screened by IPS (103 DOC 450, Attachment A) as well as by the Director of Treatment prior to placement. The Deputy Superintendent of Reentry must approve any waivers to these housing criteria.

If a job requires medical clearance, the medical clearance form must be submitted to the Assignment Officer prior to the hire. If an inmate is denied medical clearance, his name will remain on the job seniority list and he will be allowed to apply for work in another area.

The Assignment Officer is the designated staff person to supervise the work program. Applications (refer to following page) can be made for initial job assignments and questions regarding the work force may be addressed at Staff Access.

Once placed in a specific job, the inmate must remain there for minimum of (6) months prior to job

FED 07 2020
**0175**

change. The Assignment Officer will then only give favorable consideration for a job change, if the inmate in question has been performing his assigned duties to the satisfaction of his supervisor. This does not mean that the inmate will automatically be assigned at his request.

Inmates are not allowed to quit a job assignment. Doing so may be subject to disciplinary action. Any inmate who receives a Disciplinary Report and is found guilty or pleads guilty is not eligible for work depending on the disciplinary category. Inmates who are taken to the Restrictive Housing Unit are automatically terminated from their job and will be removed from the workforce list.



MAILED
02-07-20

**This application must be submitted to your unit CPO for processing.

NAME: _____ ID # _____

HOUSING UNIT: _____ DATE: _____

Work Position(s) applying for:          Vocational Program applying for:
1. _____            1. _____
2. _____            2. _____
3. _____            3. _____
4: _____

SKILLS (i.e. kitchen, barber, carpentry, plumbing, electrical, landscaping, maintenance etc.): _____

_____

_____

When applying for a work assignment, please be advised of the following:
- Inmates who are found guilty of a Category 1 D-report involving a weapon shall be ineligible to apply for a job for nine (9) months. Category 1 d-report without a weapon are ineligible to apply for six (6) months
- Inmates who are found guilty of a Category 2 D-report shall be ineligible to apply for a job for three (3) months unless otherwise indicated by the Superintendent.
- Inmates who are found guilty of a Category 3 or 4 D-report shall be ineligible to apply for a job at the discretion of the work assignment officer.
- If you are terminated from a job, you must re-apply for employment.
- There are no "switching" jobs without prior approval from the Work Assignment Officer.
- Inmates who work in the kitchen, culinary arts, industries, barber program shall require a medical clearance.
- **The Assignment Officer is the ONLY authorized hiring authority at SBCC.**

***********DO NOT WRITE BELOW THIS LINE – For unit CPO Only***********

Current Offense: _____    Sentence: _____

Check all that apply:
___Security/Escape Risk
___STG Affiliations
___Active enemies at SBCC
___Prior D-report for Work Stoppage
___Prior history of D-reports for Substance abuse, possession or distribution
___Prior history of Weapons D-reports
___ Category 1 D-report within the past nine months
___ Category 1 D-report within the past six months
___ Category 2 D-report within the past three months
___Category 3 or 4 D-report within the past _____ days (please input amount of days)
___Any history of Sex Offenses
___OTHER(comments/concerns): _____

_____

_____

CPO Signature: _____    Date: _____
Date Rec'd by Assignment Office: _____

I.P.S. Clearance: _____    Date: _____

FED 07 2020

**0175**

XXV.   **PAROLE FUNCTIONS**

The Parole Board meets at SBCC once a month.  Parole staff prior to their hearings will interview all inmates who are scheduled to appear before the Board.  Questions to the Parole Office may be directed in writing, at any time through the institutional Parole Officer or Records Manager.

XXVI.   **SENTENCING INFORMATION**

Any inmate needing information on the following topics should see their unit CPO for more information:

1.  Parole - 1/3 and 2/3 offenses
2.  Early Parole Consideration
3.  Walpole Sentences
4.  Truth-In-Sentencing (eff. 7-1-94 offenses
5.  Consecutive Sentences
6.  From and After Sentences
7.  Forthwith Sentences
8.  Deductions from Sentences
9.  Jail Credits
10. Statutory Good Time
11. Forestry Time
12. Appellate Court
13. Speedy Trial Application
14. Out of State Warrants
15. New England Interstate Compact

XXVII.   **HEALTH SERVICES UNIT (HSU)**

The SBCC HSU that is located in B-Building - Level 3 provides Infirmary Care as well as Out Patient Services.  The Health Services Unit is open twenty-four (24) hours a day and is equipped with staff to handle medical screening, physical examinations, lab work, daily sick calls, and emergencies.

A.  Sick Call Procedures: Sick call will be offered six (6) days per week, Monday through Saturday

1.  A supply of sick slips is provided for each housing unit by the Health Services staff.  Each inmate requesting to be seen will obtain a "sick slip" in their housing unit, fill it out in its entirety, including housing unit, date and time of request and services requested (i.e. mental health, dental, HIV nurse etc.) and the reason for such request.  Sick slips shall be submitted directly to nursing staff.

2.  Sick slips are picked up to be processed and triaged by qualified health care professional within twenty-four (24) hours or seventy-two (72) hours on weekends.  Inmates will be seen by qualified health care professional on a priority basis that does not exceed seven (7) calendar days from submission of the request.

MAILED
02-07-20

3. Inmates may be seen in the morning after the sick slip is submitted to nursing staff and placed on waiting schedule for next available appointment.

4. Follow-up visits may be scheduled by the physician, as needed.

5. Inmates placed on the sick call list must remain in their unit until being seen in the Protocol Room by the nurse. Any inmate who leaves and is not available for his appointment will be considered a "no show", and will not be rescheduled.

6. Refusals must be made in person to the nurse in the Protocol Room, and a refusal form must be signed. No refusals shall be accepted from inmates within their cell.

B. Medical Co-payment

Per 103 DOC 763, a co-payment fee of $3.00 shall be assessed for self-initiated sick call visits. Specific examples of services, which are exempted from co-payment fees, are listed in the 763 policy available in the library. (NOTE: Medical care is not denied based on an inmate's ability to pay).

Any medical co-payment fees so charged may be collected by voluntary debiting, involuntary debiting, and/or impoundment of an inmate's available earned funds, as provided for in 103 CMR 405 Inmate Funds. If an inmate has no available earned funds, the inmate will not be charged a co-payment fee for medical services unless he/she voluntarily agrees to pay such sum from unearned funds by use of a charge slip. This co-payment fee is considered reimbursement of incurred costs associated with these services and as such, returned to the commonwealth as revenue.

C. Medications
   1. **South-side SBCC inmates** - Medication will be distributed from the Medication window in the Housing Units. **North-side SBCC inmates** - Medication will be administered through the food/cuff slot in the door.
   2. When receiving medication, you shall present your ID to the officer and the nurse. You will be required to take your medication immediately and submit to a proper mouth check.
   3. Keep-on-person (KOP) medications will be issued in bubble packs -misuse of these medications will result in being placed on unit dose status. Instructions for renewal are on the peel off sticker on the upper right hand corner of the card. You will be required to sign a KOP agreement before being given KOP the privileges.
   4. KOP medications for North/South Side inmates will also be distributed in the units. KOP medications should be kept in the footlocker/under bed locker at all times.
   5. Inmates are required to be dressed appropriately, T-shirt and scrub bottom when medication rounds are being conducted in the unit. Scrub top and bottom when going to the medication line.

D. Special Treatments
   Inmates who require specialized treatment such as insulin, blood glucose testing, eye drops, eardrops, or bandage-dressing changes, will be called to the protocol rooms as scheduled.

E. Emergencies



If you have an emergency situation, notify an officer/staff member immediately. The Officer/staff member will notify the Health Service Staff and the HSU staff will evaluate the nature of the emergency and prioritize seeing you.

F.  HIV Education/Testing
HIV information, education, and testing are available to you from the HSU. For more information or testing, please complete a sick call slip, requesting to meet with the HIV counselor. If you have already tested positive for the HIV virus, treatment and case management services are available, by completing a sick slip.

G.  Mental Health
Mental Health Services are available for all inmates requiring emergency or crisis intervention. Inmates shall be escorted to the out-patient area of the HSU or other specified location and secured in an available restart chair to meet with Mental Health Staff. Upon the recommendation of mental health staff, individual counseling will also be made available for all inmates.

H.  Health Care Proxy
Health Care Proxy allows an inmate to name an agent who will be a substitute decision-maker regarding health care issues and treatment if for any reason an inmate is unable to make those decisions. Health Care Proxy forms is available in the HSU. Should an inmate wish more information concerning this, please complete a sick slip and write a Health Care Proxy Request.

I.  Disabilities
If you are disabled person and are in need of services; address your concerns to the Deputy Superintendent of Reentry at this facility. A formal request for reasonable accommodations of special need(s) can be made by accessing Attachment A of 103 DOC 207 in the general library.

J.  Medical Grievances and Appeals General Guidelines
A complaint must be addressed within ten (10) working days of the incident or situation, within 10 working days of the inmate becoming aware of the incident or situation, or within ten (10) working days of the date on which the inmate receives a verbal response at Management Access Hour

No grievance shall be accepted which is filed by a group, on behalf of a group or on the behalf of another inmate. The inmate is responsible for copying and maintaining their own grievance files.

K.  Medical Staff Access
All medical complaints must be addressed during Staff Access prior to submitting a grievance. An inmate may be requested to return to the next scheduled Staff Access to receive response.
If Staff Access is not available to you because of disability, housing restriction or no medical management in regular attendance, you must attempt to resolve your complaint informally by submitting a sick call slip to Health Services Administration prior to submitting a formal grievance.





L. <u>Filing a Grievance</u> (Managed by the contract medical provider)
Grievance issues are; legitimate complaints pertaining to medical services including but not limited to the actions or conduct of staff members, operational procedures or practices, denial of medically recommended care or treatment

Non-grievance issues include but are not limited to requests for alternate treatment plans as matters of medical and dental judgment are the sole province of the responsible clinical provider in accordance with 103 DOC 610.01(2).

The Inmate Medical Grievance and Appeal Form, found in the HSU and housing units, must be used and filled out in its entirety. Grievances will be triaged within 72 hours of receipt and properly executed grievances will be forwarded The Health Service Administrator or designee. Once the grievance has been received by The Health Services Administrator, a response will be sent to the inmate within 30 working days.

M. <u>Filing an Appeal</u>: (Managed by the contract medical provider)
An inmate may choose to file a formal appeal about healthcare related concerns only after dissatisfaction with the Health Services Administrator's response to a formal grievance.
An inmate may request an appeal by checking off the appeal box at the top of the Inmate Medical Grievance and Appeal Form. New or additional issues not originally addressed in the grievance should not be addressed on appeal.
An inmate may appeal the grievance decision directly to the Medical Contract Provider (Please refer to medical staff for appropriate address).

N. <u>Misuse of the Grievance Process</u>:

The following will be considered abuse or misuse of the grievance process and will result in suspension of grievance privileges:

1. Providing false or inaccurate information
2. Using the grievance process to harass staff
3. Using the grievance process to disrupt operations
4. Filing a frivolous grievance (one without merit (or a basis in fact)
5. Repeated submissions of the same complaint after a final response has been received
6. Using abusive, obscene or degrading words in the grievance
7. Filing additional grievances for the same complaint while an investigation is ongoing
8. Upon determination of abuse, limitations may be made on the inmate's ability to file a grievance.

## XVIII.  PROGRAMS/TREATMENT/EDUCATION

### A. Academic Programming-

*General Education Development (GED) Or Hi-Set Testing)* is designed to prepare students with the skill level required to take and pass the High School Equivalency Diploma Exam.  At each level classes are

run on an individualized small group basis with higher enrollments in the higher skills classes. The classes focus on math, writing, social studies, reading, and science, as well as reading comprehension and study skills.

*School Counseling* - The counselor advises individuals about their enrollment options and may provide additional evaluation so that proper program placement can be made. The counselor maintains class enrollments at appropriate levels and will provide students with any additional assistance needed to get them enrolled in school.

*Adult Basic Education* - Adult Basic Education (Literacy Development) is a program servicing those who are learning to read and write, or who are functioning at or below the fifth grade level.

*Computer Skills* - This twenty eight-- (28) week program provides students with the skills to effectively use word processing, spreadsheets, database, and presentation software, and as a consequence make them more employable.

*English as a Second Language (ESL)* - English as a Second Language is a language development program geared to the adult with limited English proficiency. The main emphasis of this program is to provide limited or non-English speakers with the fundamentals of speaking, reading, and writing English, so they may be mainstreamed into existing academic classes. The three-level program is taught exclusively in English and is available to those students whose native language is other than English.

*Pre-GED* – The Pre-GED programs are designed to prepare intermediate level students for entrance into the G.E.D. program. The focus of instruction is on math, English, grammar and usage, writing skills, and reading comprehension.

## B. Vocational Education Programming

*Barber School* - This one-year program prepares students to take and pass the written and hands-on test administered by the State Barber Board. Successful students will be awarded their State Barber Apprenticeship License. Students must commit to staying in the facility until program completion.

*Culinary Arts* - This forty (40) week program is broken into two, five-month sections that provides practical hands-on experience, classroom theory and practice in the culinary field. The two segments use the National Restaurant Association Educational Foundation curriculums in the area of hygiene and professional cooking. At the end of five months, an Association exam will be administered and successful completes will receive certificates recognized nationwide in the food service industry.

## C. Recreation

**South-side SBCC inmates** can avail themselves of recreation activities via the unit recreation deck, tier time, yard, gym, and the weight room. These activities will occur at pre-determined movement periods. Please refer to the posted schedules in your housing unit. In addition, periodic basketball, handball, whiffle ball, and board game tournaments are conducted throughout the year, please refer to posted sign-up sheets in your unit.

**North-side SBCC inmates** will utilize the unit recreation deck and tier time ONLY in accordance with schedule posted on the unit bulletin board.

## XXIX.    INMATE LIBRARY ACCESS

**South-side SBCC inmates** may utilize both the General and Law Library within the facility. The Civilian Librarian and inmate clerks will be available to assist you in your reading/research needs. Please refer to the posted schedules in your block for library access. Law library photo copy requests may be completed through the Librarian at this time. Lexus Nexus Terminals are also available within their housing units.

An additional Library call is available on specified evenings for **south-side SBCC inmates**. This is limited to those inmates with a documented need. Please see the librarian for sign-up forms.

**North-side SBCC inmates** can access the Lexus Nexus Terminals in their units for all Law Library needs. Inmates who want to utilize this shall request time from the housing unit officer via the signup sheet. All legal copy requests shall be provided to the Librarian during her scheduled round on the Northside and will be returned to the Inmate from the Librarian via institutional mail. Additionally, Inmates on the Northside will have access to a library cart and/or book request forms during recreation and tier time to satisfy their general library needs.

## XXX.    CHAPLAIN

Chaplaincy services will be available for diverse ecumenical denominations. The following services are held weekly Catholic, Protestant, Muslim Nation of Islam, Jewish, Native American and Jehovah Witness. In addition, Bible Study, Father's Group, Christian's in 12-Step Recovery, Arabic and Islamic lessons are also offered by the Chaplain staff. Please refer to posted schedules in your housing unit.

**North-side SBCC inmates** will receive all religious services via weekly rounds conducted by the assigned institutional chaplains.

## XXXI.    SPECTRUM PROGRAMMING

South-side SBCC inmate: The Core Treatment Programs offered by Spectrum Health Systems are designed to give inmates some exposure to treatment while they are incarcerated at SBCC  Core Treatment Programs currently offered at SBCC are listed below with a brief description:

*Core Skills* - The department offers a vendor facilitated program to inmates housed in the Behavioral Management Unit with programs once a week for two hours. The program runs for approximately four (4) months and utilizes a Core Skills program.

*Motivational Enhancement Program* -Most offenders entering treatment are unmotivated and resistant to treatment, and, moreover, most offenders have multiple treatment needs. To further compound the situation, offenders often do not acknowledge that they have problems. Generally they enter treatment because of pressure from external sources, such as family, or to secure an earlier release. Offenders who

FEB 07 2020
0175

are resistant to treatment may well require pre-treatment priming (motivational enhancement) in order for the formal treatment program to be effective.

The Motivational Enhancement Program meets two times a week for eight weeks, and is geared to working toward treatment motivation and commitment by helping the offender to understand behavioral habits and choices, learned behavior, creating a plan for change, setting treatment goals, and learning the basic skills of problem-solving, slow down skills, and forecasting.

**_Criminal Thinking Program_** - Many offenders are relatively unconcerned about their actions, except in terms of legal consequences. Accordingly, offenders often feel coerced into treatment, consenting only because the contingencies for refusing to participate are sufficiently negative. Minimization of the effects of their behavior on others, denial of responsibility, and rationalization of their law violations are common among offenders. The Criminal Thinking Program is designed to focus on altering the pro-criminal thinking patterns that have been identified as separating those who are serious repeat offenders from those who are not. The focuses specifically on criminal sentiments and how to develop pro-social alternatives for them, activities and associates and developing pro-social alternatives to past activities and associate, and on developing an understanding of how other people feel and how there can be more than one way to view a problem or a situation. Skills are taught, reviewed and applied, pushing the participants to generalize the application of what they are learning. The final sections of the program take what the offenders have learned and apply it to issues/situations they face daily.

**_Criminal Thinking Program Maintenance_** – A maintenance program for offenders who have completed the Violence Reduction and/or Criminal Thinking program. The program is intended to provide an opportunity for inmates who have completed either of these programs to remain engaged in treatment to practice and internalize learned skills. The program meets once per week for two hours per session.

**_Gateway to Treatment_** – This program is a non-residential substance abuse treatment program designed to educate and raise awareness of the consequences of continued substance use. Emphasis is placed on biological, psychological, and social consequences of continuing to use substances.

**_Violence Reduction Program_** - This program addresses the offender's violent behavior using a cognitive behavioral approach, and a relapse prevention model, at the same time matching the type of programming to the offenders risk/needs. The goal is to reduce or terminate the behavior engaged in which causes harm to self and/or others (i.e. aggression/violence) thereby also reducing the participants' likelihood to re-offend.

The program assists participants to understand the direct link between the ways that they think and the way that they behave; that the harmful/criminal behavior they engage in is solely a direct result of their thinking. Offenders learn and develop the skills necessary manage and/or eliminate harmful behavior in a manner which reduces or eliminates harm to self and/or others.

**_High Risk Offender Program Expansion_ – _SBCC_** – The High Risk Offender program includes a continuum of care at SBCC for those offenders who have completed the program at MCI-Cedar

02-07-20



Junction. The program includes a skills maintenance program for offenders classified from the DDU to SBCC in order to capitalize on the initial gains made with the HRO program and to reduce the incidences of aggressive behavior at SBCC. The program includes a skills review phase, skills maintenance phase and an aftercare phase.

*Substance Abuse Education Service* - Addiction is a complex disorder characterized by compulsive drug use. People who are addicted feel an overwhelming, uncontrollable need for drugs or alcohol, even in the face of negative consequences. Offenders who continue to use while incarcerated are in particular need of treatment. However, before meaningful treatment and recovery can occur, the offender must be ready to take steps toward change. This program targets those offenders who have received disciplinary reports for substance abuse issues. The Substance Abuse Education Service will provide the offender with education regarding basic guidelines for remaining sober and clean, health and wellness, the biological, psychological, and social consequences of continuing to use substances during incarceration while working on recovery issues.

*Graduate Maintenance Program – Substance Abuse –* This program is offered to graduates of the residential substance abuse programs who have returned to housing on the South-side. During Graduate Maintenance, the program concepts are reviewed, program skills are practiced, and there is individual work on a recovery plan.

*Medication Assisted Treatment Reentry Initiative (MATRI) -* The purpose of the Medication Assisted Treatment Re-Entry Initiative is to provide pre-release treatment and post-release referral for opioid-addicted and alcohol-addicted inmates at participating sites in the DOC. This program involves prison-based residential substance abuse treatment and collaboration with community based clinics to provide aftercare treatment. The goal is to facilitate transition into an outpatient substance abuse treatment program which employs a multi-faceted approach to treatment including the use of the medication Vivitrol/Naltrexone, counseling and aftercare referral to community based providers.

*Violence Reduction* – The Violence Reduction Program targets cognitions that contribute to violent behavior. The goals of the program are to decrease violent behavior and the likelihood of institutional disturbances. During the program inmates identify the specific cognitions which have led to their violent behavior. Once identified, they are taught pro-social strategies and skills to diminish the likelihood of continued violence. The program is facilitated by staff two to three times per week.

**VOLUNTEER PROGRAMS (Low Risk Programming):** These programs are posted on the unit bulletins for eligible Units. Inmates must review the bulletin regularly and sign up with the unit CPO whenever a new program is offered. Length of time to serve is not a factor in determining the waitlist for the below programs:

*Writing for Results* - Students will learn the basic steps to writing clean, compelling prose, whether for job related or personal growth purposes. This program gives offenders an essential communications tool for getting and keeping a job in the Information Economy with special emphasis on writing and

FEB 07 2020

0175

rewriting "My Story of Change and Renewal." It also gives inmates a proven model for self-reflection and organizing thoughts.

***Advanced Writing for Results*** - Advanced Writing for Results is a job-readiness program that advances the DOC's goals of reducing violence, victimization and reducing recidivism. In developing the skill sets learned in "Writing for Results", the advanced series digs deeper into inmate narratives of their turnaround. These narratives of self-examination and self- transformation then become the building blocks of successful resumes, cover letters, proposals and other communications necessary for career development.

***Book Discussion Group*** – Volunteers and participants read and discuss books in a variety of genre. All participants are required to read at a variety of levels and analyze the subject matter within each book selected.

***Formative Writing for Success*** – This program will help enhance inmates' writing skills as well as provide an opportunity for students to explore different approaches to writing a story or other types of written work.

***Law Library Clerk Training (Library)*** – A staff facilitated program provides pre-employment training in basic legal research and use of electronic legal resources for potential inmate law library clerks.

***Restorative Justice*** – This class raises awareness in the areas of self-reflection and self0-analysis, which allows for greater self-management, moral growth and interpersonal development.

***Successful Steps to a Job Search*** – This class provides students the basics of writing a resume, basic interviewing skills, and communication skills during an interview.

***Peace Education-*** This class focuses on prosocial means to resolving conflict.

***Houses of Healing-*** This class is focused on long-term and lifer population.

***HIV/AIDS Awareness Education Program-*** This is a vendor run program. The purpose of this program is to educate the inmate population and give a basic overview of definitions, history, transmission, risk reduction, and universal precautions of HIV/AIDS. The class will be supervised by Health Services staff; however a trained inmate peer educator will conduct the training. The program lasts approximately six (6) weeks; however, no good time is awarded. Please refer to the sign-up sheet in your block.

***Toastmasters-*** This is a volunteer run program, which will be taught periodically during the year. The Speech Craft Program initially will be six (6) weeks in duration. This program will train you in making oral presentations, as well as set and accomplish goals. The program will also assist in developing and improving both communication and listening skills. A certificate is awarded to those inmates who

MAILED
02-07-20

successfully complete the program. However, no good-time is awarded. Please refer to the sign-up sheets in your block for the schedule of the program.

*Reentry Unit-* The SBCC Reentry Unit is for Inmates with 18 months or less to final release with the desire to make positive life changes and obtain resources prior to release. Inmates from both the North and South of the facility are eligible for enrollment in the program. All interested inmates within the specified time frame to release should speak with the unit CPO and request recommendation be made in their personal program plan in order to be added to the waitlist. The SBCC Re-entry Unit focuses on the skills necessary for successful re-entry into the community.

XXXII. **CHAPTER 127: SECTION 38B ASSAULTS UPON GAURDS; BODILY SUBSTANCES; PENALTY**

a. For the purposes of this section, "bodily substance" shall mean any human secretion, discharge or emission including, but not limited to, blood, saliva, mucous, semen, urine or feces.

b. Any person in the custody of a correctional facility, including any jail, house of correction or state prison, who commits an assault or an assault and battery upon an officer or other employee, any volunteer or employee of a contractor in any such facility or any duly authorized officer or other employee of any such facility engaged in the transportation of a prisoner for any lawful purpose shall be punished by imprisonment for not more than 2 and one-half years in a jail or house of correction or for not more than 10 years in a state prison. Such sentence shall begin from and after all sentences currently outstanding and un-served at the time of said assault or assault and battery.

c. Any person in the custody of a correctional facility, including any jail, house of correction or state prison, who commits an assault or an assault and battery by means of a bodily substance upon an officer or other employee, any volunteer or employee of a contractor in any such facility or any duly authorized officer or other employee of any such facility engaged in the transportation of a prisoner for any lawful purpose shall be punished by imprisonment for not more than 2 and one-half years in a jail or house of correction or for not more than 10 years in a state prison. Such sentence shall begin from and after all sentences currently outstanding and un-served at the time of said assault or assault and battery.

XXXIII. **STAFF ACCESS**

The following table reflects staff that attends Staff Access.

| STAFF MEMBER | | |
|---|---|---|
| Superintendent | Treasurer | Administrative Capt. |
| Deputy of Operations | Grievance Coordinator | Assignment Officer |
| Deputy of Reentry | Food Services Director | School/Education |
| Director of Security | Medical/Mental Health | Parole |
| Director of Treatment | Property | Records Manager |
| Director of Classification | Unit CPO D's | IPS |

Inmates who are requesting to see staff at their scheduled Staff Access time shall obtain a "Staff Access Pass from their housing unit CPO.

The example of the Staff Access Pass shown below indicates what the six (6) areas on the pass are designated for.

Section 2 shall be completely filled out by the inmate. The housing unit CPO shall complete Section 1 prior to the inmate receiving the pass.

When attending Staff Access the inmate shall submit the pass to the staff member the inmate has requested to see. Each inmate is only allowed to sign-up for one (1) staff member only.

If there is a question/problem that needs further research and requires information that needs to be communicated back to the inmate, the information shall be documented in Section 3 of the pass. Then the yellow copy of the pass containing Section 3 shall be returned via institutional mail.





**Attachment H**

## PRISON RAPE ELIMINATION ACT (PREA)
## SEXUAL MISCONDUCT/STAFF SEXUAL MISCONDUCT

A)   The Prison Rape Elimination Act otherwise known as PREA is a Federal statute which was passed unanimously by the United States Congress and signed into law in 2003 by President George W. Bush. The Act supports the elimination, reduction, and prevention of sexual assault and rape in correctional systems across the country. This includes federal, state, county facilities and all other law enforcement detention facilities.

The Massachusetts DOC is committed to enforcement of the PREA law. We have a zero tolerance policy for any incidence of sexually abusive behavior by a staff member, vendor, volunteer or inmate in any facility and we afford a number of internal and external methods for victims and third parties to report abuse or suspicions of abuse. All reports/allegations of sexual abuse or sexual threats are taken seriously and investigated in a thorough and objective manner. The Department will aggressively pursue the discipline and prosecution of any perpetrator of sexual abuse. Victims and reporters of sexual assault will be afforded ongoing medical, mental health, and victim services and will be protected from retaliation.

All new admissions to the DOC will be scheduled for mandatory orientation to review this information and be educated on important issues. Additionally, refresher information shall be made available as will updated information following any intra-system transfer.

B)   The institution PREA Manager is the Deputy Superintendent of Reentry.

C)   The DOC and  **SBCC**  strive to create and maintain a safe institutional environment for both inmates and staff through the prevention, detection, and appropriate response to Sexually Abusive Behavior. Inmates are forewarned that our workforce is highly integrated in terms of the gender of our staff. As such, staff members of the opposite sex may be present and conducting rounds in housing units at any and all times. To ensure the highest level of privacy, inmates are encouraged to be appropriately dressed at all times. Should an inmate need to change clothing, the inmate bathroom or other private area should be used to do so. An announcement shall be made to signify that an opposite gender staff person is present in your housing unit. These announcements will be made only whenever there is a status change to alert you to.

D)   Inmates are responsible for familiarizing themselves with  DOC's orientation material on sexual abuse prevention and intervention and 103 DOC 519; SEXUAL HARRASSMENT/ABUSE RESPONSE AND PREVENTION POLICY (SHARPP).

E)   The Department has established multiple internal ways for inmates to privately report sexual abuse and sexual harassment or retaliation by other inmates or staff for reporting sexual abuse and sexual harassment, and staff neglect or violation of responsibilities that may have contributed to such incidents. A Department hotline has been designated within the inmate telephone system. The number is 508-422-3486 (Speed dial – 9009) and shall allow for universal and unimpeded access by all inmates within the Department. It is not recorded and is available to all inmates without using their PIN numbers. Additionally, this facility has a site specific IPS hotline **(978) 514-6532**, which may be utilized. Other methods to report include the inmate grievance system, staff access periods, the facility PREA manager, and inner perimeter security staff members.

The Boston Area Rape Crisis Center (BARCC) provides inmates with access to outside victim advocates for emotional support services related to sexual abuse. This abuse does not need to have occurred during incarceration in order for you to seek support from BARCC. An inmate can contact BARCC either in writing or via use of a dedicated hotline. All calls are free of charge from any inmate telephone. Hours of operation are seven days a week from 9:00 a.m. to 9:00 p.m. These confidential support services can be provided in English and in Spanish.

BARCC PREA HOTLINE
99 Bishop Allen Drive
Cambridge, MA 02139
(844) 774-7732
(Speed dial) 7732

BARCC is NOT a third party entity to which you should report allegations of abuse. BARCC's purpose is to provide confidential support to victims.

Inmates may also report sexual abuse or harassment to external public or private agencies via correspondence or use of the inmate telephone system. Calls to "privileged" numbers including universally approved legal assistance phone numbers (i.e., Prison Legal Services), pre-authorized personal attorney telephone numbers, a foreign national's pre-authorized telephone number to his/her consular officer or diplomat, pre-authorized clergy telephone numbers and pre-authorized licensed psychologist, social worker and/or mental health professional telephone numbers are not subject to telephone monitoring and are not recorded.

Prison Legal Services is identified as an external advocacy group that acts upon the interests of inmates housed in the Massachusetts DOC. Prison Legal Services can be reached at 617-482-2773 and is considered a privileged number. The State Prisoner Speed Dial Number is *9004#

The department shall accept and investigate verbal, written and anonymous third party reports of sexual abuse and harassment. Third party entities may report abuse to the Department Duty Station at 508-422-3481 or 508-422-3483. These reports will be immediately forwarded to the proper Superintendent or Division head.

Should you report of an allegation that you were sexually abused while confined at another facility or agency, the superintendent of this facility shall notify the appropriate superintendent or chief administrative officer of the agency where the alleged abuse occurred no later than 72 hours after receiving the allegation. The incident site is responsible for the investigation of that matter.

F)      All acts of Sexually Abusive Behavior between an inmate and a Department employee, contractor, or volunteer or an inmate and an inmate, regardless of consensual status, are prohibited; and the perpetrator shall be subject to administrative, criminal, and/or disciplinary sanctions. The DOC is committed to investigating, disciplining and referring for prosecution, Department employees, contractors, volunteers, and inmates who engage in Sexually Abusive Behavior. The Department is equally committed to providing crisis intervention and ongoing treatment or referrals to the victims of these acts.

G)      If the investigation reveals that an inmate has knowingly made false allegations or made a material statement which he/she, in good faith could not have believed to be true, the Department may take appropriate disciplinary action.

H)     All Department employees, contractors, and volunteers are responsible for contributing to the prevention of Sexually Abusive Behavior perpetrated by staff on inmates or by inmates on inmates as outlined in 103 DOC 519, Sexual Harassment/Abuse Response and Prevention Policy (SHARPP).

I)     All allegations and incidents of inmate-on-inmate or staff-on-inmate Sexually Abusive Behavior shall immediately be reported by Department employees, contractors and volunteers in accordance with 103 DOC 519 , Sexual Harassment/Abuse Response and  Prevention Policy (SHARPP).  The Shift Commander shall ensure that the Superintendent is immediately notified.  Failure of any Department employee, contractor or volunteer to report these allegations may result in disciplinary action, up to and including termination.

Ways to avoid becoming the victim of sexual abuse:

1.     Be aware of situations that make you feel uncomfortable.  Trust your instincts.

2.     If something feels wrong about the environment or situation you find yourself in,  leave the area.

3.     Don't let your manners get in the way of keeping you safe. Don't be afraid to say 'NO", "Stop It Now", or "Get Lost".

4.     Walk and stand with confidence.  Many rapists choose victims who look like they won't fight back or are emotionally weak.  Keep your head up and don't avoid eye contact.

5.     Avoid talking about sex and casual nudity.  These things may be viewed as a come-on or make another inmate believe you have an interest in a sexual relationship.

6.     Do not accept any food, clothing, or other gifts from other inmates.  Being in debt to another inmate may lead to the expectation that you will repay the debt with sex.

7.     Avoid secluded areas like closets, storage areas, stairwells, isolated showers or unoccupied bathrooms.  Position yourself in plain view of staff members.

8.     If you are being pressured for sex, talk to a staff member immediately.

9.     If you become aware that another inmate is being sexually abused, report it to a staff member. Next time it could be you.

10.     Beware of inmates who offer to protect you.  Protection frequently has a cost.

11.     Do not give out information about your family, friends, or financial support.

12.     Do not buy large quantities of canteen items



FEB 07 2020

0175

## XXXIV.    CLASSIFICATION

Classification Reviews and hearings shall occur at least annually and will be held in accordance with 103 CMR 420, Classification. The purpose of the classification board is to provide a systematic means by which the security requirements and programmatic needs of inmates are assessed in relation to Department rules and regulations, statutory requirements and available resources. Inmate security level, work and program assessments and re-entry needs are addressed. Special attention is given to the assessed need areas identified in Personal Program Plans to determine if you are in compliance and objective point base score for assessed security level. Prior to your review you will be notified in writing and interviewed by the assigned CPO. At this time, questions, concerns, and any additional requests will be discussed to include health, family, legal issues resolved, program or educational participation, enemies, etc. Inmates may submit appeals to classification recommendations to the unit CPO within 5 days of receipt of the board's recommendation.

The Superintendent of designee shall be the reviewing authority for appeals of Internal Classification status reviews. The decision shall be final and cannot be appealed.

The Commissioner or designee shall be the reviewing authority for all re-classification and/or transfer boards. This decision is final and cannot be appealed.

Any inmate housed in RHU for 90 days will receive a 90 day RHU review and follow the appeal process as described above.

## XXXV.    INMATE REQUEST FOR HOUSING STATUS CHANGE

In the majority of situations, maximum security custody is not intended to be a permanent placement throughout an inmate's incarceration and the Administration would like to support a safe transition through the levels of custody offered by the Massachusetts DOC.

At SBCC inmates housed on the North-side have demonstrated negative institutional adjustment which poses a direct threat to the safety and security of both staff and other inmates within the facility. If an inmate is currently housed on the North-side of the facility, the goal should be to maintain positive pro-social behaviors in order to transition to a unit which offers more programming and Earned Good Time along with fewer restrictions in regards to canteen, movements and other privileges offered to the population.

After a period of positive adjustment any inmate with the desire to transfer to the South-side of the institution may submit the attached request form to the Deputy Superintendent of Re-entry and Classification for review by Unit Team and Administration during a bi-weekly unit team meeting.

If you have any questions about the process for submitting a request for housing status change please speak with your unit CPO.

MAILER
02-07-20

# aria REQUEST FOR HOUSING STATUS CHANGE FORM

Inmate Name: _____    #: _____    Housing Unit: _____

Date of Request: _____    Last D-Report: _____

Note reason for your request: _____

_____

_____

State your goals for current incarceration: _____

_____

_____

CPO/ Unit Team Review:                                    Approve / Deny

Comments: _____

_____

_____

_____

_____
CPO Signature

Deputy of Reentry and Classification or Designee:            Approved/ Deny

_____            _____
SIGNATURE                            DATE

EXHIBIT D

| MASSACHUSETTS DEPARTMENT OF CORRECTION | DIVISION:  ADMINISTRATION |
|---|---|
| TITLE:  FOOD SERVICE | NUMBER:  103 DOC 760 |

**Purpose:** To establish Department of Correction ("Department") policy concerning food service.

**References:** M.G.L. c. 124, S. 1 (c) & (q); 105 CMR 590.00, State Sanitary Code Chapter X, Minimum Sanitation Standards for Food Establishments.

**Applicability:** Staff/Inmates          **Public Access:** Yes

**Location:** Department Central policy file / Each Institution's policy file

**Responsible Staff for Implementation and Monitoring of Policy:**

-Commissioner
-Deputy Commissioner of Administrative Services Division
-Superintendents
-Departmental Food Service Director

**Effective Date: 03/01/2020**

**Cancellation:** 103 DOC 760.00 cancels all previous Department policy statements, bulletins, directives, orders, notices, rules and/or regulations regarding food services which are inconsistent with this policy.

**Severability Clause:** If any part of 103 DOC 760.00 for any reason, is held to be in excess of the authority of the Commissioner, such decision shall not affect any other part of this policy.

# MASSACHUSETTS DEPARTMENT OF CORRECTION
## FOOD SERVICE POLICY
### 103 DOC 760
### TABLE OF CONTENTS

760.01    Department Policy .................................... 2
760.02    Responsibilities .................................... 2
          Central Office ...................................... 2
          Institutions ........................................ 3
760.03    Food Service Supervision ............................ 3
760.04    Institutional Food Service Directors Duties
          Responsibilities .................................... 4
760.05    Menu Requirements ................................... 4
760.06    Advanced Menu Planning and Preparation .............. 5
          Fall/Winter Cycle Menu .............................. 5
          Spring/Summer Menu .................................. 5
760.07    Food Inspection ..................................... 5
760.08    Therapeutic Diets ................................... 5
760.09    Religious Diets ..................................... 6
760.10    Health & Hygiene Protection ......................... 6
760.11    Wash Facilities ..................................... 6
760.12    Health & Safety Inspections ......................... 6
760.13    Weekly Inspections in Food Service Areas ............ 7
760.14    Serving & Scheduling Meals .......................... 7
760.15    Use of Food as Disciplinary Measure. ................ 7
760.16    Alternate Feeding ................................... 8
760.17    Satellite Feeding ................................... 10
760.18    Food Service Budgeting, Purchasing, and
          Accounting Practices ................................ 11
760.19    Meal Counts & Records ............................... 12
760.20    Food Service Uniforms ............................... 12
760.21    Responsible Staff ................................... 12

Attachment A .................................................. 13

**760.01    Department Policy**

The Department is committed to the following food services objectives:

1.  To provide all inmates with nutritionally adequate meals that are of appropriate quantity and quality through the use of a seasonally adjusted cyclical menu;

2.  To provide all inmates assigned to food service with the opportunity through training and education to acquire skills and abilities that may assist in obtaining gainful employment after release;

3.  To assure that food service operations are conducted in conformity with established security, safety and sanitation regulations;

4.  To manage food service operations as efficiently and effectively as possible;

5.  To assure all staff, contractors, and inmate workers who work in the food service department are trained in the use of food service equipment and in safety procedures to be followed in the food service department.

**760.02    Responsibilities**

<u>Central Office of the Department of Correction</u>

The Commissioner, through the Deputy Commissioner of Administrative Services Division and the Departmental Director of Food Services, is responsible for the promulgation of procedures for the delivery of food services as specified in this policy.

The Departmental Director of Food Services shall monitor the food service administration at the Departmental and institutional levels. His/Her duties shall include but not be limited to:

1.  Monitoring institutional food service policies and procedures for compliance with 103 DOC

January 2020                                                    760 - 2

760.00, including periodic on site reviews of all Department facilities;

2.  Conducting periodic compliance review of contracted food services at each institution;

3.  Coordinating and implementing the cycle menu accounting for therapeutic and religious diet menus;

4.  Departmental liaison with the Operational Services Division as head of the food procurement team;

5.  Monitoring food cost throughout the Department;

6.  Providing technical assistance in all aspects of food service to departmental sites and regulatory agencies as required;

7.  Coordinating Serve Safe and Therapeutic Diet training for the Food Service Department;

8.  Assisting in the monitoring of outside consultants and vendor contracts in the area of food services.

Institutions

Each Superintendent is responsible for assuring that the food service policy is implemented at his/her respective institution in accordance with appropriate rules and regulations in effect in the Commonwealth of Massachusetts Policies 103 DOC 760, 103 CMR 761 and 105 CMR 590. Each Superintendent may delegate the operational responsibility for the daily administration of the food service policy to an institutional food service director.

760.03    **Food Service Supervision**

Each institution shall employ a full-time qualified staff member who is responsible to provide for the institution's complete food service.

**760.04    Institutional Food Service Directors Duties &
Responsibilities**

Each institutional Food Service Director shall oversee
the daily preparation and delivery of all meals.
His/Her duties shall include, but not limited to:

1.    Assure compliance with departmental
      policies/procedures and all ACA standards
      regarding food service;

2.    Providing nutritionally adequate meals, properly
      prepared and attractively served in accordance
      with the departmental cycle menus and
      corresponding recipes;

3.    Assuring compliance with 105 CMR 590.00, State
      Sanitary Code Chapter X, Minimum Sanitation
      Standards for Food Establishments;

4.    Providing proper supervision and maintaining
      adequate scheduling of all food service staff.

**760.05    Menu Requirements**

Each institution shall ensure that inmates are
provided nutritionally adequate meals by:

1.    Having the planned cycle menu reviewed by a
      registered dietician on at least a bi-annual
      basis to ensure that food allowances required for
      basic nutrition are met, as defined by the
      nationally Recommended Dietary Allowance, the
      Food and Nutrition Board, the National
      Academy of Sciences, the National Research
      Council, and the American Correctional
      Association.

2.    Recording any substitution(s) or addition(s) in
      food actually served, ensuring that the
      substitution is in accordance with the approved
      departmental substitution guidelines.

3.    Ensuring that documentation of the menus actually
      served are maintained on a weekly basis by the

January 2020                                    760 - 4

food service supervisor. These documents are stored in accordance with 103 DOC 158.

4. Evaluating menus at least quarterly to verify adherence to the established basic daily servings.

**760.06** **Advanced Menu Planning and Preparation**

Each institution shall follow a departmental seasonally adjusted cyclical menu which meets inmates' nutritional needs. These menus shall be followed in accordance with the following schedule:

Fall/Winter Cycle Menu:

Shall commence on the first Sunday immediately following the last Saturday in October and shall end on the last Saturday in April.

Spring/Summer Cycle Menu:

Shall commence on the first Sunday immediately following the last Saturday in April and shall end on the last Saturday in October.

Food preparation shall be planned by the institutional Food Service Director at least one (1) week in advance using the food production form and formulated using approved yield-adjusted recipes, good food handling and food service sanitation techniques.

**760.07** **Food Inspection**

Each institution shall maintain appropriate food storage facilities. All shelf goods are to be maintained at 41 to 80 degrees Fahrenheit. All refrigerated storage areas are to be maintained at 41 degrees Fahrenheit or below. All frozen storage areas are to be maintained at 0 degrees Fahrenheit or below.

**760.08** **Therapeutic Diets**

Each Superintendent shall develop written procedures regarding the preparation and provision of therapeutic

January 2020

760 - 5

diets which shall be consistent with 103 CMR 761.00, Access to Therapeutic Diets and Medical Care.

### 760.09    Religious Diets

It is the policy of the Department of Correction to provide at each institution special diets accommodating inmates whose religion places restrictions on diets. Each Superintendent shall develop written procedures regarding the preparation and provision of religious diets which are consistent with 103 CMR 471, Religious Programs and Services.

### 760.10    Health & Hygiene Protection

Each institution shall maintain a written procedure to provide for adequate health protection for all inmates and staff in the institution, moreover, said procedures shall specifically address adequate health protection for inmates and staff working in food service. These procedures shall be written in accordance with 103 DOC 620.10 and 105 CMR 590, State Sanitary Code Chapter X, Minimum Sanitation Standards for Food Establishments.

*For further information on health protection, see 103 DOC 631, Communicable Diseases.

### 760.11    Wash Facilities

Institutions shall have toilet and washbasin facilities available to food service personnel and inmates in the vicinity of the food preparation area. These facilities shall be provided and maintained in accordance with 105 CMR 590.00, State Sanitary Code Chapter X, Minimum Sanitation Standards for Food Establishments

### 760.12    Health and Safety Inspections

There shall be documentation by the Department of Public Health and the Accreditation Standards Compliance Unit at least annually, that food service facilities and equipment meet established public health and safety codes, and that corrective action is taken on deficiencies, if any.

The Superintendent of each facility shall maintain documentation, provided by the Department of Public Health or the Department of Correction's Policy and Development Compliance Unit, updated annually, indicating that his/her facility and the food service equipment contained therein has met established public health and safety codes, and that corrective action was taken on any deficiencies that may have occurred.

### 760.13    Weekly Inspections in Food Service Areas

Each institution shall have a written policy and procedure which shall require weekly inspections of all food service areas including dining and food preparation areas and equipment. Refrigerator and water temperatures shall be checked and recorded on a daily basis by food service personnel.

### 760.14    Serving & Scheduling Meals

1.    Each institution shall have a written policy and procedure which insures that meals are served under conditions that minimize regimentation; however, there should be direct supervision by staff members. Space shall be provided for group dining except when security or safety considerations justify otherwise.

2.    Each institution shall have a written policy which states that at least three (3) meals, two (2) of which are hot meals, are provided at regular meal times during each twenty-four (24) hour period, with no more than fourteen (14) hours between the evening meal and breakfast. Variations may be allowed based on weekend and holiday food service demands, provided basic nutritional goals are met.

### 760.15    Use of Food as Disciplinary Measure

Each institution shall have a written policy which precludes the use of food as a disciplinary measure. All inmates, except those on special medical or religious diets, should eat the same foods.

**760.16**    **Alternate Feeding**

Standard food services shall be made available to inmates in Restrictive Housing Units, provided their participation is consistent with the safety and security of the institution and its employees. Alternative meal service may be provided to an inmate in Restrictive Housing or any other unit who uses food or food service equipment in a manner that is hazardous or otherwise disruptive to self, staff, or other inmates. Alternative meal service is provided on an individual basis, based on health or safety considerations only, meets basic nutritional requirements, and occurs with the approval of the Superintendent, or designee and responsible health authority, or designee. Inmates on alternate feeding status shall receive the same meals as those given to the population. Alternate feeding is considered the method to deliver and retrieve the food from the inmate and not an adjustment to the meal itself. The alternative feeding status shall not exceed seven (7) days unless it is extended with the review of the authorizing administrator and the approval of the health care practitioner.

1.    The Restrictive Housing Unit officer in charge or shift commander may place an inmate on alternate feeding pending the approval of the Superintendent and the Health Services Administrator or designee.

2.    The Restrictive Housing Unit officer in charge or shift commander shall submit a copy of the disciplinary report with an alternate feeding request form (103 DOC 760 Attachment A) to the Superintendent, stating the reasons why alternate feeding is requested.

3.    The Superintendent shall return approved requests for alternate feeding to the Restrictive Housing Unit officer in charge (OIC).

4.    The Restrictive Housing Unit OIC shall ensure the Alternate Feeding button is checked as yes on the SHU/RHU/DDU Inmate Information screen on IMS.

Once alternate feeding is implemented, the following feeding procedure shall be followed:

If the physical design of the cell door allows for the delivery of food without inmate contact i.e., the delivery of the meal through the leg iron restraint slot without the need to breach the cell door, this shall be the preferred method of delivery. However, if the physical design of the door does not allow for the delivery of food in such a manner, the following procedure shall be adhered to:

1.  Two (2) staff members shall be utilized and the cell light shall be turned on.

2.  The inmate shall be asked to willingly comply with alternate feeding procedures.

3.  If the inmate is willing to comply, the food slot shall then be opened, the inmate shall be ordered to turn around and back up to the door, be placed in hand cuffs and ordered to sit down on the bed. Once the inmate is sitting on the bed, the door to the cell shall be opened and the meal shall be placed in the cell. The door to the cell shall be re-secured and the inmate shall be ordered to turn around and back up to the door so the restraints can be removed. Once the meal is consumed the same process shall be utilized to retrieve all food and equipment. No food/utensils shall remain in the cell.

4.  If the inmate refuses to comply with any of these feeding procedures, it shall constitute a refusal to accept the meal and an incident report shall be submitted. The refusal shall also be noted on the inmate's activity sheet/IMS RHU Daily Log screen and in the unit logbook/IMS Unit/Activity Log screen.

5.  When removing the inmate from alternate feeding, the Restrictive Housing Unit OIC or shift commander shall submit a written request (103 DOC 760 Attachment A) to the "Superintendent or designee and the Health Services Administrator

January 2020

760 - 9

or <u>designee</u> prior to removing the inmate from alternate feeding.

All inmates placed on alternate feeding shall be asked to comply with institutional procedures after each meal. If the inmate does not comply, he/she shall be reviewed after five (5) days to determine further alternate feeding status. Any extension request for alternate feeding past seven (7) days shall be submitted in a written request (103 DOC 760 Attachment A) to the authorizing administrator and health care practitioner.

The Superintendent, or designee and the Health Services Administrator, or designee, are the approving authority for removing an inmate from alternate feeding status. The authorizing administrator and health care practitioner are the approving authority for extending an inmate on alternative feeding status past seven (7) days.

**NOTE:** Inmates on therapeutic or religious diets shall be afforded the same food values in accordance with their therapeutic or religious diets while on alternate feeding status. In these instances, the institutional Food Service Director shall consult with the respective dietitian.

## 760.17    Satellite Feeding

Each institution shall have a written procedure that provides instructions for satellite feeding. These instructions shall include but are not limited to the following:

1. Visual inspection and recording of food quality, quantity, and accuracy of food(s) upon receipt;

2. Taking and recording of food temperatures upon receipt of said food items;

3. A comprehensive set of serving instructions, inclusive of required portion sizes;

4. Meal evaluation procedures to include acceptability, shortages, leftovers, etc.

5. Procedures for obtaining additional food as necessary;

6. Instructions on proper and safe food handling techniques.

**7.60.18** **Food Service Budgeting, Purchasing, and Accounting Practices**

The institutional Food Service Director shall use budgeting, purchasing and accounting practices that include, but are not limited to the following:

1. A Food expenditure cost accounting system designed to determine cost per meal per inmate, such as; the Food Service Directors shall keep an accurate record of per inmate/ per day feeder costs at the end of each month with the intention of remaining within their budgeted food account. Accurate monthly food inventories shall be compiled in accordance with departmental guidelines in 103 DOC 339, Materials Supplies Inventory and Control, Sections .09 .10 and .12 and forwarded in a timely manner to the fiscal unit;

2. Projection of food service funding requirements;

3. Purchase of supplies shall be made in accordance with departmental and state purchasing mandates in accordance with 103 DOC 340, Departmental Purchasing Procedures, sections .01 and .02 and 801 CMR 21.00.

4. Refrigeration and storage of food, with specific storage periods.

The food service operation shall follow written budgeting, purchasing, and accounting procedures

January 2020

760 - 11

to ensure nutritional and economical meals and minimum waste.

**760.19    Meal Counts and Records**

Each institution shall have a written policy and procedure detailing how the number of actual meals served to inmates, employees, and guests is to be documented. In all cases, counts are to be only the number of complete meals actually served. This figure is in no way intended to include the number of meals prepared.

The above is required for fiscal accounting, food purchasing purposes and budget planning. Food service records shall include published menus, information on waste, food costs and nutritional accounting.

**760.20    Food Service Uniforms**

Regulation uniforms for all food service personnel shall conform to the provisions as set forth in departmental policy 103 DOC 224, Uniforms.

**760.21    Responsible Staff**

The Deputy Commissioner of Administrative Services Division shall be responsible for the implementation of 103 DOC 760.00 as it relates to food services.

Each Superintendent shall be responsible for the implementation of this policy and for the development of any and all necessary institutional procedures and policies.

January 2020                                              760 - 12

Attachment A

**Commonwealth of Massachusetts**
**Department of Correction**
**Alternate Feeding Request**

_____
Facility

| Inmate Name | Number | Date | Time |
|---|---|---|---|
|  |  |  |  |

Requested By:_____

Shift Commander Review:_____

Reason For Request:

_____
_____
_____

Approved:_____
          Superintendent,         Date

Approved:_____
          Medical Authority,         Date

Therapeutic/Religious Diet:  Yes_____    No_____

| Day | Date | Breakfast | Lunch | Dinner | OIC Review |
|---|---|---|---|---|---|
| 1 |  |  |  |  |  |
| 2 |  |  |  |  |  |
| 3 |  |  |  |  |  |
| 4 |  |  |  |  |  |
| 5 |  |  |  |  |  |
| 6 |  |  |  |  |  |
| 7 |  |  |  |  |  |

Indicate "C" for compliance with feeding and "R" for refusing to comply with feeding.

**Authorization for Extension (past 7 days)**

Reason For Request:

_____
_____
_____

Approved:_____
          Authorizing Administrator,         Date

Approved:_____

January 2020                                               760 - 13

**Medical Practitioner,**          **Date**

**Therapeutic/Religious Diet:  Yes**_____          **No**_____

| Day | Date | Breakfast | Lunch | Dinner | OIC Review |
|-----|------|-----------|-------|--------|------------|
| 1 | | | | | |
| 2 | | | | | |
| 3 | | | | | |
| 4 | | | | | |
| 5 | | | | | |
| 6 | | | | | |
| 7 | | | | | |

Indicate "C" for compliance with feeding and "R" for refusing to comply with feeding.

**Authorization for Removal:**

**Approved:**_____
                    **Superintendent,**          **Date**

**Approved:**_____
                    **Medical Authority,**          **Date**

**Forward to inmate's case file upon completion.**

January 2020                                                        760 - 14

**ATTACHMENT TO 103 DOC 760, FOOD SERVICES POLICY
CULINARY ARTS PROGRAM – MILFORD HEADQUARTERS**

**Purpose:**   To establish standard operating guidelines for the Culinary Arts Program ("Program") located at Milford Headquarters.

I.   OVERVIEW

The Program shall provide food services to all Department of Correction ("Department") and Military Division staff employed at the Milford Headquarters. Inmates shall learn skills in the areas of food preparation, food serving and health/sanitation. The Division of Administration shall maintain supervision over the Program.

The program shall provide breakfast and lunch from Monday thru Friday. The Program Supervisor shall determine the normal hours of operation and shall ensure that the hours are posted in the general area of the cafeteria.

Inmate workers shall be restricted to the immediate cafeteria and food preparation area. Access to any other part of Milford Headquarters is prohibited unless accompanied by the proper Department staff person.

II.   STAFFING

This program shall be staffed with two (2) Educational Specialists positions, one (1) being the Program Supervisor. These two (2) staff shall report to the Department Director of Food Services. The Department Director of Food Services shall maintain Form 30's detailing the duties of these two (2) positions. The Director of Food Services shall review the Form 30's on an annual basis and update them as necessary. The Educational Specialists shall receive annual training in accordance with department training requirements. In addition to standard food service training, the staff shall receive training in areas involving the security of inmates in the workplace. The Director of Food Services shall coordinate this training.

January 2020                                                                 760 - 15