# EXHIBIT I

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
                                )
DERRICK WASHINGTON,             )
                                )
          Plaintiff,            )
                                )     Civil Action
v.                              )     No. 23-cv-10063
                                )     Pages 1 to 31
MASSACHUSETTS DEPARTMENT        )
OF CORRECTION ET AL,            )
                                )
          Defendant.            )
                                )
```

BEFORE THE HONORABLE MARGARET R. GUZMAN
UNITED STATES DISTRICT JUDGE


MOTION HEARING


April 22, 2026
2:00 p.m.


Harold D. Donohue Federal Building and U.S. Courthouse
Courtroom No. 2
595 Main Street
Worcester, Massachusetts


Jessica Leonard, CSR, FCRR
Official Court Reporter
United States District Court of Massachusetts
595 Main Street
Worcester, MA 01608
Jessica@wickedsteno.com

APPEARANCES:

On Behalf of the Plaintiff:

    BOIES SCHILLER FLEXNER LLP
    By: Sabina Mariella
    55 Hudson Yards
    Ste 2046C
    New York, NY 10001
    212-754-4541
    Smariella@bsfllp.com

    BOIES SCHILLER FLEXNER LLP
    By: Katherine Zhang
    Boies Schiller Flexner LLP
    55 Hudson Yards
    Floor 20
    New York, NY 10001
    212-446-2300
    Kzhang@bsfllp.com

On Behalf of the Defendant Massachusetts Department of
Correction:

    COMMONWEALTH Of MASSACHUSETTS, DEPARTMENT Of CORRECTION
    By: Stephanie M. Caffrey
    70 Franklin Street
    Suite 600
    Boston, MA 02110
    617-727-3300
    Stephanie.m.caffrey@doc.state.ma.us

On Behalf of the Defendant Christian Capoccia:

    ADLER COHEN
    By: Matthew J. Holmes
    2 Oliver Street
    Suite 1005
    Boston, MA 02109
    413-237-4262
    Mholmes@adlercohen.com

                Proceedings reported and produced
                  by computer-aided stenography.

**STENOGRAPHER'S NOTE:**  All quotations from exhibits or other documents are transcribed as they were read into the record and do not necessarily reflect the exact wording of the original document.

Quotation marks in the transcript are used for readability and stylistic purposes and may not represent a direct quote.

**P R O C E E D I N G S**

THE CLERK:  This is Civil Action No. 23-cv-10063, *Derrick Washington v. The Massachusetts Department of Correction et al.*

Counsel, would you please note your appearance for the record beginning with the Plaintiff?

ATTORNEY MARIELLA:  Good afternoon, Your Honor. Sabina Mariella from Boies Schiller Flexner for the plaintiff. With me I have my team from Boies Schiller Flexner Katherine Zhang, Julia Bevan, and Jayden Rush.  And we have our co-counsel from Rights Behind Bars Derrick Luster here as well.

THE COURT:  All right.  Thank you all very much.

ATTORNEY CAFFREY:  Good afternoon, Your Honor. Stephanie Caffrey on behalf of the Department of Correction defendants.

THE COURT:  And co-counsel at the table?

ATTORNEY CAFFREY:  Yes, Your Honor.  With me is Yasmine Bailey, also with the Department of Correction.

ATTORNEY HOLMES:  Good afternoon, Your Honor.  Matt Holmes on behalf of Christian Capoccia.

THE COURT:  Thank you very much, everyone.  I really appreciate you being here in person.

I want to begin with the joint discovery dispute.  The goal today is to have a conferring and, if possible, reach some

resolution on most of the issues.  This hearing should be treated as an opportunity for dialogue with the Court and with one another.

The discovery cutoff is August 15.  I do not expect to move that deadline.  However, should exceptional circumstances be presented to me, I'll be willing to have that conversation.

So let's start right in.  I'd like to start with the deposition dispute, and I will hear arguments from both sides. So for the plaintiff, let's start with the math.  We have 24 named defendants, seven hours each.  Is it your position that every one of these individuals has non-overlapping testimony that cannot be streamlined?

ATTORNEY MARIELLA:  Your Honor, my associate Julia Bevan will address the discovery issues today.

ATTORNEY BEVAN:  It's our position that -- starting from the beginning, we don't want to take 240 hours of deposition testimony.  We understand that's a lot.  I think it's a bit difficult for us because that number is calculated based on an abundance of caution of the maximum that we would need to require with outstanding discovery disputes and information that we haven't been able to receive yet.

We do believe that we intend to depose all defendants but, as discussed in the February 11th hearing, we believe that other matters including, *Diggs*, might have deposition testimony that could overlap and reduce the amount of numbers of

deposition hours that we need to take.

However, defendants let us know that they are only willing to produce potential deposition testimony from *Diggs*. They gave us a list of all the defendants or all the deponents from *Diggs* and there's only overlap for two defendants in our case.

THE COURT:  So there are -- so there are 22 defendants that -- named defendants that would be relevant to Mr. Washington's case?

ATTORNEY BEVAN:  Yes.

THE COURT:  And certainly we would not be inquiring about any of the other plaintiffs.

ATTORNEY BEVAN:  No, but we would be inquiring about the circumstances going on at SBCC that led to Mr. Washington's assault, which are also the same circumstances that led to many of these other plaintiffs' assaults.  Very significant overlap in facts.

THE COURT:  All right.  So to the extent that you can streamline that, that would be helpful.  There is an issue related to being able to observe the video evidence that might give you more clarity about some of the individuals?

ATTORNEY BEVAN:  Yes.  So we've reached a resolution on the video issue.  We've been able to view the video footage that we had.  There's still, until just earlier today, some outstanding videos that we had not yet received and reviewed,

so once we review those we could potentially resolve some of these issues as well.

Kind of the bottom line is we just don't have enough information to significantly reduce that number yet. But we would hope that if we receive deposition transcripts from the non-related cases, if we could review the current video footage that we have, and then also another issue is some of the documents that we've been given have redactions of potential witness names.

THE COURT: Well, let me ask you that about the depositions for the other named -- the plaintiffs. We're talking about the ones that engaged in a settlement.

ATTORNEY BEVAN: Yes.

THE COURT: How would that be relevant for Mr. Washington?

ATTORNEY BEVAN: Sorry, the deposition plaintiffs from those actions?

THE COURT: Yes.

ATTORNEY BEVAN: So, we don't know yet without reviewing the transcript if there's relevant information within those, again, to the atmosphere at the time. Some of those plaintiffs were in the same unit as Mr. Washington so it's potential that they have information related to his assaults. We just don't know what's in the deposition transcripts so we can't ascertain whether or not there's anything in there that

would help us further reduce how many depositions we need to take and how many hours we need to take.

THE COURT:  All right.  Do you anticipate, just regarding the depositions, being able to complete -- as long as we get the names out there and access -- before the end of discovery?

ATTORNEY BEVAN:  Yes, we do.

THE COURT:  So thank you.  That's just on that matter. So let me hear regarding from the defendants.

Do you have any question or any concern regarding the number of depositions that they anticipate taking?

ATTORNEY CAFFREY:  Your Honor, I understand that the named parties would be subject to deposition.  I think -- I have provided the list of deponents that were deposed in the class action as well as the stenographer information for counsel to reach out to the stenographers to obtain those transcripts.

In this particular case, the area of concern that I do have is that Mr. Washington sought to distinguish himself from the class members, and in his amended complaint alleges that the retaliation was as a result of his participation in this certain group that he organized.  Whereas in the *Diggs* matter, obviously, those retaliation allegations were separate.  So I understand that it happened at the same timeline, but the amount of overlap, I don't think -- I don't believe that there

is as much overlap as Plaintiff is asserting.

THE COURT:  Do we know how many officers in common there were for Mr. Washington and any of the other named plaintiffs?

ATTORNEY CAFFREY:  I believe it was only the two.  I don't believe that any of the deponents in any of the other cases were named in this case.

THE COURT:  And do you have any concerns about the 24 named officers sitting for seven hours of deposition testimony?

ATTORNEY CAFFREY:  I do have concern that it's not going to be completed by the August 15th deadline.  We're only several months away.  That's a lot of depositions to take in a short amount of time.

THE COURT:  Let's table that issue.  I do have some concerns about making sure that our discovery deadlines are not breached.  I mean, generally speaking, ten, we thought, would be more appropriate.  But if there are no objections to it and the depositions can be arranged for and completed within the discovery parameters, I think that the Court would defer to the parties' agreement on that.

So we'll table that until we have an opportunity to talk about some of the other issues that may have some issues related to getting within the time periods that we already have.

So the discovery for the other named plaintiffs that

has already been provided, the *Diggs* plaintiffs, the question is, is there -- I'm not sure what the nature of the discovery for the *Diggs* plaintiffs is.  And, certainly, if any of it is relative to issues raised by Plaintiff Washington, then it should be -- it would be easier to provide that than having to start anew, I would think.

And so the question then is how are we going to be sure that what you give them is, in fact, relevant and not just some type of a data dump without -- these  I imagine the amount of discovery provided is significant.

ATTORNEY CAFFREY:  There was approximately 100,000 pages of documents as well as hundreds of hours of video.  We did recently produce from the *Diggs* discovery just over 2,000 pages of documents related to Mr. Washington.

THE COURT:  Does the plaintiff have a plan for search terms that would make the balance of that very significant amount of discovery that was already provided relevant to your case?

ATTORNEY BEVAN:  Yes.  We suggested search terms to defendants and they say they want to consider narrowing them. They haven't provided us a hit report; we haven't seen a hit report.  We'd like to know before narrowing them how many documents we're talking about hitting on those terms.

I also think it's important to note that we're also discussing wanting discovery from the eight other related

actions related to Mr. Washington, applying those search terms as well as videos.

We don't agree with the position that *Diggs* is the only case that would have relevant discovery to Mr. Washington. In fact, in *Silva-Prentice*, there's no protective order in that case, Your Honor, so we were able to speak counsel in *Silva-Prentice*. And they were able to confirm for us that there was video footage that was produced in that case that confirms our allegations in paragraph 112 of the complaint that officers were caught on audio planning their attack on Mr. Washington for the next day.

Additionally, there were documents in *Silva-Prentice* that also hit on Mr. Washington's name. And that makes sense when you think about the context of what was going on at SBCC at the time.

THE COURT: Well, I would suggest, then, that you put together, as quickly as you can, some description of the discovery that you wish to have that isn't directly related, according to the DOC, to Mr. Washington and present that to the defendants. And then if there is any contest, if we can't come to an agreement, we can create a -- we can have a Zoom conference at anytime so that the Court can, if we need to, intervene and get this -- the point is to get the discovery going on an aggressive fashion so we can meet the deadlines in this case.

I have no intention on extending those deadlines out. So we're going to do the best that we can. So I would ask that that be a task that you put yourself to, and perhaps within a week get those search terms and other identifiable information related to specific information that you think is out there and should be discovered.

ATTORNEY MARIELLA: And, Your Honor, just to clarify, we did provide the search terms already to the defendants. I think we addressed that. But we did provide them. The problem is, it's hard to narrow them without knowing what the burden is. We provide search terms, usually the defendant comes back and says, "Your search terms hit on this many documents, it's too much." And then we narrow them and we can weed out things that are hitting on too many documents or irrelevant documents.

THE COURT: Well, you should continue in that vein using as quick a fashion of searching as we can. But as evidence becomes clearly relevant or desired by Mr. Washington's team, I would say you should send what you have.

ATTORNEY CAFFREY: Certainly, Your Honor. And in terms of the search terms that were provided, there was a lot of search terms that were talking about the *Diggs* documents. So those are Adobe -- they're PDF files that we have to search through. The hit reports we get through e-mails from the DOC e-mails, that's the only hit reports that I am aware of that

can be provided.

THE COURT:  Has that been provided?

ATTORNEY CAFFREY:  I just received it this morning, so I can certainly provide it to Plaintiff's counsel in terms of what it showed for the e-mails, the DOC e-mails.

THE COURT:  All right.  Well, there's another issue that is similar.  The video files.  As far as the video files, my understanding is that some are difficult to view or some are difficult to -- the format or something?

ATTORNEY BEVAN:  Yes.  We've been able to reach a resolution on this and have been able to view the videos so we don't need to discuss that today.

THE COURT:  So we don't need to worry about that right now.  Okay.

So you have been working very diligently.  I appreciate that, because it not only will just keep us on track, it will get to Mr. Washington and his team relevant information that you can start really working through.  And, of course, the Court is always here to help resolve any disputes that you might have.

And so there's no issue now with the footage.  There was a request from the plaintiff that -- to search personal phones and messaging apps.  I would like to have some further information.  What is it that you're looking for and how is it is relevant to their work?

ATTORNEY BEVAN:  Yes, of course.

So we're looking for any information that these officers or defendants have discussed on their personal devices -- personal e-mails, text messages -- about work.  We understand that we're not expecting defendants to image every single phone and search them.  They can inquire into their clients whether or not they use their phones for work and if the answer is no then the answer is no.

But I think our concern is that the responses that we've received in discovery seem to presume that defendants are only representing DOC, not also each of these individual defendants and that they don't have -- each of these individual defendants has an independent obligation under discovery to search and provide relevant discovery of their own devices.  It's not relevant whether those devices are under the control of DOC.  And so we're seeking discovery inquiry into those.

THE COURT:  So how would their personal texts and messages to -- that aren't related to -- you know, not speaking to their boss, not speaking to someone during the day while they're at work but they're on their own personal time.  How is that discoverable?

ATTORNEY BEVAN: Yes, so, we posit that if they use their phone for work purposes and then if their phones hit on search terms we can brief on, it's relevant.  It happened in *Silva-Prentice* --

THE COURT:  Well, that's different.  You've indicated if they used them for work purposes.  Now, you mean during their workday or as part of their responsibilities as a corrections officer?

ATTORNEY BEVAN:  I mean if they are regularly using their devices to discuss work with each other and discuss their responsibilities.  Again, in *Silva-Prentice*, the Court faced this same issue and agreed to allow their phones to be searched for relevant search terms and they found relevant discovery on officers' personal e-mails, personal text messages, relating to the plaintiffs in that matter and relating to coordinating on what they were going to put in use-of-force reports, back-dating incident reports.

Those aren't things that necessarily might have happened here, but they are things that happened in that case and were discovered through personal e-mails and texts.

THE COURT:  Well, before we're asking people to give up their information from their personal devices, which -- we have to make a determination that they actually have some use during their work day related to their work.

ATTORNEY BEVAN:  Yes.  Again, it -- defendant's counsel, if they could inquire to their clients, "Do you use your phone for this purpose?  Do you use your personal e-mail for this?"  If the answer is no, they don't need to go further than that.  We're not suggesting they should seize these

phones.  But we haven't even received an answer on that.  What we've received is, "We're not responsible for these devices. We'll inquire."

THE COURT:  I would say it starts earlier than that. Some people may be in a position of authority and they have a work phone.  I have a phone from my work and I also have a personal phone; they're not combined.  So if there are officers -- and we know the named officers that were involved here -- if they have a work phone, that should be discoverable.

ATTORNEY BEVAN:  Yes.

THE COURT:  And if it is discoverable then that data can be subject to the search terms as you're seeking.  And so the personal devices, if they are not issued by the DOC and are not used for their work, then I fail to see a link to that in allowing access to their devices.  So that would be -- there would have to be a showing of relevance to betray the private nature of a person's cell phone.  They don't give up all their rights merely because they work for the Department of Corrections.

ATTORNEY BEVAN:  No, certainly not.  I think we would posit that it's potential that -- I sometimes use my --

THE COURT:  There's all kinds of potential.  That's not the standard.  You're asking to -- and I'm not saying -- if they have a work device, that is searchable.  A personal device, even if they make off-color comments or if they speak

to one of their fellow guards on a Saturday and they talk about what happened in their personal context, I don't know, there would have to be a showing that would allow me to order that to be discovered.  So there has to be some relevance to their actions in terms of their work because they're being sued in their professional capacity, not their personal capacity.

So you're working through those things.  Again, you can always come to the Court should there be any reason to even -- navigate through disparate ideas about what's discoverable and what's not or any other reasons you want to reach to the Court.

Let me speak to counsel for Nurse Capoccia.  Is that how it's pronounced?

ATTORNEY HOLMES:  I believe it's Capoccia.

THE COURT:  So we have your client's motion to dismiss.  You have very narrow grounds.  You're seeking a dismissal of Nurse Capoccia because failure to state a claim under the Eight Amendment, deliberate indifference.  The failure to exhaust under the PLRA and the insufficient service of process?

ATTORNEY HOLMES:  Yes, Your Honor, except the insufficient service of process has been cured so that's moot at this point.

THE COURT:  Well, that's more ministerial in any event.  So the other two are important.

So let me hear your best argument on the deliberate indifference argument.

ATTORNEY HOLMES:  Thank you, Your Honor.  Really, it comes down primarily to the subjective prong of the inquiry, whether Mr. Capoccia -- whether facts are pled sufficient to establish that Mr. Capoccia possessed the subjective deliberate indifference, whether he intended to wantonly inflict pain. It's a very narrow inquiry and primarily we should look at what's pled in the plaintiff's complaint.

Deliberate indifference requires that Mr. Capoccia knew and disregarded an excessive risk to Mr. Washington's health or safety, that there is a substantial risk of serious harm.  And that's not adequately pled.

The plaintiff did not plead that Mr. Capoccia knew that Mr. Washington's asthma was life threatening.  What they pled was that at most his asthma substantially limited his major life activities.

According to Plaintiff's complaint, Mr. Capoccia examined Mr. Washington on January 24th and provided him medical treatment.  So initially it comes down to an inquiry of whether the treatment was sufficient or insufficient, which gets into the realm of medical malpractice and negligence which, by definition, doesn't meet the bar for deliberate indifference.

But what Plaintiff alleges Mr. Capoccia was aware of

or knew was that Mr. Washington was asthmatic, that at the time Mr. Capoccia treated him he was exhibiting signs and symptoms of asthma, specifically, difficulty breathing, that -- continuing from the use of a chemical agent the night before and that Mr. Washington was still having difficulty breathing.

So I'd like to pause there for a moment, because there are two modalities or two types of treatment that the plaintiff alleges Mr. Capoccia failed to provide to Mr. Washington.

We'll get to provision of his asthma inhaler in a moment. But the other thing that Plaintiff alleges is that Mr. Capoccia should have provided a shower or some method to wash off the chemical agent from Mr. Washington's skin because he was experiencing ongoing chemical burns.

But if you look at Plaintiff's complaint, there is no allegation in the entirety of the complaint that Mr. Capoccia knew that the chemical agent was still on Mr. Washington's skin or that it was continuing to irritate, burn, bother him, that it was continuing to have an impact or an affect. That's simply not pled. Absent that allegation that Mr. Capoccia knew the chemical agent was still impacting Mr. Washington's skin, the claim of deliberate indifference must fail there as to that modality or type of treatment.

Returning to the asthma, what Plaintiff alleges Mr. Capoccia was aware of was that Mr. Washington was asthmatic, that he had survived prior exposures to the same

chemical agent that had exacerbated his asthma.  But there's no allegation that it had been fatal or life threatening on the previous occasions.  And that Mr. Washington, the following morning after he had been exposed to this chemical agent, was still under the influence of it, meaning that hours had passed.

So Plaintiff does not allege that Mr. Capoccia was aware of a serious medical need and they don't allege that he was reckless in his care and treatment of Mr. Washington.

THE COURT:  Is there any evidence that he treated him at all -- not that he didn't see him, but that he provided any treatment?

ATTORNEY HOLMES:  There's no allegation that he provided any treatment, no, just that he examined Mr. Washington.

THE COURT:  We're in a position where there's not a contest that he wasn't suffering from an asthma condition or that he hadn't been exposed to what could potentially be a serious substance as a result of the pepper spray or whatever spray or whatever compound that he was -- so if he presented to someone who is in the medical services with those conditions and there's no evidence any treatment was provided, can't that be deliberate indifference?  Couldn't that satisfy the standard?

ATTORNEY HOLMES:  I don't believe so, Your Honor.  And the reason is, Mr. Capoccia is alleged to have been aware that

Mr. Washington had weathered exposure to these chemical agents previously, that he had been -- if in an uncomfortable position, that he had been in a non-critical or non-serious medical condition from the exposure the night before through the morning when Mr. Capoccia actually saw him.

And, indeed, what Plaintiff alleges as to the severity or the extent of Mr. Washington's asthma more broadly or more generally is not that it was a life-threatening condition, not that it was something that would potentially put him at risk of a serious medical harm or a serious harm.  Plaintiff alleges in their complaint that Mr. Washington's asthma at worst would -- I'm sorry.  I'm just looking for the language -- substantially limit his major life activities.

THE COURT:  Let me ask Plaintiff's counsel about -- where is it in the pleadings that there's an allegation that Nurse Capoccia had knowledge and actually gave no relief to something that he had actual knowledge about?

ATTORNEY ZHANG:  Thank you, Your Honor.  I would say that Defendant Capoccia's knowledge is pleaded at several points in the complaint.  I think most obviously it would come from the severe asthma symptoms that my client, Derrick Washington, was experiencing at the time.

So this would be paragraph 121 of our amended complaint.  We say that our client was gasping for air, sneezing excessively, severe throat pain that made it feel like

he was swallowing metal, severe difficulty breathing.  So that is, I think, to any licensed medical professional would itself have been an indication that a serious medical need was occurring.

I would say the second source of knowledge for Defendant Capoccia was the fact that, as pleaded, our client requested a shower and a keep-on-person an inhaler and his express requests were denied by Defendant Capoccia.

So there are cases that show that the ignoring of an express request by a patient for medical care can constitute deliberate indifference.

And, third, I do want to address Defendant Capoccia's counsel's point that, because according to him, my client had survived previous exposure to chemical agents which, you know, is not a part of our amended complaint.  But in any case, if that were true, I don't understand how that would impact the standard of care that Nurse Capoccia would have to provide to our client upon, like, an objective serious medical condition.  But it is pleaded in our complaint that the DOC knew about our client's well-established asthma condition.

It is also pleaded that our client --

THE COURT:  Is there support for that pleading?

ATTORNEY ZHANG:  That the DOC knew about our client's serious -- yes.  It is in his medical record.  A doctor, as pleaded, had said that he should have a keep-on-person inhaler

with him at all times.  That's in the amended complaint, as is the fact that our client has previously filed a civil litigation against the Massachusetts Department of Corrections related to his asthma condition.

THE COURT:  Well, how is that information transferable to Nurse Capoccia?

ATTORNEY ZHANG:  I would say that it would have been registered in -- not the litigation, but the asthma condition would have been registered in our client's medical chart.  I also think it is utterly plausible and eminently likely that when --

THE COURT:  Well, we're talking about your pleadings here.  So this is at the pleadings stage.

ATTORNEY ZHANG:  Yes.  I understand.

THE COURT:  So plausibility is really not something that we should be dealing with right now.

ATTORNEY ZHANG:  Right.  Understood.

Well, I mean, like I said, I think our client's symptoms speak for themselves.  I think his express requests for medical care speak for themselves.  He did plead that the DOC recognized that he had asthma and that there was a need for him to have a keep-on-person inhaler with him at all times which was disregarded by Defendant Capoccia.  Those things are pleaded in the complaint.

THE COURT:  And what was the result for Mr. Washington

as a result of not getting, as his pleading indicates, that he didn't -- the claim that he got no treatment, no bath, no inhaler.

ATTORNEY ZHANG:  That is also pleaded in our complaint.  I can find the exact paragraph, but I believe that we plead he suffered from skin irritation, wheezing, trouble sleeping, coughing, discomfort.  Yeah, I can find the exact --

THE COURT:  No, that's all right.  Thank you.

ATTORNEY HOLMES:  Your Honor, could I --

THE COURT:  Yes, go ahead.  I'm going to ask you also -- I'll give you one more opportunity to respond, but then I'd like to talk about the exhaustion claim.

ATTORNEY HOLMES:  Just very briefly, Your Honor.

When Plaintiff's counsel points to the allegations in paragraph 121 about Mr. Washington having severe difficulty breathing, including gasping for air, sneezing excessively, severe throat pain, et cetera, those allegations chronologically appear to be right after the use of the chemical agent, not the following morning and appear to have no temporal relation to the following morning when he was seen by Mr. Capoccia.

Indeed, I think it's telling that where Plaintiff alleges that immediately after the exposure to the chemical agent Mr. Washington was having severe difficulty breathing, but the following morning when Mr. Capoccia saw him, they only

allege that he was having difficulty breathing.  They dropped the "severe" qualifier there.

I think it's also important to note that, contrary to counsel's assertion, there's no allegation that Mr. Washington asked Mr. Capoccia for his inhaler or that he asked Mr. Capoccia for a bath or a shower or to have the chemical agent washed off.  These are requests he made of different personnel, different employees, not -- at least as alleged, not what he requested as to Mr. Capoccia.

And the final thing I wanted to note is Plaintiff alleges that Mr. Capoccia was aware that chemical agents exacerbated Mr. Washington's asthma.  That's in paragraph 268 of the complaint.  So they did allege that Mr. Capoccia was aware of Mr. Washington's prior exposures to these chemical agents.

THE COURT:  I'd like to talk about the exhaustion as an affirmative defense.  So my understanding is that there was some -- was there some administrative action on the part of Mr. Washington?

ATTORNEY ZHANG:  Yes.  We allege in the complaint at paragraph 145 that Mr. Washington submitted a grievance regarding the January 23rd to 24th incident.  The grievance and resulting appeal were again denied and Mr. Washington was again informed that an internal investigation revealed no staff misconduct.  So that is in the complaint.

Additionally, as referenced in our briefing, and this is at Docket Nos. 80-1 and 80-2, we have completed Wellpath Patient Medical, Dental, and Mental Health Grievance and Appeal Form, that's 80-1; and the Department of Correction Medical Inmate Grievance Form at 80-2.  So, I mean, our position is --

THE COURT:  How does that serve as an answer to a failure to exhaust an actual claim?

ATTORNEY ZHANG:  So our position in the first instance is that *Jones v. Bock* holds that it is -- if exhaustion is not -- exhaustion is an affirmative defense, and if it is not clear on the face of the pleadings that a motion to dismiss is not the correct phase of litigation to address this issue.

If the Court is not inclined to grant that argument, we hold that both the grievance as referenced in the complaint at paragraph 145 and the grievances that are referenced in our briefing satisfy the exhaustion requirement.

And then, additionally, if the Court does not credit that argument, we posit that the grievance process was obstructed by the Department of Correction as is, you know, a prominent feature of our retaliation claims in this case, that the grievance coordinator at the prison, Sergeant Tocci, explicitly told our client that all of his grievances would be denied.

And, indeed, there was physical exam intimidation including, after the spray of chemical agent at our client, we

plead that as our client is being transported to the hospital unit, there are correctional officers that continue to tell him that this is his fault and physically intimidate him.

THE COURT:  So how does that impute to Nurse Capoccia?

ATTORNEY ZHANG:  How does it impute to Nurse Capoccia?

THE COURT:  Well, you're saying he was thwarted in any attempt to file a claim, that's what you allege he says they said to him, "Doesn't matter what you do."  He hadn't even yet seen the nurse.

ATTORNEY ZHANG:  That is true.  But I think the threat of intimidation towards our client and the threat to denial of his grievances extends to medical grievances as well.

THE COURT:  Well, did he even have a medical grievance yet?  He didn't even have that grievance yet, right?  Aren't you saying that he didn't -- was that the same day or was that the next day?  What day was it that you say -- that you allege that he was threatened regarding any administrative claim you make he's going to be denied.

ATTORNEY ZHANG:  It was after the application of chemical agent but before he was seen by Defendant Capoccia.

THE COURT:  It was a day before, right?

ATTORNEY ZHANG:  Well, it was the evening of the 23rd and Defendant Capoccia saw our client on the morning of the 24th.

THE COURT:  And there's no allegation that the nurse

was present or was the one who made this threat to him regarding any claim?

ATTORNEY ZHANG:  No, but we would argue that that does not itself mean that the exhaustion process that -- I mean, our client was estopped from going through the grievance process by physical intimidation, it need not have been applied by Nurse Capoccia.

And also I just wanted to quickly say that we do allege at paragraph 263 that our client made an express request to Defendant Capoccia explicitly for a shower and an inhaler. This is, again, paragraph 263.

"Despite Mr. Washington's well-documented history of asthma, knowing he was exposed to chemical agents the night before and his obvious need for immediate treatment, Nurse Capoccia failed to decontaminate Mr. Washington or provide him with a KOP inhaler despite Mr. Washington's express request." So that is at paragraph 263.

THE COURT:  Thank you.

Counsel raised the issue of *Jones v. Bock*.  It does indicate that it is an affirmative defense.  How do you respond to that in support of your motion to dismiss?

ATTORNEY HOLMES:  Your Honor, it is an affirmative defense, but the exhaustion of the potential remedy still has to be pleaded, still has to be pled.

There's no allegation that any grievance was filed

against Mr. Capoccia and so they failed to plead that they exhausted those remedies.

THE COURT:  All right.  I do want to get back to the questions related to -- for DOC generally.

There is some mention that asthma is not a qualifying disability and that's in some of the filings by the DOC.  Do you stand by that?

ATTORNEY BAILEY:  Good afternoon, Your Honor.

So we acknowledge that the cases cited in our opening brief apply to the pre-amendment standard and we don't rely on them today.  So our reply brief addressed that directly and our argument rests entirely on post-amendment authority.

So the operative standard is the one established by the ADA Amendments Act and under that standard, this complaint still fails.  So if you would like, Your Honor, I could get into the --

THE COURT:  No, that's fine.  That's fine.  I really want to just touch base on some of the -- now that we're getting deeper into the litigation, we had a lot of significant questions.  I also want to ask about the -- the complaint alleges Mr. Washington warned officers on both occasions that he was asthmatic, that DOC had a prior court judgment against it for some of the same conduct, and that DOC's own policy required the medical director to review his file for contraindications before authorizing chemical agents.

At what point does deploying chemical agents in the face of that knowledge become discrimination by reason of disability rather than just deliberate indifference?

ATTORNEY CAFFREY:  In terms of DOC policy, Your Honor, without having it in front of me, I can't explicitly cite to the paragraph, but it is -- when there is available time, that DOC would meet with the medical director for any contraindicators, but that doesn't necessarily preclude DOC's use of the chemical agent.

Furthermore, I disagree with assertion [verbatim] that there was a previous judgment against the Department of Correction for chemical agent and the asthma based on my review of that docket.

THE COURT:  Unless he was aware of it.  Unless Mr. Washington was aware of it.  I mean, I don't know.  He seemed to be a pretty well-informed individual, Mr. Washington. Thank you for that.

We have several tasks that the parties have to complete.  The Court will remain available if there are any conflicts so that we can get through this fairly quickly.  I know that the number of officers, if it turns out that there are concerns about the relevance of some of them, you should feel free to reach out to the Court.

Generally speaking, you limit the number of depositions, but Plaintiff's counsel have assured the Court

that they intend to get to these tasks as soon as possible.  We will follow up with an e-order regarding the discovery issues that we've discussed today.  And so I'll give each party -- anything further they wish to address before the Court before we adjourn?

ATTORNEY MARIELLA:  No, Your Honor, thank you.

ATTORNEY CAFFREY:  Not for DOC defendants, Your Honor.

THE COURT:  Thank you all very much.  I appreciate seeing people in person and we have a lot more things to do in this case.  Let us know if there are any disagreements that we can resolve as soon as possible.

(Whereupon the hearing concluded.)

CERTIFICATE OF OFFICIAL REPORTER


I, Jessica Leonard, Certified Shorthand Reporter and Federal Certified Realtime Reporter for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing transcript is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter, to the best of my skill and ability.

Dated this 26th day of May, 2026.



/s/ Jessica M. Leonard
Jessica M. Leonard, CSR, FCRR
Official Court Reporter