# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| DERRICK WASHINGTON,<br><br>*Plaintiff*,<br><br>v.<br><br>MASSACHUSETTS DEPARTMENT OF CORRECTIONS, WELLPATH LIQUIDATING TRUST, MATTHEW J. DUNDON as Trustee of the Wellpath Liquidating Trust, SUPERINTENDENT STEVE KENNEWAY, LIEUTENANT ROBERT DESCHENE, LIEUTENANT ARTHUR FORGET, SERGEANT RYAN HILLIS, SERGEANT THOMAS TOCCI, OFFICER ANTHONY CATALANO, OFFICER JOSHUA GAGNON, NURSE CHRISTIAN CAPOCCIA, SERGEANT ARTHUR BARNES, OFFICER JOSEPH CUMMINGS, OFFICER NICHOLAS DUMONT, OFFICER ZACHARY FONSECA, OFFICER DANIEL HOLLENBACH, OFFICER ERIC LAWSON, SERGEANT NATHAN OWEN, OFFICER CORY SHEPHERD, OFFICER JEFFREY PEPOLI, SERGEANT BRIAN RAYNER, OFFICER ROBERT BASHAW, OFFICER RAYMOND SIMULA, OFFICER SERGIO CACIOPPO, OFFICER THOMAS MEMBRINO, OFFICER DAVID GILMAN, OFFICER RYAN KALRIESS, MEDICAL DIRECTOR DOE, AND NURSE DOE,<br><br>*Defendants*. | Civ. Case No. 1:23-cv-10063<br><br>FIRST AMENDED COMPLAINT, REQUEST FOR RELIEF AND JURY DEMAND |

**<u>FIRST AMENDED COMPLAINT</u>**

1. Souza Baranowski Correctional Center ("SBCC") is a maximum-security prison operated by the Massachusetts Department of Corrections ("DOC"). Since its inception in 1998,

the prison has been notorious for its "toxic culture" of violence, psychological abuse, and racism against those incarcerated at the facility by the very people entrusted with their care.

2. Most recently, in January 2020, SBCC guards unleashed a campaign of irrational, vindictive, and often racialized violence against the prisoners—including those who were uninvolved in an original altercation that injured three guards. This campaign was comprised of unprovoked beatings, positional torture, attacks by guard dogs, confiscation and theft of personal property, and denial of access to legal counsel.

3. One victim of this terror regime was Derrick Washington, a 38-year-old Black man with asthma who is incarcerated by the DOC and was housed at SBCC from September 2018 to June, 2023. During his time at SBCC, Mr. Washington has been an outspoken advocate for better treatment and racial justice in the prison. In October 2019, he founded the Black, Latino, Asian Cultural Coalition ("BLACC"), SBCC's first incarcerated-led cultural program to support self-improvement in prison. He has also spoken out on numerous occasions about guard abuse and racism in SBCC, including by filing formal grievances and speaking with state legislators.

4. Mr. Washington was not involved in the January 2020 altercation, and he was not suspected of being involved in any way. However, on three separate incidents in January and March 2020, SBCC guards brutally beat and tased Mr. Washington, causing lacerations and contusions to his face and body, breathing problems, and loss of consciousness on several occasions. Mr. Washington was specifically targeted as retaliation for his participation in the BLACC program and for speaking out against SBCC staff for their mistreatment of prisoners.

5. While they beat him, guards shouted slurs, calling Mr. Washington "black ass," "nigger," "bitch," and "cunt." During one of these beatings, a guard told him "all of your grievances will be denied." Guards also twice sprayed Mr. Washington with chemical agents—

despite knowing that he has asthma. Both times, the chemical agents provoked serious asthma attacks. And both times, DOC medical staff failed to provide Mr. Washington with even basic medical treatment, like an inhaler or an opportunity to shower. As a result, Mr. Washington struggled to breathe for weeks afterwards.

6. This lawsuit is based on these three instances of guard brutality and staff misconduct suffered by Mr. Washington, which were intended to silence Mr. Washington's voice and punish him for engaging in protected speech activities.

7. These instances of abuse constitute excessive force and deliberate indifference to serious medical needs, in violation of the Eighth and Fourteenth Amendments to the United States Constitution; retaliation for constitutionally protected speech, in violation of the First Amendment to the United States Constitution; disability discrimination, in violation of the Americans with Disabilities Act; and assault and battery and intentional infliction of emotional distress, in violation of state tort law.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction over Plaintiff's claims under 42 U.S.C. § 1983 pursuant to 28 U.S.C. § 1331.

9. This Court has supplemental jurisdiction over Plaintiff's claims under Massachusetts law pursuant to 28 U.S.C. § 1367.

10. Venue lies in the District of Massachusetts under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims in this action took place in this District, and the Plaintiff resides in this District.

**PARTIES**

Plaintiff

11. Derrick Washington is a 38-year-old Black man, currently imprisoned at MCI Shirley in the DOC. He was incarcerated at SBCC for all times relevant to this First Amended Complaint.

Defendants

12. The DOC is an agency of the Commonwealth, which oversees SBCC. The DOC received federal financial assistance during the period operative in this complaint.

13. The Wellpath Liquidating Trust is a nominal party pursuant to Wellpath LLC's Bankruptcy proceedings in the United States Bankruptcy Court for the Southern District of Texas Houston Division. The Wellpath Liquidating Trust is named as a nominal defendant pursuant to Plaintiff's rights under 28 U.S.C. 157(b)(5) to establish or liquidate the amount of Plaintiff's claim against Wellpath LLC for distribution under the Bankruptcy Plan from the Liquidating Trust after exhausting the required procedures in the plan. Wellpath LLC received federal financial assistance during the period operative in this complaint.

14. Matthew J. Dundon is the Trustee of the Wellpath Liquidating Trust and is named as a nominal party.

15. Superintendent Steve Kenneway, sued in their individual capacity, was the Superintendent of SBCC who ordered Sgt. Rayner to deploy chemical agents on Mr. Washington on March 5, 2020.

16. Lieutenant Robert Deschene, sued in their individual capacity, is a corrections officer employed by the DOC who assaulted Mr. Washington with chemical agents on January 23, 2020.

17. Lieutenant Arthur Forget, sued in their individual capacity, is a corrections officer employed by the Massachusetts Department of Corrections who, on the night of January 23, 2020, yanked Mr. Washington's handcuffs so hard his wrists started bleeding, then, along with three other corrections officers, kept Mr. Washington cuffed behind his back for five hours after he was discharged from the medical unit.

18. Sgt. Ryan Hillis, sued in their individual capacity, is a corrections officer employed by the Massachusetts Department of Corrections who, along with three other corrections officers, kept Mr. Washington cuffed behind his back for five hours after he was discharged from the medical unit the night of January 23, 2020.

19. Sgt. Thomas Tocci, sued in their individual capacity, is a corrections officer employed by the Massachusetts Department of Corrections who, along with three other corrections officers, kept Mr. Washington cuffed behind his back for five hours after he was discharged from the medical unit the night of January 23, 2020.

20. Officer Anthony Catalano, sued in their individual capacity, is a correctional officer employed by the DOC who beat and tased Mr. Washington while calling him "nigger" on two separate occasions on January 21, 2020.

21. Officer Joshua Gagnon, sued in their individual capacity, is a corrections officer employed by the DOC who, along with other corrections officers, beat and verbally abused Mr. Washington while he was in a strip cage on March 5, 2020, and then beat him again in cell #5 in the K-3 unit later that same day.

22. Nurse Christian Capoccia, sued in their individual capacity, is a nurse employed by Wellpath LLC who worked in SBCC's medical unit and failed to decontaminate Plaintiff or provide him with his KOP Inhaler while Plaintiff was under care of the medical unit the morning

of January 24, 2020.

23. Sgt. Arthur Barnes, sued in their individual capacity, is a corrections officer employed by the DOC who, along with other corrections officers, beat, tased, and verbally abused Plaintiff with racial slurs on January 21, 2020.

24. Officer Joseph Cummings, sued in their individual capacity, is a corrections officer employed by the DOC who, along with other corrections officers, beat, tased, and verbally abused Plaintiff with racial slurs on January 21, 2020.

25. Officer Nicholas Dumont, sued in their individual capacity, is a corrections officer employed by the DOC who, along with other corrections officers, beat, tased, and verbally abused Plaintiff with racial slurs on January 21, 2020.

26. Officer Zachary Fonseca, sued in their individual capacity, is a corrections officer employed by the DOC who, along with other corrections officers, beat, tased, and verbally abused Plaintiff with racial slurs on January 21, 2020.

27. Officer Daniel Hollenbach, sued in their individual capacity, is a corrections officer employed by the DOC who, along with other corrections officers, beat, tased, and verbally abused Plaintiff with racial slurs on January 21, 2020.

28. Officer Eric Lawson, sued in their individual capacity, is a corrections officer employed by the DOC who, along with other corrections officers, beat, tased, and verbally abused Plaintiff with racial slurs on January 21, 2020.

29. Sgt. Nathan Owen, sued in their individual capacity, is a corrections officer employed by the DOC who, along with other corrections officers, beat, tased, and verbally abused Plaintiff with racial slurs on January 21, 2020.

30. Officer Cory Shepherd, sued in their individual capacity, is a corrections officer

employed by the DOC who, along with other corrections officers, beat, tased, and verbally abused Plaintiff with racial slurs on January 21, 2020.

31. Officer Jeffrey Pepoli, sued in their individual capacity, is a corrections officer employed by the DOC who recorded other corrections officers as they beat, tased, and verbally abused Plaintiff with racial slurs on January 21, 2020.

32. Sgt. Brian Rayner, sued in their individual capacity, is a corrections officer employed by the DOC who deployed chemical agents on Mr. Washington on March 5, 2020.

33. Officer Robert Bashaw, sued in their individual capacity, is a corrections officer employed by the DOC who, along with other corrections officers, beat and verbally abused Mr. Washington while he was in a strip cage and while he was in cell #5 in unit K-3 on March 5, 2020.

34. Officer Raymond Simula, sued in their individual capacity, is a corrections officer employed by the DOC who, along with other corrections officers, beat and verbally abused Mr. Washington while he was in a strip cage and while he was in cell #5 in unit K-3 on March 5, 2020.

35. Officer Sergio Cacioppo, sued in their individual capacity, is a corrections officer employed by the DOC who, along with other corrections officers, beat and verbally abused Mr. Washington while he was in a strip cage and while he was in cell #5 in unit K-3 on March 5, 2020.

36. Officer Thomas Membrino, sued in their individual capacity, is a corrections officer employed by the DOC who, along with other corrections officers, beat and verbally abused Mr. Washington while he was in a strip cage and while he was in cell #5 in unit K-3 on March 5, 2020.

37. Officer David Gilman, sued in their individual capacity, is a corrections officer employed by the DOC who, along with other corrections officers, beat and verbally abused Mr. Washington while he was in a strip cage and while he was in cell #5 in unit K-3 on March 5, 2020.

38. Officer Ryan Kalriess, sued in their individual capacity, is a corrections officer employed by the DOC who recorded other corrections officers beat and verbally abuse Mr. Washington while he was in a strip cage and while he was in cell #5 in unit K-3 on March 5, 2020.

39. Medical Director Doe, sued in their individual capacity, is an employee of Wellpath LLC was the Medical Director of SBCC who ordered Sgt. Rayner to deploy chemical agents on Mr. Washington on March 5, 2020.

40. Nurse Doe, sued in their individual capacity, is a nurse employed by Wellpath LLC as who worked at SBCC's medical unit and failed to decontaminate Plaintiff or provide him with his Keep-On-Person (KOP) Inhaler while Plaintiff was under the medical unit's care on January 23, 2020.

## FACTUAL ALLEGATIONS

41. Derrick Washington is a 38-year-old Black man who has been imprisoned in DOC custody since February 2007 and is currently housed at MCI-Shirley. He was previously housed at SBCC from September 9, 2018 to June 1, 2023.

42. During his time at SBCC, Mr. Washington often worked with others incarcerated at SBCC to advocate for better treatment or greater political rights, such as the right to vote.

43. Mr. Washington has asthma, a condition whose symptoms include difficulty breathing. When Mr. Washington is experiencing symptoms of his asthma, he is unable to

participate in recreation time, sleep, or do almost anything else—including, most importantly, breathe.

44. Mr. Washington's condition requires that he regularly use an inhaler and have immediate access to an inhaler at all times.

45. His asthma condition was well-documented at SBCC, and he used and continues to use a Keep-On-Person ("KOP") Inhaler to manage his asthma on a daily basis. Mr. Washington had been previously exposed to chemical agents while in prison, and had filed one or more grievances alerting the prison to the impact that chemical agents had on his asthma and ability to breath.

**SBCC's Culture of Racism and Violence**

46. SBCC is a maximum-security prison with 1,410 beds. On information and belief, as of January 6, 2020, the prison was at about half-capacity, with 795 people incarcerated there.

47. Most of the prisoners at SBCC are Black and Latino, and the guards are overwhelmingly white. In January 2020, DOC reported that approximately two thirds of the prisoners at SBCC were Black or Latino (37% and 30%, respectively, or 67% total). In contrast, of the approximately 390 officers assigned to SBCC, 82% are white. In DOC as a whole, roughly one-half of the population is Black or Latino (27% Black and 26% Latino, or 53% total).

48. The supervisory ranks of officers at SBCC are even less diverse: of fifty sergeants, forty-three, or 86%, are white. Twenty-one of the twenty-two lieutenants are white—and the one non-white lieutenant is Latino. Only one of the seven captains is non-white, and he is also Latino. There are no Black lieutenants or captains. On information and belief, the racial makeup of SBCC staff in January 2020 was substantially similar.

49. Violence at SBCC is entrenched and pervasive.

50. DOC deployed tactical teams to SBCC at least nineteen times from 2017 through 2020, not including the eight months in 2019 and 2020 during which tactical teams were at the prison for two shifts daily.

51. Conditions at SBCC are harsh and restrictive. Prisoners spend at least 20 hours each day locked in their cells, with only a thin, unopenable window that offers a view to the outdoors. DOC typically places two individuals in each thirteen-by-seven-foot cell. Education, programming, work assignments, and recreational opportunities are severely limited. SBCC also regularly deprives prisoners of access to scheduled out-of-cell opportunities like yard time, library, classes, work, or other programs. Limits on the amount and type of property a person can have, how much one can buy from the prison canteen, and the number of visitors one can have on their visitation list are all extremely restrictive.

52. SBCC is, in short, a violent, racist, and harsh institution—even in the best of times.

**Mr. Washington's Experience of Racism and Violence before January 10, 2020**

53. Since arriving at SBCC in 2018, Mr. Washington has been a vocal advocate for racial justice inside SBCC and has suffered consequences for that advocacy.

54. Prior to Mr. Washington's arrival, there were no cultural programs available for incarcerated people at SBCC. As such, in May or June 2019, Mr. Washington decided to initiate a cultural program known as the Black, Latino, Asian Cultural Coalition ("BLACC"). The goal of the program was to build community and facilitate the exchange of culture between its members, as well as to advocate for better treatment and racial justice within SBCC. The program was approved by DOC Superintendent Kenneway and Director of Treatment Sara Fisher, who did not raise any concerns about BLACC being a threat to prison security.

55. The group organized a membership, selected a board (of which Mr. Washington was designated Chairman), and held its first meeting in October 2019. Several SBCC staff members, including Superintendent Kenneway and Director Fisher, attended the first meeting as guests. However, despite the official approval of the program, lower-level prison staff quickly became hostile to the group and undermined BLACC's organizational efforts by harassing members of the group and targeting leadership.

56. The lower-level prison staff's animus against the group was due in large part to its name. Several officers asserted that the name BLACC discriminated against white people, despite the fact that the BLACC program had numerous white members, several of whom served on its board. Another guard made homophobic remarks about the name by disparagingly comparing the acronym "BLACC" to "LGBTQ" in an effort to discourage membership. Multiple guards demanded Mr. Washington change the group's name, but at that point the group had already organized membership and elected a board, meaning Mr. Washington could not unilaterally change the name without the consent of BLACC's members. Mr. Washington told the guards about this procedural point and brought the guards' request to his membership, which independently rejected the request.

57. SBCC officials were also hostile to the BLACC program because it criticized the culture of abuse and mistreatment at the hands of SBCC guards and advocated for better treatment within the prison.

58. As a result of this animus, Mr. Washington was specifically singled out for retribution. Between November 2019 and January 2020, Mr. Washington was terminated from his institutional job at the prison library on November 8, 2019; transferred from a privileged housing assignment to solitary confinement on November 8, 2019; had various items stolen from

him in November and December 2019; and ultimately banned from participating in the BLACC program, which directly caused the organization to fizzle out and dissolve. On information and belief, these incidents—which occurred shortly after BLACC's first meeting, the one attended by various high-level SBCC staff members—were in retaliation for Mr. Washington's organizational efforts and intended to suppress the BLACC program's pursuit of better treatment and racial equality.

59. Further, on November 23, 2019, several guards brought Mr. Washington to a solitary confinement cell without providing a reason. The guards then ordered Mr. Washington to strip naked and cuffed and shackled him. Although Mr. Washington was restrained, the guards slammed him onto the floor of the cell, which was covered in dirt and urine, then removed Mr. Washington's shoes and left him in the cell, barefoot. Mr. Washington suffered a permanent shoulder injury and scar as a result of this assault. Adding insult to injury, the guards issued Mr. Washington several disciplinary tickets for this incident, falsely alleging that he had refused to comply with orders. On information and belief, this incident—which was again after Mr. Washington organized BLACC—was in retaliation for Mr. Washington's organizational efforts.

60. Further, in November and December 2019, a CO took several possessions from Mr. Washington, which included a gold religious chain with great personal significance. None of these possessions was ever returned to Mr. Washington, despite his repeated requests. On information and belief, this incident—which was again after Mr. Washington organized BLACC—was in retaliation for Mr. Washington's organizational efforts.

61. Mr. Washington believes that this continuous degrading treatment and violence was in retaliation for his involvement in the BLACC program. As a result of these incidents, Mr. Washington submitted two grievances on December 2, 2019 and January 5, 2020, detailing

the violence and mistreatment he experienced at the hands of the SBCC staff in retaliation for his involvement in BLACC. Both of these grievances, as well as the resulting appeals, were denied.

**SBCC's Response to the Altercation on January 10, 2020**

62. On the morning of January 10, 2020, there was an altercation between a small number of prisoners and SBCC guards in the N1 Unit, during which several guards were injured.

63. SBCC officials immediately transferred the prisoners who were involved out of the unit.[1]

64. Officials then began a massive operation to reorganize SBCC by dividing the prison into two sections—the North Side and South Side—and assigning the remaining prisoners to either side. The reorganization operation began on January 21, 2020.

65. At all times relevant to this Complaint, SBCC imposed severe restrictions on people held on the North Side. On the North Side of SBCC, people were locked into their cells for 23.5 hours per day with a cellmate. They were not permitted to attend programming or religious services, engage in recreational activities in the yard or gym, use the library, or have a job. Visits and access to the commissary were severely restricted, as was property: among other things, people on the North Side were not permitted to have a television or sneakers. People on the North Side also could not earn good time, which lengthened their overall prison sentence.

66. Prison officials assigned people to the North or South Sides without any process.

67. At the time of the January 10, 2020 altercation, Mr. Washington was housed in

---

[1] *See* Scott J. Croteau, *Souza-Baranowski Correctional Center remains on lockdown days after gang members attacked guards*," MASS LIVE (Feb. 20, 2020, 11:13AM), https://www.masslive.com/worcester/2020/01/souza-baranowski-correctional-center-remains-on-lockdown-days-after-gang-members-attacked-guards.html.

the L-2 Unit, which was immediately placed on lockdown and became part of the North Side.

68. Due to the sham disciplinary tickets Mr. Washington received from the retaliatory incidents following his initiation of the BLACC program, Mr. Washington was assigned to the North Side without any hearing or process. All of these disciplinary tickets were eventually dismissed with no finding of wrongdoing, but Mr. Washington nevertheless remained on the North Side from January 2020 to March 2021.

69. Staff violence against prisoners escalated dramatically after January 10, 2020. In the six weeks following the altercation, there were over 120 complaints of excessive force used by guards, which was three times the number of brutality complaints in the whole year prior.[2]

70. On information and belief, examples of force used by DOC staff included: beating and kicking prisoners; gouging eyes; grabbing testicles; smashing faces into the ground or wall; deploying Taser guns, pepper ball guns, and other chemical agents; ordering K9s to menace and bite prisoners; and excessively tightening handcuffs and forcing prisoners' arms into unnatural and painful positions, among other positional torture tactics. SBCC guards subjected prisoners to other dehumanizing, humiliating, and punitive actions, including being strip searched in view of numerous other prisoners and staff; being led barefoot through toilet water and human waste; having personal property destroyed; and being denied medical and mental health care.

71. On information and belief, SBCC guards targeted Black and Latino prisoners for

---

[2] *See* Jackson Cote, *Violence, abuse and retaliation: How a 'toxic culture' within the walls of Souza-Baranowski Correctional Center has turned it into a 'powder keg,'* MASS LIVE (Mar. 15, 2020, 6:00AM), https://www.masslive.com/police-fire/2020/03/violence-abuse-and-retaliation-how-a-toxic-culture-within-the-walls-of-souza-baranowski-correctional-center-has-turned-it-into-a-powder-keg.html

especially brutal and degrading treatment. The guards would yank and rip out dreadlocks and braids and shout racist comments and slurs while assaulting Black and Latino prisoners.

72. In describing SBCC officials' response to the January 10, 2020 altercation, James Eldridge, the state senator whose district includes SBCC, said that "[t]here is a toxic culture at the prison."[3]

<u>Assaults on Mr. Washington on January 21, 2020</u>

73. Mr. Washington was not involved in the January 10, 2020 altercation in any way, and SBCC officials did not suspect him of any involvement.

74. On January 20, 2020, while the L-2 Unit was still on lockdown, Mr. Washington submitted another grievance detailing the violence and abuse he had experienced at the hands of SBCC guards in retaliation for his participation in the BLACC program. Like his previous grievances, this grievance and the resulting appeal were denied.

75. Mr. Washington also sent to his close friends both inside and outside of SBCC an email essay he had written describing the concerted retaliatory actions by officers and administrators that had occurred since he had initiated the BLACC program in October 2019. At the end of the essay, Mr. Washington urged the recipients to share his story with lawmakers and the press.

76. Unbeknownst to Mr. Washington, by January 2020, Sgt. Tocci, the Inmate Grievance Coordinator, had begun sharing all of Mr. Washington's confidential grievances with other SBCC staff members, in violation of DOC policy 103 CMR 491.23. Furthermore, the guards in charge of monitoring Mr. Washington's email communications had circulated copies of Mr. Washington's email essay to other SBCC officers as well.

---

[3] *Id.*

77. Knowledge of Mr. Washington's grievances and complaints against SBCC officers became widespread. In retaliation for Mr. Washington speaking out, as well as for his history of activism against prisoner mistreatment in SBCC, SBCC officers subjected Mr. Washington to brutal treatment and weeks of irrational, vindictive, and often racialized violence.

78. On the morning of January 21, 2020, the day the SBCC reorganization operation commenced, tactical officers and other SBCC officials entered the L-2 cellblock where Mr. Washington was housed. They carried guns, tasers, and shields, and wore masks but no nametags, causing difficulty in identifying the officers. The guards went from cell to cell, ordering prisoners to strip and putting them in handcuffs and shackles.

79. Two guards came to Mr. Washington's cell. They ordered him to strip naked, bend over, spread his legs, and cough. Mr. Washington complied. He was then permitted to put on underwear and a T-shirt, but nothing else, not even his glasses. Mr. Washington was also not permitted to keep his inhaler with him.

80. The guards next ordered Mr. Washington to put his hands behind his back, and Mr. Washington complied. The guards then began twisting his right wrist inwards, in a way that it could not naturally bend. Suddenly, a CO yelled, "Stop resisting!" and tackled Mr. Washington to the floor, causing Mr. Washington's head to hit the edge of the metal bunk bed.

81. Mr. Washington was not resisting.

82. Other guards rushed into the cell and pointed their weapons at Mr. Washington, who was on the ground.

83. The guards put Mr. Washington in handcuffs and leg shackles. The guards then escorted him and the other L-2 prisoners at gunpoint to their new housing assignments.

84. When Mr. Washington arrived at the new cell to which he was assigned, he saw

another prisoner, also dressed only in his underwear, already inside it. Mr. Washington realized at that moment that the facility had assigned him a cellmate. He had not had a cellmate for the past ten years while in a maximum-security facility and was reasonably afraid of having one due to the high risk and history of assaults by cellmates in SBCC. Accordingly, Mr. Washington verbally communicated to the guards present that he did not want to enter the cell.

85. Mr. Washington remained handcuffed, shackled and passive at this time.

86. Without warning, Sgt. Barnes, Officer Catalano, Officer Cummings, Officer Dumont, Officer Fonseca, Officer Hollenbach, Officer Lawson, Sgt. Owen, and Officer Shepherd immediately began to tase and beat Mr. Washington, while Officer Pepoli recorded the incident with a handheld camcorder. The guards slammed Mr. Washington on the floor. Another guard tased him in the arms and feet during the beating.

87. While beating him, they called him "black ass," "nigger," and "bitch." They also shouted: "This is our base!"

88. The guards then escorted Mr. Washington to SBCC's hospital unit, where he was examined by medical staff while Officer Pepoli recorded him on a video camera.

89. The assault caused contusions on two areas of Mr. Washington's face and a larger contusion to the right side of his forehead. The tasing left Mr. Washington's arm and his leg numb and shaky, symptoms which lasted for months after the assault. The tasing also left lasting bruises on his arms and feet.

90. The physical violence and racialized verbal abuse inflicted by Sgt. Barnes, Officer Catalano, Officer Cummings, Officer Dumont, Officer Fonseca, Officer Hollenbach, Officer Lawson, Sgt. Owen, and Officer Shepherd also caused Mr. Washington severe emotional distress. He was humiliated and in fear for his life. The distress manifested as hyperventilation

and loss of sleep. He continues to have trouble sleeping because he wakes up at the slightest movement in fear that he will be attacked.

91. For over a year following this attack, Mr. Washington had panic attacks that caused him difficulty breathing, making him feel like he was being choked or suffocated.

92. Mr. Washington told medical staff that he was experiencing unprovoked and targeted violence. Nonetheless, medical staff discharged Mr. Washington, and Sgt. Barnes, Officer Catalano, Officer Cummings, Officer Dumont, Officer Fonseca, Officer Hollenbach, Officer Lawson, Sgt. Owen, and Officer Shepherd escorted him out of the hospital unit.

93. Upon discharge, Mr. Washington expected that he would be taken to solitary confinement: the regular process at SBCC when an incarcerated person disputes their cell assignment. Instead, the guards escorted him back to the cell in M-2, which he had previously verbally declined to enter.

94. At the cell, the officers positioned Mr. Washington with his face against a wall.

95. Officer Catalano ordered another officer to remove Mr. Washington's handcuffs, and he did.

96. Mr. Washington then stood still, facing the wall. The officers ordered him to get in the cell, while pointing assault rifles and red beams at him. Mr. Washington at first did not enter the cell. He was fearful that if he moved at all, one of the guards would assault or kill him.

97. Following this minor delay, immediately and without any warning, Sgt. Barnes, Officer Catalano, Officer Cummings, Officer Dumont, Officer Fonseca, Officer Hollenbach, Officer Lawson, Sgt. Owen, and Officer Shepherd tased Mr. Washington multiple times while he was standing facing the wall. Then the officers threw him to the floor and tased him again.

98. Once Mr. Washington was on the floor, Officer Shepherd and Officer Owens

repeatedly smashed his face into the ground. He was bleeding, and his blood was on the floor and the walls.

99. While assaulting him, the guards called him racial slurs. Multiple officers, including Officer Catalano, repeatedly called him “nigger” and told him, “Get your black ass in the cell.” Throughout the assault, the officers continued to point assault rifles and red beams at his face and groin.

100. Mr. Washington periodically lost consciousness during this incident from the physical assault and psychological reaction.

101. Mr. Washington was again put in handcuffs and shackles.

102. Four officers, Officer Dumont, Officer Fonseca, Officer Hollenbach, and Sgt. Owen, escorted him back to the SBCC hospital unit a second time. Mr. Washington was readmitted to the SBCC hospital unit about 20 minutes after he had been first discharged.

103. In the hospital unit, Mr. Washington stood on his feet but he was bleeding so profusely that he felt light-headed. He heard a doctor state that Mr. Washington had to be sent to an outside hospital because the doctor could not treat such severe injuries in the prison medical unit.

104. Mr. Washington collapsed on the floor. The escorting officers then picked Mr. Washington up and put him into a hospital bed.

105. When Mr. Washington later regained consciousness, Officer Dumont, Officer Fonseca, Officer Hollenbach, and Officer Owen were standing by his bed. Mr. Washington heard them calling him “bitch” and “cunt.” He kept his eyes closed and pretended to be unconscious, out of concern for his safety. One of the officers was holding a video camera. Mr. Washington heard an officer say, “You didn’t record me saying that on camera, did you?”

Another officer replied, "I cut it off for that."

106. Mr. Washington was transported in an ambulance to Leominster Hospital in only his underwear and no shoes, despite the fact that it was January. Mr. Washington was in and out of consciousness in the ambulance but felt people poking and pulling on his skin as if to check if he was dead.

107. The next time Mr. Washington regained consciousness, he was in Leominster Hospital wearing a neck brace. He heard a doctor say he needed to fix up Mr. Washington's face. The doctor asked Mr. Washington questions but, out of fear, Mr. Washington did not respond: guards were standing next to him, he was handcuffed to the hospital bed, and he was terrified that the guards would retaliate against him with violence if he spoke with the doctor. As a result, Mr. Washington remained silent while the doctor put stitches in his face. When the doctor asked whether anything else was wrong, Mr. Washington again did not speak even though he was in severe pain. After the doctor left, guards started to lift Mr. Washington up out of the hospital bed to put him in a wheelchair, discovering that Mr. Washington had urinated on himself.

108. On information and belief, the abuse inflicted on Mr. Washington by Sgt. Barnes, Officer Catalano, Officer Cummings, Officer Dumont, Officer Fonseca, Officer Hollenbach, Officer Lawson, Sgt. Owen, and Officer Shepherd was retaliation for Mr. Washington's participation in the BLACC program and the grievances he had filed against SBCC officers.

109. The incident caused Mr. Washington severe emotional distress, including humiliation and fear for his life. Mr. Washington experiences flashbacks regularly, which make him feel severe depression and like his life is not worth living. During these flashbacks, he experiences shortness of breath. And he regularly has nightmares. Mr. Washington has

difficulty sleeping because the attacks have made him feel as if he needs to be hypervigilant. His heart races and he panics when he hears keys or cells opening or slamming shut. Further, one of the guards involved in the attack, Officer Pepoli, now works as a guard at MCI-Shirley, where Mr. Washington is now housed. Mr. Washington is reminded of the attack whenever he sees Officer Pepoli.

110. On January 30, 2020, Mr. Washington submitted a grievance regarding the January 21, 2020 assault. However, the grievance and the resulting appeal were denied, and Mr. Washington was informed that an internal investigation revealed no staff misconduct. As with Mr. Washington's previous grievances, Sgt. Tocci shared this confidential grievance with other SBCC staff members in violation of 103 CMR 491.23, which further spread knowledge that Mr. Washington had filed grievances and complaints against SBCC officials and resulted in retaliation against Mr. Washington.

Assaults on January 23–24, 2020

111. Mr. Washington returned from Leominster Hospital to the SBCC hospital unit the evening of January 21.

112. Unbeknownst to Mr. Washington, however, SBCC officers were planning another assault specifically targeted against him. Audio recorded from the afternoon of January 22, 2020 revealed a conversation between SBCC officers wherein a guard stated, "I'm not doing nothing with Washington right now. I'll deal with him tomorrow. He can stay [at the hospital unit] another night and rest up . . . . So he can get bit tomorrow."

113. On January 23, 2020, tactical officers entered the hospital unit, carrying guns and

tactical equipment, and force-moved[4] him to his new housing assignment, cell #13, in the M-2 Unit. The guards forced Mr. Washington into the cell and then forced Mr. Washington's cellmate into the cell at gunpoint.

114. That same night, at around 9:00PM, Mr. Washington's cellmate became agitated and apparently began experiencing a mental health crisis. The high beam light in cell #13 was malfunctioning and would not turn off, which led Mr. Washington's cellmate to repeatedly ask the M-2 Unit CO to move him to a different cell or to have the light fixed. Nothing was done, and Mr. Washington's cellmate began yelling and dragging his mattress off of the bottom bunk and onto the ground. The cellmate then threw the mattress around the cell, expressing that he could not mentally endure the flashing light and that he needed to exit the cell. Mr. Washington believes his cellmate was designated as "SMI," a prisoner with serious mental illness.

115. Mr. Washington did not join his cellmate in yelling or throwing the mattress around the cell. Instead, Mr. Washington remained lying on the top bunk of his cell, reading, and posed no threat or risk to safety.

116. In response to the cellmate's actions, at about 10:45PM, Lt. Deschene burst into the cell with a canister of chemical agent. Mr. Washington, who is asthmatic, shouted at Lt. Deschene that he had asthma and that the Lieutenant should not use the chemical agents.

117. Lt. Deschene nonetheless aimed the canister at Mr. Washington and his cellmate and deployed chemical agents for a prolonged period. He continued to deploy the chemical agents even though Mr. Washington yelled repeatedly that he was asthmatic.

118. On information and belief, Lt. Deschene did not seek authorization before using

[4] A force-move is a type of use of force in which a tactical team uses shields and tactical equipment to move a prisoner from one space to another space.

chemical agents.

119. Supervisory officers at Lt. Deschene's rank are responsible for knowing prisoners' medical needs, and Mr. Washington's asthma has been well-documented by DOC and Mr. Washington's prior grievances. Indeed, Mr. Washington obtained a previous court judgment that determined DOC had improperly used chemical agents against him despite his medical condition.

120. On information and belief, Lt. Deschene deployed chemical agents and inflicted injuries on Mr. Washington in retaliation for his participation in the BLACC program and the grievances he had filed against SBCC officers.

121. As a result of Mr. Washington's exposure to the chemical agents, he suffered consecutive asthma attacks and severe difficulty breathing. Specifically, Mr. Washington was left gasping for air, sneezing excessively, and with severe throat pain that made it feel like he was swallowing metal.

122. Additionally, the chemical agents made significant contact with Mr. Washington's skin, and his hands in particular when he raised them in an unsuccessful attempt to prevent the chemical agents from getting to his face. The exposure made his skin feel like it was burning, but he was not provided with an opportunity to bathe and wash the chemical agents off of his skin until a week later. Moreover, for days after the chemical agents were deployed, Mr. Washington was not able to touch his face or eyes without causing an intense burning sensation wherever he touched.

123. After Lt. Deschene deployed the chemical agents, at least five additional guards entered the cell and began striking Mr. Washington's cellmate.

124. One guard placed Mr. Washington in handcuffs, and several guards escorted him

Case 1:23-cv-10063-MRG Document 23-1 Filed 01/18/23 Page 24 of 55

to the SBCC medical unit. During the transport, Mr. Washington felt pain all over his body.

125. While on the way to the hospital, one of the guards who was escorting him called Mr. Washington a "bitch," asserted that Mr. Washington's injuries were his own fault, and additionally blamed other recent incidents in the block on Mr. Washington.

126. When Mr. Washington arrived at the SBCC hospital, he was examined by Nurse Doe. He was still struggling to breathe, feeling dizzy, and showing symptoms of an asthma attack. Despite these obvious symptoms, Nurse Doe failed to decontaminate Mr. Washington or permit him to have his KOP inhaler. Moreover, Mr. Washington asked directly for a shower and for his KOP inhaler, but Nurse Doe denied these requests. Nurse Doe discharged Mr. Washington from the hospital without decontaminating him and without his KOP inhaler. As a result of the failures of Nurse Doe, Mr. Washington continued to experience difficulty breathing and recurrent asthma attacks for another week and a half.

127. On information and belief, Nurse Doe's actions were based on Wellpath LLC's policies and customs, including those related to the treatment of patients with asthma, patients with prescriptions for KOP medication, patients exposed to chemical agents, and patients injured following uses of force by prison officers.

128. Upon discharge, Mr. Washington was brought back to the M-2 Unit and placed into an empty cell, #15. Mr. Washington was not permitted to shower and was left wearing the same clothes that had been contaminated by chemical agents. The temperature that night was around 35 degrees and the cell was freezing cold, but Mr. Washington was given no blankets, sheets, mattress, or anything else that could keep him warm.

129. At around 11:00PM, Mr. Washington asked the guard making security rounds, Officer Logan, for blankets, a sheet, and a mattress, but Officer Logan did not give him any.

About an hour later, a captain made a security round, and Mr. Washington asked for the same. He also told the captain that he was still experiencing asthma attacks from having been sprayed with chemical agents.

130. Two hours later, at around 2:00AM on January 24, 2020, Lt. Forget, Sgt. Tocci, Sgt. Hillis, and Officer Logan came to Mr. Washington's cell and demanded that he "cuff up." Mr. Washington complied. When Defendants then opened the cell gate, Lt. Forget brandished a canister of chemical agents in Mr. Washington's face and ordered him to go to the back of the cell. Mr. Washington again complied, and Defendants flung a mattress into the cell and quickly closed the gate. Mr. Washington asked Defendants if he would be getting sheets and blankets. One Defendant replied that Mr. Washington was lucky to be getting a mattress and would not be getting anything else.

131. Lt. Forget, with Sgt. Tocci standing by, then told Mr. Washington to put his back against the cell door and insert his hands through the slot in the cell door in order to have the handcuffs removed. Mr. Washington did so, but Lt. Forget did not uncuff him. Instead, he told Mr. Washington to bend over. Mr. Washington complied.

132. Instead of uncuffing Mr. Washington, Lt. Forget yanked upward on the handcuffs, causing lacerations to Mr. Washington's wrists and bleeding. Lt. Forget asserted—falsely—that Mr. Washington was failing to relinquish the handcuffs. Mr. Washington begged Lt. Forget and Sgt. Tocci to remove the handcuffs, but they did not. Mr. Washington then backed away from the cell door with his hands still in handcuffs after nearly two minutes of waiting for his handcuffs to be removed by Lt. Forget.

133. Mr. Washington asked Sgt. Tocci why he was assaulting Mr. Washington when his normal duties were to serve as the Inmate Grievance Coordinator. Sgt. Tocci laughed at Mr.

Washington and responded, "I'm not serving in that capacity right now." He then taunted Mr. Washington by saying, "Now all your grievances will be denied," indicating that the assault was in retaliation for the grievances Mr. Washington had previously filed.

134. Lt. Forget and Sgt. Tocci then left the cell, joking about how funny it would be to leave Mr. Washington in handcuffs for the entire night.

135. Later that night, Mr. Washington asked Officer Logan to remove the handcuffs. He said that the handcuffs were rubbing against his bloody, broken skin and that he needed to urinate. Officer Logan refused and informed Mr. Washington that he called Sgt. Hillis.

136. By the time Sgt. Hillis arrived, Mr. Washington had urinated on himself. Sgt. Hillis looked into Mr. Washington's cell, saw him handcuffed behind the back—in a cold cell with no blankets or sheets, and with a urine stain on his pants—and told him he would stay that way the whole night.

137. For the rest of the night, while unnecessarily restrained in handcuffs behind his back, Mr. Washington suffered significant physical pain, urinated on himself again, and continued to experience difficulty breathing and burning on his skin from his exposure to chemical agents. Mr. Washington additionally experienced significant dizziness because he was having such a hard time breathing.

138. Due to the handcuffs, Mr. Washington was not able to lie down the entire night. Without blankets, in the cold winter air, Mr. Washington's fingers and toes went numb.

139. On information and belief, Lt. Forget, Sgt. Tocci, and Sgt. Hillis subjected Mr. Washington to this punishment in retaliation for his participation in the BLACC program and the grievances he had filed against SBCC staff.

140. On the morning of January 24, 2020, at around 7:00AM, Mr. Washington was

finally uncuffed and examined by RN Capoccia.

141. RN Capoccia was aware that Mr. Washington was asthmatic because his asthma is well-documented, and also because Mr. Washington was still exhibiting obvious symptoms of asthma, including difficulty breathing. But RN Capoccia failed to provide Mr. Washington with his KOP inhaler or wash off the chemical agents.

142. On information and belief, RN Capoccia's actions were based on Wellpath LLC's policies and customs, including those related to the treatment of patients with asthma, patients with prescriptions for KOP medication, patients exposed to chemical agents, and patients injured following uses of force by prison officers.

143. Mr. Washington was moved back to the cell he was housed in, cell #13, which had not been decontaminated. Still cold, Mr. Washington tried using the blankets in his cell. But he found that his asthma symptoms and the burning sensation on his skin were exacerbated because the blankets and pillow in his cell were still contaminated by the chemical agents. Mr. Washington continued to cough, wheeze, and choke due to exposure to those blankets for days.

144. The stress of the incident further prevented Mr. Washington from sleeping for at least three days.

145. On January 30, 2020, Mr. Washington submitted a separate grievance regarding the January 23–24 incident. The grievance and the resulting appeal were again denied, and Mr. Washington was again informed that an internal investigation revealed no staff misconduct. As with Mr. Washington's previous grievances, Sgt. Tocci shared this confidential grievance with other SBCC staff members in violation of 103 CMR 491.23, which further spread knowledge that Mr. Washington had filed grievances and complaints against SBCC officials and resulted in retaliation against Mr. Washington.

Assaults on March 5, 2020

146. Following the January 2020 assaults, Mr. Washington continued to experience violence, abuse, and racism at the hands of SBCC officials. Mr. Washington submitted several more grievances for this misconduct, but each of these grievances and resulting appeals was denied. As with Mr. Washington's other grievances, Sgt. Tocci shared these confidential grievances with other SBCC staff members in violation of 103 CMR 491.23.

147. In February 2020, Mr. Washington met with state legislators to inform them about the issues occurring at SBCC's North Side, including the retaliatory abuse and violence he himself had experienced. He also met with various journalists from NPR and The Boston Globe in the hopes of raising awareness about the abhorrent conditions inside the prison.

148. The SBCC officers overseeing these visits made clear their hostility towards Mr. Washington's speech. One of these officers, Lt. Deschene, criticized Mr. Washington for engaging in his "usual rants about racism" and threatened him with harm if he did not stop discussing the issues in SBCC with lawmakers and journalists. Undeterred, Mr. Washington continued to speak out. As a result, SBCC staff raised the intensity of their retaliation against Mr. Washington.

149. On March 5, 2020, at about 10:30AM, Lt. Nichols came to Mr. Washington's cell and told him that he would be moved from the M-2 Unit back to the L-2 Unit, where he had previously been housed.

150. Mr. Washington was escorted to his new housing assignment in L-2. Upon arriving at the new cell, Mr. Washington learned that he was to have a cellmate again. Being in a maximum-security facility, he was afraid that the housing assignment would put him in danger and that he could be killed by his cellmate, legitimate fears at SBCC.

151. Out of fear, Mr. Washington refused the housing assignment and requested that he be housed in the Restrictive Housing Unit ("RHU") (that is, solitary confinement) instead.

152. Mr. Washington was brought to the non-contact visiting room and kept there for two hours, without being allowed to urinate, eat, or drink water.

153. At around 1:20PM, Officer Williams escorted Mr. Washington to the RHU and locked him into a strip cage. A strip cage is a small room with metal bars in place of a door.

154. A sergeant then told Mr. Washington that he would be placed in the RHU with a cellmate. Mr. Washington still feared having a cellmate, especially in the RHU. He again requested to be put in a single cell.

155. Mr. Washington was left in the strip cage for another 3 hours. During that time, he was not fed, given water, or permitted to use the bathroom. At some point, Mr. Washington asked a guard if he could use the bathroom, and the guard told him to "piss on the floor."

156. At about 4:00PM or 5:00PM, a mental health worker named Wendy entered, carrying a camera. She stood next to the strip cage and asked Mr. Washington, "Are you complying?" In response, Mr. Washington asked to speak with her about his mental health, which was deteriorating under the stress of the situation. She didn't answer and walked away without providing any treatment.

157. Sometime after, Officer Bashaw, Officer Cacioppo, Officer Gagnon, Officer Gilman, Officer Kalriess, Officer Membrino, Sgt. Rayner, and Officer Simula gathered outside the door to the strip cage. The officers were not wearing name tags and had on helmets that covered their faces, causing difficulty in identifying them. One officer, Sgt. Rayner, was holding a canister of chemical agents, which he pointed at Mr. Washington's face.

158. Mr. Washington put both of his hands above his head and told the officers that

he was complying and that he was asthmatic.

159. Mr. Washington also told the officers that they were not following regulations and that they were required to get a hand-held camera. Officer Kalriess left to get the camera, returned with it, and appeared to begin filming. Mr. Washington repeated for the camera that he had asthma.

160. There was a surveillance camera at the back of the strip cage, and—with his hands still raised—Mr. Washington turned to the back of the strip cage to face that camera. He spoke to the camera, repeating that he had asthma and protesting the use of force he was anticipating.

161. Sgt. Rayner deployed the chemical agents through the gate, hitting Mr. Washington in the back of the head and body. Sgt. Rayner deployed so much chemical agent that the spray pooled on the ground.

162. On information and belief, Superintendent Kenneway and Medical Director Doe ordered Sgt. Rayner to use chemical agents, despite the fact that Mr. Washington is asthmatic and has a well-documented history of asthma.

163. On information and belief, Medical Director Doe's actions were based on Wellpath LLC's policies and customs, including those related to the use of chemical agents against patients with asthma and patients with prescriptions for KOP medication.

164. The officers then opened the gate and rushed into the strip cage. The officers did not cuff Mr. Washington. Instead, they slammed him into the floor. While he was on the floor, the officers twisted his ankle and his ear, kneed him, kicked him, and finally held him to the floor by placing a knee on his neck. His head was in the pool of chemical agents and his lips were contaminated. He could not breathe.

165. The officers got scissors and cut off all of Mr. Washington's clothes, leaving him

dressed only in his boxers.

166. Because Mr. Washington could not walk, a tactical team brought in a gurney. Mr. Washington was lifted up, placed on the gurney, and cuffed to it. He continued to gasp for air and struggle to breathe.

167. Mr. Washington was taken to the SBCC hospital unit. At the unit, medical staff attached him to a nebulizer to restore his breathing. While he was on the nebulizer, Mr. Washington began vomiting and continued struggling to breathe.

168. Mr. Washington was discharged from the SBCC hospital and Officer Bashaw, Officer Cacioppo, Officer Gagnon, Officer Gilman, Officer Kalriess, Officer Membrino, Sgt. Rayner, and Officer Simula carried Mr. Washington to K-3, cell #5, on a gurney. Mr. Washington's hands were cuffed together but not cuffed to the gurney this time. All officers were wearing tactical gear.

169. Upon entering the cell, the officers tipped the gurney to the side and dumped Mr. Washington onto the floor. The officers dragged Mr. Washington—who was still cuffed—to the back of the cell and slammed his head against the steel bedframe.

170. The officers then uncuffed Mr. Washington and began to beat him. The officers hit Mr. Washington on his back, neck, and head.

171. While Mr. Washington was being assaulted, multiple officers called him a "bitch" and a "fucking bitch."

172. The beating caused Mr. Washington's face to bleed, and he eventually passed out in the middle of the cell by the toilet, in a pool of his own blood.

173. Officer Bashaw, Officer Cacioppo, Officer Gagnon, Officer Gilman, Officer Kalriess, Officer Membrino, Sgt. Rayner, and Officer Simula left him on the floor in a pool of

his blood. On information and belief, they did not call for medical treatment.

174. Other prisoners in the K-3 unit banged on their cell doors to call attention to Mr. Washington's condition and in an effort to get Mr. Washington medical treatment for his physical injuries.

175. Mr. Washington regained consciousness. He could not move his legs. He called out for help to officers who were passing by the cell door distributing food on the tier, but the officers ignored him.

176. Hours later, approximately four officers and medical staff arrived with a gurney. The officers put Mr. Washington back in handcuffs, lifted him onto a stretcher, and brought him back to the SBCC hospital.

177. At the hospital, Mr. Washington was put in a hospital bed and suffered bouts of unconsciousness.

178. Mr. Washington was so terrified after the two recent assaults that he could not speak. As a result, a mental health clinician was assigned to him, and he was placed on suicide watch for the night. Staff stripped him naked and put him in a smock, but did not wash off the chemical agents or blood from his face. He was also not given blankets and not allowed to shower off the chemical agents until March 7th.

179. On information and belief, the abuse inflicted on Mr. Washington by Officer Bashaw, Officer Cacioppo, Officer Gagnon, Officer Gilman, Officer Kalriess, Officer Membrino, Sgt. Rayner, and Officer Simula was in retaliation for Mr. Washington's participation in the BLACC program, the grievances he had filed against SBCC officers, and his efforts to speak out about unconstitutional issues in the facility.

180. As a result of the assaults, Mr. Washington suffered injuries to his face and lip.

His ribs and midsection were lacerated, and his wrists were swollen from the handcuffs digging into them. He had difficulty breathing for days after the attack because he was not permitted to wash off the chemical agents.

181. Mr. Washington also suffered feelings of humiliation because of the verbal abuse and because, once placed on suicide watch, he was observed by officers while he was almost naked and freezing. The attacks have caused him to experience constant fear and stress that he could be attacked at any time.

**DOC Policies Governing Use of Force**

182. DOC's written regulations, policies, and procedures closely regulate prison staff's use of force. Along with the United States Constitution, these written rules set strict limits on officers' authority to use force against prisoners.

183. Scrupulous adherence to rules governing the use of force is aimed at protecting incarcerated people from abuse. DOC use of force regulations, 103 CMR 505, define "reasonable force" as "the least amount of force necessary in a manner to carry out" a permissible action. Excessive force is defined as any force that exceeds that minimum amount of force necessary. The regulations prohibit the use of excessive force and the use of force as punishment or discipline. The regulations also require that an employee report any excessive force to a supervisor.

184. DOC also has Standard Operating Procedures for the use of force. These include a Pyramid of Force, which provides guidance on how officers must assess the risk with which they are faced and what defensive or offensive actions are permitted based upon that risk. The Pyramid is intended to ensure that all employees use force that is both reasonable and proportional to the risk facing them.

Case 1:23-cv-10063-MRG Document 26 Filed 01/22/26 Page 34 of 56

185. DOC policy 103 CMR 505.10 (2) and (3) specifically restrict the use of chemical agents. The policy states that chemical agents shall not be used without prior authorization from both the superintendent and the Medical Director. The Medical Director, in particular, shall review the prisoner's medical file to determine if any medical contraindications exist in using chemical agents. All authorizations shall be documented in writing and noted in reports after the incident.

186. DOC has additional requirements that apply to cell extractions, including ordering the prisoner to comply before commencing force (potentially eliminating the need to use force at all), providing medical care as soon as possible for a prisoner injured during a use of force, and immediately decontaminating the prisoner from any chemical agents used. DOC keeps this policy secret from the public and by doing so, shields itself from accountability with respect to enforcement and implementation of the policy.

187. After force is used, all staff who used or witnessed the force are required, by the end of their shift, to submit a report describing the incident in detail. All incident reports corresponding to a use of force, together with the reporting forms filled out by the higher-ranking staff and administrators and all video and other documents, are compiled into a Use of Force package. To ensure compliance with governing law and policies, the Superintendent must review and approve all Use of Force packages related to the prison they manage. The Director of Special Operations must review all Use of Force packages throughout DOC.

188. DOC has additional policies regarding the use of force in certain circumstances that, like many of its other policies, DOC refuses to disclose to the public. These include the Disorder Management Policy, Forced Movement of Inmates, and policies governing the use of the Special Operations tactical and special response teams, and the use of K9s and specialty

impact weapons. Commissioner Mici declared a Major Disorder following the incident on January 10, 2020, thus invoking the Disorder Management Policy.

## CLAIMS FOR RELIEF

### COUNT I
### 42 U.S.C. §1983 – Eighth Amendment – Excessive Use of Force
### Against Sgt. Barnes, Officer Bashaw, Officer Cacioppo, Officer Catalano, Officer Cummings, Lt. Deschene, Officer Dumont, Officer Fonseca, Lt. Forget, Officer Gagnon, Officer Gilman, Sgt. Hillis, Officer Hollenbach, Officer Kalriess, Superintendent Kenneway, Officer Lawson, Officer Membrino, Sgt. Owen, Officer Pepoli, Sgt. Rayner, Officer Shepherd, Officer Simula, Sgt. Tocci, Medical Director Doe, Wellpath Litigation Trust, and Matthew J. Dundon As Trustee of the Wellpath Litigation Trust

189. Mr. Washington incorporates each paragraph of this Complaint as if fully restated here.

190. ***January 21, 2020 Incident.*** Defendants Sgt. Barnes, Officer Catalano, Officer Cummings, Officer Dumont, Officer Fonseca, Officer Hollenbach, Officer Lawson, Sgt. Owen, and Officer Shepherd violated Mr. Washington's right to be free from the unnecessary and wanton infliction of pain through their excessive use of force against Mr. Washington on January 21, 2020.

191. Sgt. Barnes, Officer Catalano, Officer Cummings, Officer Dumont, Officer Fonseca, Officer Hollenbach, Officer Lawson, Sgt. Owen, Officer Pepoli, and Officer Shepherd used more than *de minimis* force against Mr. Washington when they tased, punched, choked, and otherwise beat him.

192. Further, Defendants used force maliciously and sadistically, as indicated by, *inter alia*, the facts that: Mr. Washington was not resisting; the force used—namely punching, choking and tasing—was disproportionate to address Mr. Washington's momentary verbal refusal to enter a filthy cell; Defendants were shouting racial slurs, including "black ass" and "nigger," at Mr. Washington during the assaults; and, during the first assault on January 21,

2020, Mr. Washington was handcuffed and shackled.

193. As a result of Defendants' excessive force, Mr. Washington experienced severe emotional distress, humiliation, and fear for his life; regular flashbacks that caused Mr. Washington severe depression and shortness of breath; nightmares; and difficulty sleeping.

194. ***January 23, 2020 Incident.*** Defendant Lt. Deschene violated Mr. Washington's right to be free from the unnecessary and wanton infliction of pain through his excessive use of force against Mr. Washington on January 23, 2020.

195. Lt. Deschene used more than *de minimis* force when he deployed chemical agents against Mr. Washington on January 23, 2020.

196. The force used was malicious and sadistic, as indicated by, *inter alia*, the fact that it was unnecessary and disproportionate, because Mr. Washington was on his top bunk and not posing any threat to safety, and in violation of DOC policy 103 CMR 505.10(2)–(3), as Lt. Deschene did not get clearance from supervisors before deploying chemical agents. Lt. Deschene knew that Mr. Washington was asthmatic, and deployed the chemical agents anyways. He knew Mr. Washington was asthmatic because: Mr. Washington told him so; officers of Lt. Deschene's rank are responsible for knowing prisoners' medical needs, and Mr. Washington's asthma is well-documented; and Mr. Washington also previously sued and won against DOC for using chemical agents against him despite his medical condition.

197. As a result of Lt. Deschene's excessive force, Mr. Washington suffered chemical burns on his skin, dizziness, difficulty breathing, and recurrent asthma attacks for a week and a half.

198. ***January 23-24, 2020 Incident.*** Defendants Lt. Forget, Sgt. Tocci, and Sgt. Hillis violated Mr. Washington's right to be free from the unnecessary and wanton infliction of pain

on the night of January 23, 2020 into January 24, 2020.

199. Defendants Lt. Forget, Sgt. Tocci, and Sgt. Hillis used more than *de minimis* force against Mr. Washington when they kept him handcuffed behind his back for five hours from January 23 to January 24, 2020.

200. They applied that force maliciously and sadistically, as indicated by, *inter alia*, the facts that Mr. Washington was inside a secure cell, making handcuffs unnecessary; Defendant Lt. Forget repeatedly yanked on Mr. Washington's wrists so hard they started to bleed; Defendants left Mr. Washington in handcuffs for five hours; and Defendants taunted Mr. Washington and joked about leaving him in handcuffs all night.

201. As a result of Defendants' excessive force, Mr. Washington experienced severe emotional distress, humiliation, fear for his life, and loss of sleep for at least three days.

202. ***March 5, 2020 Incident.*** Defendants Officer Bashaw, Officer Cacioppo, Officer Gagnon, Officer Gilman, Officer Kalriess, Officer Membrino, Sgt. Rayner, and Officer Simula violated Mr. Washington's right to be free from the unnecessary and wanton infliction of pain on March 5, 2020.

203. Defendant Sgt. Rayner used more than *de minimis* force against Mr. Washington when he deployed chemical agents against Mr. Washington. Defendant Sgt. Rayner used force maliciously and sadistically, as indicated by, *inter alia*, the facts that: Mr. Washington was in a secure strip cell, making chemical agents unnecessary; and Defendant knew that Mr. Washington was asthmatic because his asthma is well-documented and because Mr. Washington told him so.

204. Superintendent Kenneway and Medical Director Doe used more than *de minimis* force when they ordered Sgt. Rayner to deploy chemical agents against Mr. Washington. *See*

103 CMR 505.10(2)–(3) (Superintendent and Medical Director must authorize use of chemical agents). Defendants Kenneway and Medical Director Doe ordered that force maliciously and sadistically, as indicated by, *inter alia*, the facts that: Mr. Washington was in a secure strip cell; he has a well-documented diagnosis of asthma; Defendants knew Mr. Washington was asthmatic; and Defendants nonetheless ordered the use of chemical agents against him.

205. On information and belief, Medical Director Doe's actions were based on Wellpath LLC's policies and customs, including those related to the use of chemical agents against patients with asthma and patients with prescriptions for KOP medication. Wellpath LLC knew or should have known that its policies and customs failed to adequately train Medical Director Doe, but it exhibited excessive use of force to the unconstitutional effects of those inadequacies.

206. Defendants Officer Bashaw, Officer Cacioppo, Officer Gagnon, Officer Gilman, Officer Kalriess, Officer Membrino, and Officer Simula used more than *de minimis* force against Mr. Washington when they punched, choked, and otherwise beat him after chemical agents were deployed. Defendants used force maliciously and sadistically, as indicated by, *inter alia*, the facts that: Mr. Washington was restrained in a secure strip cell, making the force unnecessary; and the force (punching, choking, beating) was disproportionate to the situation (Mr. Washington was verbally refusing a cell assignment).

207. Defendants Officer Bashaw, Officer Cacioppo, Officer Gagnon, Officer Gilman, Officer Membrino, Sgt. Rayner, and Officer Simula used more than *de minimis* force against Mr. Washington when they punched, choked, and otherwise beat Mr. Washington inside the cell in K-3 after he was returned from the SBCC hospital unit. Defendants used force maliciously and sadistically, as indicated by, *inter alia*, the facts that: Mr. Washington was in a secure cell,

cuffed behind his back, and not posing any safety threat; Defendants punched Mr. Washington anyways, and to a point of unconsciousness; and Defendants left Mr. Washington, bleeding and unconscious on the floor of his cell, and did not get him medical attention.

208. As a result of Defendants' excessive force, Mr. Washington suffered severe injuries to his face, lip, ribs, midsection, and wrists. Mr. Washington also endured severe emotional distress and humiliation, causing him to experience constant fear of attack and suicidal ideation.

**COUNT II**
**42 U.S.C. § 1983 – Fourteenth Amendment – Failure to Intervene**
**Against Officer Pepoli and Officer Kalriess**

209. Mr. Washington incorporates each paragraph of this Complaint as if fully restated here.

210. ***January 21, 2020 Incident.*** On January 21, 2020, Defendant Officer Pepoli witnessed an attack on Mr. Washington at SBCC.

211. The use of force—namely punching, choking, and tasing—by Sgt. Barnes, Officer Catalano, Officer Cummings, Officer Dumont, Officer Fonseca, Officer Hollenbach, Officer Lawson, Sgt. Owen, and Officer Shepherd against Mr. Washington was excessive and violated Mr. Washington's constitutional rights.

212. Officer Pepoli was in the immediate proximity of the attack and could have intervened to prevent the use of excessive force. Instead, Officer Pepoli merely stood by and recorded the punching, choking, and beating of Mr. Washington in conscious disregard of Mr. Washington's health and safety.

213. As a result of Officer Pepoli's failure to intervene, Mr. Washington experienced severe emotional distress, humiliation, and fear for his life; regular flashbacks that caused Mr. Washington severe depression and shortness of breath; nightmares; and difficulty sleeping.

214. ***March 5, 2020 Incident.*** On March 5, 2020, Defendant Officer Kalriess witnessed an attack on Mr. Washington at SBCC.

215. The use of force—namely punching, choking, and beating—by Officer Bashaw, Officer Cacioppo, Officer Gagnon, Officer Gilman, Officer Membrino, and Officer Simula against Mr. Washington was excessive and violated Mr. Washington's constitutional rights.

216. Officer Kalriess was in the immediate proximity of the attack and could have intervened to prevent the use of excessive force. Instead, Officer Kalriess merely stood by and recorded the punching, choking, and beating of Mr. Washington in conscious disregard of Mr. Washington's health and safety.

217. As a result of Officer Kalriess's failure to intervene, Mr. Washington suffered severe injuries to his face, lip, ribs, midsection, and wrists. Mr. Washington also endured severe emotional distress and humiliation, causing him to experience constant fear of attack and suicidal ideation.

218. By failing to intervene and prevent the violence against Mr. Washington, Officer Pepoli and Officer Kalriess violated the Fourteenth Amendment of the United States Constitution.

**COUNT III**
**Intentional Torts – Assault & Battery**
**Against Sgt. Barnes, Officer Bashaw, Officer Cacioppo, Officer Catalano, Officer Cummings, Lt. Deschene, Officer Dumont, Officer Fonseca, Lt. Forget, Officer Gagnon, Officer Gilman, Sgt. Hillis, Officer Hollenbach, Officer Kalriess, Officer Lawson, Officer Membrino, Sgt. Owen, Officer Pepoli, Sgt. Rayner, Officer Shepherd, Officer Simula and Sgt. Tocci**

219. Mr. Washington incorporates each paragraph of this Complaint as if fully restated here.

220. ***January 21, 2020 Incident.*** Defendants Sgt. Barnes, Officer Catalano, Officer Cummings, Officer Dumont, Officer Fonseca, Officer Hollenbach, Officer Lawson, Sgt. Owen, Officer Pepoli, and Officer Shepherd committed the intentional torts of assault and battery when

they used intentional, unjustified, and unreasonable force against Mr. Washington on January 21, 2020.

221. Sgt. Barnes, Officer Catalano, Officer Cummings, Officer Dumont, Officer Fonseca, Officer Hollenbach, Officer Lawson, Sgt. Owen, Officer Pepoli, and Officer Shepherd, tased, punched, choked, and otherwise beat Mr. Washington, which is more than *de minimis* force.

222. Defendants were malicious and sadistic, as indicated by, *inter alia*, the facts that: Mr. Washington was not resisting; the force used was disproportionate; Defendants were shouting racial slurs, including "black ass" and "nigger," at Mr. Washington during the assaults; and, during the first assault on January 21, 2020, Mr. Washington was handcuffed and shackled.

223. As a result of Defendants' assault and battery, Mr. Washington experienced severe emotional distress, humiliation, and fear for his life; regular flashbacks that cause Mr. Washington severe depression and shortness of breath; nightmares; and difficulty sleeping.

224. ***January 23, 2020 Incident.*** Defendant Lt. Deschene committed the intentional torts of assault and battery when he used intentional, unjustified, and unreasonable force against Mr. Washington on January 23, 2020.

225. Lt. Deschene used chemical agents, which is more than *de minimis* force.

226. Lt. Deschene was malicious and sadistic, as indicated by, *inter alia*, the fact that the force he used was unnecessary and disproportionate, because Mr. Washington was on his top bunk and not posing any threat to safety, and in violation of DOC policy 103 CMR 505.10(2)–(3), as Lt. Deschene did not get clearance from supervisors first. Lt. Deschene also knew that Mr. Washington was asthmatic, and deployed the chemical agents anyways. He knew Mr. Washington was asthmatic because: Mr. Washington told him so; officers of Lt. Deschene's

rank are responsible for knowing prisoners' medical needs, and Mr. Washington's asthma is well-documented; and Mr. Washington also previously sued and won against DOC for using chemical agents against him despite his medical condition.

227. As a result of Lt. Deschene's assault and battery, Mr. Washington suffered chemical burns on his skin, dizziness, difficulty breathing, and recurrent asthma attacks for a week and a half.

228. ***January 23-24, 2020 Incident.*** Defendants Lt. Forget, Sgt. Tocci, and Sgt. Hillis committed the intentional torts of assault and battery when they used intentional, unjustified, and unreasonable force against Mr. Washington from January 23 to 24, 2020.

229. Defendants Lt. Forget, Sgt. Tocci, and Sgt. Hillis used more than *de minimis* force against Mr. Washington when they kept him handcuffed behind his back for five hours from January 23 to January 24, 2020.

230. They applied that force maliciously and sadistically, as indicated by, *inter alia*, the fact that Mr. Washington was inside a secure cell, making handcuffs unnecessary; Defendant Lt. Forget repeatedly yanked on Mr. Washington's wrists so hard they started to bleed; Defendants left Mr. Washington in handcuffs for five hours; and Defendants taunted Mr. Washington and joked about leaving him in handcuffs all night.

231. As a result of Defendants' assault and battery, Mr. Washington experienced severe emotional distress, humiliation, fear for his life, and loss of sleep for at least three days.

232. ***March 5, 2020 Incident.*** Defendants Officer Bashaw, Officer Cacioppo, Officer Gagnon, Officer Gilman, Officer Kalriess, Officer Membrino, Sgt. Rayner, and Officer Simula committed the intentional torts of assault and battery when they used intentional, unjustified, and unreasonable force against Mr. Washington on March 5, 2020.

233. Defendant Sgt. Rayner used more than *de minimis* force against Mr. Washington when he deployed chemical agents against Mr. Washington. He used force maliciously and sadistically, as indicated by, *inter alia*, the facts that Mr. Washington was in a secure strip cell, making chemical agents unnecessary, and also that Sgt. Rayner knew that Mr. Washington was asthmatic because Mr. Washington told him so.

234. Defendants Officer Bashaw, Officer Cacioppo, Officer Gagnon, Officer Gilman, Officer Kalriess, Officer Membrino, and Officer Simula used more than *de minimis* force against Mr. Washington when they punched, choked, and beat him after chemical agents were deployed. Their use of force was malicious and sadistic, as indicated by, *inter alia*, the facts that: Mr. Washington was restrained in a secure strip cell, and the force used (punching, choking, beating) was disproportionate to the situation (Mr. Washington was verbally refusing a cell assignment).

235. Defendants Officer Bashaw, Officer Cacioppo, Officer Gagnon, Officer Gilman, Officer Kalriess, Officer Membrino, Sgt. Rayner, and Officer Simula used more than *de minimis* force against Mr. Washington when they punched, choked, and beat Mr. Washington inside the cell in K-3 after he was returned from the SBCC hospital unit. Defendants used force maliciously and sadistically, as indicated by, *inter alia*, the facts that: Mr. Washington was in a secure cell, cuffed behind his back, and not posing any safety threat; Defendants punched Mr. Washington anyways, and to a point of unconsciousness; and Defendants left Mr. Washington bleeding and unconscious on the floor of his cell, and did not get him medical attention.

236. As a result of Defendants' assault and battery, Mr. Washington suffered severe injuries to his face, lip, ribs, midsection, and wrists. Mr. Washington also endured severe emotional distress and humiliation, causing him to experience constant fear of attack and suicidal ideation.

## COUNT IV
**Intentional Tort – Intentional Infliction of Emotional Distress**
**Against Sgt. Barnes, Officer Bashaw, Officer Cacioppo, Officer Catalano, Officer Cummings, Officer Dumont, Officer Fonseca, Officer Gagnon, Officer Gilman, Officer Hollenbach, Officer Kalriess, Officer Lawson, Officer Membrino, Sgt. Owen, Officer Pepoli, Sgt. Rayner, Officer Shepherd, and Officer Simula**

237. Mr. Washington incorporates each paragraph of this Complaint as if fully restated here.

238. ***January 21, 2020 Incident.*** Defendants Sgt. Barnes, Officer Catalano, Officer Cummings, Officer Dumont, Officer Fonseca, Officer Hollenbach, Officer Lawson, Sgt. Owen, Officer Pepoli, and Officer Shepherd inflicted emotional distress on Mr. Washington on January 21, 2020. Defendants beat Mr. Washington, while calling him "black ass," "nigger," and other slurs.

239. ***March 5, 2020 Incident.*** Defendants Officer Bashaw, Officer Cacioppo, Officer Gagnon, Officer Gilman, Officer Kalriess, Officer Membrino, Sgt. Rayner, and Officer Simula inflicted emotional distress on Mr. Washington on March 5, 2020. Defendants repeatedly assaulted Mr. Washington by spraying him with chemical agents while his hands were up; punching and kneeing his body, kneeling on his neck cutting off his air supply and pressing his face into the pool of chemical agents on the floor; brutally punching him and banging his head on the tile floor while calling him "bitch" and other slurs, then leaving him unconscious and bleeding out in his cell without calling for medical attention.

240. This verbal and physical abuse was extreme and outrageous, and Defendants intended (or, at the very least) should have known that the combination of threats, slurs, actual physical violence and leaving Mr. Washington for dead would likely cause Mr. Washington emotional distress—as, in fact, it did.

241. As a result of Defendants' behavior, Mr. Washington suffered humiliation, fear

for his life, hyperventilation, and loss of sleep.

**COUNT V**
**42 U.S.C. § 1983 – First Amendment – Retaliation**
**Against Sgt. Barnes, Officer Catalano, Officer Cummings, Officer Dumont, Officer Fonseca, Officer Hollenbach, Officer Lawson, Sgt. Owen, Officer Shepherd, Officer Pepoli, Lt. Deschene, Lt. Forget, Sgt. Tocci, Sgt. Hillis, Defendants Officer Bashaw, Officer Cacioppo, Officer Gagnon, Officer Gilman, Officer Membrino, Sgt. Rayner, Officer Simula, Superintendent Kenneway, Officer Kalriess, and Medical Director Doe**

242. Mr. Washington incorporates each paragraph of this Complaint as if fully restated here.

243. During his time at SBCC, Mr. Washington has been an outspoken activist for racial justice in the prison. In May or June 2019, Mr. Washington initiated and served as Chairman of the BLACC self-improvement program, which was approved by Defendant Superintendent Kenneway and which held its first meeting in October 13, 2019. Mr. Washington's participation in the BLACC program was a constitutionally protected activity under the First Amendment.

244. SBCC officers quickly expressed hostility towards the BLACC program, criticizing its name and its mission for better treatment in the prison. As payback for initiating the BLACC program, Mr. Washington experienced numerous instances of retaliation at the hands of SBCC officers, including an unwarranted strip search in November 2019; theft of his property in December 2019; termination from his library job; and ultimately prohibition from participation in BLACC, which caused the program to collapse.

245. Mr. Washington filed multiple grievances between November 2019 and January 2020 detailing this mistreatment. He also sent an email to his close friends both inside and outside SBCC describing the concerted retaliatory actions by officers and administrators that occurred since Mr. Washington initiated the BLACC program in October 2019. These activities were likewise constitutionally protected under the First Amendment.

246. Unbeknownst to Mr. Washington, SBCC officials, specifically Defendant Sgt. Tocci, circulated Mr. Washington's confidential grievances and his email amongst other SBCC staff members without consent. This caused knowledge of Mr. Washington's grievances and complaints against SBCC officials to become widespread, resulting in further retaliation against Mr. Washington.

247. As further retaliation for the BLACC program and Mr. Washington's grievances, Defendants engaged in adverse actions against Mr. Washington, including but not limited to:

a. On January 21, 2020, Defendants Sgt. Barnes, Officer Catalano, Officer Cummings, Officer Dumont, Officer Fonseca, Officer Hollenbach, Officer Lawson, Sgt. Owen, Officer Shepherd, and Officer Pepoli used excessive and unwarranted force to tase, punch, choke and otherwise beat Mr. Washington while transferring him to a new housing unit shared by an unknown cellmate with a serious mental illness. The officers also subjected Mr. Washington to threats and verbal abuse, calling him "black ass," "nigger," and other slurs.

b. On January 23, 2020, Defendant Lt. Deschene deployed chemical agents towards Mr. Washington's hands and face. Upon Mr. Washington's return to the new cell after being treated at the SBCC hospital, Lt. Forget, Sgt. Tocci, and Sgt. Hillis inflicted further injuries on Mr. Washington by keeping him handcuffed and exposing him to cold air without any blankets for over five hours.

248. Following the January 2020 assaults, Mr. Washington filed multiple grievances detailing the mistreatment he experienced. He also met with state legislators and journalists to inform them about the culture of violence, abuse, and racism within SBCC's North Side. Both of these activities were constitutionally protected under the First Amendment.

249. Sgt. Tocci continued to share Mr. Washington's confidential grievances with other SBCC staff members, in violation of DOC policy 103 CMR 491.23. As a result, Defendants engaged in adverse actions against Mr. Washington for these constitutionally protected activities, including but not limited to:

a. On March 5, 2020, Defendant Sgt. Rayner, as ordered by Defendants Superintendent Kenneway and Medical Director Doe, used excessive and unwarranted force in deploying chemical agents against Mr. Washington.

b. Thereafter, Defendants Officer Bashaw, Officer Cacioppo, Officer Gagnon, Officer Gilman, Officer Kalriess, Officer Membrino, Sgt. Rayner, and Officer Simula used excessive and unwarranted force to punch, choke, and otherwise beat Mr. Washington while moving him to a new housing unit. The officers also subjected Mr. Washington to threats and verbal abuse, calling him a "bitch" and other slurs.

c. Following Mr. Washington's treatment at the SBCC hospital unit for injuries sustained from the first beating, Defendants Officer Bashaw, Officer Cacioppo, Officer Gagnon, Officer Gilman, Officer Kalriess, Officer Membrino, Sgt. Rayner, and Officer Simula again used excessive and unwarranted force to punch, choke, and otherwise beat Mr. Washington after escorting him to the K-3 cell, leaving him bleeding and unconscious on the floor without giving him medical attention.

250. Defendants subjected Mr. Washington to this treatment with the improper motive of punishing Mr. Washington for engaging in protected activities—namely, participating in the BLACC program, filing grievances, and speaking out against mistreatment and abuse by SBCC

officials. But for this improper motive, Defendants would not have inflicted this harm on Mr. Washington.

**COUNT VI**
**42 U.S.C. § 1983 – Eighth Amendment – Deliberate Indifference**
**Against Nurse Doe, Nurse Capoccia, Wellpath Litigation Trust, and Matthew J. Dundon As Trustee of the Wellpath Litigation Trust**

251. Mr. Washington incorporates each paragraph of this Complaint as if fully restated here.

252. ***January 23, 2020 Incident.*** On January 23, 2020, Mr. Washington—who is asthmatic—was exposed to chemical agents. Nurse Doe examined Mr. Washington at the SBCC hospital and observed him experiencing a severe asthma attack. Despite his well-documented history of asthma and his obvious need for treatment, Nurse Doe discharged Mr. Washington without decontaminating him or permitting him his inhaler. As a result, Mr. Washington continued to experience asthma attacks, and was at substantial risk of even more serious complications related to his condition.

253. On information and belief, Nurse Doe's actions were based on Wellpath LLC's policies and customs, including those related to the treatment of patients with asthma, patients with prescriptions for KOP medication, patients exposed to chemical agents, and patients injured following uses of force by prison officers. Wellpath LLC knew or should have known that its policies and customs failed to adequately train Nurse Doe, but it exhibited deliberate indifference to the unconstitutional effects of those inadequacies.

254. As a result of Nurse Doe's deliberate indifference to Mr. Washington's medical needs, Mr. Washington experienced chemical burns, dizziness, difficulty breathing, and recurrent asthma attacks for a week and a half.

255. ***January 24, 2020 Incident.*** On the morning of January 24, 2020, Nurse Capoccia

examined Mr. Washington, who had been exposed to chemical agents the night before, but had not been provided with an inhaler or decontaminated. Mr. Washington was struggling to breathe and at substantial risk of experiencing further asthma attacks. Despite his well-documented history of asthma and the obvious need for immediate treatment, Nurse Capoccia failed to decontaminate him or provide him with a KOP Inhaler. As a result, Mr. Washington continued to experience asthma attacks, and was at substantial risk of even more serious complications related to his condition.

256. On information and belief, Nurse Capoccia's actions were based on Wellpath LLC's policies and customs, including those related to the treatment of patients with asthma, patients with prescriptions for KOP medication, patients exposed to chemical agents, and patients injured following uses of force by prison officers. Wellpath LLC knew or should have known that its policies and customs failed to adequately train Nurse Capoccia, but it exhibited deliberate indifference to the unconstitutional effects of those inadequacies.

257. As a result of Nurse Capoccia's deliberate indifference to Mr. Washington's medical needs, Mr. Washington experienced chemical burns, dizziness, difficulty breathing, recurrent asthma attacks, and loss of sleep for at least three days.

258. Defendants Nurse Doe and Nurse Capoccia were deliberately indifferent to Mr. Washington's serious medical needs, subjecting him to cruel and unusual punishment in violation of the Eighth Amendment.

**COUNT VII**
**42 U.S.C. § 12102 – Americans with Disabilities Act, Title II**
**Against DOC**

259. Mr. Washington incorporates each paragraph of this Complaint as if fully restated here.

260. DOC (by and through the individual Defendants acting in their official capacities)

is a public entity as defined in 42 U.S.C. § 12131(1)(A).

261. Mr. Washington has asthma, a condition whose symptoms include difficulty breathing. When Mr. Washington is experiencing symptoms of his asthma, he is unable to recreate, sleep, or do almost anything else. His asthma makes him "substantially limited" in "one or more of his major life activities," qualifying him as an individual with a disability within the meaning of the Americans with Disabilities Act. 42 U.S.C. §§ 12102(1)(A). Specifically, when Mr. Washington experiences symptoms, he is "substantially limit[ed]" in his ability "to perform a major life activity as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(l). Because of his disability, Mr. Washington was denied equal access to the programs, services, and activities provided by DOC and Wellpath LLC employees at SBCC. *See* 42 U.S.C. §§ 12131(2). Specifically, he was denied equal access to the safe use of force.

262. ***January 23, 2020 Incident.*** Lt. Deschene, a DOC employee, deployed chemical agents against Mr. Washington on January 23, 2020, despite Mr. Washington's documented disability and express request, and without effort to make accommodations for that disability. Subsequently, Nurse Doe discharged Mr. Washington without decontaminating him or permitting him his inhaler, against despite Mr. Washington's express request. As a result, Mr. Washington continued to experience asthma attacks, and was at substantial risk of even more serious complications related to his condition.

263. ***January 24, 2020 Incident.*** Despite Mr. Washington's well-documented history of asthma, knowing he was exposed to chemical agents the night before, and his obvious need for immediate treatment, Nurse Capoccia failed to decontaminate Mr. Washington or provide him with a KOP Inhaler, despite Mr. Washington's express request. As a result, Mr. Washington continued to experience asthma attacks, and was at substantial risk of even more serious

complications related to his condition.

264. ***March 5, 2020 Incident.*** Sgt. Rayner, a DOC employee, deployed chemical agents against Mr. Washington on March 5, 2020, despite Mr. Washington's documented disability and express request, and without effort to make accommodations for that disability.

265. Superintendent Kenneway and Medical Director Doe also ordered Sgt. Rayner to use chemical agents, despite Mr. Washington's documented disability and without providing reasonable accommodations for the use of force. *See* 103 CMR 505.10(2)–(3).

266. With respect to both January 23, January 24, and March 5, 2020 incidents, DOC and Wellpath LLC violated the ADA by failing to make "reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability." 28 C.F.R. §§ 35.130(b)(7).

267. Lt. Deschene's and Sgt. Rayner's actions were in contravention of prison policy, and Nurse Doe's, Nurse Capoccia's, and Medical Director Doe's actions were in contravention of prison and Wellpath LLC policy, and so constituted an unlawful and discriminatory practice; or their actions were consistent with policy, meaning that the policy is discriminatory and defective.

268. Lt. Deschene, Sgt. Rayner, Nurse Doe, Nurse Capoccia, and Medical Director Doe, moreover, knew of Mr. Washington's disability because his condition was well-documented in his medical records; because he had previously sued DOC, successfully, for failing to accommodate his disability; because he has previously filed grievances explaining how the use of chemical agents exacerbated his asthma, and because he told them Lt. Deschene and Sgt. Rayner that he was asthmatic when Lt. Deschene and Sgt. Rayner exposed him to chemical agents, and Lt. Deschene and Sgt. Rayner continued to do so anyways.

269. DOC employees' failure to accommodate Mr. Washington's asthma caused him to suffer asthma attacks, which prevented him from sleeping, breathing, walking, or doing virtually anything else without significant pain.

**COUNT VIII**
**Section 504 of the Rehabilitation Act, 29 U.S.C. § 794a**
**Against DOC, Wellpath Litigation Trust, and Matthew J. Dundon As Trustee of the Wellpath Litigation Trust**

270. Mr. Washington incorporates each paragraph of this Complaint as if fully restated here.

271. Section 504 of the Rehabilitation Act, codified at 29 U.S.C. § 701 et seq., states that "no qualified individual with a disability in the United States shall be excluded from, denied the benefits of, or be subjected to discrimination under" any program or activity that receives federal financial assistance.

272. During the times operative in this complaint, DOC and Wellpath LLC received federal financial assistance and are subject to the Rehabilitation Act.

273. Mr. Washington has asthma, a condition whose symptoms include difficulty breathing. When Mr. Washington is experiencing symptoms of his asthma, he is unable to recreate, sleep, or do almost anything else. Asthma is a "disability" under the Rehabilitation Act. 29 U.S.C. § 705(20)(B); 42 U.S.C. §§ 12102 and 12131(2); 28 C.F.R. § 35.108 (the phrase "physical or mental impairment means . . . [a]ny physiological disorder . . . affecting one or more body systems, such as . . . respiratory"). His asthma makes him "substantially limited" in "one or more of his major life activities," qualifying him as an individual with a disability within the meaning of the Americans with Disabilities Act. 42 U.S.C. §§ 12102(1)(A). Specifically, when Mr. Washington experiences symptoms, he is "substantially limit[ed]" in his ability "to perform a major life activity as compared to most people in the general population." 29 C.F.R. §

1630.2(j)(l). Solely because of his disability, Mr. Washington was denied equal access to the programs, services, and activities provided by DOC and Wellpath LLC employees at SBCC. *See* 42 U.S.C. §§ 12131(2). Specifically, he was denied equal access to the safe use of force.

274. DOC and Wellpath programs and activities are covered by Section 504, 29 U.S.C. § 794(b)(1). These programs and activities that DOC and Wellpath provide to prisoners in its custody include, but are not limited to, safe use of force.

275. ***January 23, 2020 Incident.*** Lt. Deschene, a DOC employee, deployed chemical agents against Mr. Washington on January 23, 2020, despite Mr. Washington's documented disability and express request, and without effort to make accommodations for that disability. Subsequently, Nurse Doe, a Wellpath LLC employee, discharged Mr. Washington without decontaminating him or permitting him his inhaler, against despite Mr. Washington's express request. As a result, Mr. Washington continued to experience asthma attacks, and was at substantial risk of even more serious complications related to his condition.

276. ***January 24, 2020 Incident.*** Despite Mr. Washington's well-documented history of asthma, knowing he was exposed to chemical agents the night before, and his obvious need for immediate treatment, Nurse Capoccia, a Wellpath LLC employee, failed to decontaminate Mr. Washington or provide him with a KOP Inhaler, despite Mr. Washington's express request. As a result, Mr. Washington continued to experience asthma attacks, and was at substantial risk of even more serious complications related to his condition.

277. ***March 5, 2020 Incident.*** Sgt. Rayner, a DOC employee, deployed chemical agents against Mr. Washington on March 5, 2020, despite Mr. Washington's documented disability and express request, and without effort to make accommodations for that disability.

278. Superintendent Kenneway and Medical Director Doe also ordered Sgt. Rayner to

use chemical agents, despite Mr. Washington's documented disability and without providing reasonable accommodations for the use of force. *See* 103 CMR 505.10(2)–(3).

279. With respect to both January 23, January 24, and March 5, 2020 incidents, DOC and Wellpath LLC violated the ADA by failing to make "reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability." 28 C.F.R. §§ 35.130(b)(7).

280. Lt. Deschene's and Sgt. Rayner's actions were in contravention of prison policy, and Nurse Doe's, Nurse Capoccia's, and Medical Director Doe's actions were in contravention of prison and Wellpath LLC policy, and so constituted an unlawful and discriminatory practice; or their actions were consistent with policy, meaning that the policy is discriminatory and defective.

281. Lt. Deschene, Sgt. Rayner, Nurse Doe, Nurse Capoccia, and Medical Director Doe, moreover, knew of Mr. Washington's disability because his condition was well-documented in his medical records; because he had previously sued DOC, successfully, for failing to accommodate his disability; because he has previously filed grievances explaining how the use of chemical agents exacerbated his asthma, and because he told them Lt. Deschene and Sgt. Rayner that he was asthmatic when Lt. Deschene and Sgt. Rayner exposed him to chemical agents, and Lt. Deschene and Sgt. Rayner continued to do so anyways.

282. DOC employees' failure to accommodate Mr. Washington's asthma caused him to suffer asthma attacks, which prevented him from sleeping, breathing, walking, or doing virtually anything else without significant pain.

## REQUEST FOR RELIEF

a. Enter judgment in favor of Plaintiff and against Defendants.

b. Award Plaintiff compensatory damages for physical injury and pain and suffering under the First and Eighth Amendments.

c. Award Plaintiff punitive damages under the First and Eighth Amendments.

d. Award Plaintiff compensatory damages under the ADA and the Rehabilitation Act.

e. Award Plaintiff's costs and reasonable attorney's fees as allowed by law.

f. Award any other relief this Court deems just, equitable, and proper.

Dated: January 28, 2026

Respectfully submitted,

*/s/ Sabina Mariella*

Sabina Mariella (*pro hac vice*)
John Lyons (BBO No. 569500)
Katherine Zhang (*pro hac vice*)
Jayden Rush (*pro hac vice*)
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, NY 10001
(t) +1 212 446 2300
(f) +1 212 446 2380
smariella@bsfllp.com
jlyons@bsfllp.com
kzhang@bsfllp.com
jrush@bsfllp.com

Lillian Novak (*pro hac vice*)
Derrick Luster (*pro hac vice*)
RIGHTS BEHIND BARS
1800 M Street NW FNT 1 #33821
Washington, DC 20033
(t) +1 202 455 4399
lily@rightsbehindbars.org
derrick@rightsbehindbars.org

*Attorneys for Plaintiff*