# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Civil Case No. 1:23-cv-10063

-----------------------------------x

DERRICK WASHINGTON,

Plaintiff,

v.

MASSACHUSETTS DEPARTMENT OF CORRECTIONS, WELLPATH LIQUIDATING TRUST, MATTHEW J. DUNDON AS TRUSTEE OF THE WELLPATH LIQUIDATING TRUST, SUPERINTENDENT STEVE KENNEWAY, LIEUTENANT ROBERT DESCHENE, LIEUTENANT ARTHUR FORGET, SERGEANT RYAN HILLIS, SERGEANT THOMAS TOCCI, OFFICER ANTHONY CATALANO, OFFICER JOSHUA GAGNON, NURSE CHRISTIAN CAPOCCIA, SERGEANT ARTHUR BARNES, OFFICER JOSEPH CUMMINGS, OFFICER NICHOLAS DUMONT, OFFICER ZACHARY FONSECA, OFFICER DANIEL HOLLENBACH, OFFICER ERIC LAWSON, SERGEANT NATHAN OWEN, OFFICER CORY SHEPHERD, OFFICER JEFFREY PEPOLI, SERGEANT BRIAN RAYNER, OFFICER ROBERT BASHAW, OFFICER RAYMOND SIMULA, OFFICER SERGIO CACIOPPO, OFFICER THOMAS MEMBRINO, OFFICER DAVID GILMAN, OFFICER RYAN KALRIESS, MEDICAL DIRECTOR DOE, AND NURSE DOE,

Defendants.

-----------------------------------x

VIDEOTAPED DEPOSITION OF CHRISTIAN CAPOCCIA
August 13, 2026

Q. Okay. Are there any papers or notes in front of you right now?

A. No.

Q. Okay. Great.

What is your current employment status, Mr. Capoccia?

A. I work at Emerson Hospital in Concord, Massachusetts. I'm a med/surge nurse.

Q. Okay. Do you do any clinical practice in correctional facilities at this current time?

A. I do not.

Q. Are you a registered nurse licensed in Massachusetts?

A. Yes.

Q. Okay. When did you first become licensed as a registered nurse?

A. About August of 2019.

Q. Okay. Do you happen to remember your license number?

A. I do not.

Q. Have you ever been subject to a complaint or disciplinary action before the Massachusetts Board of Registration in Nursing or any other state's nursing board?

A. No.

Q. Okay. Have you ever been the subject of a lawsuit?

A. No.

Q. Okay. What is your nursing education background? Where did you train and when did you graduate?

A. I graduated from Mount Wachusett Community College in June of 2019 --

Q. Mm-hmm.

A. -- and then I completed my bachelor's in nursing at Worcester State University and I graduated from there in June of 2021.

Q. Did you ever receive any training during your nursing training in respiratory conditions or asthma management?

A. In school, there's a portion of our training that's specifically on respiratory management.

Q. Did you receive any training in practicing in correctional medicine?

A. Yes, specifically with Wellpath.

Q. Okay. But not in school?

A. Not in school.

Q. And in what school context did you receive

A. We -- I -- yes.

Q. And that was the last sort of degree-granting medical training that you received?

A. For degrees, yes. I -- we have continuing education all the time to maintain certifications and further trainings.

Q. Right. So since 2021, you know, what -- where did you practice as a registered nurse? And we can go chronologically from 2021 to now, 2026.

A. In 2021, I still worked with Wellpath at Souza-Baranowski. I worked there until about January of 2022. And then in February of 2022, I took the job at Emerson Hospital, and I've worked there ever since.

Q. So before you graduated with your bachelor's in 2021, were you practicing in clinical settings without having obtained that degree?

A. Yes, I had my associate's.

Q. Okay. When did you obtain your associate's degree?

A. In 2019 of June.

Q. Okay. When did you start practicing as a nurse?

A. It was -- it was -- I believe it was the end of August of 2019.

Q. Okay. So between the end of August of 2019 to 2021, were you -- what -- what clinical settings were you practicing in?

A. I worked at Souza-Baranowski that entire time.

Q. Okay. So you had no nursing experience prior to being employed at Souza-Baranowski?

MR. MEDOFF: Objection.

A. No nur --

MR. MEDOFF: You can answer.

THE WITNESS: Sorry.

A. I had no nursing, but I had paramedical experience.

Q. Paramedical experience?

A. I was a EMT and I was also a medic in the Army.

Q. Okay. Can you say a little bit about those experiences, when they took place and where they took place?

A. I was a member of the Army National Guard. I joined in -- I don't remember the month, but I joined in 2015. I was in for four years. And I did medical training in San Antonio, Texas, at Fort Sam that involved becoming an EMT through the Army. That was

But go ahead.
A. Technically, yeah.
Q. Okay. How many inmates would you see on a typical shift at SBCC?
A. So I ran the infirmary, which, if I remember correctly, was an 18-bed infirmary on the 3-to-11 shift. I was specifically responsible for those beds. And then, on the 11-to-7, all the -- the other nurses would go home, and it was ki -- kind of -- I would still be responsible for those infirmary beds, but then, if anything else happened throughout the facility, myself and the -- the other nurse or two that were on the night shift could see up -- no pa -- no extra patients, or we could see at -- a few more based on what -- just the events of the night.
Q. I see.
Were you authorized, as a registered nurse, to independently administer a prescribed rescue haler -- inhaler without any other physician or nurse practitioner authorization?
A. Yeah, if it was prescribed, I could -- I could administer that.
Q. Okay. And were you authorized to independently determine whether an inmate needed to be

appropriately, and then we'd give them the new one and make sure that they had their refill.

Q. I see.

So if you saw a patient and they complained that they had had their KOP inhaler taken from them by DOC staff, what were actions that you, as a medical provider, could take, if any, in that situation?

MR. MEDOFF: Objection.

Go ahead.

A. If it was taken by staff, by DOC staff, I -- I had limited power to make them get their inhaler back. But I could give them a replacement inhaler to use temporarily, that they would use the one or two puffs that they needed, and then I'd take it back with me and they could call if they needed more.

But the -- the personal belongings and the KOP stuff, in terms of wh -- them being able to keep that and everything with DOC, that was between them and DOC.

Q. Got it.

But if you -- so let me put it this way: You could not authorize -- sorry -- you could not instruct DOC staff to return a KOP inhaler to an inmate, but on a limited basis, while the inmate was in your care,

A. The whole medical area's kind of in the same general spot, just -- it -- the infirmary and the trauma area are separated by a locked door, so you'd have to be, like, buzzed in and -- and -- or let in by security.

Q. Okay. So in -- we discussed earlier how when you first started working at Souza, you were doing general population visits, then by the time January 2020 had rolled around, you were almost exclusively in the infirmary; is that correct?

A. Yes.

Q. And -- but it sounds like the infirmary and the trauma unit are distinct areas, and the trauma unit may not have been in your purview during that time?

A. Correct.

Q. So you did not staff the trauma unit, and if people had been admitted to the trauma unit, they were not under your care?

A. I was exclusively responsible for the trauma unit after 11.

Q. After --

A. I --

Q. -- 11 p.m.?

on-duty medical staff about use-of-force incidents that occur during their shift?

MR. MEDOFF: Objection.

You can answer.

A. Really, not much. We treat, like, the medical issues that arise, but we never know, like, at what types of force they used. They -- you might know that they used gas, for example, but that's because you can smell it and taste it and feel it as well.

But in terms of disclosing specific inci -- incidents that happened, I -- I wouldn't really know. Un -- unless, like said, a medical complaint arose due to that force that was used.

Q. You didn't get briefings when you started your shift on what use-of-force incidents had taken place in the shift prior?

A. Definitely not. That was completely on -- like, with security.

Q. Okay. And then if a use-of-force incident occurred during your shift, that was not something that you were briefed on?

A. No.

Q. Okay. And would radio traffic, you know, from DOC staff, be available to you on your shift if

Now we're looking at Exhibit 5, WASH_0003853, this one you believe took place at his cell because you remembered that, not because of anything written in this progress note; is that right?

A. (Witness viewing exhibit.) Yes, and also the context of doing a restraint check. Restraint checks are always conducted with the inmate in their cell.

Q. I see. Okay.

Was this the only restraint check that you performed on Mr. Washington during your shift?

A. Yes.

Q. What is CSM?

A. (Witness viewing exhibit.) That's -- it stands for sensory circulation and motor -- or circulation, sensory and motor. It's -- it's a quick acronym to assess how well your blood is perfusing your tissue.

So circulation, you're assessing the color and the refill of the patient's fingers, making sure that blood is adequately filling. Sensory is making sure that he can feel me squeezing his fingers. And motor is showing me that you can wiggle your fingers and that you have full function, basically, showing that the restraints aren't compromising his blood flow

and sensations.

Q. Okay. And NAD, I think we talked about that earlier, but what does it mean here?

A. (Witness viewing exhibit.) No acute distress.

Q. Right. Okay. Because this was -- okay. You said that your shift starts at 3 p.m., but at 11 p.m., there -- most medical staff goes home and you are one of the only medical staff remaining at the infirmary; is that right?

A. Correct.

Q. So if there needs to be a restraint check -- okay, well, strike that.

When -- when is the nurse -- active nurse available staffing pool replenished in the morning?

A. You -- like, after seven.

Q. Okay. So from 11 p.m. to 7 a.m., you are one of very few nurses on -- on staff during the shift?

MR. MEDOFF: Objection.

Go ahead.

A. Yes.

Q. And like, how many nurses typically are -- are being -- are staffed overnight with you during a shift like that?

Patient Problems that Mr. Washington's asthma is still listed as a chronic diagnosis for him?

A. (Witness viewing exhibit.) Yes.

Q. And would you have seen that before you conducted the restraint check?

A. It -- I guess it would depend on the extent of the information I was given. In this -- in this instance, I wasn't called for a specific inmate or a specific person to go conduct a restraint check. I was only told to come down and do a restraint check, which was pretty typical.

Q. Mm-hmm. Mm-hmm. So you may not have looked at Mr. Washington's chart or his preexisting diagnoses or -- before seeing him?

MR. MEDOFF: Objection.

Go ahead.

A. [Indiscernible] --

(Technical difficulties.)

(Reporter inquiry.)

THE WITNESS: No problem.

A. Correct, because a restraint check and a medical complaint or a medical need are kind of separate. The officers would express to me if it was a -- a medical issue, and then I would kind of

approach it differently. The restraint check is more a security-driven measure where I'm making sure that the restraints are appropriate, that they're not causing any harm. But where there was no medical complaint, it's different from a medical assessment.

Q. I see.

Looking at the Patient Vitals, what -- what were Mr. Washington's vitals when you saw him on the 24th?

A. (Witness viewing exhibit.) It's -- it's not a medical assessment, so I wouldn't do a set of vitals on him at this time unless I had concerns of -- of him being in distress or anything. But this isn't a medical assessment, it's -- it's a restraint check where I'm a -- I'm assessing the -- that the restraints aren't causing issues with his circulation. But it's different from where a -- a medical complaint is -- is given, where I'm doing a full-picture assessment. This is a focused assessment to assess the restraints.

Q. I see.

And so do -- did you perceive any signs of distress from Mr. Washington when you saw him that would lead you to believe that it was important to

take his vital signs?

A. No.

Q. Okay. Is -- strike that.

Does it say -- well, strike that.

Based on this progress note and your recollection of the incident, did Mr. Washington refuse to have his vital signs taken?

A. No. It's not -- it's not standard practice to do vital signs on a restraint check. If -- if he had any complaints, he would have had the chance to -- to voice them to me. He -- he had to come to the cell door, and I saw his face, and he was arguing back and forth with the officers while I re -- checked his restraints. He never voiced any complaints to me or anything. So there was nothing that would have really prompted me to feel the need to do vital signs at that time.

Q. So when you do a restraint check, can you lead me through what the steps involved in that are, starting with, you know, you arriving at the cell to perform the check?

A. Yes. It depends on the type of restraints they have. If they have wrist restraints or wrist and ankle restraints. If they're just wrist restraints,

the inmate would simply just put his hands through the wicket, and then I would be able to assess him like that.

I would put my finger, like, kinda where the restraints meet the wrist to make sure they're not -- the restraints aren't digging into his wrist or causing any harm in that sense. And then I'd also check his fingers, assessing the color, the temperature and the capillary refill of his fingers and his hands, making sure that -- like I said before, that his circulation isn't being compromised by the restraints.

Q. Is that what happened in this instance, which is that Mr. Washington had wrist restraints and then you asked him to put his hands through the wicket and he put them in the wicket and then you performed the restraint check?

A. Yes, but I wouldn't be the one to ask him to put his hands through the restraints [sic]. That's -- that's a security thing.

Q. I see.

You didn't ask him to put his hands in the wicket, but he -- in your recollection, security asked him to put his hands in the wicket and he did so, and

A. No. That's not what I'm checking. He -- he was talking with the officer, so part of my assessment that I'm able to do from the door is, if you're talking and, like, yelling back and forth, that's already part of my assessment, that you're not having respiratory distress, just based on the fact that you're -- you're talking and -- and having no issues with clear sentence and voice. So I had no concerns of his respiratory status at that time.

Q. So if a patient is talking to you as a clinician, that's an indication that their breathing and respiratory well-being, general well-being is okay?

MR. MEDOFF: Objection.

You can answer.

A. [Indiscernible] --

(Technical difficulties.)

(Reporter inquiry.)

A. It's not the full picture, but it is a -- a big part of the picture. And he also was talking with the officers and didn't voice any complaints to me as well.

Q. Do you remember what Mr. Washington was talking to officers about?

to the officers, going back and forth with them. That is already a sign of not being in distress.

Q. So you did assess Mr. Washington for distress?

A. I was able to visualize him get up, come to the cell, he was standing at the cell, he was going back and forth with the officers. I didn't pull him out for a full medical assessment, but from my limited assessment, I could see that he wasn't in any distress.

Q. Did you see, before you encountered Mr. Washington on the 24th, that he had had an acute head indis -- injury three days prior?

A. No, because I wasn't given information that I was going to see Mr. Washington. I was just asked to come conduct a restraint check.

Q. Mm-hmm.

A. And once arriving there is when I realized -- or once arriving there, I was informed that it was Mr. Washington so that I could document on the restraint check.

Q. You did see a mild abrasion to Mr. Washington's left wrist, correct, when you performed the restraint check?

MR. MEDOFF: Objection.
Go ahead.
A. I -- I guess you could say that.
Q. Okay. Did Mr. Washington ever communicate to you that he had been exposed to chemical agents before you saw him?
A. No.
Q. Did Mr. Washington ever communicate that he had been kept in restraints for more than two hours before you saw him?
A. No.
Q. Did Mr. Washington communicate that he had not been given the opportunity to decan -- decontaminate before you saw him?
A. No.
Q. Did Mr. Washington communicate that he did not have access to his keep-on-person inhaler before you saw him?
A. No.
Q. Did Mr. Washington request his keep-on-person inhaler or any inhaler during your visit?
A. No.
Q. Did you see Mr. Washington have labored breathing?

A. No.
Q. Did you observe Mr. Washington coughing or wheezing?
A. No.
Q. Did you perceive any chemical agent taste or smell when you encountered Mr. Washington?
A. No.
Q. Did you know that Mr. Washington had been exposed to chemical agent before you saw him?
A. No.
Q. Did you know that Mr. Washington had asthma when you saw him on January 24th?
A. I don't recall if I knew that he had asthma when I saw him.
Q. Do you agree that you had seen Mr. Washington as recently as November, as we looked at your progress note from that visit?
A. Yes.
MR. MEDOFF: Objection.
You can answer.
BY MS. ZHANG:
Q. Do you agree that you had actually seen Mr. Washington on three separate occasions at least in November?

his chart and known that he suffered from chronic asthma; is that correct?

MR. MEDOFF: Objection.

You can answer.

A. Yes. And those three prior incidences with him were medical complaints and medical issues. The restraint check is a security request for the restraint check, so it's -- the protocol for that is a bit different. So there would -- there's usually less review prior to, and there's less medical treatment rendered, less medical assessment.

Q. When, during a restraint check, would you perform any medical assessment?

A. If I had any concerns, if the patient exhibited any signs of distress, if the patient voiced any concerns or medical complaints to me, then I would request to pull the patient out for further assessment.

Q. You did not do that in this scenario on January 24th with respect to Mr. Washington?

A. No, I did not.

Q. In November 2019, when you saw Mr. Washington for medical assessment, would you have known at that time that he had been prescribed his levalbuterol

"complaint"?

A. (Witness viewing exhibit.) Yes. Lieutenant Deshane [sic] sprayed me with chemical agent on 1/23/2020 after I told him I'm an asthmatic. At 10:45 p.m. they said I could not keep my asthma inhaler on my person. Then returned me to the M-2 unit without my asthma inhaler. My asthma inhaler is now missing and lost as of 1/25/2020.

Q. Okay. Were you aware that Mr. Washington had had his asthma inhaler taken from him on January 23rd, 2020, in the evening?

A. No.

Q. Okay. Were you aware that he was placed in a cell without his inhaler after having been sprayed with chemical agent?

A. No.

Q. Okay. So further down on the page, there is a section called Receipt by the Health Service Administrator.

Do you see that?

A. (Witness viewing exhibit.) Yes.

Q. And the Final Decision for the grievance is Partial Approval.

And then, under Decision, do you mind reading

A. No, but during that time, he'd have adequate opportunity to ask for an inhaler. It just wouldn't be KOP at that time. And if he was in any medical distress, he could ask to be pulled to be assessed by medical and we could always supply him with a temporary inhaler that he could use at that time.

Q. Here, above on the page next to remedy requested for the grievance, do you see where it says, I need my asthma inhaler?

A. (Witness viewing exhibit.) Yes.

Q. Okay. Do you see the date of this grievance is 20200125, or in other words, January 25th, 2020?

A. (Witness viewing exhibit.) Yes.

Q. So looking at this, would you say that Mr. Washington requested an inhaler by saying, I need my asthma inhaler on January 25th, 2020?

MR. MEDOFF: Objection.

Go ahead.

A. Yes, but he submitted it in a grievance. He also has the opportunity to submit a sick slip, which would go directly to nursing. And the process for that would be much quicker. He would be seen that day if he submitted that way.

Q. Do you know that -- whether -- well, strike