# EXHIBIT I

**REPORT OF SONDRA S. CROSBY, M.D.**

---

## I. Introduction

1. I have been asked by counsel for Mr. Derrick Washington to obtain a trauma history, review records, and perform a physical examination of Mr. Washington. I have been retained by counsel to provide an expert medical opinion regarding whether Mr. Washington sustained physical injuries as a result of the violent assaults that occurred while he was incarcerated at Souza-Baranowski Correctional Center on January 21, January 23/24, and March 5, 2020. I have also been asked to assess whether the medical evaluation and treatment he received for those injuries met the applicable standard of care. For my work on this case, I am being compensated at a rate for $300–$350 per hour. My compensation is not contingent on the opinions I reach in this case.

2. In summary, and for the reasons set forth in this report, it is my expert medical opinion, within a reasonable degree of medical certainty, that Mr. Washington sustained severe physical injuries as a result of blunt force trauma, restraints (including shackle-related injuries), chemical agent exposure, and conducted electrical weapon (Taser) deployment. These injuries caused substantial pain and suffering and resulted in long-lasting physical effects. It is also my opinion, to a reasonable degree of medical certainty, that Mr. Washington was denied appropriate medical evaluation and treatment for asthma exacerbations and skin irritation induced by exposure to chemical agents.

3. My opinion is based on my evaluation of Mr. Washington and my review of relevant documents, including medical records and video evidence, applying the principles

outlined in the *Istanbul Protocol*.[1] In formulating my opinion, I also relied on my professional knowledge and experience and reviewed the relevant medical and scientific literature.

a. I performed an in-person clinical interview and physical examination of Mr. Washington on 7 July 2026, for approximately 4 hours.

b. I reviewed documents and videos provided to me by counsel for Mr. Washington.

## II. Relevant Experience and Qualifications

4. I am a licensed physician in the Commonwealth of Massachusetts and am board-certified in the specialty of Internal Medicine. I graduated from the University of Washington School of Medicine and received my clinical training at the Boston City Hospital (now Boston Medical Center) residency program in Internal Medicine.

5. Currently, I am a professor of Medicine and Public Health at the Boston University Schools of Medicine and Public Health, in the Departments of Medicine, and Center for Health Law, Ethics, and Human Rights, and a member of the Section of General Internal Medicine at Boston Medical Center.

6. My clinical practice focuses on the care of asylum seekers and refugees, most of whom have experienced trauma, including displacement, torture, and sexual and gender-based violence. I have taught extensively on the medical care and evaluation of refugees and survivors of torture, and I have given invited presentations throughout the United States and internationally on torture documentation.

---

[1] United Nations High Commissioner for Human Rights. *Istanbul Protocol: Manual on the Effective Investigation and Documentation of Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment*. United Nations High Commissioner for Human Rights; 2022:225. Accessed September 1, 2023. https://www.ohchr.org/sites/default/files/documents/publications/2022-06-29/Istanbul-Protocol_Rev2_EN.pdf

7. Along with individuals such as Juan E. Méndez and Nils Melzer, both former United Nations Special Rapporteurs on torture and other cruel, inhuman, or degrading treatment, I served on an international committee to update the Istanbul Protocol.[2] This updated version was published by the United Nations High Commissioner for Human Rights in June 2022. The Istanbul Protocol is the international gold standard for the medical and legal documentation of torture.

8. I have taught and mentored Istanbul Protocol evaluation and documentation in Bishkek, Kyrgyzstan; Dushanbe, Tajikistan; Istanbul, Turkey; Reyhanli, Turkey; Almaty, Kazakhstan; Amman, Jordan; and Erbil and Duhook, Iraq, as a medical consultant for Physicians for Human Rights.

9. I have given workshops on the preparation of medical affidavits and have lectured in the Asylum Officers Basic Training Course in Lansdowne, VA, and in the Boston Asylum office, on medical forensic findings in asylum cases.

10. In addition, I have published scholarly peer-reviewed papers in The New England Journal of Medicine, The Journal of the American Medical Association (JAMA), Annals of Internal Medicine, The British Medical Journal, The Journal of General Internal Medicine, The Laryngoscope, The British Journal of Ophthalmology, Urology, and Torture, among others, on my work in torture treatment and documentation.

11. I have been qualified as an expert witness in the United States Immigration Court in Boston, the Federal District Court for the District of Columbia, the Military Commission Court in Guantánamo Bay, Cuba (in the case of *United States v. Nashiri*), and the

[2] Ibid

International Criminal Court, among other jurisdictions. I have written hundreds of affidavits documenting medical and psychological sequelae of torture.

12. I have evaluated and examined nearly 1,000 survivors of torture in my medical practice. I am a consultant to Physicians for Human Rights and have evaluated the effects of torture as well as other forms of cruel, inhuman, and degrading treatment and displacement on Darfuri women living in a refugee camp in Chad, on former detainees in US detention at Guantánamo Bay, and on individuals held at other sites in Iraq and Afghanistan. Furthermore, I have served as a medical forensic expert for the Bahrain Independent Commission of Inquiry, investigating allegations of torture.

13. I have served on the National Advisory Council for the Center for Victims of Torture (CVT).

14. My curriculum vitae is attached to this declaration as Appendix A.

## III. Methodology

15. My evaluation and this report follow the principles and guidelines set forth in The Manual on the Effective Investigation and Documentation of Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (The Istanbul Protocol) (Office of the United Nations High Commissioner for Human Rights).

16. My evaluation was conducted in a medical examination room within the Health Services Unit (HSU) at MCI Shirley, in Shirley, MA. A correctional officer remained outside the room with visual observation through a window; however, the door remained closed throughout the evaluation. The interview and examination were conducted in English.

17. My evaluation of Mr. Washington was conducted with his full voluntary and informed consent, and he was made aware of the limits of confidentiality associated with my assessment of him and the resulting reports and potential testimony.

## IV. Limitation of Evaluation

18. Limitations to this evaluation are the elapsed time from the date of injuries to the date of evaluation.

## V. Background History

19. Derrick Washington was born in Cleveland, Ohio, on November 18, 1984. He is one of five children, with two sisters, two brothers, and one stepsibling. His parents separated before his birth. His mother worked for a newspaper company and later owned and operated a daycare business. His father worked in the field of social work. Mr. Washington's mother was incarcerated from 2003 through 2008.

20. During his childhood, Mr. Washington relocated frequently, living in Cleveland, Ohio; Massachusetts; Cleveland again; South Carolina; Massachusetts; Cleveland; and ultimately returning to Massachusetts. As a result, he attended 12 different schools before graduating from high school in Springfield, Massachusetts, in 2003.

21. Mr. Washington has a history of prior incarceration from September through December 2004 on a juvenile matter. He was taken into custody again in February 2005, convicted of two counts of first-degree murder, armed robbery, and firearms offenses. Relevant to this case, Mr. Washington was incarcerated at Souza-Baranowski Correctional Center from September 2018 until his transfer to MCI Shirley in June 2023.

22. Mr. Washington received a bachelor's degree in liberal arts from Boston University in June 2026.

23. Mr. Washington has suffered from asthma since birth, which he describes as severe. During childhood, he required treatment with both a metered-dose inhaler MDI and nebulizer. He reports numerous hospital visits for treatment of acute asthma exacerbations but has never required admission to an intensive care unit. His asthma attacks were often triggered by poor air quality or exposure to pollen. In addition, he reports a history of meningitis at approximately seven years of age.

24. Mr. Washington reports sustaining a right wrist fracture in approximately 2008, from which he continues to experience chronic right-hand pain. He also reports an altercation at approximately 17 or 18 years of age during which his lip was cut with a razor, requiring sutures. In addition, he recalls sustaining multiple minor abrasions to his knees and elbows during childhood, such as from bicycle falls.

25. Mr. Washington underwent eye surgery in 2024.

26. Mr. Washington does not report a history of substance use disorder, including alcohol use disorder. He does not smoke cigarettes.

27. Mr. Washington is allergic to bananas, nuts, and seafood, including fish.

28. Relevant to my evaluation, a medical record dated 11/4/2010 documents that Mr. Washington was evaluated at Health Alliance Hospital following an assault. This record documents that Mr. Washington sustained injuries (hematomas, lacerations, abrasions) to

his scalp, face, and upper lip, jaw (TMJ strain), and minor abrasions to the neck and torso.[3]

## VI. Review of Documents

29. I reviewed documents and video files provided to me by counsel which are detailed in Appendix B.

## VII. Derrick Washington's Trauma History on January 21, 2020

30. Mr. Washington reports that correctional officers wearing tactical gear came to his cell and instructed him to "cuff up." His wrists were restrained behind his back with metal handcuffs, after which he was slammed onto the lower bunk by force applied to his restrained arms causing lacerations and contusions. He reports that he was then stripped to his underwear and T-shirt.

31. Mr. Washington reports that he was escorted to a different housing unit and cell under circumstances that he experienced as humiliating and degrading. I reviewed video footage of Mr. Washington's movement on 1/21/2020, which is consistent with his account, although the footage did not include audio. The footage shows Mr. Washington barefoot and clothed only in underwear, with his wrists restrained and his legs secured in irons, as he reported. He was escorted by multiple correctional officers wearing tactical gear.[4]

[3] HealthAlliance Hospital, Leominster, MA, Emergence Care Report, Encounter #6013136319, 11/04/2010, Notes by William R. Carbonneau, NP
[4] Video file "1-21-2020 CIRT Derrick WASHINGTON W89316 Elevator Lv3 to Lv2".

32. Mr. Washington reports that, while still shackled, he was subjected to multiple conducted electrical weapon ("Taser") applications by direct contact of the probes with his skin. He recalls feeling electrical "jolts" throughout his body before falling and striking his head. He believes he may also have been punched but states that his memory of these events is incomplete and clouded.

33. He reports feeling lightheaded and experiencing severe pain in his joints, muscles, and nerves unlike anything he had previously experienced. He also describes burns involving his arms, chest, abdomen, and feet.

34. Mr. Washington reports that he was escorted to the medical unit while his ankles remained tightly shackled, causing significant pain as he walked. He states that he was evaluated by a nurse but did not receive treatment and was medically cleared to return to the housing unit.

35. A Nursing Progress Note dated 01/21/2020 and was added at 01:58 PM states: "Patient was brought to the trauma room after he was involved in a spontaneous use of force. Patient stated that he felt lightheaded and that his eyes were hurting, He stated that a taser was used to subdue him and that he was knocked to the floor… Patient was speaking and answering questions until the rounding provider came into the room to evaluate the patient. Pt was A&O at this time. Able to converse in full sentences. In NAD…no injuries were noted at this time. Patient was seen by Dr. Petros and cleared to return to his housing unit…." [5]

---

[5] Massachusetts Department of Corrections, Souza-Baranowski Correctional, Nursing Progress Notes, Booking Number W89316, Date of Service 1/21/2020. Added by KSteinmetz LPN at 01:58 PM.

36. Upon returning to the housing unit, Mr. Washington reports that he complied with orders to enter his cell. Despite his compliance, he states that he was thrown to the ground while still handcuffed and struck his head against the wall. He sustained a laceration near his right eye that bled. While on the ground, he reports being subjected to multiple additional Taser applications to various parts of his body, including his feet.

37. Throughout the assault, Mr. Washington reports that correctional officers directed repeated racial slurs at him, including calling him the "n-word."

38. Mr. Washington reports that he lost consciousness during the incident. He recalls being returned to the medical unit but believes he again lost consciousness.

39. He was subsequently transported to an outside hospital, UMass Memorial Health Care. Mr. Washington recalls being "in and out of consciousness" during transport and evaluation and states, "I don't remember much." He does recall experiencing urinary incontinence. He reports that hospital personnel asked him what had happened, but he was afraid to answer in the presence of the correctional officers accompanying him because he feared retaliation.

40. Mr. Washington's medical records include similar information.

41. A Nursing Progress Note dated 01/21/2020 and added at 01:28pm states: "At approx. 1304 this nurse was asked to assess patient in his cell after refusing to comply with the move team. There was force used and the patient was tazed two times. The patient is conscious but will not respond verbally to questions. The patient has a laceration approx.

1 inch in length on his right temple. No other visible injuries… I advised the patient be brought up to HSU for further evaluation…" [6]

42. A note added at 02:59 PM stated "… The nurse removed one prong from the patient's shirt". [7]

43. A nursing progress note dated 1/21/2020 and added at 1:39 PM states "Patient brought to exam room #1 in HSU following a use of force in the housing unit. Pt is initially standing against wall, answers to his name, states he doesn't know his W#. Approx 2cm laceration next to right eye with minimal active bleeding at time of assessment. Multiple contusions to left side of head. Left side lower lip visibly swollen. No apparent injuries within his mouth. Patient mostly non-verbal, does not open eyes and look my direction when I say his name. Examined by Dr. Petros, determined he should go to ER via BLS for sluggish pupillary response. C-collar applied per Dr. Petros for unknown mechanism of injury/location of injury…." [8]

44. A Provider Progress Note dated 1/21/2020 and added at 01:38 PM states: "35 yo M who was admitted to the trauma room after an altercation with the CO during which he was tasered x1. Upon arrival in the trauma room, the pt c/o dizziness and a headache. He denied LOC. The pt was lethargic but did follow commands during the subsequent PE. On PE, the pt had minor contusions right temporal and left parietal areas and a larger contusion to the right side of the forehead. There was no blood in the ears or nostrils. The oral cavity was free of blood and the teeth appeared intact. The bridge of the nose

---

[6] Massachusetts Department of Corrections, Souza-Baranowski Correctional, Nursing Progress Notes, Booking Number W89316, Date of Service 1/21/2020. Added by ABond RN at 01:28 PM.
[7] Massachusetts Department of Corrections, Souza-Baranowski Correctional, Nursing Progress Notes, Booking Number W89316, Date of Service 1/21/2020. Added by ABond RN at 02:59 PM.
[8] Massachusetts Department of Corrections, Souza-Baranowski Correctional, Nursing Progress Notes, Booking Number W89316, Date of Service 1/21/2020. Added by KERyder RN at 01:39 PM.

was nontender to palpation and appeared intact. There were no scalp or facial lacerations. There were no periorbital hematomas or swelling. There was EOM and PERRLA. The pt had full ROM of his neck with no tenderness. The pt was returned to his unit. 20 minutes later, the pt returned to exam room 1 after a second altercation with the CO and being tasered x2. PE showed a 2cm skin laceration over the right zygoma. There was EOM but the pupil were minimally reactive. The pt appeared to be more lethargic but he was standing and ambulating. No additional lacerations or contusions of the head, face, and neck were appreciated. Once again, there was no hematoma in the ear canals or in the nostrils. No hematoma was seen in the oral cavity and the teeth appeared intact. There was a mild to moderate contusion of the right lower lip with swelling". [9]

45. The hospital record from UMass Memorial Health is also consistent with Mr. Washington's account.[10] He was evaluated for moderate-to-severe head trauma and an episode of unresponsiveness. CT imaging of the head, cervical spine, and facial bones showed no intracranial hemorrhage or other acute fracture, although mild asymmetry of the nasal bones was noted, raising the possibility of a nasal bone fracture. A 2-cm right facial laceration was repaired. The record further documents: "He became unresponsive and nonverbal. Upon arrival, he seemed to have some volitional awareness even though he would never answer any questions."

46. Mr. Washington reports that, following the incident, he was unable to walk without assistance when attempting to transfer to a wheelchair. He states, "The Tasers messed up my nerves," and "I couldn't feel my body." He reports painful muscle twitching and

---

[9] Massachusetts Department of Corrections, Souza-Baranowski Correctional, Provider Progress Notes, Booking Number W89316, Date of Service 1/21/2020. Added by JPetros Provider at 01:38 PM.
[10] UMass Memorial Health, MR#801271559, ED visit 1/21/2020.

describes his arm as having "locked up tight," causing severe pain. He recalls thinking, "I thought it permanently damaged me."

47. After returning to the prison medical unit from the hospital, Mr. Washington reports that he experienced severe headaches for approximately two days, persistent muscle pain that he attributed to the Taser exposures, and difficulty walking.

48. A Nursing Progress Note dated 1/21/2020 07:08 PM states: "Pt returned from ED, s/p use of force rule out head trauma, diagnosis facial laceration, laceration above right eye glued, VSS, NAD, PERRL, pt complains of headache, pain in face, ankles, wrist, back, self reports urinating on himself and being "unaware". Pt was tased x2, on call medical consulted and per Dante Anderson will be housed in HSU for med observation with VS and neuro checks q4h and change in LOC on call to be notified". [11]

49. A "Nursing Documentation Pathway" dated January 31, 2020, documents that Mr. Washington presented to sick call reporting "numbness in his left arm and both legs, constant since being tased a week ago," as well as that his "arm shakes uncontrollable all day."

50. A Nursing Progress Note dated 2/18/2020 at 08:55 PM states "Pt ambulated to protocol room for sick call. Pt states he was tased on Jan 22 and since that time has had numbness in right arm, from elbows to fingers, and "uncontrollable shaking" in his torso. Pt appears in no distress at this time. Able to move arm and fingers freely. Good csms and ROM. Vitals obtained. Pt advised to rest arm and seek medical attention if condition worsens or persists." [12]

---

[11] Massachusetts Department of Corrections, Souza-Baranowski Correctional, Nursing Progress Notes, Booking Number W89316, Date of Service 1/21/2020. Added by JTRobles LPN at 07:08 PM.
[12] Massachusetts Department of Corrections, Souza-Baranowski Correctional, Nursing Progress Notes, Booking Number W89316, Date of Service 2/18/2020. Added by KWheaton LPN at 08:55 PM.

51. A Provider Progress Note dated 3/16/2020 states: "Pt 35m presents to protocol room with complaints of tingling sensations in left arm s/p "being tazed 4 times by officers" on January 21st 2020. Area reportedly affected is the lateral aspect of the entire length of his arm starting at the humeral head to the 5th digit. Pt states that he has difficulty holding on to objects because "it goes numb" when reasking if the numbness is intermittent the patient states "its numb all the time, I lose strength sometimes". Pt denies improvement or worsening. Denies previous neuropathies or pain in the affected limb. Denies other trauma. Denies reduction in movement but states that his arm is "fidgety". "I don't have full control". Msk: …Strength 5/5 b/l at shoulder, 4/5 in hands and fingers on left. Right 5/5. Scarring noted to anterior medial aspect of left biceps (reportedly from "prongs"}…A/P? Possible ulnar nerve neuropathy s/t taser use. Pt will be submitted for EMG to rule out neuropathy…" [13]

52. These contemporaneous medical records from 1/31/2020, 2/18/2020, and 3/16/2020 are consistent with Mr. Washington's account of neurologic symptoms following the TASER exposure.[14]

## VIII. Derrick Washington's Trauma History on January 23/24, 2020

53. Mr. Washington reports that approximately 15 correctional officers armed with firearms and conducted electrical weapons entered his hospital room and ordered him to "cuff up." He states that he was forcibly removed from the hospital and returned to the cell block. He was assigned to a cell with a cellmate, which he describes as frightening and

---

[13] Massachusetts Department of Corrections, Souza-Baranowski Correctional, Provider Progress Notes, Booking Number W89316, Date of Service 3/16/2020. Added by MRibeiro Nurse Practitioner at 04:19 PM.
[14] Massachusetts Department of Corrections, Souza-Baranowski Correctional, Nursing Documentation Pathway, Booking Number W89316, Date of Service 1/31/2020.

distressing. He states, “I feared for my life.” Mr. Washington reports that he voiced these concerns to a mental health professional.

54. Mr. Washington reports that his cellmate subsequently experienced an apparent mental health crisis. Correctional officers entered the cell while Mr. Washington was on the upper bunk and discharged multiple canisters of chemical agents into the cell. He states that he repeatedly yelled, “I am asthmatic.”

55. Mr. Washington reports that he observed correctional officers severely assault his cellmate before the cellmate was removed to the medical unit.

56. Mr. Washington reports telling correctional officers, “I am choking. I can’t breathe.” He was then escorted to the medical unit, where he requested an inhaler for what he believed was an asthma exacerbation. He reports that he was neither evaluated nor provided treatment for his respiratory symptoms.

57. Mr. Washington reports that he was subsequently transferred to another cell.

58. Mr. Washington reports that once in the new cell, he was instructed to insert his hands into the slot in order to have his handcuffs removed. He states that instead of removing the cuffs, correctional officers forcefully yanked on the metal handcuffs, causing pain and bleeding at both wrists.

59. Mr. Washington reports that the new cell was cold and that his asthma symptoms worsened. He repeatedly requested both an inhaler and a blanket. He states that at approximately 2:00 a.m. he was provided only a mattress but received neither an inhaler nor a blanket. He reports remaining handcuffed, cold, and unable to breathe comfortably throughout the night. He further reports that he was not decontaminated or permitted to shower following his exposure to chemical agents.

60. Mr. Washington reports that he had urinated on himself before his handcuffs were finally removed at approximately 7:00 a.m. He states that he still had not been decontaminated following the chemical agent exposure.

61. After being moved to a different cell, for approximately the following week, Mr. Washington reports experiencing frequent episodes of shortness of breath throughout the day. He also describes an intense burning sensation involving his skin, including his face and groin. He reports that he was not provided an inhaler, decontamination, or clean clothing during this period and described the experience as "being in a torture chamber."

62. A Nursing Progress Note dated 01/24/2020 and added at 0657 AM states: "I conducted a restraint check on this patient. Skin intact, mild abrasion to L wrist, CSM's intact, NAD, no medical complaints at this time. Restraints removed at this time.

63. Notably, I found no documentation that medical professionals assessed Mr. Washington's respiratory status or provided treatment after his exposure to OC spray. I also found no documentation that either Mr. Washington or his environment was decontaminated.

## IX. Derrick Washington's Trauma History on March 5, 2020

64. On the morning of March 5, 2020, Mr. Washington reports he was ordered to "cuff up" because he was being moved to a different unit with a cellmate. He informed the officers he did not want a cellmate and to "Take me to the hole."

65. He reports he was placed in a strip cage holding cell for 3-4 hours and sprayed with chemical spray. He reports he told officers "I am asthmatic please stop!". He reported falling to the ground and was kneed in the face and stomach. An officer pulled and twisted his right ear, which bled and his clothes were cut off.

66. He reports that multiple canisters of chemical spray were deployed, which caused him to choke and be unable to breathe. He reports he was lying in a pool of the chemical liquid that had accumulated on the floor.

67. Mr. Washington reports he was taken to the medical unit by stretcher and treated with a nebulizer, and returned to the "hole", cuffed to a stretcher. After arrival, he was pushed off the gurney and remained cuffed. He reports he couldn't feel his legs. He was punched in the face and reports he was bleeding and lying in a pool of blood. He recalls calling for help.

68. I reviewed video documentation[15] of the forced cell extraction and Mr. Washington's subsequent treatment in the Health Services Unit (HSU), including the trauma room. The footage documents a correctional officer stating that medical personnel approved the use of chemical agents, despite Mr. Washington's known history of asthma. It also shows Mr. Washington loudly informing staff that he was asthmatic. A correctional officer administered at least three bursts of a chemical agent from a white canister, in close proximity to Mr. Washington. He was subsequently heard coughing and choking. He was subsequently observed lying on the floor of a small, enclosed space. He is heard to state, "I can't breathe."

69. In the video, Mr. Washington was placed in restraints and transported to the HSU. What appeared to be blood was visible on his underwear in the video. At the HSU, his eyes appeared to be rinsed, after which he was transferred to the trauma room and given a nebulizer treatment. This treatment appeared to be approximately 45 minutes after the chemical-agent exposure. Brief video images of Mr. Washington's body in the trauma

---

[15] Video files "M2U01466" and "M2U01467".

room reveal tachypnea (increased respiratory rate) and increased work of breathing, which are typical clinical findings in a person experiencing an asthma exacerbation.

70. A Nursing Progress Note dated 03/06/2020 1206 am states: “inmate was seen post use of force - he enter protocol room on a gurney - his eyes were flushed with eye wash - he had a small laceration on his right ear and a bump on his head- patient respiration increased for 18 to 22 and he complained of SOB - lungs were congested - he was taken to HSU via gurney where he received a nebulizer treatment - post the neb his lungs were clear and his respiration returned to 18-antibiotic ointment was placed on his ear and a scratch on his head - patient returned to his cell”. [16]

71. Approximately three hours after being returned to the cell, Mr. Washington reports he was again returned to the medical unit, where he reports that he lost consciousness and required “resuscitation.” He was evaluated by a mental health professional and subsequently stripped naked and placed on suicide watch after he refused to answer questions. He reports that his body was not decontaminated following exposure to the chemical agents. The following day, he was moved to a single cell and continued to experience asthma symptoms.

72. A Nursing Progress Note dated 03/06/2020 12:25 am states: “I responded to a Code 99 chest pain on a patient - he was taken from his cell where his respiration seen to be 18 and he had his eyes opened for periods of time on the gurney - once in HSU an EKG was done which yielded normal results - he stated he didn’t was(sic) return to his cell due to

---

[16] Massachusetts Department of Corrections, Souza-Baranowski Correctional, Nursing Progress Notes, Booking Number W89316, Date of Service 3/5/2020. Added by FHinds LPN on 3/6/2020 at 12:06 AM.

not feeling safe - he spoke to mental health and was placed on mental health watch - patient was not diaphoretic - didn't seem in distress". [17]

73. These contemporaneous medical records and video documentation are consistent with Mr. Washington's account of events on March 5, 2020.

## X. Current Physical Symptoms and Disabilities

74. Mr. Washington reports that his asthma symptoms have become worse since 2020, and that he continues to have random flares of asthma exacerbations, approximately once per week.

75. He reports "my body is not the same after 2020" and that his muscles "lock up", especially when working out.

76. He reports headaches that began after the 2020 traumatic events, which he described as throbbing and pulsating, and which lasted for approximately 2 years.

77. Mr. Washington describes lightheadedness, which occurs 4-5 times per week, during which he describes his energy drop and feeling weak. He drinks water and typically recovers in about 15 minutes. The root cause of this symptom is unclear.

78. He reports right hip pain, following being kneed in the hip while playing basketball, and which is not related to the experiences addressed in this report.

79. He reports right elbow pain, which began after shoveling and which is not related to the experiences addressed in this report.

80. Mr. Washington reports that physical scars from the trauma trigger intrusive memories of the traumatic experiences.

---

[17] Massachusetts Department of Corrections, Souza-Baranowski Correctional, Nursing Progress Notes, Booking Number W89316, Date of Service 3/6/2020. Added by FHinds LPN on 3/6/2020 at 12:25 AM.

## XI. Mental Status Examination

81. Mr. Washington is of African American descent. He was appropriately dressed and groomed. He was engaged and articulate during the evaluation. He displayed a normal range of affect. He was alert and oriented, with no evidence of cognitive impairment or psychosis.

## XII. Physical Examination and Interpretation

82. **Head and neck:**

a. There is a linear scar lateral to the right eye, which is hypopigmented and slightly raised which measures 1 cm. This is consistent with a healed laceration.

b. There is a small palpable scar/deformity on the right ear, upper portion of pinna, which is consistent with prior trauma to his ear as described.

c. Cranial nerves are normal.

83. **Skin:**

a. There is a scar on the right upper chest, which is hypopigmented and slightly raised, that measures ¾ cm. This lesion is nonspecific but is consistent with prior trauma.

b. There is an oval lesion on the right upper back that is hypopigmented and measures 1.5 cm. This lesion is nonspecific but is consistent with prior trauma.

c. There is an atrophic lesion on the dorsum of the left wrist that measures 0.5 cm. This is consistent with a healed handcuff laceration, as Mr. Washington described.

d. There are small hypopigmented marks on the left upper arm which are consistent with probe injuries from a TASER, as Mr. Washington described.

e. On the dorsum of the right hand, there is a curvilinear scar which is hypopigmented. This is a result of a childhood injury and is not related to the experiences addressed in this report.

84. **Lung and Cardiovascular Exam:**

a. Lung examination is normal; breath sounds are normal and there are no wheezes present.

b. Heart examination is normal

85. **Musculoskeletal Exam:**

There is mild right hip tenderness, attributable to a basketball injury. The remainder of the musculoskeletal examination is unremarkable.

## XIII. Consistency Between Mr. Washington's Reports and the Evidence

86. The above information concerning the traumatic events of January 21, January 23, and March 5, 2020, is drawn in part from Mr. Washington's self-report. I find Mr. Washington's account largely consistent with the collateral materials I have reviewed, including medical records and video evidence. His account of his traumatic experiences is also consistent with the symptoms he reports and manifests. I also note that Mr. Washington does not indiscriminately report symptoms. During my evaluation, I asked him about numerous symptoms, many of which he denied experiencing. And based on my physical examination of Mr. Washington, he has scars consistent with the injuries he reports having sustained during the incidents at issue in this case.

## XIV. Conclusion and Analysis

87. It is my expert medical opinion, to a reasonable degree of medical certainty, that Mr. Washington experienced traumatic events on January 21, January 23, and March 5, 2020, resulting in physical and psychological injuries. His injuries and suffering resulted from repeated physical assaults, exposure to chemical agents, conducted electrical weapons, forceful restraint, inadequate medical care, and adverse conditions of confinement. He was also subjected to threats, fear of death, humiliation, and degradation, which compounded the harm he experienced. I understand that the details of Mr. Washington's psychological evaluation and resulting psychological injuries will be addressed in a separate report authored by Dr. Katherine Porterfield.

88. Mr. Washington was subjected to repeated exposures to OC spray, which deserves further attention, especially given that Mr. Washington is asthmatic.

89. Oleoresin capsicum (OC spray) is a highly concentrated form of the active ingredient in hot peppers. Commercial OC spray formulations may also contain solvents or other chemical agents. The mechanism of action is stimulation of sensory receptors, which in turn release inflammatory neuropeptides that cause burning pain, redness, swelling, increased vascular permeability, mucous secretion, and bronchoconstriction.

90. The effects on skin include immediate burning pain, stinging, tingling, redness, swelling and itching. If not adequately decontaminated, pain may persist for hours, and severe exposure may result in dermatitis, blister formation, and even chemical burns.[18]

91. The effects on the eye include severe burning pain, excessive tearing, swelling, conjunctivitis, and temporary inability to open the eyes. More serious effects include

[18] Yeung MF, Tang WY. Clinicopathological effects of pepper (oleoresin capsicum) spray. Hong Kong Med J. 2015 Dec;21(6):542-52. doi: 10.12809/hkmj154691. Epub 2015 Nov 6. PMID: 26554271.

corneal abrasions, ulcers, and persistent inflammation. Usually, these symptoms are temporary but can be long lasting if irrigation is delayed.[19]

92. Respiratory effects are common, and include sneezing, burning of nasal mucosa, cough, choking sensation, chest tightness, shortness of breath and wheezing due to bronchoconstriction. Oleoresin capsicum (OC/pepper) spray can provoke acute bronchoconstriction and exacerbate asthma, and that risk is plausibly greater with high-concentration exposure, prolonged exposure, inadequate ventilation, and failure to promptly remove/decontaminate the exposed person. The medical evidence is substantially stronger for OC-induced acute bronchoconstriction and asthma exacerbation than for OC exposure as a cause of persistent or permanent pulmonary injury.

93. A useful mechanistic study is Fuller, Dixon & Barnes, *Journal of Applied Physiology* (1985). Inhaled capsaicin—the principal irritant responsible for OC's effects—produced a dose-dependent decrease in airway conductance, with decreases of approximately 28% and 38% at the tested doses.[20] Importantly, the investigators demonstrated actual bronchoconstriction rather than merely a subjective sensation of breathlessness.

94. A 2015 clinical review of human OC exposure concluded that inhalation can cause cough, chest tightness, and dyspnea, with effects mediated largely through capsaicin-induced neurogenic inflammation.[21] The authors emphasized decontamination and early recognition and treatment of systemic toxicity. A more recent 2024 review likewise identifies the pulmonary system as a major site of acute OC toxicity and specifically

---

[19] Ibid
[20] Fuller RW, Dixon CM, Barnes PJ. Bronchoconstrictor response to inhaled capsaicin in humans. 1985 Apr 1;58(4):1080-1084. doi: 10.1152/jappl.1985.58.4.1080.
[21] Yeung MF, Tang WY. Clinicopathological effects of pepper (oleoresin capsicum) spray. Hong Kong Med J. 2015 Dec;21(6):542-52. doi: 10.12809/hkmj154691. Epub 2015 Nov 6. PMID: 26554271.

emphasizes the need to reassess risks in vulnerable populations.[22] Although uncomplicated OC exposure is generally transient, the clinical risk may be greater in individuals with underlying respiratory disease and under circumstances involving substantial or repeated exposure, confinement, exertion, or inadequate decontamination.

95. There is also clinical evidence from actual law-enforcement exposures. In an emergency department series of 81 people exposed to OC during police encounters, respiratory symptoms occurred in six patients.[23] The authors specifically cautioned clinicians to consider pulmonary toxicity after OC exposure. Clinical guidance also recognizes bronchospasm and cough as effects of capsicum spray and recommends treating bronchospasm with an inhaled beta-agonist such as albuterol/salbutamol.

96. A confined, poorly ventilated environment can reasonably be expected to increase inhaled exposure because aerosol cannot disperse as rapidly. Literature on riot-control agents more generally reports that exposure in closed spaces increases respiratory toxicity, although some of that evidence concerns CS (tear gas) rather than OC.

97. A controlled NIJ-sponsored study of healthy volunteers found no clinically significant deterioration in spirometry, oxygenation, or ventilation after standardized OC exposure, even with prone restraint.[24] That study is useful for showing that ordinary OC exposure generally does not cause serious respiratory compromise in healthy subjects. It does not

---

[22] Patowary P, Pathak MP, Barbhuiya PA, Karmakar S, Chattopadhyay P, Zaman K. Oleoresin Capsicum (OC) Spray: An Assessment of Respiratory Health and its Management Following Accidental and Deliberate Exposures. Curr Top Med Chem. 2024;24(18):1542-1556. doi: 10.2174/0115680266298811240514061433. PMID: 38778617.
[23] Watson WA, Stremel KR, Westdorp EJ. "Oleoresin Capsicum (CAP-STUN) Toxicity from Aerosol Exposure." Annals of Pharmacotherapy. 1996;30:733–735. DOI: 10.1177/106002809603000704.
[24] Chan, T. C. (2001). Pepper spray's effects on a suspect's ability to breathe / by Theodore C. Chan ... [and others]. U.S. Dept. of Justice, Office of Justice Programs, National Institute of Justice.

establish that OC cannot trigger bronchospasm in an individual with asthma, particularly under materially different exposure circumstances.

98. In summary, OC spray is a potent respiratory irritant capable of producing cough, dyspnea, chest tightness, wheezing, and acute bronchoconstriction. In a person with pre-existing asthma, a substantial exposure—particularly in an enclosed, poorly ventilated cell—can precipitate acute asthma exacerbation. When respiratory symptoms develop following OC exposure, appropriate medical management includes prompt removal from the contaminated environment, decontamination, respiratory assessment, and treatment of bronchospasm, including an inhaled beta-agonist when clinically indicated.

99. Mr. Washington informed correctional officers that he had asthma, developed choking and difficulty breathing immediately following OC deployment, and requested an inhaler.

100. It is important to note that on January 7, 2020, approximately two weeks before his exposure to OC spray, Mr. Washington was evaluated in Health Services[25] for worsening asthma. At that visit, he described his asthma control as poor and worsening and reported using his rescue inhaler (levalbuterol) five to six times per day. His asthma treatment required escalation, with initiation of a maintenance inhaled corticosteroid (ciclesonide). These findings indicate that Mr. Washington's asthma was poorly controlled shortly before the OC spray exposure, placing him at increased risk for significant respiratory effects from an inhaled irritant such as OC spray.

101. Based on the information provided to me, it is my opinion that Mr. Washington was not provided with appropriate medical evaluation and treatment for his asthma symptoms following the January 23, 2020 exposure to OC spray. He also reports that he was not

---

[25] Massachusetts Department of Correction Health Services Assessment Form, Booking Number W89316, 1/7/2020.

decontaminated and remained contaminated with the chemical agent, resulting in continued exposure to a respiratory irritant and potentially prolonging or exacerbating his asthma symptoms.

102. Although Mr. Washington received a nebulizer treatment following the March 5, 2020 OC spray exposure, this intervention was delayed, and insufficient, as he continued to experience asthma symptoms. In addition, he apparently was not fully decontaminated following the exposure. Failure to promptly remove residual OC agent from the skin, clothing, and surrounding environment likely prolonged his exposure and contributed to the persistence of his respiratory and other irritant-related symptoms.

103. Mr. Washington's account of the OC spray exposures is consistent with the contemporaneous medical and correctional records and by the video evidence I reviewed. The close temporal relationship between the exposures and the onset of his respiratory symptoms, together with the well-established capacity of OC spray to cause bronchoconstriction and exacerbate asthma—particularly following repeated exposures in confined spaces—provides a strong medical basis for my opinion that the OC exposures precipitated repeated irritant-induced acute asthma exacerbations and placed Mr. Washington at risk of potentially life-threatening complications, including respiratory failure and death.

104. In my opinion, the use of OC spray on Mr. Washington was medically contraindicated given his asthma, which had been poorly controlled shortly before these exposures. His underlying respiratory disease placed him at increased risk of significant adverse respiratory effects from exposure to OC spray, and if, as a correctional officer stated in the March 5 footage, medical professionals did in fact authorize chemical agent use on

Mr. Washington, they should not have done so. Documentation in Mr. Washington's own DOC medical records states that Mr. Washington has a contraindication to the use of chemical agents because of his asthma. See Appendix C.

105. In addition, the failure to promptly remove Mr. Washington from the contaminated environment, adequately decontaminate him, assess his respiratory status, and appropriately treat his bronchospasm, including with an inhaled bronchodilator when clinically indicated, was inconsistent with appropriate medical care.

106. This opinion is consistent with current CDC guidance regarding exposure to riot-control agents (including OC spray), which recommends prompt removal from the source of exposure, decontamination, and medical attention when indicated. The CDC also recognizes that respiratory symptoms following such exposures may require treatment, including medications used for asthma, such as bronchodilators and corticosteroids.

107. Mr. Washington was injured with a TASER. A TASER, more precisely a conducted electrical weapon (CEW), produces intense involuntary skeletal muscle contractions and may result in acute muscle pain, strain, or other musculoskeletal injury.[26,27] TASER exposure can cause injury through multiple mechanisms: probe penetration, electrical/neuromuscular effects, and secondary trauma from associated incapacitation resulting in falls and restraint injuries. Although most uncomplicated TASER-related musculoskeletal symptoms are transient, persistent pain or functional impairment may

---

[26] Bozeman W, Hauda W, Heck J, Safety and Injury Profile of Conducted Electrical Weapons Used by Law Enforcement Officers Against Criminal Suspects, Annals of Emergency Medicine, 2009; 53, 480-489

[27] Baliatsas C, Gerbecks J, Dückers MLA, Yzermans CJ. Human Health Risks of Conducted Electrical Weapon Exposure: A Systematic Review. JAMA Netw Open. 2021;4(2):e2037209. doi:10.1001/jamanetworkopen.2020.37209

occur when the exposure results in significant muscle injury, traumatic injury, or occurs in conjunction with repeated electrical exposures and other forms of physical force.

108. Mr. Washington experienced a range of injuries associated with TASER exposure, including probe puncture wounds, bruising, muscle pain, and injuries resulting from sudden neuromuscular incapacitation and falls. These included a significant head injury for which he was transported to an outside hospital for evaluation and treatment. The injury he reported is consistent with the medical records.[28]

109. Following the TASER incident, Mr. Washington reported new numbness, tingling, and weakness of the left upper extremity. These symptoms are documented in the medical record as consistent with an ulnar neuropathy.[29] He reported no similar symptoms before the incident, establishing a clear temporal relationship between the use-of-force event and the onset of his neurologic symptoms. Subsequent EMG testing demonstrated left ulnar neuropathy at the elbow.[30]

110. Mr. Washington also reported persistent muscle weakness and shaking for months following the incident, as well as difficulty walking, including episodes in which he described his leg as "locking up."

111. Most studies of short-duration CEW exposures have focused on immediate physiologic effects and have not demonstrated persistent neuromuscular injury in uncomplicated exposures. However, the available literature provides limited evidence regarding long-term outcomes, particularly following repeated CEW exposures or exposures occurring in conjunction with falls, restraints, and other forms of physical force. Persistent

---

[28] UMass Memorial Health, MR#801271559, ED visit 1/21/2020.
[29] Massachusetts Department of Corrections Podiatry Referral, Booking Number W89316, 12/14/2020.
[30] Lemuel Shattuck Hospital, LSH EMG/NCS Report, dated 9/27/2021, WASH_0001361, WASH_0001362.

musculoskeletal or neurologic symptoms may result from associated muscle, peripheral nerve, or soft-tissue injury; probe-related injury; or secondary trauma caused by sudden neuromuscular incapacitation and falling.

112. The precise mechanism of Mr. Washington's ulnar neuropathy cannot be determined from the available information. Potential mechanisms include direct trauma, traction or compression of the nerve during restraint or other physical force, injury associated with a fall, or less likely direct probe-related injury, depending on probe location. Nevertheless, the onset of previously absent ulnar-distribution symptoms following the incident, together with objective electrodiagnostic findings, supports an association between the use-of-force event and the subsequent ulnar neuropathy.

113. Mr. Washington describes head and facial injuries due to a fall and blunt trauma to the head, due to either incapacitation from the CEW and/or use of force. This is consistent with the medical records previously cited. He describes headaches for 2 years following the event, which can occur after mild traumatic brain injury.

114. Some of Mr. Washington's physical scars are nonspecific, meaning that it is not possible to determine the exact cause of the injury after so much time has elapsed. The wrist scar is in a typical location for a healed handcuff laceration.

115. Some of the injuries that Mr. Washington described (such as bruising, soft tissue inflammation, and swelling) would be expected to heal after this interval of time without visible scarring or marks.

116. It is important to understand that the medical and psychological effects of multiple forms of assault and adverse conditions of confinement should not be considered in isolation. Repeated physical assaults, chemical-agent exposure, conducted electrical weapon

exposure, threats, fear, forceful restraint, inadequate medical care, degradation and humiliation, and adverse conditions of confinement can interact to produce cumulative and potentially synergistic physical and psychological harm. The combined effect may therefore be substantially greater than the harm attributable to any single method considered independently, particularly when the exposures are repeated, unpredictable, uncontrollable, and occur in an environment from which the individual cannot escape. In my opinion, these experiences, occurring within a common custodial environment, amplified Mr. Washington's physical and psychological suffering beyond that which would reasonably be expected from any individual traumatic event considered in isolation.

## XV. Conclusion

117. In conclusion, based on my review of the records and documents, clinical interview with Mr. Washington, and physical examination, it is my opinion within a reasonable degree of medical certainty that Mr. Washington sustained severe physical injuries as a result of blunt-force trauma, restraints, including shackle-related injuries, chemical-agent exposure, and conducted electrical weapon (TASER) deployment. These injuries caused substantial pain and suffering and resulted in long-lasting sequelae. It is also my opinion, to a reasonable degree of medical certainty, that Mr. Washington was denied appropriate medical evaluation and treatment for asthma exacerbations and skin irritation resulting from chemical-agent exposure.

Signed under the pains and penalties of perjury under the laws of the Commonwealth of Massachusetts and the United States of America.

Sondra Crosby M.D.

Dated: 24 September 2026

Sondra S. Crosby, MD

Professor of Medicine, Boston University School of Medicine

Professor of Health Law, Ethics, and Human Rights, Boston University School of Public Health

Section of General Internal Medicine, Boston Medical Center

**REBUTTAL REPORT OF DR. SONDRA CROSBY, M.D.** **October 9, 2026**

## Introduction

1. On September 25, 2026, I submitted an expert report in this matter setting forth my opinions regarding the physical injuries sustained by Plaintiff Derrick Washington in connection with the claims underlying this lawsuit.

2. Counsel for Mr. Washington provided me with an expert report authored by Susan Minter, DNP, APRN, CCHP, dated September 21, 2026.[1] DNP Minter's report addresses Mr. Washington's allegations concerning the absence of a medical evaluation and responsive treatment following the January 23, 2020, use-of-force incident. The details of that incident are described in my report.

3. I submit this brief rebuttal in response to DNP Minter's report to reaffirm and explain my opinion that Mr. Washington did not receive an appropriate medical assessment or responsive treatment following the January 23, 2020, use-of-force incident. Additional materials that I reviewed are detailed in Appendix A.

4. My expert opinion remains that: Following the January 23, 2020, use-of-force incident, Mr. Washington should have been promptly evaluated by medical

[1] Expert Report of Susan Minter, DNP, APRN, CCHP, Civ. Case No. 1:23-cv-10063, 09/21/26 ("Minter Rep")

professionals for physical and psychological injuries, in accordance with DOC policy: [2]

> 505.15 Medical Treatment
>
> (1) Medical staff shall examine any inmate involved in a use of force as soon as possible. This examination and any treatment performed shall be documented.

5. An appropriate medical evaluation of Mr. Washington following the use-of-force incident on January 23, 2020, would have included a targeted history, a review of his symptoms, and a physical examination including vital signs with particular attention to his respiratory status and skin exam, given his exposure to a chemical agent and known asthmatic condition. As described in my report, Mr. Washington should have promptly received necessary treatment, which includes decontamination of his skin and clothing. Health professionals should have fully documented the assessment, findings, and care provided and arranged for follow-up evaluation. There is no evidence that any such medical assessment was performed. As described in my report, Mr. Washington was left untreated, despite being at risk for potentially life-threatening complications of asthma.

6. In my opinion, when Nurse Capoccia visited Mr. Washington to remove his shackles on the morning of January 24, 2020, approximately eight hours after the use-of-force incident, he had a professional obligation to recognize the delay in medical

[2] Department of Corrections, 103 CMR 505.00: USE OF FORCE, 08/07/09

evaluation and treatment and to promptly assess Mr. Washington for resulting injuries and symptoms or arrange for another qualified health professional to do so. The evaluation should have included the elements outlined in the preceding paragraph. There is no evidence that Nurse Capoccia performed any such assessment.

7. The assumption in DNP Minter's report that, when Nurse Capoccia arrived, Mr. Washington would no longer have been experiencing skin irritation from the chemical agent is unfounded. Without asking about his symptoms or examining him, Nurse Capoccia could not determine whether Mr. Washington continued to experience skin irritation from OC spray exposure. Even if true, DNP Minter's assumption does not excuse the fact that Mr. Washington was left to suffer all night without decontamination. The review cited by DNP Minter (Yeung et al[3]) in fact emphasizes that without adequate decontamination, pain following OC exposure can persist for hours. The time estimate would be influenced by the volume and concentration of the chemical delivered, as well as individualized factors. There is no evidence in the record that Mr. Washington was decontaminated following the OC exposure on January 23, 2020.Therefore, the evidence does not support a conclusion, to any degree of medical certainty, as to whether Mr. Washington's skin irritation had subsided by the time Nurse Capoccia saw him.

[3] Yeung MF, Tang WY. Clinicopathological effects of pepper (oleoresin capsicum) spray. Hong Kong Med J. 2015 Dec;21(6):542-52. doi: 10.12809/hkmj154691. Epub 2015 Nov 6. PMID: 26554271.

8. DNP Minter characterized Mr. Washington's reported symptoms on January 24, 2020 — difficulty breathing, skin irritation, and dizziness — as medically unsupported.[4] In my opinion, the medical documentation (or lack thereof) does not justify this conclusion. There is no documentation that Nurse Capoccia asked Mr. Washington about these symptoms, despite his known diagnosis of asthma and exposure to a chemical agent. The absence of documented symptoms following a seriously deficient assessment does not establish that those symptoms were absent.

9. DNP Minter seemed to rely on non-medical evidence to form her opinion that Mr. Washington's symptoms were not present following the January 23, 2020 use-of force incident. For example, DNP Minter cites a grievance concerning a separate use-of-force incident on January 21, 2020, as evidence that Mr. Washington did not experience "lingering effects of the January 23rd incident."[5] A grievance concerning an earlier, separate incident provides no sound basis for concluding that symptoms from the January 23 incident were absent or had resolved. As discussed above, the absence of documented symptoms does not establish their absence.

10. DNP Minter's assertion that "Capoccia documented a normal examination" is unfounded, as he only reports examination of Mr. Washington's wrists, as noted in my report. However, Nurse Capoccia's note does document a wrist abrasion, which is consistent with Mr. Washington's allegation of restraint injury.

---

[4] Of note, DNP Minter also dedicates significant time to opining that a nebulizer is a sufficient substitute for an inhaler. This is irrelevant considering Mr. Washington was neither administered a nebulizer nor given his inhaler after the January 23 use of OC spray. A substitution only counts if it was actually given.
[5] Minter Rep. at 27.

11. DNP Minter concludes that Nurse Capoccia's examination met the standard of care, but she neither defines that standard nor identifies the elements required for an adequate examination of a patient with asthma following a use-of-force incident involving exposure to a chemical agent. DNP Minter shifts responsibility onto Mr. Washington to volunteer symptoms, rather than onto the clinician to conduct a thorough evaluation, including asking targeted questions. It is the clinician's responsibility to obtain a relevant history and perform a physical examination sufficient to make an informed assessment. In Paragraph 5, I outline a medically reasonable standard of care for a patient with asthma following exposure to a chemical agent. Even if Mr. Washington did not independently volunteer symptoms following the January 23, 2020 OC spray exposure, Nurse Capoccia remained responsible for actively assessing for those symptoms and providing appropriate treatment. The absence of volunteered symptoms does not relieve the clinician of that responsibility.

12. In conclusion, it remains my opinion that Mr. Washington did not receive appropriate medical evaluation or responsive treatment following the January 23, 2020 use-of-force incident.

Signed under the pains and penalties of perjury under the laws of the Commonwealth of Massachusetts and the United States of America.

Sondra S. Crosby

Dated: 9 Oct 2026

Sondra S. Crosby, MD

Professor of Medicine, Boston University School of Medicine

Professor of Health Law, Ethics, and Human Rights, Boston University School of Public Health

Section of General Internal Medicine, Boston Medical Center